## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| IN RE ALIBABA GROUP HOLDING LIMITED SECURITIES LITIGATION | ) ) ) ) ) ) ) ) ) |

**Civil Action 1:15-md-02631 (CM)**

**CONSOLIDATED COMPLAINT**

**CLASS ACTION**

**JURY TRIAL DEMANDED**

Plaintiffs, individually and on behalf of all other persons similarly situated, by plaintiffs' undersigned attorneys, alleges the following based upon personal knowledge as to themselves and their own acts, and upon information and belief as to all other matters, based on the investigation conducted by and through their attorneys.

## NATURE OF THE ACTION

1.      This is a federal securities class action on behalf of a class consisting of all persons or entities, other than defendants, who purchased or otherwise acquired Alibaba Group Holding Limited ("Alibaba") American Depositary Shares ("ADS") or purchased call options or sold put options on Alibaba ADS during the period from September 19, 2014, through and including January 29, 2015 (the "Class Period"), seeking to recover damages for violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder.

2.      Defendant Alibaba is a China-based online and mobile commerce company in retail and wholesale trade, as well as cloud computing and other services. Alibaba claims that it

is "the largest online and mobile commerce company in the world in terms of gross merchandise volume" in 2013.

3.      On September 19, 2014, Alibaba completed a $25.0 billion initial public offering on the NYSE (the "IPO").  It was the largest initial public offering in history.

4.      In the registration statement Alibaba filed in connection with the IPO (the "Registration Statement") and throughout the Class Period, Defendants concealed that Alibaba was the subject of administrative law enforcement proceedings that created imminent and material risk to its business operations, and which would have a material effect on its revenue, income and share price.

5.      Specifically, Alibaba failed to disclose that on July 16 2014, it was subject to an unusual and unprecedented high level administrative guidance law enforcement proceeding administered by China's State Administration of Industry and Commerce ("SAIC") and 7 provincial and local Administrations of Industry and Commerce ("AIC"), China's powerful regulators of businesses and economic activity.  This was just two months before Alibaba's $25.0 billion IPO.

6.      An SAIC administrative guidance meeting is a formal non-compulsory administrative law enforcement proceeding used by the SAIC to direct businesses to comply with laws and regulations.  Failure to accept and follow SAIC's administrative guidance typically results in severe administrative penalties.

7.      The July 16, 2014 meeting was unprecedented because it included the Director General of the SAIC's Market Regulation Department together with senior executives from 7 provincial and local AIC offices.  Also present were senior executives of Alibaba Group,

including Chief Risk Officer and Alibaba Partner Xiaofeng Shao[1] and senior managers from its primary business units, signifying the high level importance of the meeting.   Although ordinarily open to the public, these administrative guidance proceedings were held behind closed doors and not disclosed publicly to avoid exposing any negative information that might affect the progress of Alibaba's upcoming IPO.

8.      At the July 16, 2014 meeting, the SAIC admonished Alibaba for engaging in wide ranging violations of People's Republic of China ("PRC") laws and regulations.   The SAIC identified a variety of illegal business practices Alibaba was engaging in which the SAIC demanded Alibaba cease and desist.   The SAIC said that these illegal practices are "leading Alibaba to its greatest credibility crisis since its incorporation. … and that [Alibaba] also sets a bad example with negative influence on other law-abiding e-commerce companies, making itself a target of a torrent of blame from public opinion and creating tremendous pressure on market regulatory agencies."   The illegal business practices which SAIC directed Alibaba to immediately cease and remedy included:

      a.   Knowingly facilitating the widespread sale of counterfeit goods, including fake cigarettes, alcohol, branded handbags, and clothing;

      b.   Knowingly facilitating the sale of weapons, drugs and other forbidden items;

      c.   Permitting unlicensed or inadequately licensed and otherwise illegal businesses to operate;

      d.   Taking bribes from merchants in return for unfairly boosting their search rankings and providing more advantageous advertising positions;

---

[1]   Source:  http://news.163.com/15/0129/15/AH4V0N9T00014SEH.html#f=snew.  Mr. Shao is listed as Chief Risk Officer and a current Partner of Alibaba Group in the Registration Statement.

e.  Knowingly participating in vendors' illegal practice of (i) faking transactions to create a false sense of popularity or customer demand; and (ii) providing fake positive customer reviews and deleting negative reviews to make consumers believe products were of higher quality or that vendors were more trustworthy;

f.  Tipping illegal vendors off to impending SAIC enforcement actions to help evade law enforcement;

g.  Knowingly assisting vendors in engaging in false and misleading advertising;

h.  Deliberately setting up an unreasonably difficult complaint process to discourage consumers from protecting their rights and to prevent law enforcement; and

i.  Engaging in anticompetitive behavior such as forbidding merchants to participate in rival sites' promotions.

9.  At the administrative guidance meeting, Alibaba admitted to the SAIC that it had engaged in the misconduct and violations of law identified by the SAIC.

10.  Alibaba accepted the administrative guidance and promised to remedy its ongoing violations.

11.  The SAIC, in turn, threatened that "Alibaba would be penalized 1,000 times, or even several thousand times a year, such as there would be a target of administrative penalties worth 1% of the daily sales amounts" on Alibaba's e-commerce platforms, if Alibaba failed to remedy the violations and cease the illegal business practices.[2]

---

[2]  The translation of "daily sales amounts" means the gross merchandise value ("GMV") of goods sold on Alibaba's e-commerce platforms.  For fiscal 2014, the GMV for all of Alibaba's e-commerce platforms was $296 billion.

12.     Defendants concealed the administrative guidance law enforcement proceeding from investors in the IPO and aftermarket.

13.     Prior to the disclosure of the adverse facts concerning the July 16, 2014 administrative guidance meeting, Alibaba and certain "selling shareholders" including Executive Chairman Jack Ma and Chief Executive Joseph Tsai sold more than 368 million ADSs in the IPO at $68 each, receiving proceeds of more than $25 billion.  Alibaba also sold $8.0 billion of unsecured notes in November 2014.

14.     Throughout the Class Period, Alibaba's ADS continued trading at ever-increasing, artificially inflated prices, reaching a Class Period high of $120 each in intraday trading on November 13, 2014.

15.     On January 27, 2015 in the evening, after market close, financial media reported that SAIC had released a white paper detailing Alibaba's illegal business practices which SAIC had previously identified to Alibaba and which were the subject of the July 16, 2014 administrative guidance meeting between the SAIC and senior Alibaba executives (the "White Paper").[3]

16.     The next morning, January 28, 2015, on this news, the price of Alibaba ADS dropped 4.4%, or $4.49 per ADS, closing at $98.45 per ADS on January 28, 2015, on unusually high volume of approximately 42 million shares traded.

17.     The following day, on January 29, 2015, before market opened, Alibaba issued a press release announcing its financial results for the fiscal quarter ended December 31, 2014. In a written statement issued that morning and on a conference call, Alibaba's CEO attempted

---

[3]   Attached as Exhibit 1 and incorporated herein, is the White Paper issued by the SAIC January 28, 2015 (with attached translation).

to diminish the significance of the white paper, denying it was factually accurate or that it had any legal significance. But to no avail.

18.     Immediately following the January 29, 2015 earnings conference call, financial analysts across the board opined that the SAIC white paper would have a material negative effect on Alibaba's future revenues, earnings and share price, and that it showed a material risk of ongoing regulatory scrutiny and SAIC administrative action threatening Alibaba's core business and operations.

19.     Thus, as a result of the disclosure of the details of the July SAIC Meeting and Alibaba's violations of law, the price of Alibaba ADSs plunged another $8.64 per ADS to close at $89.81 per ADS on January 29, 2015, declining approximately 9% from the previous day, again on extremely unusually high volume of more than 76.3 million shares traded.

20.     The two declines caused by news of the SAIC White Paper collectively erased nearly $33 billion in shareholder value.

<strong>JURISDICTION AND VENUE</strong>

21.     Jurisdiction is conferred by §27 of the Exchange Act. The claims asserted herein arise under §§10(b) and 20(a) of the Exchange Act and Rule 10b-5 promulgated thereunder. This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §1331 and §27 of the Exchange Act.

22.     Venue is proper in this District pursuant to §27 of the Exchange Act and 28 U.S.C. §1391(b).

23.     In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not

limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## PARTIES

24.     Lead plaintiffs William Tai and Christine Asia Co., Ltd. purchased Alibaba shares at artificially inflated prices during the Class Period and suffered damages upon the revelation of the alleged corrective disclosures.   Their PSLRA certifications have been previously filed with the Court and are incorporated by reference herein.

25.     Named plaintiffs Abel Amoros, Arthur Gabriel, and Raymond Lee purchased Alibaba ADS at artificially inflated prices during the Class Period and suffered damages upon the revelation of the alleged corrective disclosures.   Their PSLRA certifications are attached hereto.

26.     Named plaintiff Gang Liu purchased Alibaba call options at artificially inflated prices during the Class Period and suffered damages upon the revelation of the alleged corrective disclosures.   His PSLRA certification is attached hereto.

27.      Defendant Alibaba is headquartered in China and incorporated in the Cayman Islands. Its ADS are traded on the NYSE under the ticker symbol "BABA."

28.     Defendant Ma is the founder of Alibaba is, and at all relevant times during the Class period was, the Company's Executive Chairman of the Board.   Ma owned 8.8% of Alibaba's outstanding shares prior to the IPO.   Ma sold approximately 12,750,000 Alibaba ADSs in the IPO and received gross proceeds of approximately $867,000,000.

29.     Defendant Tsai is a co-founder of Alibaba, is, and at all relevant times during the Class period was Executive Vice Chairman of the Board of Alibaba.   Tsai owned 3.6% of

Alibaba's outstanding shares prior to the IPO.  Tsai sold approximately 4,250,000 Alibaba ADSs in the IPO and received gross proceeds of approximately $289,000,000.

30.     Defendant Jonathan Zhaoxi Lu ("Lu") is, and at all relevant times during the Class Period was, Chief Executive Officer ("CEO") and a director of Alibaba.

31.     Defendant Maggie Wei Wu ("Wu") is, and at all relevant times during the Class Period was, the Company's Chief Financial Officer ("CFO").

32.     According to SEC correspondence dated July 3, 2014, "each manager of Alibaba's business units reports to either the Chief Executive Officer or the Chief Financial Officer."  Alibaba considers each individual marketplace, such as Taobao, Tmall, Juhuasuan, and Aliexpress, to be an individual business unit.

33.     Defendants Alibaba, Ma, Tsai, Lu and Wu are collectively referred to herein as "Defendants."

34.     The Defendants Ma, Tsai, Lu, and Wu are collectively referred to herein as the "Individual Defendants."

## DEFENDANTS' WRONGDOING

### Background of Alibaba

35.     Alibaba is a China-based online and mobile commerce company. The Company operates several highly popular online marketplaces where independent third party merchants sell products to wholesale and retail buyers around the world.

36.     Alibaba's marketplaces include Taobao Marketplace, the world's largest online shopping site, TMall, a third-party platform for branded products, 1688.com a wholesale marketplace, AliExpress an international consumer marketplace, Alibaba.com an international wholesale marketplace , and Juhuasuan, a group shopping site. Alibaba's business is to provide

the fundamental technology infrastructure and marketing reach to help businesses leverage the ability of the Internet to establish an online presence and conduct commerce among consumers and businesses. The Company operates e-commerce sales platforms to facilitate trade among third parties and does not engage in direct sales, compete with merchants, or hold inventory.

37.     For a fee, Alibaba will perform various levels of verification of third party vendors' operations in order to assure customers of their authenticity and legitimacy. Alibaba also provides customers with further assurance by providing mechanisms to obtain refunds through Alibaba, rather than the merchant, in the event that the customer is unsatisfied.

38.     Taobao is by far the largest and most active of Alibaba's e-commerce platforms accounting for about 55% of gross merchandise value sold. Tmall is the second largest, accounting for about 32% of gross merchandise value sold on Alibaba's platforms.

39.     Alibaba earns money by charging vendors pay-for-performance (P4P) marketing fees, display advertising fees, commissions, and fees from memberships, as well as other "value added services". In fiscal year 2014, pay-for-performance, or P4P, marketing services, display marketing services, commissions and fees from memberships and value-added services accounted for 45.3%, 7.7%, 24.3% and 9.8% of Alibaba's total revenue, respectively.

*Alibaba's checkered corporate history*

40.     Alibaba was formed in 1999. At inception, it was a business-to-business platform connecting Chinese manufacturers and foreign and domestic buyers. Alibaba quickly added a focus on consumers. In 2003, Alibaba added Taobao, a consumer-to-consumer site; in 2008, it added TMall, a business to consumer site, initially under Taobao's umbrella.

41.     From inception, selling counterfeits represented a substantial part of both Alibaba's business-to-business and business-to-consumer platforms.

42.     While consumers could go to Taobao.com to obtain individual counterfeit items, business could buy them wholesale on alibaba.com. In a report to the United States Trade Representative, the International AntiCounterfeiting Coalition – an anti-counterfeiting association that counts the U.S. Federal Bureau of Investigation and the U.S. Department of Homeland Security amongst its members – reported that "counterfeiters from all over the world converge on the alibaba.com site." *Submission of the International AntiCounterfeiting Coalition, Inc. to the United States Trade Representative*, February 11, 2005, at 14 (the "IACC Report"). The IACC Report cited as an example a manufacturer of counterfeit cigarettes "98% close to original" that let buyers take "trial orders" of "one 40 foot container" – several million cigarettes – as well as a seller of counterfeit antivirus software that did not take orders smaller than 300 units. *Id.*

43.     Similarly, counterfeits prospered on Taobao. According to Ronald Brohm, head of SNB-React, an anti-counterfeiting non-profit organization, on March 15th, 2007 (for example) there were 601,145 auctions for seven leading brands at taobao.com, most of them presumed counterfeit. Some of these counterfeits were farcically obvious, such as the $200 iTunes gift cards that sold for about $2.60.

44.     For this widespread counterfeiting, both Taobao and Alibaba were deemed Notorious Markets in the United States Trade Representative's (the "USTR") annual report in 2008, a designation reflecting markets where piracy, counterfeiting, and other violations of intellectual property rights abound. The USTR continued to deem both Taobao and Alibaba

Notorious Markets in each of its 2009 and 2010 reports, and deemed Taobao a Notorious Market in its 2011 report.

45.     In 2012, Alibaba spent $461,000 to lobby the White House, Capitol Hill, and the USTR regarding Taobao's designation as a Notorious Market. Alibaba hired James Mendenhall, a USTR former general counsel.

46.     Alibaba's lobbying was successful. In December 2012, the USTR removed Taobao from its Notorious Market report.

47.     Alibaba's lobbying coincided with its taking Alibaba.com private from the Hong Kong Exchange in a transaction announced in February 2012, and consummated in June 2012.

48.     In announcing the going private transaction, Defendant Ma was quoted as saying the transaction "will allow our company to make long-term decisions that are in the best interest of our customers and that are also free from the pressures that come from having a publicly listed company."

49.     Yet in September 2013, little more than a year after delisting Alibaba.com from the Hong Kong Exchange, Alibaba announced that it would seek to list the entire Alibaba Group on a U.S. Exchange.

50.     In truth, Alibaba sought to remove its Notorious Market designation to clean its tarnished image in advance of its U.S. listing so as to convince Western institutional investors to purchase Alibaba shares and maximize the funds it could obtain from U.S. capital markets.

## BACKGROUND ON SAIC

### *SAIC IS A POWERFUL NATIONAL GOVERNMENTAL AGENCY OVERSEEING ALL ECONOMIC AND MARKET ACTIVITY IN CHINA.*

51.     All businesses in China are regulated by The State Administration for Industry & Commerce of the People's Republic of China ("SAIC").

52.     The SAIC is a powerful ministry in China that wields great influence over the Chinese economy and markets.

53.     The SAIC is "the competent authority of ministerial level directly under the State Council[4] in charge *of market supervision/regulation and related law enforcement* through administrative means." [5]  Its functions are to maintain market order and protect the legitimate rights and interests of businesses and consumers.

54.     The SAIC is charged with promulgating and enforcing laws and regulations affecting all manner of business activities, including business registration, consumer protection, product quality, illegal marketing, unfair trade practices, trademarks, brokerage activity, contracts, mortgages, anti-monopoly, credit rating, advertising, and most pertinently, online or e-commerce activities.[6]

55.     The Department of Market Regulation of the SAIC,[7] which issued the *White Paper Regarding* the *Administrative Guidance Provided to Alibaba Group*, is one of 17 departments of the SAIC. Two of the Department of Market Regulation's responsibilities are

---

[4]  The State Council of the People's Republic of China, namely the Central People's Government, is the highest executive organ of State power, as well as the highest organ of State administration. The State Council is composed of a premier, vice-premiers, State councilors, ministers in charge of ministries and commissions, the auditor-general and the secretary-general.   The State Council is responsible for carrying out the principles and policies of the Communist Party of China as well as the regulations and laws adopted by the National People's Congress, and dealing with such affairs as China's internal politics, diplomacy, national defense, finance, economy, culture and education.
http://english.gov.cn/state_council/2014/09/03/content_281474985533579.htm, June 27, 2015
[5] http://www.saic.gov.cn/english/aboutus/Mission/index.html , June 26, 2015.
[6] http://www.saic.gov.cn/english/aboutus/Mission/index.html , June 26, 2015.
[7]  Also known as Department of Regulation on Online Commodity Transactions.

regulating online transactions in goods and services and initiating special campaigns to deal with outstanding marketplace problems.[8]

56.     Working under the national SAIC are provincial and municipal level Administrations for Industry and Commerce, known as "AICs".   The SAIC oversees and coordinates all of the regulatory activity of local AICs.

*SAIC Initiates Special Program to Clean Up Online Commerce*

57.     The SAIC had been struggling for years to enforce laws and instill order in China's fast growing e-commerce marketplaces, in particular, to prevent counterfeiting, false advertising and other forms of fraud.

58.     On June 12, 2014 the SAIC announced that it had launched the "Red Shield and Web Sword" special program designed to clean up rampant abuses in Chinese e-commerce ("Red Shield 2014").   The SAIC viewed e-commerce as an important engine of growth for the economy and intended to substantially increase regulation over online marketplaces, including those operated by Alibaba and its competitors such as Tencent and Baidu. The Red Shield 2014 program was intended to intensively investigate and strictly punish violations of law by e-commerce companies.   It was also intended to eliminate the following illegal practices that were prevalent in Chinese online marketplaces:

- Sales of counterfeit and fake products

- Sales of shoddy, adulterated, unsafe and defective merchandise

- Sales of illegal merchandise

- False and misleading advertising and product claims

- Illegal sales practices

---

[8] http://www.saic.gov.cn/english/aboutus/Departments/, June 26, 2015.

- Unfair trade and other monopoly practices

- Pyramid schemes

- Unlicensed merchants

- Phony customer reviews and ratings

59.     The SAIC Red Shield initiative instructed each of the provincial and local AIC offices to work cooperatively under the SAIC to achieve these regulatory goals.  Thus, the full resources of the national, provincial and local AIC offices were being harnessed for this high-priority regulatory initiative.

60.     In launching the Red Shield 2014 program, the SAIC mandated that "law enforcement must be intensified with harsher efforts in a forceful manner".

61.     In short, the SAIC made clear to PRC e-commerce business operators that it would immediately start cracking down on violators and enforcing laws and regulations in a much more disciplined and intensive manner.

62.     The SAIC notice announcing Red Shield 2014 (the "Red Shield 2014 Notice") stated that by December 15, 2014, the SAIC would "submit the final report on the special program, the *Statistical Summary of the Special Program 'Red Shield and Web Sword of 2014,'*" the list of closed websites (online vendors) (including specific names and web addresses) and three or more typical cases concerning breach of law (the notice of penalty decision attached) to the SAIC Department of Market Regulation via the SAIC e-commerce regulatory platform."

*SAIC's Administrative Guidance Law Enforcement Meeting with Alibaba*

63.     On July 16, 2014, more than two months before Alibaba's IPO, officials from the SAIC's Department of Market Regulation, and executives from Provincial AICs for

14

Beijing, Zhejiang, Jiangsu, Shandong, Guangdong, and Fujian provinces; and the Hangzhou AIC (also known as Hangzhou Market Regulation Bureau) called senior Alibaba executives to a meeting at the Zhejiang AIC offices (the "July SAIC Meeting").

64.     The purpose of the meeting was to provide "administrative guidance" to Alibaba through its senior management and demand Alibaba cease and desist the long-standing and systemic violations of PRC laws and regulations being committed on its electronic commerce platforms.

65.     The meeting was chaired by SAIC Department of Market Regulation Director General Liu Hongliang.

66.     The principal officers of Alibaba, along with the senior manager of each of Alibaba's core departments, (i.e. the persons with topline responsibility for each of Alibaba's online marketplaces) attended the meeting and accepted the administrative guidance.

67.     Director General Liu stated at the meeting that in order "not to affect the progress of the work for Alibaba's upcoming IPO, the meeting was being held 'behind closed doors'" (*i.e.*, secretly, without disclosure to the public).

68.     At the July SAIC Meeting, the SAIC harshly criticized Alibaba's violations of the law, stating:

> Alibaba Group, for a long time, has failed to take seriously the operational violations on its e-commerce platforms and did not take effective measures to address the violations. ***This caused a miniscule issue to snowball into a serious problem, leading Alibaba to its greatest credibility crisis since its incorporation.***

SAIC White Paper (Emphasis added).

69.     The SAIC stated that it had conducted an extensive analysis of the long-standing misconduct and violations on Alibaba's e-commerce platforms.  The SAIC then outlined 19 issues in five different areas that it would require Alibaba to take immediate action

to redress.  In addition, the AICs' Departments of Regulation identified an additional 6 areas in which Alibaba's e-commerce platforms were deficient in adhering to PRC laws and regulations.

70.     According to the subsequently released SAIC White Paper, the five areas in which Alibaba violated laws and regulations were:

(i)     Unlicensed Vendors.  Alibaba permits unlicensed vendors to operate on its e-commerce platforms; to operate under false names, false business licenses or under business licenses granted to other businesses; and  to illegally use trademarks and business names owned by other businesses.

(ii)    Counterfeit and Illegal Products.  Alibaba knowingly facilitates merchants' sales of counterfeit, fake, substandard, and illegal products, including counterfeit luxury goods such as handbags, cigarettes, alcohol, mobile phones, gambling items, weapons, and eavesdropping equipment.  Alibaba set up unreasonable procedural hurdles for harmed consumers wishing to file a complaint.  These hurdles prevented consumers from lodging their complaints and hindered enforcement agencies' efforts to identify violations.  The SAIC accused Alibaba of knowingly aiding and abetting these violations.

(iii)   Improper Sales Practices.  Alibaba permitted vendors to engage in illegal sales practices such as:

- ***False advertising*** by making false statements such as "lowest price in history" and "ranked #1" and by making misleading or false claims about the nature or quality of the product.

- ***Running illegal raffles.***

16

- ***Abusing monopoly power*** by forbidding merchants to use other e-commerce platforms.

- ***Violating consumer rights*** with illegal contract terms that waive compliance with some or all consumer laws.

- ***Accepting commercial bribes*** to favor certain merchants over others or to waive compliance with laws and regulations, or to gain advantage over competitors in ratings or search rankings.

- ***Fraudulently enhancing merchants' reputation*** by allowing false ratings and evaluations of vendors' products and reputations.

- ***Violating consumer rights*** by ignoring or not fairly addressing consumer complaints of fraud and erecting insurmountable requirements for customers to file complaints or enforce rights.

- ***Tolerating illegal activities***, by not penalizing them or failing to discourage or otherwise address them.

- ***Misleadingly suggesting products were discounted*** or on sale by, for example, increasing prices just before running promotions or sales so as to deceive consumers into thinking that the products were discounted, when in reality they were not.

(iv)    False or Flawed Evaluations.  Alibaba knowingly aided and abetted vendors in creating false evaluations of merchants and their products; aided and abetted vendors in creating fictitious transactions to give the false impression of high consumer demand for certain vendors' products; and refused to allow consumers to give feedback beyond the initial purchase period.

17

(v)     Lax Internal Controls.  When the SAIC investigated sales of illegal products, it regularly advised Taobao that it was planning to make raids on certain merchants. The merchants removed the illegal products shortly before the SAIC's raid. The SAIC accused Taobao of tipping off the merchants.

71.     At the July SAIC Meeting, Director General Liu told Alibaba that its monitoring and enforcement efforts were deficient, its internal regulation policies were defective, and its e-commerce platforms were operating "in contravention of national laws, regulations and policies"

72.     Director General Liu sternly warned Alibaba senior executives that the SAIC was prepared to "penalize Alibaba 1,000 times or even several thousand times a year," with each fine amounting to 1% of Alibaba's daily sales amounts.[9]

73.     Alibaba executives acknowledged to the SAIC and AIC at the July SAIC Meeting that currently, the greatest risks threatening its e-commerce platforms are from counterfeit products, violations of intellectual property rights and false evaluations or feedback on merchants and products.

74.     Further, Alibaba executives admitted that "the problems pointed out by SAIC and local AICs are right on point; the SAIC and local AICs' administrative guidance is very prompt and well-grounded."

75.     Alibaba senior executives accepted the SAIC's administrative guidance at the July SAIC Meeting and promised that their e-commerce platforms will take this misconduct

---

[9]   Source:  Chengdu Commercial Daily, January 30, 2015.

seriously and take proper measures in accordance with pertinent laws and regulations to address the deficiencies pointed out by the SAIC and AICs.

## ADMINISTRATIVE GUIDANCE IS A FORM OF LAW ENFORCEMENT UNDER CHINESE LAW

    a.   The definition of Administrative Guidance administered by Administration For Industry and Commerce agencies

76.    Administrative Guidance is a form of law enforcement that has been extensively applied by SAIC in its regulatory practice throughout China since 2009.

77.    On November 25, 2009, SAIC issued an "Opinions of the State Administration for Industry and Commerce for Administration for Industry & Commerce Agencies to Comprehensively Promote Administrative Guidance" in which the SAIC announced that throughout the entire Administration for Industry & Commerce system nationwide, it would implement law enforcement through the use of administrative guidance.[10]

78.    On January 4, 2013, the SAIC promulgated the "Rules Regarding Administration For Industry and Commerce Agencies' Administrative Guidance Work,"[11] effective March 1, 2013 (hereinafter "Administrative Guidance Work Rules"). The Administrative Guidance Work Rules govern the SAIC and local AICs' use of Administrative Guidance in their respective jurisdictions.[12]

---

[10]  (Gong Shang Fa Zi [2009] No. 230) (copies of original Chinese version and certified English translation are attached hereto as Exhibit 2)

[11]  (Gong Shang Fa Zi [2013] No. 3) (copies of original Chinese version and certified English translation are attached hereto as Exhibit 3).

[12] See Article 2 of the Administrative Guidance Work Rules ("Administration For Industry and Commerce Agencies shall implement administrative guidance in accordance with these Rules, unless applicable law provides otherwise".

79.     Article 3 of the Administrative Guidance Work Rules: defines Administrative

Guidance as:

> [T]he act of an AIC agency, within the scope of its legal authority and by way of non-compulsory measures such as advising, tutoring, reminding, admonishing, demonstrating by examples, publishing, summoning for meeting, etc., to lead citizens, legal persons and other entities (hereinafter 'Administrative Counterparty') to willingly perform or not perform certain acts, in order to achieve certain administrative objectives.

80.     Article 12 of the Administrative Guidance Work Rules sets forth the methods

for administering Administrative Guidance:

1. Advising. In order to regulate the conduct of an Administrative Counterparty, to raise suggestive or leading advice with respect to issues on industry and commercial administration.
2. Tutoring. To provide assistance and support to an Administrative Counterparty with respect to industrial and commercial administrative businesses;
3. Reminding. To remind an Administrative Counterparty regarding an industrial and commercial administrative matter which such counterparty may easily be neglectful of;
4. Admonishing. To caution or urge an Administrative Counterparty regarding misconduct that is likely to happen or may happen;
5. Demonstrating by example. To lead an Administrative Counterparty to conduct business in compliance with law and standards by way of recommending, evaluating or exhibiting etc.;
6. Publishing. To collect, organize and analyze the information made or obtained in the course of industrial and commercial administration and to publish such to the publish pursuant to law, in order to provide leading references to administrative counterparties;
7. Summoning for a meeting. To summon an Administrative Counterparty for a meeting and lead such counterparty to conduct its business in compliance with law and standards by way of communicating, and studying and evaluating etc. regarding certain industrial and commercial administrative matters;
8. Other Administrative Guidance methods that are not in contravention of law, regulations and rules.

     b.  <u>Administrative Guidance is a "Soft Law Enforcement" measure before "Tough Law Enforcement" measures such as administrative penalization are to be taken.</u>

81.    Despite Administrative Guidance being defined as a "non-compulsory" administrative proceeding where an Administrative Counterparty may not be forced to accept the administrative guidance, Administrative Guidance is a recognized form of law enforcement. If an entity fails to accept and follow the Administrative Guidance provided by the SAIC or an AIC, it will very likely face administrative penalization thereafter.

*Administrative Guidance is a "Soft Law Enforcement" Measure*

82.    Administrative Guidance's status as an important form of law enforcement has been repeatedly confirmed by the Chinese government and prominent Chinese legal academics.

83.    In his summary speech delivered at the August 27, 2010 National Law-Based Administration Work Conference, Mr. Ma Kai, then State Councilor of China, Secretary General of the State Council, and President of Chinese Academy of Governance, and currently one of four Vice Premiers of China, stated that Administrative Guidance is a form of "soft law enforcement measure".[13]

84.    At a national conference of all AICs in 2010, Mr. Fu Shuangjian, then Vice Minister of the SAIC, reiterated the same decree to all AICs nationwide: Administrative Guidance is a form of "soft" law enforcement.[14]

---

[13] *See* State Councilor Ma Kai's Summary Speech at the National Law-Based Administration Work Conference, August 27, 2010. Sec. 4, ¶5. ("We shall promote soft law enforcement methods such as administrative guidance, adhere to the equal significance of regulation and services, the combination of penalization and persuasion. We shall perform continual education and necessary warnings on parties and lead them to willingly follow the law and achieve the congruence of legal effects and social effects.")
http://www.mohrss.gov.cn/fgs/FGSlingdaojianghua/201009/t20100919_83161.htm, June 27, 2015.
[14] See SAIC Vice Minister Fu Shuangjian's Speech at China National Video- and Telephonic-Conference on Exchanging Experiences as to Promoting Administrative Guidance throughout

85.     Dr. Mo Yuchuan, Professor at Renmin University of China Law School and the Director of Administrative Law Research Center of China, is a nationally renowned expert in Chinese administrative laws and the recipient of multiple governmental and professional institutional awards for his extensive research on administrative guidance in the past 15 years. He has repeatedly participated in the drafting of multiple national administrative laws and regulations[15]

86.     Mr. Mo has written that "Administrative Guidance is not a mere theoretic concept but also a legal concept."  He explains that:

> From the standpoint of *practicing regulation and enforcement*, the laws governing Administrative Guidance include multiple strata of constitution, laws, autonomy regulations, special regulations, administrative laws and regulations, and regulations and rules, etc. Where there is no specific provision under such aforementioned laws and regulations, Administrative Guidance that conform to legislative intents, legislative spirits and legal principles and Administrative Guidance administered in accordance with administrative regulatory documents, national policies, social ethics, local conventions etc. which are not in contravention of the aforementioned legal documents shall be equally legitimate.

> "*Several Suggestions as to Further Promoting Administrative Guidance of Administration For Industry and Commerce Agencies*" Part II, Section 1 (emphasis added).[16]

---

the National Administration For Industry and Commerce System, dated November 4, 2010. Sec. 3, Art. 1. ("When we comprehensively promote administrative guidance, we shall organically combine soft law enforcement methods such as *administrative guidance* etc. and tough law enforcement methods such as administrative penalizations etc. Where the objective of law enforcement cannot be achieved by administrative guidance, penalization shall be administered pursuant to law at the same time administrative guidance is being conducted. We shall endeavor to adhere to the equal significance of regulation and services, the combination of penalization and persuasion.") (emphasis added)."
http://www.saic.gov.cn/fgs/gzdt/zjfzdt/201012/t20101229_103119.html , June 27, 2015.
[15] http://www.law.ruc.edu.cn/eng/show.asp?No=68, June 27, 2015.
[16]  A copy of the article is attached hereto as Exhibit 4.

87.    The SAIC has endorsed Dr. Mo's article, which was published on SAIC's official website on August 23, 2012. *See* http://www.saic.gov.cn/gsld/gztt/xxb/201208/t20120823_128842.html, June 27, 2015.

> *Failure to Follow Administrative Guidance Will Very Likely Result in Administrative Compulsory Procedures or Administrative Penalization Being Taken.*

88.    The SAIC established the formal procedure of law enforcement through administrative guidance in order to improve SAIC's regulation and enforcement and to relieve friction with Chinese businesses caused by conventional administrative law enforcement. Previously, administrative penalization measures had been immediately imposed without first giving businesses an opportunity to voluntarily remedy their violations.[17]

89.    Section 5 of the Administrative Compulsory Law of the People's Republic of China (effective January 1, 2012) also provides that "where objectives of administrative regulation can be achieved by non-compulsory measures, administrative compulsory measures shall not be established or applied."

90.    However, "where the objective of law enforcement cannot be achieved by administrative guidance, penalization shall be administered pursuant to law at the same time

---

[17] See SAIC Opinions of the State Administration for Industry and Commerce for Administration for Industry & Commerce Agencies to Comprehensively Promote Administrative Guidance, November 25, 2009, Part I, Art. 3 ("administrative guidance has also alleviated and avoided possible contradictions between the SAIC authority and an Administrative Counterparty during the process of advocacy arising from the traditional administrative mode, so that the harmony of the society has been promoted"); See also Part I, Sec. 4. ("Administrative guidance shall coordinate with traditional administrative regulatory methods such as administrative penalization based on the understanding and cooperation of an Administrative Counterparty, so that the purpose of administrative regulation can be realized more smoothly, and damages to rights and interests of an Administrative Counterparty can be avoided to the largest extent.")

administrative guidance is being conducted."[18]  This means that if a business does not follow the SAIC's administrative guidance it will be subject to more severe law enforcement measures, including a range of penalties such as revocation of business licenses, fines and other punitive regulatory measures.

91.     The July 16, 2014 Administrative Guidance meeting with Alibaba was an administrative law enforcement proceeding.  Alibaba's failure to accept the administrative guidance and follow the directions set forth by the SAIC and the seven AICs during the meeting would have created a high risk of administrative penalization.  This is evidenced by Director General Liu's threats at the July SAIC Meeting to fine Alibaba 1.0% of daily sales a thousand times or even several thousand times a year, if Alibaba doesn't cease its violations of law.

92.     Thus, the July SAIC Meeting was a formal administrative law proceeding against Alibaba with the purpose of enforcing PRC laws and regulations and preventing further violations.  Moreover, the fact that executive officials from the SAIC, six provincial AICs, and one municipal AIC participated in the July SAIC Meeting in conjunction with the issuance of a White Paper demonstrate that this was not just a routine administrative guidance.  This was an unprecedentedly high level administrative guidance meeting that was "guidance" in name only, and it delivered to Alibaba a strong SAIC regulatory mandate backed by the threat of severe monetary penalties.

---

[18] SAIC Vice Minister Fu Shuangjian's Speech at China National Video- and Telephonic-Conference on Exchanging Experiences as to Promoting Administrative Guidance throughout the National Administration For Industry and Commerce System, dated November 4, 2010. Sec. 3, Art. 1.

93.     SAIC's official website frequently publishes administrative guidance proceedings for the public to reference. When the Chinese term "administrative guidance" is searched on the SAIC website, 189 results can be found as of June 25, 2015. Of the 189 administrative guidance proceedings listed, none of them, except for the July 16, 2014 Administrative Guidance to Alibaba Group, involved such an array of high level officials from the SAIC and several local AICs participating in one administrative guidance proceeding.

94.     The fact that the July SAIC Meeting unambiguously is not a run of the mill administrative guidance can be proved by the multiple steps that SAIC took before, at and after the July SAIC Meeting in order to complete the entire law enforcement proceeding, based upon the information disclosed in the White Paper.

    i).     Step one, before the July SAIC Meeting, executives from Department of Market Regulation and five AICs established an administrative guidance working team and conducted research and study in preparation for the Meeting.

    ii).    Step two, SAIC and 7 AICs summoned senior Alibaba executives for a meeting to deliver important administrative guidance to Alibaba at the July SAIC Meeting in the form of advising, tutoring, reminding, admonishing, and demonstrating by examples pursuant to Article 12 of the Administrative Guidance Work Rules which provides for the methods for administering Administrative Guidance.

    iii).    Step three, Zhejiang Provincial AIC whose jurisdiction Alibaba is headquartered in, conducted a special meeting to review the July SAIC

Meeting and further decided to submit a special report to Zhejiang Provincial Government regarding such administrative guidance.

iv).   Step four, Zhejiang Provincial AIC planned to go to Alibaba Group offices to conduct another administrative guidance soon.

v).   Step five, SAIC published the White Paper, summarizing and publishing to the public the entire administrative guidance proceeding, in order to provide leading references to an Administrative Counterparty, which is one of the methods of administrative guidance under Article 12 of the Administrative Guidance Work Rules.

95.    Clearly, none of any other administrative guidance proceedings published by SAIC is comparable in terms of scope and depth to the administrative guidance at the July SAIC Meeting.

96.    The five steps that SAIC had meticulously taken to complete this administrative guidance undeniably indicate that the administrative guidance to Alibaba was a special procedure under Chapter 3, Section 3 of the Administrative Guidance Work Rules where SAIC anticipated that such administrative guidance "may affect the social public interests or the development of a specific industry or impose other material influence" rather than a general procedure or a simplified procedure as provided for in other sections of the Administrative Guidance Work Rules.

97.    Given the SAIC's serious position in preparing for, arranging, and delivering its administrative guidance at the July SAIC Meeting, and further given that SAIC expressed its concern about the severe negative social and commercial impact that Alibaba's misconduct and violations of law were having on Chinese e-commerce, and further given that SAIC has the

26

legal authority to administer penalization "where the objective of law enforcement cannot be achieved by administrative guidance", had Alibaba not followed the administrative guidance delivered by SAIC and 7 AICs at such meeting, Alibaba would have faced severe penalties from the SAIC - creating a very material risk to its business and operations.  This material risk is evidenced by Director General Liu's threat at the July SAIC Meeting to impose fines on Alibaba of 1% of daily sales amounts if Alibaba did not remedy its violations of law.

## DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS

## DURING THE CLASS PERIOD

### Alibaba's IPO Registration Statement

98.     On May 6, 2014, Alibaba filed with the SEC the Registration Statement on Form F-1 for the sale of its ADS in connection with its planned IPO on the NYSE.[19]

99.     On September 15, 2014, Alibaba filed the seventh and final amendment to the Registration Statement, which registered 368,122,000 Alibaba ADS for public sale.

100.     The SEC declared the Registration Statement effective on September 18, 2014.

101.     On or about September 19, 2014, Alibaba priced the IPO at $68 per ADS and filed the final Prospectus for the IPO on September 22, 2014, which forms part of the Registration Statement (collectively, the "Registration Statement").

102.     The Registration Statement misled investors because it failed to disclose that just two months earlier on July 16, 2014, senior executives from Alibaba had met with senior SAIC and AIC officials and were told that Alibaba's e-commerce businesses were in serious violation of PRC laws and regulations and that SAIC had threatened Alibaba with thousands of financial penalties – each with a target of 1.0% of daily sales on its e-commerce platforms.

---

[19]   A copy of the Registration Statement is attached as Exhibit 5.

103.    The Registration Statement also failed to disclose that the SAIC had commenced the "Red Shield and Web Sword" special program to clean up rampant abuses in Alibaba's e-commerce platforms, including counterfeiting and consumer fraud, and that the SAIC considered Alibaba one of its main targets.

104.    The Registration Statement was materially misleading because it failed to disclose that: (i) a material portion of Alibaba's consolidated revenues and earnings were derived from the sale of non-genuine merchandise so that investors would be fairly and fully informed of the true nature and quality of its revenue and earnings; (ii) Alibaba's financial performance was reasonably likely to be materially impacted as a consequence of yielding to SAIC pressure to fully bring its operations within the ambit of the law; and (iii) if Alibaba did not adequately bring its operations in line to the satisfaction of the SAIC, then it would be subject to regulatory action that would materially impact its business, such as thousands of monetary fines each amounting to 1% of daily sales.

105.    The risk disclosures Alibaba included in the Registration Statement were themselves misleading given Defendants' knowledge of the SAIC's administrative guidance delivered at the July SAIC Meeting and the Red Shield 2014 special program.

106.    The Registration Statement disclosed that "the regulatory and legal system in China is complex and developing, and future regulations may impose additional requirements on our business".

107.    This statement was itself materially misleading because it implied that there was no present or imminent threat that the Chinese government would impose additional regulatory requirements or penalties on Alibaba, when in fact Defendants knew that the SAIC had recently implemented the Red Shield 2014 initiative and had provided administrative guidance

to Alibaba at the July SAIC Meeting which actually did impose additional regulatory requirements on its business.

108.    The Registration statement disclosed that "[*m*]*aintaining the trusted status of our ecosystem is critical to our success, and any failure to do so could severely damage our reputation and brand, which would have a material adverse effect on our business, financial condition and results of operations.*"

109.    This statement was materially misleading because Alibaba was aware that its e-commerce platforms were actively continuing to sell counterfeit goods, engage in myriad fraudulent practices against its consumers, and violate various PRC laws and regulations, all of which were an imminent threat to its reputation, and that the SAIC had threatened severe penalties if the violations were not remedied.

110.    The Registration Statement stated that Alibaba's "ability to maintain our position as a trusted platform for online and mobile commerce is based in large part upon: … the quality and breadth of products and services offered by sellers through our marketplaces; [and] the strength of our consumer protection measures."

111.    This statement was materially misleading because Alibaba was aware that a majority of the products being sold on Taobao and Tmall were counterfeit or non-genuine and that its consumer protection measures were materially deficient, as Alibaba executives admitted to the SAIC and AICs at the July SAIC Meeting, and as set forth in the White Paper.

112.    The Registration Statement disclosed:

> We have received in the past, and we anticipate we will receive in the future, communications alleging that items offered or sold through our online marketplaces by third parties or that we make available through other services, such as our online music platform, infringe third-party copyrights, trademarks and patents or other intellectual property rights. Although we have adopted measures to verify the authenticity of products sold on our marketplaces and

minimizes potential infringement of third-party intellectual property rights through our intellectual property infringement complaint and take-down procedures, these measures may not always be successful. We have been and may continue to be subject to allegations of civil or criminal liability based on allegedly unlawful activities carried out by third parties through our online marketplaces. We also have been and may continue to be subject to allegations that we were participants in or facilitators of such allegedly unlawful activities.

113.    These statements were incomplete and materially misleading because Defendants failed to disclose that the SAIC and AICs had recently accused Alibaba of violating applicable laws and regulations in the conduct of its e-commerce platforms at the July SAIC Meeting and that Alibaba faced imminent threat of severe monetary and other regulatory penalties as a result. The forgoing risk disclosure was inadequate and misleading because there was no mention of any government investigation or of the administrative guidance provided at the July SAIC Meeting, the serious threats of fines by the SAIC or the impending SAIC report.

114.    The Registration Statement disclosed: "Any costs incurred as a result of liability or asserted liability relating to the sale of unlawful goods or other infringement could harm our business."

115.    This statement was incomplete and materially misleading because it failed to disclose that the Director General of the SAIC's Department of Market Regulation had just recently threatened to issue thousands of fines against Alibaba each amounting to 1.0% of its daily sales amounts if it did not immediately clean up its e-commerce platforms and prevent the sale of counterfeit and other unlawful goods.

116.    The Registration Statement disclosed "We may implement further measures in an effort to strengthen our protection against these potential liabilities that could require us to spend substantial additional resources and/or experience reduced revenues by discontinuing certain service offerings."

117.    This statement was incomplete and materially misleading because it was couched in vague uncertain terms such as "[w]e may" and "these potential liabilities could require," when in reality, the SAIC and AICs had recently demanded that Alibaba implement far-reaching changes to its e-commerce platforms to stop the sale of counterfeit products, eliminate unfair and deceptive trade practices, and protect and enforce the rights of consumers. The changes the SAIC was demanding of Alibaba were bound to have a negative effect on its revenue, earnings and share price.

118.    The Registration Statement disclosed:

> Moreover, illegal, fraudulent or collusive activities by our employees could also subject us to liability or negative publicity. For instance, we learned that in early 2011 and 2012 in two separate incidents, certain of our employees had accepted payments from sellers in order to receive preferential treatment on Alibaba.com and Juhuasuan. Although we dismissed the employees responsible for the incidents and have taken action to further strengthen our internal controls and policies with regard to the review and approval of seller accounts, sales activities and other relevant matters, we cannot assure you that such controls and policies will prevent fraud or illegal activity by our employees or that similar incidents will not occur in the future. Any such illegal, fraudulent or collusive activity could severely damage our brand and reputation as an operator of trusted marketplaces, which could drive users and buyers away from our marketplaces, and materially and adversely affect GMV transacted on our marketplaces, our revenues and our net income.

(Emphasis added).

119.    The above risk disclosure was incomplete and materially misleading because Alibaba failed to disclose that its employees was continuing to engage in illegal activities, such as accepting bribes from sellers to receive preferential treatment in the form of higher search placement and/or better vendor and product reviews on its e-commerce platforms, and that the SAIC had recently threatened to fine Alibaba 1% of daily sales volume or more if it did not sufficiently strengthen its internal controls and policies to prevent such illegal activity.

120.    In truth, Alibaba continued to condone such illegal activities as described more fully in ¶228, ¶229, ¶¶252-273 below.   For example, Alibaba employees were required to develop software programs to fraudulently report greater sales volumes to make certain products appear to be in greater demand.  *Id.*

121.    The Registration Statement stated:

> ***We may increasingly become a target for public scrutiny, including complaints to regulatory agencies, negative media coverage, including social media and malicious reports, all of which could severely damage our reputation and materially and adversely affect our business and prospects.***
>
> \* \* \*
>
> There is no assurance that we would not become a target for public scrutiny in the future or such scrutiny and public exposure would not severely damage our reputation as well as our business and prospects.

122.    The foregoing statements were incomplete and materially misleading because they failed to disclose that the SAIC and all the AICs had recently commenced special program Red Shield and Web Sword to target illegal and fraudulent conduct on Alibaba's and others' e-commerce platforms.  The SAIC specifically stated that "law enforcement must be intensified with harsher efforts in a forceful manner."

123.    The statement was also incomplete and materially misleading due to Alibaba's failure to disclose SAIC's administrative guidance, as well as the threatened financial penalties, that were presented to Alibaba at the July SAIC Meeting.

124.    Alibaba was in fact experiencing harsher regulatory scrutiny.  There was not merely the possibility of it happening.  It had already happened.

125.    The Registration Statement disclosed:

> China has enacted laws and regulations governing Internet access and the distribution of products, services, news, information, audio-video programs and other content through the Internet. The PRC government has prohibited

the distribution of information through the Internet that it deems to be in violation of PRC laws and regulations. If any of the information disseminated through our marketplaces and websites were deemed by the PRC government to violate any content restrictions, we would not be able to continue to display such content and could become subject to penalties, including confiscation of income, fines, suspension of business and revocation of required licenses, which could materially and adversely affect our business, financial condition and results of operations.

* * *

***We may be subject to claims under consumer protection laws, including health and safety claims and product liability claims, if property or people are harmed by the products sold on our marketplaces.***

* * *

For example, under applicable consumer protection laws in China, e-commerce platform operators may be held liable for consumer claims relating to damage if they are unable to provide consumers with the true name, address and contact details of sellers or service providers. In addition, if we do not take appropriate remedial action against sellers or service providers for actions they engage in that we know, or should have known, would infringe upon the rights and interests of consumers, we may be held jointly liable with the seller or service provider for such infringement. Moreover, applicable consumer protection laws in China hold that trading platforms will be held liable for failing to meet any undertakings such platforms make to consumers with regard to products listed on their websites. … Furthermore, we are required to report to SAIC or its local branches any violation of applicable laws, regulations or SAIC rules by sellers or service providers, such as sales of goods without proper license or authorization, and to take appropriate remedial measures, including ceasing to provide services to such sellers or service providers. If claims are brought against us under any of these laws, we could be subject to damages and reputational damage as well as action by regulators, which could have a material adverse effect on our business, financial condition and results of operations.

126.    The above risk disclosures were incomplete and misleading for failing to disclose that the SAIC and AICs findings and administrative guidance delivered at the July SAIC Meeting that Alibaba was in violation of PRC consumer laws and regulations and had been systematically engaging in unfair trade practices on its e-commerce platforms.  The SAIC also criticized Alibaba for providing assistance to vendors in violating consumer laws.  The

foregoing statements were also misleading for failing to disclose that the SAIC and AICs had told Alibaba that it must immediately institute remedial measures to prevent the ongoing violations of PRC laws and regulations or Alibaba would face severe monetary penalties.

127.    The Registration Statement disclosed:

*Measures against counterfeit products*. To protect consumers, brand owners and legitimate sellers and to maintain the integrity of our marketplaces, we have put in place a broad range of measures to prevent counterfeit and pirated goods from being offered and sold on our marketplaces. These measures include:

- identifying, issuing warnings and taking down counterfeit products from our marketplaces;
- providing an online complaint platform for brand owners to report infringements;
- conducting random checks by using third parties to purchase suspected counterfeit products on our marketplaces; and
- enhancing our communication with various relevant government authorities to eradicate sources of counterfeit goods.

We have also established cooperative relationships with over 1,000 major brand owners and several industry associations in connection with intellectual property rights protection to enhance the effectiveness of our take-down procedures and other anti-counterfeiting measures.

128.    The foregoing risk disclosures were incomplete and misleading for failing to disclose that the SAIC and AIC had warned Alibaba that the measures against counterfeit products were insufficient and ineffective.  In addition, the SAIC determined that Alibaba had in many cases thwarted its law enforcement efforts by tipping off illegal vendors to the SAIC and AICs enforcement actions permitting illegal vendors to avoid sanctions.  The Registration Statement was further misleading for failing to disclose that a material portion of Alibaba's consolidated revenues and earnings were derived from the sale of non-genuine merchandise; and that Alibaba's financial performance was reasonably likely to be materially impacted as a consequence of yielding, albeit slowly or belatedly, to SAIC pressure to fully bring its

operations within the ambit of the law. In addition Alibaba's search engines intentionally facilitated the purchase and sale of counterfeit goods.  *See* ¶228, ¶229, ¶¶252-273 below.  .

129.    The Registration Statement purported to disclose:

> *Measures against fictitious transactions.* We have implemented measures to prevent, detect and reduce the occurrence of fictitious transactions on Taobao Marketplace and Tmall including:
>
> •    requiring the use of sellers' real identities to set up accounts with us;
>
> •    analyzing transaction patterns to identify anomalies;
>
> •    dynamic password protection and real-time monitoring of user login behavior;
>
> •    enabling buyers and sellers to report suspicious transactions to us;
>
> •    maintaining a "blacklist" of sellers and buyers who have been involved in fictitious transactions in the past; and
>
> •    collaborating with industry partners and law enforcement authorities on Internet security.

130.    This risk disclosure was false misleading because the SAIC had told Alibaba at the July SAIC Meeting that such measures to prevent fictitious transactions were ineffective and that as a result its e-commerce platforms were in violation of PRC laws and regulations. These statements were further misleading because Alibaba management encouraged, indeed required in certain cases, that its programmers write programs that artificially created fictitious transactions to give the false appearance of demand for specific products in an effort to provide a selling advantage to certain vendors. *See* ¶¶228-229 below.  In addition Alibaba's search engines intentionally facilitated the purchase and sale of counterfeit goods.  *See* ¶¶252-273 below.

131.    The Registration Statement purported to disclose:

Penalties. **We maintain a "no tolerance" policy with regard to counterfeit and fictitious activities on our marketplaces**. However, because many sellers doing business on our marketplaces depend on us for their livelihood, we have generally eschewed a "shoot-first, ask questions later" approach to handling complaints. When we receive complaints or allegations regarding infringement or counterfeit goods, we follow well-developed procedures to verify the nature of the complaint and the relevant facts before de-listing the items. Generally, we give sellers who have been accused of posting or selling counterfeit products up to three days to refute the allegations and provide evidence of the authenticity of the product.

If allegations of posting or selling counterfeit products have not been refuted or fictitious activities have been confirmed, we penalize the parties involved through a number of means including:

- immediately delisting the products;
- arranging for the seller to reimburse the buyer;
- assessing penalty points against the seller or limiting its ability to add listings for a certain period;
- adopting a "name and shame" policy;
- imposing restrictions from participation in promotional activities on our marketplaces; and
- closing down storefronts and, for Tmall sellers, confiscating the consumer protection security deposits paid. The seller is banned permanently from establishing another storefront on our marketplaces.

In appropriate circumstances we also notify the relevant law enforcement and other authorities to take legal action against the offending party, including in extreme cases criminal proceedings.

132.   The foregoing risk disclosure was false and misleading because Alibaba did not employ a "no tolerance" policy with regard to counterfeit and fictitious activities on its marketplaces. In truth Alibaba tolerated the sale of non-genuine merchandise on its websites and permitted, indeed in some cases created, fictitious transactions on its e-commerce platforms. *See* ¶¶228-229 below. In many cases, even after Alibaba was sued by a brand owner for permitting the sale of counterfeit merchandise on its e-commerce platforms, Alibaba failed to remove offending merchant or its merchandise from its e-commerce platforms. *Id.*

133.   In addition, Taobao had optimized its search engines to specifically search and identify vendors of counterfeit products. For example, if a user entered the term "Replica," a

euphemism for counterfeit, Taobao's search engine would automatically offer a variety of vendors selling replicas (fakes) of well-known luxury branded goods such as Chanel or Gucci. *See* ¶¶252-273 below.

134.    On February 26, 2015, Nomura Securities issued an analyst report describing an interview with Xi Liao, the former third party development manager of Taobao's pay-for-performance ("P4P") advertising department from 2009-2013 and current CEO of Fan Xi Tech.  P4P marketing services accounted for 55% of Alibaba's revenue in 2014, most of it derived from Taobao. Mr. Liao was asked about the SAIC's White Paper and its impact on Alibaba. He stated in the interview that "at the end of the day, the platform will find its balance between counterfeit and brand products as both product categories have their own target customers. ***The percentage of fake goods on Taobao is unlikely to significantly decrease because the platform reflects the market's actual demand***."

135.    In essence, Mr. Liao made clear counterfeit merchandise is a "product category" for Alibaba with its own target customers.  In fact, Alibaba has knowingly relied on non-genuine merchandise to fuel its explosive growth and a material portion of its revenue and income.  Mr. Liao stated in the interview, "[a]s Alibaba steps up its monitoring effort with regards to the counterfeit product issue, there is likely to be certain impact on its advertising revenue."

136.    In June, 2015, Mr. Liao was interviewed by Plaintiffs' private investigator.  Mr. Liao estimated that by now the proportion of counterfeit goods sold on Taobao "should be under 50%".  He explained that Alibaba does not make a serious effort to eliminate non-genuine goods from Taobao.  This is because counterfeits are a product category for Alibaba and that category has its own target customers with strong demand.  Mr. Liao said "If the water

is too clear, no fish will survive." Meaning, its customers want counterfeits and Alibaba needs the revenue it earns from the merchants that provide them.

137. Confidential Witness 1 ("CW 1") was a Taobao Product Manager between February 2010 and November 2013. Her primary responsibilities were to develop and improve Taobao algorithms, especially in the area of ad displays and search marketing.

138. According to CW 1, during her tenure, Taobao ignored counterfeits unless a brand vociferously and persistently complained. At that point, Taobao might take action – for example, reviewing the top 100 sites carrying the brand's products.

139. CW 1 explained that because Taobao earned so much of its revenues from keyword bidding and counterfeit sellers paid top dollar for keywords, Taobao's attitude was "Ok, pay for the keyword and go for it." According to CW 1, though Taobao had rules prohibiting sale of counterfeit goods, "[o]ften times the pressure of making the revenue outweighed that."

140. The foregoing risk disclosure was also incomplete and misleading for failing to warn investors that the SAIC had launched the "Red Shield Web Sword" initiative, and that it had told Alibaba at the July SAIC Meeting that it was in violation of PRC laws and regulations for allowing the sale of non-genuine products on its e-commerce platforms and that it faced severe financial penalties if it did not institute immediate remedial measures.

141. Under the heading "Legal Proceedings" the Registration Statement disclosed:

> **Legal Proceedings**
>
> From time to time, we have been involved in litigation relating to copyright, trademark and patent infringement, defamation, unfair competition, contract disputes and other matters in the ordinary course of our business. We are not currently a party to any material legal or administrative proceedings.

\* \* \*

### REGULATION

We operate in an increasingly complex legal and regulatory environment. We are subject to a variety of PRC and foreign laws, rules and regulations across a number of aspects of our business. This section summarizes the principal PRC laws, rules and regulations relevant to our business and operations. Areas in which we are subject to laws, rules and regulations outside of the PRC include data protection and privacy, consumer protection, content regulation, intellectual property, competition, taxation, anti-money laundering and anti-corruption. See "Risk Factors — Risks Related to Our Business and Industry — We and Alipay are subject to regulation, and future regulations may impose additional requirements and other obligations on our business or otherwise that could materially and adversely affect our business, financial condition and results of operations."

142.   This disclosure was incomplete and misleading for omitting to disclose the details of the July SAIC Meeting in which the SAIC and AICs delivered administrative guidance and warned Alibaba that its e-commerce platforms were guilty of serious violations of PRC laws and regulations and that if Alibaba did not immediately rectify these violations then it would be subject to severe financial penalties. The foregoing risk disclosure was misleading because the July SAIC Meeting was a formal administrative law enforcement proceeding mandating that Alibaba stop violating PRC laws and regulations.

143.   This disclosure was also incomplete and misleading for failing to disclose that the SAIC had recently commenced the Red Shield Web Sword special program to remediate violations of PRC laws and regulations by Alibaba and other e-commerce companies.  In short, the SAIC and AICs had embarked on a very strict enforcement regulatory enforcement program that was reasonably likely to materially impact Alibaba's financial performance as a consequence of yielding to SAIC pressure to fully bring its operations within the ambit of the law.

144.    The Registration Statement disclosed:

**Regulation of Advertising Services**

The principal regulations governing advertising businesses in China are:

- The Advertising Law of the PRC (1994);

- The Advertising Administrative Regulations (1987);

- The Implementing Rules for the Advertising Administrative Regulations (2004); and

- The Administration Rules of Foreign-invested Advertising Enterprises (2008).

* * *

Applicable PRC advertising laws, rules and regulations contain certain prohibitions on the content of advertisements in China (including prohibitions on misleading content, superlative wording, socially destabilizing content or content involving obscenities, superstition, violence, discrimination or infringement of the public interest). Advertisements for anesthetic, psychotropic, toxic or radioactive drugs are prohibited, and the dissemination of advertisements of certain other products, such as tobacco, patented products, pharmaceuticals, medical instruments, agrochemicals, foodstuff, alcohol and cosmetics, are also subject to specific restrictions and requirements.

Advertisers, advertising operators and advertising distributors, including the businesses that certain of the variable interest entities operate, are required by applicable PRC advertising laws, rules and regulations to ensure that the content of the advertisements they prepare or distribute are true and in compliance with applicable laws, rules and regulations. Violation of these laws, rules and regulations may result in penalties, including fines, confiscation of advertising income, orders to cease dissemination of the advertisements and orders to publish an advertisement correcting the misleading information. In circumstances involving serious violations, the SAIC or its local branches may revoke the violator's license or permit for advertising business operations. In addition, advertisers, advertising operators or advertising distributors may be subject to civil liability if they infringe the legal rights and interests of third parties, such as infringement of intellectual

proprietary rights, unauthorized use of a name or portrait and defamation.
[emphasis added]

145.    The foregoing risk disclosure was incomplete and misleading for failing to
disclose that the SAIC had recently commenced the Red Shield Web Sword special program to
more strictly enforce consumer protection, false advertising and intellectual property laws and
regulations more strictly.

146.    The disclosure was also false and misleading because while it discloses that the
Alibaba might be subject to fines, penalties and loss of its business license if it violates PRC
laws or regulations governing advertising, it omits to disclose that the SAIC and AICs had
delivered administrative guidance and informed Alibaba senior management at the July SAIC
Meeting that the advertising on its websites was in violation of PRC laws and regulation and
that if Alibaba did not remedy the violations immediately, it would be subject to severe
financial penalties.

147.    The Registration Statement disclosed that Alibaba's Online and Mobile
Commerce businesses were subject to regulation as follows:

**Regulation of Online and Mobile Commerce**

**China's online and mobile commerce industry is at an early stage of
development and there are few PRC laws, regulations or rules specifically
regulating this industry.** The SAIC adopted the Interim Measures for the
Administration of Online Commodities Trading and Relevant Services on May
31, 2010 and replaced those measures with the Administrative Measures for
Online Trading on January 26, 2014, which became effective on March 15,
2014. The SAIC also issued the Opinions on Strengthening the Administration
of Online Group Buying Operations on March 12, 2012 to subject group
buying website operators to the foregoing measures, especially those relating to
marketplace platform service providers. **These newly issued measures impose
more stringent requirements and obligations on the online trading or
service operators as well as the marketplace platform providers**. *For
example, the marketplace platform providers are obligated to examine the*

*legal status of each third-party merchant selling products or services on the platform and display on a prominent location on the web page of such merchant the information stated in the merchant's business license or a link to such business license, and a group buying website operator must only allow a third-party merchant with a proper business license to sell products or services on its platform.* Where the marketplace platform providers also act as online distributors, these marketplace platform providers must make a clear distinction between their online direct sales and sales of third-party merchant products on the marketplace platform. [emphasis added]

148.    The foregoing risk disclosure was incomplete and misleading for failing to disclose that the SAIC and the AICs had delivered administrative guidance and informed Alibaba senior management at the July SAIC Meeting that it was in serious violation of PRC laws and regulations governing online and mobile commerce.  For example, the SAIC found that Alibaba had been knowingly facilitating illegal vendors operating on Alibaba's e-commerce platforms without necessary business licenses or under false names using another business' license, and that as a result Alibaba faced severe monetary penalties if it failed to remedy the violations.

149.    The Registration Statement purported to disclose risks to Alibaba's business relating to enforcement of consumer protection laws as follows:

**Regulations Relating to Consumer Rights Protection**

Our online and mobile commerce business is subject to a variety of consumer protection laws, including the PRC Consumer Rights and Interests Protection Law, as amended and effective as of March 15, 2014, and the Administrative Measures for Online Trading, both of which have provided stringent requirements and obligations on business operators, including Internet business operators and platform service providers like us. For example, consumers are entitled to return goods purchased online, subject to certain exceptions, within seven days upon receipt of such goods for no reason. To ensure that sellers and service providers comply with these laws and regulations, we, as platform operators, are required to implement rules governing transactions on our platform, monitor the information posted by sellers and service providers, and report any violations by such sellers or service providers to the relevant authorities. In addition, online marketplace platform providers may, pursuant

to PRC consumer protection laws, be exposed to liabilities if the lawful rights and interests of consumers are infringed in connection with consumers' purchase of goods or acceptance of services on online marketplace platforms and the platform service providers fail to provide consumers with the contact information of the seller or manufacturer. In addition**, platform service providers may be jointly and severally liable with sellers and manufacturers if they are aware or should be aware that the seller or manufacturer is using the online platform to infringe upon the lawful rights and interests of consumers and fail to take measures necessary to prevent or stop such activity.**

**Failure to comply with these consumer protection laws could subject us to administrative sanctions, such as the issuance of a warning, confiscation of illegal income, imposition of a fine, an order to cease business operations, revocation of business licenses, as well as potential civil or criminal liabilities.** [emphasis added]

150.    The foregoing risk disclosure was incomplete and misleading for failing to disclose the administrative guidance provided by the SAIC at the July SAIC Meeting, in particular the SAIC's findings that Alibaba was currently violating PRC laws and regulations concerning counterfeit products, consumer protections, unfair trade practices, commercial bribery and was at great risk of serious monetary penalties.   In short, Alibaba had already been subjected to adverse administrative guidance proceedings, and was under imminent threat of severe penalties if it did not bring its e-commerce platforms into compliance with PRC laws and regulations.

151.    The Registration Statement purported to disclose risks concerning Anti-counterfeiting regulations affecting Alibaba as follows:

**Anti-counterfeiting Regulations**

According to the Trademark Law of the PRC, counterfeit or unauthorized production of the label of another person's registered trademark, or sale of any label that is counterfeited or produced without authorization will be deemed as an infringement of the exclusive right to use a registered trademark. The infringing party will be ordered to cease infringement immediately, a fine may be imposed and the counterfeit goods will be confiscated. The infringing party

may also be held liable for damages suffered by the owner of the intellectual property rights, which will be equal to the gains obtained by the infringing party or the losses suffered by such owner as a result of the infringement, including reasonable expenses incurred by such owner in connection with enforcing its rights.

Under the Tort Liability Law of the PRC, an Internet service provider may be subject to joint liability if it is aware that an Internet user is infringing upon the intellectual property rights of others through its Internet services, such as selling counterfeit products, and fails to take necessary measures to stop that activity. If an Internet service provider receives a notice from an infringed party regarding an infringement, the Internet service provider is required to take certain measures, including deleting, blocking and unlinking the infringing content, in a timely manner.

**In addition, under the Administrative Measures for Online Trading issued by the SAIC on January 26, 2014, as an operator of an online trading platform, we must adopt measures to ensure safe online transactions, protect consumers' rights and prevent trademark infringement.**

152.    The foregoing risk disclosure was incomplete and misleading for failing to disclose that the SAIC and AICs had informed Alibaba at the July SAIC Meeting that it was in serious violation of PRC laws and regulations for knowingly facilitating the sale of counterfeit merchandise on its e-commerce platforms and that it faced imminent threat of enormous monetary penalties if did not bring its e-commerce operations into compliance with the law.

153.    The Registration Statement was further misleading because Alibaba knowingly and intentionally was facilitating the sale of counterfeit products by programming its e-commerce search engines to suggest the purchase of counterfeit goods and direct customers to merchants selling such counterfeit goods.  *See* ¶¶252-273 below.

*SEC Regulation S-K required Alibaba to disclose known trends and uncertainties in the Registration Statement.*

Item 303 demands disclosure

154.    SEC Regulation S-K (27 CFR 229.10) provides that registration statements such as the one filed by Alibaba on Form F-1 comply with the other requirements of Regulation S-K "to the extent provided in the forms to be used for registration under the [Securities] Act." 17 C.F.R. 229.10. Form F-1 requires registrants to furnish the information required by Part I of Form 20-F.

155.    Part I, Item 5(d) Form 20-F, in turn, requires registrants to:

[D]iscuss, for at least the current financial year, any known trends, uncertainties, demands, commitments or events that are reasonably likely to have a material effect on the company's net sales or revenues, income from continuing operations, profitability, liquidity or capital resources, or that would cause reported financial information not necessarily to be indicative of future operating results or financial condition.

156.    Item 5(d) of Form 20-F "call[s] for the same disclosure as Item 303 of Regulation S-K". *In Re Comm'n Guidance Regarding MD&A of Fin. Condition & Results of Operation*, Release No. 8350 (Dec. 19, 2003) (the "2003 Guidance") available at 2003 WL 22996757, *1 n.1.

157.    Regulation S-K provides that the discussion of known trends, uncertainties, and events should appear in the section of an issuer's registration statement reporting "Management's Discussion and Analysis of Financial Condition and Results of Operations" ("MD&A"). In an 1989 Interpretive Release, the SEC described the purposes of MD&A:

The Commission has long recognized the need for a narrative explanation of the financial statements, because a numerical presentation and brief accompanying footnotes alone may be insufficient for an investor to judge the quality of earnings and the likelihood that past performance is indicative of future performance. MD&A is intended to give investors an opportunity to look at the registrant through the eyes of management by providing a historical and prospective analysis of the registrant's financial condition and results of operations, with a particular emphasis on the registrant's prospects for the future.

*Management's Discussion & Analysis of Fin. Condition & Results of Operations; Certain Inv. Co. Disclosures*, Release No. 6835 (May 18, 1989) (the "1989 Interpretive Release") available at 1989 WL 1092885.[20]

158.    Item 5(d) requires disclosure based on "currently known trends, events, and uncertainties that are reasonably expected to have material effects." *Id.* at *4.

159.    In June 2014, the SAIC announced a new policy: it made fighting online sale of counterfeit, shoddy, or illegal goods a priority. The SAIC's focus included forcing platform operators like Alibaba to take action. In tandem, the SAIC also escalated its long-smoldering dispute with Alibaba over its complicity with the sellers of counterfeit, shoddy, and illegal goods. The SAIC and 7 AIC offices met with Alibaba at the July SAIC Meeting in a formal administrative proceeding and sternly warned Alibaba that it would incur "thousands" of fines of 1% of daily sales amounts if it did not stop violating PRC law and regulations on its e-commerce platforms.  Under Item 5(d), Alibaba was required to disclose both the SAIC's new policy and the SAIC's specific threats to Alibaba.

### The impact of Chinese regulators' policy to target the sale of counterfeit goods

*Foreign issuers must disclose governmental action that could materially affect them.*

160.    Issuers must disclose both (a) known trends and uncertainties and (b) any material impact of known trends and uncertainties on their own operations even if the trends are a matter of public knowledge. 1989 Interpretive Release, 1989 WL 1092885 at *6. *See also Litwin v. Blackstone Grp., L.P.*, 634 F.3d 706, 721 (2d Cir. 2011).

161.    Indeed, because it is a foreign issuer, Alibaba faces heightened obligations to disclose government action. Item 303 specifically instructs foreign private registrants like

---

[20] The 1989 Interpretive Guidance applies to Item 5(d) of Form 20-F. Form 20-F, Instruction 5 (stating that issuers should refer to the 1989 Interpretive Guidance); 2003 Guidance, at 2003 WL 22996757, *1 n.1 (same).

Alibaba to "discuss briefly any pertinent governmental economic, fiscal, monetary, or political policies or factors that have materially affected or could materially affect, directly or indirectly, their operations or investments by United States nationals." 17 C.F.R. § 229.303, ¶12. There is no corresponding specific requirement for domestic companies.

162.    Thus, Alibaba was required to disclose that the SAIC and AICs had commenced a new regulatory enforcement program specifically targeting Alibaba's violations of PRC laws and regulations

*The SAIC's 2014 campaign against online sales of counterfeit goods could materially affect Alibaba's operations*

163.    On June 12, 2014, the SAIC launched Red Shield 2014, specifically targeting online sales of fake and shoddy goods, and running from July to November 2014. One of Red Shield 2014's principal objectives was to crack down on trademark infringement, especially well-known and foreign (non-Chinese) trademarks.

164.    As set out above in ¶¶58-61, the Red Shield Notice informed Alibaba that (a) cracking down on illegal practices on e-commerce platforms and cleaning up e-commerce was one of the SAIC's top priorities; (b) the full resources of the national, provincial, and local AIC offices would be harnessed to this goal; and (c) law enforcement would be stepped up.

*The SAIC's escalation against Alibaba's sale of counterfeit, shoddy, and illegal goods was a known trend requiring disclosure in the Registration Statement*

165.    Red Shield 2014 imposes obligations on platform operators like Alibaba. The Red Shield 2014 Notice alerted third-party platform operators that they would be required to actively support the SAIC, to punish illegal acts, and to carry out self-examination and self-correction. [p. 5].The Red Shield 2014 Notice also stated that the Chinese government would

47

prioritize rectification of e-commerce platforms like Alibaba. It makes no sense that the SAIC would embark on an operation demanding the cooperation of the platform operators like Alibaba, and then conceal the operation from them.

166.    Indeed, in a closed-door session at the July SAIC Meeting, the SAIC explained to Alibaba that it was one of the main targets of Red Shield 2014.

167.    At the meeting were, among others, Alibaba Chief Risk Officer Xiaofeng Shao, managers of Alibaba's core departments, and SAIC Department of Market Regulation Director Liu Hongliang. According to the White Paper, at the meeting, one of the purposes of the meeting was to convey to Alibaba that the SAIC would accentuate and intensify strict regulations. At the meeting, further, as set out above in ¶68, the SAIC specifically told Alibaba that its unwillingness to take effective action to address operational violations had by that time "snowball[ed] into a serious problem".   The SAIC told Alibaba it would need to take immediate action. *See* ¶¶71-75, above.

168.    Moreover at the July SAIC Meeting, the SAIC specifically told Alibaba that its e-commerce platforms were guilty of a myriad of violations of PRC laws and regulations and that it faced imminent threat of thousands of financial penalties each worth 1% of daily sales amounts if the violations were not stopped.

> *The SAIC's escalating administrative actions against Alibaba's sale of counterfeit, shoddy and illegal goods could reasonably be expected to have a material impact on Alibaba's operations, and in fact Alibaba believed it would have a material impact on its operations.*

169.    The SAIC's escalation of its regulatory campaign against Alibaba's sale of counterfeit, shoddy, and illegal goods was material.

170.    Item 303 demands disclosure of known trends unless management determines

that a material effect on financial condition or results of operations is not likely to appear. The

1989 Interpretive Release provides the following test to determine if disclosure under Item

303(a) or Part I, Item 5 of Form 20-F is required:

> Where a trend, demand, commitment, event or uncertainty is known,
> management must make two assessments:
> (1) Is the known trend, demand, commitment, event or uncertainty likely to
> come to fruition? If management determines that it is not reasonably likely to
> occur, no disclosure is required. (2) If management cannot make that
> determination, it must evaluate objectively the consequences of the known
> trend, demand, commitment, event or uncertainty, on the assumption that it
> will come to fruition. Disclosure is then required unless management
> determines that a material effect on the registrant's financial condition or
> results is not reasonably likely to occur.
> 1989 Interpretive Release,  1989 WL 1092885, at *6

171.    Issuers must disclose regulatory actual or contemplated regulatory action, as

shown by an example provided by the 1989 Interpretive Release:

> Facts: A registrant has been correctly designated a PRP by the EPA with
> respect to cleanup of hazardous waste at three sites. No statutory defenses are
> available. The registrant is in the process of preliminary investigations of the
> sites to determine the nature of its potential liability and the amount of
> remedial costs necessary to clean up the sites. Other PRPs also have been
> designated, but the ability to obtain contribution is unclear, as is the extent of
> insurance coverage, if any. Management is unable to determine that a
> material effect on future financial condition or results of operations is not
> reasonably likely to occur.
>
> Based upon the facts of this hypothetical case, MD&A disclosure of the
> effects of the PRP status, quantified to the extent reasonably practicable,
> would be required. [Footnote omitted]. For MD&A purposes, aggregate
> potential cleanup costs must be considered in light of the joint and several
> liability to which a PRP is subject. Facts regarding whether insurance
> coverage may be contested, and whether and to what extent potential sources
> of contribution or indemnification constitute reliable sources of recovery may
> be factored into the determination of whether a material future effect is not
> reasonably likely to occur.
>
> *Id.* at *6.

172.    As set out above in ¶72, at the July SAIC Meeting, the SAIC threatened to impose thousands of administrative penalties on Alibaba, each fine amounting to 1% of Alibaba's daily sales amounts or GMV, or an annual penalty of more than three times annual revenues, a clearly material amount. As set out above in ¶75, Alibaba admitted at the July SAIC Meeting that the SAIC's criticisms were right on point, and its demands that Alibaba take immediate action grounded. Alibaba's exposure to penalties from its regulator was material, and it was not capable of determining that it was not reasonably likely that the regulator would do exactly what it threatened to do.  Thus, Alibaba was required to disclose the SAIC's aggressive enforcement campaign.

173.    Second, both Alibaba and the SAIC agreed that the trends were material. The Director General of the SAIC Department of Market Regulation specifically stated at the July SAIC Meeting that it was holding the meeting behind closed doors to prevent news from leaking out to investors in Alibaba's IPO. If the news had the potential to upset the IPO, then a reasonable investor would view it as having altered the total mix of information available.  And at the July SAIC Meeting, Alibaba agreed that it "believes that the greatest risk that it is currently faced with originates from three areas: counterfeits, intellectual property rights, and hyped up credibility claims."

174.    Third, as set out above in ¶¶134-139 and ¶¶242-271, Alibaba deliberately allows counterfeit goods to be sold on its site, as it draws revenues from advertisements linked to the sales. With the SAIC crackdown on sale of counterfeit goods, Alibaba would lose its lucrative niche as a marketplace for counterfeit goods, and its revenues and profits would therefore decline.

175.    When the White Paper was made public on January 28, 2015, a number of market analysts commented that the SAIC's enforcement action was likely to have a material negative affect on Alibaba's revenue.  For example, Nomura Securities issued a February 26, 2015 report stating: "As Alibaba steps up its monitoring effort with regards to the counterfeit product issue, there is likely to be certain impact on its advertising revenue."   Indeed, the release of the White Paper caused Alibaba's ADS price to immediately decrease 13% over two trading days as the news was fully absorbed by the markets.

### *Item 503 demands disclosure*

176.    Item 503 requires disclosure and discussion of, among other things, "the most significant factors that make the offering risky or speculative."

177.    In violation of Item 503, the Registration Statement omitted to disclose material facts, including:

a)  ***The SAIC crackdown***: As set out above, beginning with Red Shield 2014, the SAIC cracked down on the sale of counterfeit, shoddy, and illegal goods on ecommerce platforms. At the July SAIC Meeting, the SAIC made clear that Alibaba was one of the worst offenders. Alibaba, for its part, stated at the meeting that counterfeits and intellectual property rights were among the greatest risks it faced.

b)  ***No internal controls to ensure compliance with Chinese law***: Chinese law required that vendors who sold on Alibaba have valid business licenses. Prior to the IPO, the SAIC informed Alibaba that it was violating the law by permitting vendors to sell without a business license, or pursuant to business licenses that were obviously inauthentic, because they had a different name, address, and

residential information than on the business license uploaded to Alibaba. These business licenses must be displayed; often, the SAIC told Alibaba, they were not. The SAIC told Alibaba that its staff took bribes to favor platform participants and squeeze out competitors in activities like search ranking and homepage advertisement. The SAIC further told Alibaba that when the SAIC had provided Alibaba with the names of vendors who would be raided, Alibaba staff repeatedly informed the vendors of the raid, and they then took their stock off their shelves. (White Paper - "5., Lax management and regulation of internal staff"). In response, Alibaba admitted to the SAIC that it lacked managerial experience and was not sufficiently communicating with the SAIC. Alibaba also admitted that the problems pointed out by the SAIC and the local AICs were "right on point".

c)  ***Circumvention of its obligations***. Alibaba is notorious in business circles for setting a high bar for consumer complaints or requests that vendors be taken down. For example, companies owning some of the world's leading brands sued Alibaba in this Court, claiming that it continued to allow vendors to sell even after they are found to have sold counterfeit goods three times, automatically reject take down complaints, and designed its takedown policy to be deliberately ineffective. *Gucci America, Inc. v.  Alibaba Group Holding Ltd.*, 15-cv-3784, Dkt. # 1, ¶¶ 217, 230-231,(S.D.N.Y.) (the "*Gucci* Action"). Similarly, the American Apparel & Footwear Association (the "AAFA"), whose members contribute $361 billion in annual U.S. retail sales, represented that Taobao's violations have only worsened since it was removed from the USTR's

list of notorious marketplaces. It additionally reports that before responding to a takedown request, Alibaba frequently demands sensitive irrelevant information such as scanned copies of individual IDs or information about their business partners, demands additional unnecessary documents (e.g. affidavits regarding the use of the mark and court decisions finding the mark well known), or refuses to take down willfully confusing items if they slightly change the mark (e.g., "Guchi" for Gucci). For its part, the SAIC reproached Alibaba at the July SAIC Meeting that Alibaba set a high bar for harmed consumers to file complaints and for agencies to take enforcement actions. The SAIC further accused Alibaba of making available on its e-commerce platforms "numerous counterfeits and substandard products" and that "prohibited items sprout again every time after banning." And echoing the AAFA, the SAIC said at the July SAIC Meeting that it suspected Alibaba knowingly provided assistance to trademark infringers.

**Post-IPO Materially False and Misleading Statements**

178.    In an interview on 60 Minutes that aired on September 28, 2014, Jack Ma was asked:

> Logan: Are you happy with where you are now? Or is it still too easy to get fake products?

> Jack Ma: We are making progress.  We are the doctors that are helping to cure the cancer.  But the cancer is so aggressive.  If you kill the doctor the cancer is still there. You buy one fake product, you are angry.  But for us it's all our business

179.    Jack Ma's statements were materially misleading because, in truth, Alibaba was knowingly facilitating the sale of counterfeit products by programming its search engines to suggest the purchase of counterfeit products and by intentionally directing consumers to merchants that it knew were selling counterfeit goods.

*Additional misleading statements*

180.    On October 3, 2014, Alibaba filed a registration statement on Form S-8 to register 65,923,230 shares under its equity incentive compensation plans.  The registration statement incorporated by reference the IPO Registration Statement.

181.    Because the October 3, 2014 registration statement incorporated by reference the IPO Registration Statement, it reiterated the same misleading statements, and was misleading for the same reasons, as the IPO Registration Statement.

182.    On November 13, 2014, in connection with the proposed sale of $8.0 billion of senior unsecured notes, Alibaba filed with the SEC its financial statements.  The footnotes to the financial statements contained a section on risks and contingencies on page F-39, which stated in pertinent part:

> The PRC market in which the Company operates poses certain macro-economic and regulatory risks and uncertainties. These uncertainties extend to the ability of the Company to operate or invest in online and mobile commerce or other Internet related businesses, representing the principal services provided by the Company, in the PRC. The information and technology industries are highly regulated. Restrictions are currently in place or are unclear regarding what specific segments of these industries foreign owned enterprises, like the Company, may operate. If new or more extensive restrictions were imposed on the segments in which the Company is permitted to operate, the Company could be required to sell or cease to operate or invest in some or all of its current businesses in the PRC. [emphasis added]

183.    The above risk disclosures were incomplete and materially misleading for omitting to disclose the administrative guidance and other details of the July SAIC Meeting and the implementation of Red Shield 2014 special program, both of which were likely to have a materially negative effect on Alibaba's business prospects, revenue, income and share price.

184.    Attending China's first-ever World Internet Conference in Wuzhen City, Zhejiang province on November 19, 2014, Alibaba Group founder Jack Ma asserted that the e-

commerce giant's Taobao mall doesn't have any counterfeit goods.   According to a subsequently-published article on the conference, Ma gave a speech in which he said:

> "Those who say the platform has lot of counterfeit goods, they must have no online shopping experience on Taobao at all," Ma said.

> "How could our sales reach 6-7 billion yuan (US$1.14 billion) per day if most of the products are fake?" China's richest man asked.

> He also pointed out that buyers can tell if a product is fake just by looking at the price.
> "You may be too greedy if you want to buy a Rolex with 25 yuan," Ma said.

> Fake-goods makers are actually afraid of selling their products on Taobao because the company can easily pin down such vendors and have them arrested, he said.

185.    Defendant Ma's statement was materially misleading because Alibaba had received administrative guidance from SAIC at the July SAIC Meeting making clear that Alibaba was guilty of knowingly facilitating the sale of counterfeit goods on its e-commerce platforms and assisting illegal merchants to evade capture by tipping off counterfeiters to SAIC and other law enforcement actions.

186.    On December 23, 2014, the Company issued a press release entitled "2014 Counterfeit Report Press Conference - Speech By Jonathan Lu, CEO of Alibaba Group - Hangzhou, China, December 23, 2014." The release asserted that Alibaba was actively monitoring and deterring counterfeit sales on its platform and other fraudulent activity, stating, in pertinent part, as follows:

> Ever since the founding of Alibaba Group in 1999, it has been our mission to make it easy to do business anywhere. This ease of doing business must be facilitated by trust. We believe that trust is the basis for wealth and that trust is an important currency that makes our e-commerce platforms tick. All the work that we have done over the past 15 years underscores this belief.

> Since the establishment of Taobao in 2003, Alibaba Group has constantly fought to protect the interests of consumers in the Internet space and together

with our valued government partners, we have made great strides in addressing this issue.

However counterfeiting is a global problem and one that we need to face together as a society. From Alibaba Group's perspective, we bear a serious responsibility in this fight against counterfeits. Jack Ma said yesterday – if e-commerce does well in China, that may have little to do with Alibaba Group, but if counterfeits in society are not tackled effectively, it has a lot to do with Alibaba Group.

In our years of combating this problem, we have built cooperative relationships with various government bodies to combat counterfeiting at its source in order to safeguard the interests of consumers. We have built systems and services like Alipay that are based on trust and are there to protect the consumer because in the end, counterfeiting hurts Alibaba Group as consumers who receive fake goods may no longer want to shop on our platforms.

Thankfully, Internet technology has made it easier for transactions to be traced. This means that by analyzing transaction data we can trace counterfeiters who sell online. Through the analysis of big data, online sources of counterfeit products can be tracked offline, making it easier to enforcement authorities to do their work.

Secondly, we believe that protecting customer rights and combating counterfeits should be a long-term and persistent goal. To achieve that, support needs to come from all levels of society. Through the years, Alibaba Group has become more effective at protecting consumer rights and combating counterfeits. According to the latest data available, only 3.5 transactions in every 10,000 transactions received customer complaints, 22% decline from last year.

Effectively combating the counterfeiting issue requires the active involvement from different government agencies and authorities, as the root of the counterfeit problem is offline. By collaborating with China's Public Security Bureau, the General Administration of Quality Supervision, China's State Intellectual Property Office and State Administration of Press, Publication, Radio, Film and Television and leveraging new tools such as the Internet and big data, Alibaba hopes that these measures will be impactful in combating fakes in the real world. We hope that by exposing counterfeiters and supporting the fight in a long-term fashion, fakes can be eliminated one day.

(*Emphasis added*.)

187.    The foregoing statements were incomplete and materially misleading for failing to disclose the administrative guidance in the July SAIC Meeting, the threats of penalization from the SAIC, the SAIC's Red Shield 2014 initiative and that Alibaba was knowingly complicit in, and facilitating, the sale of counterfeit merchandise on its e-commerce platforms.

188.    On January 8, 2015, the Company issued a press release entitled "Alibaba and Microsoft Collaborate To Improve Online Customer Experience, Creating a Safer Internet." The release again claimed Alibaba was actively monitoring and deterring counterfeit sales on its platform and other fraudulent activity, stating in pertinent part as follows:

> "*Alibaba Group takes the issue of IPR infringement very seriously and we are constantly working with partners and stakeholders to enhance IPR protection on our platforms in order to tackle the problem of counterfeiting effectively,*" *said Ni Liang, Alibaba Group's Senior Director of Security Operations*.

(Emphasis added.)

189.    The foregoing statement was false and misleading.  The true facts, which were known by the Defendants, but were not disclosed to the investing public were as follows:

a. the Company was knowingly engaged in illegal business practices aiding and abetting the sale of counterfeit goods;

b. The SAIC had delivered the administrative guidance to Alibaba in the July SAIC Meeting as part of their efforts to increase enforcement of consumer protection laws in China, exposing the Company to fines, penalties and damage to reputation;

c. Alibaba was under investigation and scrutiny by the SAIC and its relationship with SAIC and other PRC regulators was at serious risk of resulting in harsh regulatory actions; and

57

> d. Alibaba's 4Q 2014 sales growth was declining and would continue to decline as a result of a crackdown on its unscrupulous business practices and the SAIC's efforts to force Alibaba to remedy its violations of law.

190.   On January 23, 2015, SAIC issued its investigative report *Results of Targeted Monitoring of E-Commerce for the Second Half of 2014*.  The report detailed the results of its investigation of Alibaba's Taobao, Tmall and several other Chinese e-commerce platforms. According to the results, samples of Taobao's e-commerce platform had the highest rate of counterfeit and non-genuine products at 62.75%.[21]

## THE TRUTH MATERIALIZES CAUSING PLAINTIFF'S LOSSES

191.   At 6:49 PM on January 27, 2015 (EST), about 36 hours before Alibaba was scheduled to report its quarterly earnings to investors, the SAIC posted on its website the White Paper.

192.   The White Paper described the events of the July SAIC Meeting, and the administrative guidance directed to Alibaba, including the violations of PRC laws and regulations that the SAIC accused Alibaba of engaging in, or facilitating.

193.   As set out above,  SAIC White Paper outlined 5 areas in which Alibaba had consistently violated PRC laws and regulations.  These specific areas with violations were:

- Unlicensed Vendors

- Sale of Counterfeit and Illegal Goods

- Illegal and fraudulent Sales Practices, including commercial bribery

- False or Flawed Evaluations of Vendors and Products

---

[21]   A copy and translation is attached as Exhibit 6 and incorporated by reference herein.

- Law Internal Controls

194.    Because the White Paper was written in Chinese, a reliable translation was not available to non-Chinese readers for at least 24 hours, because it would take at least that long for a rush translation of the White Paper to be completed, though English language summaries were available sooner.

195.    Late in the evening on January 27, 2015 and early in the morning before the opening of trading in New York on January 28, 2015, various members of the financial media reported that SAIC had released the White Paper accusing Alibaba of engaging in the illegal conduct identified to Alibaba executives in the July SAIC Meeting.

196.    The first Western media reference to the White Paper was at 9:40 p.m. on January 27, 2015 when Bloomberg News reported the following summary of it.[22]

- Document says gov't inspection found Alibaba is lax in controlling market entry process and lacks supervision on product information sold through Taobao and other Alibaba platforms
- Taobao, Alibaba and store operators misled consumers in online promotions
- Advertisement violations were found in stores on the platforms
- Taobao's credit rating system has flaws
- Taobao was found not strict in internal control
- Govt urges Alibaba not to be arrogant
- Alibaba pledges to improve management

197.    A second Bloomberg News report at 11:09 p.m. on January 27, 2015 provided additional detail:

The scathing report by the State Administration for Industry & Commerce accused Alibaba of allowing merchants to operate without required business licenses, to run unauthorized stores that co-opt famous brands and sell fake wine and handbags. Alibaba employees took bribes, and the

---

[22]    The Bloomberg news article provided a link to the Chinese language version of the article. The link was disabled when the SAIC removed the White Paper from its website at 5:00 a.m. (EST) on January 28, 2015.

e-commerce giant didn't fix flaws in customer feedback or internal credit-scoring systems, the report said.

"For a long time, Alibaba hasn't paid enough attention to the illegal operations on its platforms, and hasn't effectively addressed the issues," the report said. "Alibaba not only faces the biggest credibility crisis since its establishment, it also casts a bad influence for other Internet operators trying to operate legally."

198.   The New York Times Hong Kong Bureau reported the following at 4:00 a.m.

New York time on January 28, 2015:

> China's main corporate regulator, the State Administration for Industry and Commerce, released a report summarizing its findings of the deficiencies on Alibaba's sites, including Taobao Marketplace and Tmall.com. In a statement on its website, the regulator said that after a thorough review, it had discovered "the long-term existence of illegal problems regarding the management of transaction activity and other issues."
>
> The agency said that it had presented the findings to unidentified top Alibaba executives in a July 17 meeting at the company's headquarters in the eastern city of Hangzhou, but that it had kept the results confidential at the time so as "not to affect Alibaba's preparations for a stock market listing."

199.   Alibaba immediately fought back, releasing a statement criticizing Director General Liu of the SAIC Department of Market Regulation for "misconduct in the process of law enforcement".   At the same time, Alibaba said it would to hire 300 more people and improve its technologies to fight counterfeits on and claimed (falsely) that Alibaba itself was a victim of counterfeits, not a beneficiary.

200.   In an effort to limit the damage caused by the SAIC White Paper, Alibaba used its considerable wealth and influence to pressure the SAIC to remove the White Paper from its website.   As a result, on January 28, 2015 at approximately 5:00 a.m. (EST), the SAIC

removed the White Paper from its website.[23]   This created additional ambiguity as investors were uncertain of the authenticity of the media reports concerning the SAIC White Paper.

201.    As a result of the news concerning the SAIC White Paper, Alibaba shares opened for trading on the NYSE down $2.64/share and continued declining to a low of $97.79/share that morning – down $5.15/share.

202.    Carlos Tejada, a reporter from the *Wall Street Journal* who had reviewed the SAIC White Paper wrote an article on January 28, 2015 entitled "China Raps Alibaba for Fakes." The article states in relevant part:

> The Chinese government accused e-commerce giant Alibaba of failing to crack down on the sale of fake goods, bribery and other illegal activity on its sites in a rare public dispute with one of the country's most prominent companies.
>
> ***
>
> Alibaba has long grappled with allegations that Taobao, its biggest e-commerce platform, is rife rife with counterfeit goods. ***The accusations from the Chinese government could lend further force to those complaints and damage Alibaba's reputation among investors and brands overseas, while the highly public spat could hurt the company's relationship with the government, experts warn.***
>
> The government's accusations are in a white paper made public on Wednesday by China's State Administration for Industry and Commerce, ***but based on conversations between the agency and Alibaba officials in July.*** That was two months before Alibaba's U.S. IPO, which valued the Chinese company at more than $230 billion. ***In the paper, the agency said it held off on disclosing details of the talk so as not to affect the IPO.***
>
> ***
>
> ***The report said the problems had grown to become Alibaba's "greatest credibility crisis" since the company was established. Citing a Chinese phrase that refers to letting a small problem fester, the paper said, "for a long time,***

---

[23]   The White Paper continued to be available for some time at another website affiliated with the SAIC.

*[Alibaba] didn't pay sufficient attention to the issue and didn't adopt effective measures, causing a neglected carbuncle to become the bane of its life."*

(emphasis added)

203.    At 1:30 p.m. New York time, the South China Morning Post published an article titled: "Jack Ma to face grilling over e-commerce site" which stated in part:

> Alibaba Group executive chairman Jack Ma Yun is set to face a barrage of questions when the e-commerce giant reports quarterly earnings today, spurred by a government regulator's blistering accusation of widespread fraud and other illegal activities at the company's popular online shopping platform.
>
> A State Administration for Industry and Commerce (SAIC) white paper published yesterday by People.cn, the news website of the Communist Party mouthpiece People's Daily, alleged that Taobao Marketplace, China's largest online shopping service, sold counterfeit goods as merchants without business licenses were allowed to operate and run unauthorised stores

204.    News media reported that the White Paper hurt not only Alibaba's stock price, but it had caused the share prices of many other Chinese e-commerce companies to decline. Indeed, on January 28, 2015 all of the Chinese e-commerce stocks had suffered a noticeable decline as a result of the SAIC White Paper.

205.    Because Alibaba was scheduled to report second quarter earnings the next day, and the White Paper had been removed from the SAIC website just 12 hours after it first appeared and no reliable English translation was yet available for non-Chinese readers, investors were unsure of how to interpret the news surrounding the White Paper.

206.    Thus, many stock market participants held off on making an investment decision based on the White Paper pending the next day's quarterly conference call with Alibaba management, hoping to gain insight from Alibaba as to the true facts surrounding the July SAIC Meeting and the White Paper. Many Alibaba investors watched and waited, and did

not immediately sell off their Alibaba shares as a result of the uncertain news concerning the White Paper.

207.    As a result of the adverse news in the SAIC White Paper, Alibaba's share price closed at $98.45, down 4.4%, or $4.49 per ADS, on January 28, 2015, on unusually high volume of over 42 million shares traded.

208.    At 11:15 p.m. (EST) January 28, 2015, Chinese news media reported that several participants of the July SAIC Meeting revealed that Director General Liu had threatened to impose penalized "1,000 times, or even several thousand times a year; such as there would be a target of administrative penalties worth 1% of the daily sales amounts." if it did not get its e-commerce platforms to comply with PRC laws.[24]  Participants at the July SAIC Meeting referred to the SAIC's threatened monetary penalties as "clear-cut 'administrative guidance' for Alibaba". *Id.*

209.    Then, on January 29, 2015, before the market opened, Alibaba issued a press release announcing its financial results for the fourth quarter 2014 ended December 31, 2014. Alibaba reported mixed financial results and addressed the rumors surrounding the SAIC White Paper.

210.    In a written statement that morning, Alibaba Executive Vice-Chairman Tsai confirmed the authenticity of the White Paper and the harsh position taken by the SAIC, but attempted to downplay its significance and asserted that the SAIC had been mistaken.

211.    But investors were not reassured by Tsai's excuses:

---

[24]    Source: Xinhua News Agency, January 29, 2015 – From the Scene. A translation of the Chinese media report is attached hereto as Exhibit 7 and incorporated by herein.

a.  BMO Capital Markets lowered its price target for Alibaba shares stating, "We are lowering our price target on BABA to $110 (from $125), reflecting a lower target multiple, owing primarily to the increased uncertainty around the regulatory outlook for the company, coupled with the slower-than-expected revenue growth."

b.  An analyst at Evercore ISI also reduced his price target for Alibaba shares because of the White Paper.  "[W]hile we continue to view the fundamentals as quite attractive, the uncertainty on how the SAIC complaint gets resolved and the timing is something we must recognize in shares. As such, on roughly similar estimates, we are trimming our target to $115 from $130."[25]

c.  A Stifel Research analyst explained on January 29, 2015, "Alibaba does outline anti-counterfeit measures in its filings, but the SAIC report puts the effectiveness of these measures into question." Stifel believed that the SAIC White Paper presented a threat to Taobao's business. Stifel Research downgraded Alibaba ADSs to "Hold" as a result of the SAIC White Paper. "Following a reduction in our estimates and more importantly the incremental risk stemming from the recently released SAIC report into counterfeit goods sold through the Alibaba platform, we are lowering our rating on Alibaba shares to Hold from Buy.'"[26]

---

[25]  "Strong Volumes on Good Bottom Line: Lower Take a Negative, but a Temporary One," Ken Sena, et al., Evercore ISI, analyst report, 30 January 2015. (emphasis added).
[26]  "Stifel Downgrades Alibaba Stock, Citing Counterfeit Control Issues," by Martin Blanc, Bidness Etc., 29 January 2015.

d.  Several financial analysts predicted that the SAIC's regulatory initiatives targeting Alibaba would have the likely effect of decreasing advertising revenue on Taobao.

e.  Scott Kessler, an analyst at S&P Capital IQ, asserted that the SAIC report made investors nervous.  "The perception has been that Alibaba has had good relationships with China authorities and regulators, and the implication that those relationships are not as strong as before is a source of worry for some," Kessler said. "Does this mean that Alibaba will have to spend more money to meet the demands of regulators, are there penalties that could accrue and what impact will all this have on Alibaba's ability to operate and grow?"

f.  An analyst at Cantor Fitzgerald stated that Alibaba's mixed earnings results were "amplified by recent tensions with SAIC, which may have a negative short-term impact as well."[27]

212.  Analysts believed the SAIC White Paper indicated that Alibaba's advertising revenue would be negatively affected, that its costs of regulatory compliance would increase, hurting net income and that there existed an unquantifiable PRC political risk to Alibaba's business.

213.  As a result of the regulatory risks to Alibaba's business and the expected decrease in future revenue posed by the SAIC White Paper, along with Alibaba's failure to meet estimated revenue and income guidance for the quarter, the price of Alibaba ADS

---

[27]  "Lower Monetization Offsets Solid GMV Growth; Maintain BUY; PT Lowered to $100," Youssef Squali, et al., Cantor Fitzgerald, analyst report, 29 January 2015. p. 1. (emphasis added).

plummeted another $8.64 per ADS to close at $89.81 on January 29, 2015, a one-day decline of almost 9%, again on unusually high volume of more than 76.5 million shares traded.

214.    The BMO Capital Markets analyst directly attributed the share price decline on January 29 to the July SAIC White Paper:

> We believe the sell-off in the shares of BABA is ***largely owing to a white paper that was posted to the SAIC website***, but subsequently removed, which suggested that Alibaba has not done enough to eliminate the sale of counterfeit items on its Taobao (consumer to consumer website). The paper also suggested that the release of the finding was delayed by the government owing to the timing of the IPO. Alibaba strongly denied the allegations during its prepared remarks for the earnings call. We believe investors will react to the uncertainty by placing a lower target multiple on the shares of the stock – until, at least, we get a better understanding as to what has been alleged and how it may affect the company.
>
> Results Mixed but Growth Remains Strong, Edward S. Williams, BMO Capital Markets, analyst report, 29 January 2015. p. 3. (emphasis added).

215.    The January 28 and 29 corrective disclosures collectively reduced the price of Alibaba's ADS 13%.

216.    Commenting on the SAIC White Paper's release, one PRC news outlet reported "Stocks of Alibaba and other Chinese companies plunged as a result. In a matter of two days, Chinese companies as a sector dropped $60 billion and $33 billion in Alibaba market capitalization was wiped out."

*Market Commentators Highlighted the Importance of Disclosing the July SAIC Meeting in the Registration Statement for the IPO*

217.    Many finance experts commented that they were surprised that Alibaba had concealed the July SAIC Meeting from investors in the IPO.

66

218.    Sam Hamadeh, CEO of IPO research firm PrivCo said that "[t]he report may be the biggest crisis for Alibaba since its founding".  He likened the situation to a U.S. company concealing a Department of Justice investigation.   Hamadeh explained that "Chinese companies rely on being in one or two categories: blessed and favored by the government or not".  Hamadeh believed that disclosing the investigation would have taken the IPO in a different direction.   "There's no question the narrative would have started to change, there would have been questions at their road show. That would be true even for a U.S. company."

219.    On January 30, 2015, following the release of the SAIC White Paper, the SEC initiated a non-public investigation into whether Alibaba had violated the federal securities laws by failing to disclose the July SAIC Meeting in the Registration Statement. As part of its investigation, the SEC requested that Alibaba provide documents related to background facts and other information related to its interaction with the SAIC, and related matters.

*Alibaba's public response to the SAIC White Paper was misleading*

220.    On January 29, 2014 Defendant Tsai issued a series of false and misleading exculpatory statements attempting to diffuse investor furor over the White Paper and that Alibaba had concealed the July SAIC Meeting and the facts described in the White Paper prior to its IPO.

221.    Tsai stated that Alibaba meets from time to time with regulators in the normal course of business and suggested that the July SAIC Meeting was just another routine meeting.

222.    This statement was false because the July SAIC Meeting was an unprecedented high level meeting between the SAIC and 7 AICs and senior Alibaba management in which the SAIC and AICs delivered important administrative guidance to Alibaba and Alibaba accepted such administrative guidance.  It was not a routine meeting with regulators.

223.   Tsai stated that Alibaba did not review the SAIC White Paper until January 28, 2015.  This statement is misleading because, while Alibaba may not have *seen* the completed White Paper until January 28, 2015, senior management of Alibaba had full knowledge of the matters contained in the White Paper and knew that the SAIC and AICs would prepare a formal record of the administrative proceedings.  Alibaba knew that the July SAIC Meeting had been video-taped and recorded by the SAIC and that meeting minutes would be drafted and memorialized in a report as is standard practice when the SAIC delivers administrative guidance to a company at a formal meeting such as the July SAIC Meeting.

224.   Tsai also asserted that Alibaba never requested the SAIC to delay publication of the report until after its IPO. This was a false exculpatory statement.  SAIC administrative guidance proceedings are open to the public as a matter of PRC law.  The White Paper states that the meeting was held "behind closed doors" specifically to avoid negatively affecting the progress of Alibaba's IPO.  SAIC regulations require that administrative guidance meetings be held publicly.[28] The SAIC had nothing to gain by not adhering to PRC laws and holding the meeting behind closed doors.  It only did so for the benefit of Alibaba and its planned IPO.  And the only way that the SAIC would have believed that the July SAIC Meeting posed some danger to the Alibaba IPO is if Alibaba executives explained the potential risks that the SAIC administrative guidance might pose to the IPO.  Therefore, it is much more plausible that

---

[28]   On January 4, 2013, SAIC promulgated the "Rules Regarding Administration for Industry and Commerce Agencies' Administrative Guidance Work" (Gong Shang Fa Zi [2013] No. 3). "Article 4, Section 4 of the Administrative Guidance Work Rules provides that "unless required to be confidential under the law, administering the Administrative Guidance shall be conducted *publicly* (emphasis added)".

Alibaba requested that the SAIC hold the July SAIC Meeting behind closed doors to conceal the proceedings from public disclosure.

225.    And even if Alibaba had not formally requested that the SAIC delay publication of the White Paper until after the IPO (and Plaintiffs deny this is true), Alibaba senior executives were told at the July SAIC Meeting that it was being held "behind closed doors" and the administrative guidance would not be disclosed publicly in order to avoid negatively affecting Alibaba's IPO.

226.    Thus, Alibaba knew the SAIC was granting Alibaba a favor by not disclosing the adverse administrative guidance publicly.   Alibaba therefore decided that it would not disclose in the Registration Statement the formal administrative guidance delivered at the July SAIC Meeting because it believed (incorrectly) that the SAIC would never disclose the administrative proceedings publicly.

227.    Tsai also listed a number of different methods Alibaba took to eliminate counterfeit products from its e-commerce platforms, asserting: "These policies and procedures are tough and we work very hard to enforce them."   These statements were false exculpatory statements because Alibaba knowingly tolerated and even facilitated the sale of counterfeit products and unfair trade practices on its e-commerce platforms.

228.    On October 8, 2014, it was publicly announced that Tmall executives had tampered with data so as to fraudulently report the demand for a particular smartphone. According to Forbes article, an Alibaba programmer manually wrote code that would automatically multiply by three the actual number of reported pre-orders for the 4G Smartisan T1 smart phone  in an effort to create a false sense of demand for the product and scarcity that would spur consumers to want to order more of the smart phones right immediately.   The

practice is called "starvation marketing".  This was the type of illegal unfair trade practice that the SAIC had sanctioned Alibaba for at the July SAIC Meeting.

229.    A computer programmer who worked as an intern for the position of "frontend engineer" at Alibaba in July 2014 detailed how his superiors required him to write software that would artificially inflate the number of "likes" for specific products.[29]  He objected to his bosses, but they insisted that he follow their orders.  He then "tried for a long time to figure out how to forge data that may appear somewhat genuine to users".  He said the trick was to create the forged data in a non-random manner to make it look more believable to consumers.  This is another example of Alibaba's intentional violations of PRC consumer laws and regulations cited by the SAIC at the July SAIC Meeting.

*The SAIC backtracks after Alibaba lobbies PRC government officials*

230.    Later after Alibaba had brought to bear all of its influence on the SAIC and in particular pointed out that the White Paper had caused a decline in the value of other important Chinese e-commerce companies, an SAIC spokesperson announced that:

> On July 16, 2014, SAIC E-Commerce Regulation Department held an administrative guidance meeting with Alibaba Group in Zhejiang Province. The purpose of this event was to supervise Alibaba Group strengthen self-regulation, purify the environment of online shopping, as well as safeguard legitimate rights and interests of consumers and businesses. Based on the minutes of the meeting, the E-Commerce Regulation Department issued the White Paper on Administrative Guidance Provided to Alibaba Group on January 28, 2015. As the records are the minutes of the meeting by nature instead of a white paper, they have no judicial effect.

---

[29]   The computer programmer described his experience at Alibaba on www.Zhihu.com, a Chinese question-and-answer website where questions are created, answered, edited and organized by the community of its users.

231.    While the news report suggests that the SAIC purportedly attempted to downplay the significance of the White Paper following the strong market reaction and political pressure applied by Alibaba to soften its effect, the SAIC confirmed that the White Paper was a faithful description of the events of the July SAIC Meeting.

232.    Indeed, the SAIC's decision to withdraw the description of "White Paper" cannot diminish its high level importance and legal significance.

233.    When the Chinese term "white paper" is searched on the SAIC website, 11 results can be found as of June 25, 2015, none of which is regarding administrative guidance.

234.    The website of China Xinhua News Agency which is the official press agency of the People's Republic China provides an explanation of the White Paper: "The Encyclopedia of China (compact version) defines a "white paper" as an alternative name for the important documents or reports that are officially issued by a country's government or congress and are bound with a white cover.  … white paper or blue paper are used the most by countries in world. Particularly, a white paper has become an official governmental document widely recognized in the world. The white paper as an official governmental document represents the government's positions and stresses clear facts, definite positions, standard style and succinct wording."

## DEFENDANTS HAD A FINANCIAL MOTIVE TO COMMIT FRAUD

235.    More than $25 billion of Alibaba ADSs were sold in the IPO.  Alibaba received $10 billion of the offering proceeds.  Other early shareholders of Alibaba, including Ma and Tsai among them, received the other $15 billion.

236.    On November 13, 2014, the Company issued a press release stating that it was planning to offer Senior Unsecured Notes (the "Notes").  On November 21, 2014, the

Company announced the following pricing and sale of the Notes which would be sold to the U.S. investing public in an offering exempt from registration under the federal securities laws for a total of $8 billion net proceeds to Alibaba:

- US$300 million floating rate notes due 2017 at an issue price per note of 100.000%;

- US$1,000 million 1.625% notes due 2017, at an issue price per note of 99.889%;

- US$2,250 million 2.500% notes due 2019 at an issue price per note of 99.618%;

- US$1,500 million 3.125% notes due 2021 at an issue price per note of 99.558%;

- US$2,250 million 3.600% notes due 2024 at an issue price per note of 99.817%; and

- US$700 million 4.500% notes due 2034 at an issue price per note of 99.439%.

237.    The Notes were priced favorably to Alibaba.


**ALIBABA KNOWINGLY FACILITATED SALES OF COUNTERFEITS**

**BEFORE AND AFTER THE JULY SAIC MEETING**

238.    Alibaba provides essential support and services to its merchants.  According to the Registration Statement, "[s]ellers not only build their storefronts and product catalogues on our marketplaces; they also rely on our platform for a range of essential support services to operate their businesses.  These include Web-based and mobile interfaces to manage listings, orders and customer relationships, as well as cloud computing services for their enterprise resource planning, or ERP, and client relationship management, or CRM, systems." Registration Stmt. at 176.

239.    Alibaba also maintains enormous databases containing "transactional and user behavior data generated on [their] marketplaces" that enable Alibaba "to construct a powerful search engine that generates personal results." *Id.*, at 211.

240.    Alibaba also maintains the "industry's most comprehensive standard product unit, or SPU, database that was built on the vast amount of items listed on Taobao Marketplace and Tmall." *Id.*, at 211.   Alibaba uses this transactional and user behavior data on its marketplaces to enable Alibaba to "construct a powerful search engine that generates personalized results." *Id.*

241.    Alibaba also uses "cloud-based deep learning" to enable sellers to know what keywords or advertisements to buy in order to attract customers. *Id.*

242.    Alibaba can insert specific keywords into customers' searches in an effort to connect consumers to products the Alibaba believe consumers are searching for.   Thus, Alibaba's search engine suggests search terms and provides search results that are a reflection of the each customer's prior sales and searches on the platform.

243.    These analytics and technologies are critical to Alibaba's success compared to its competitors and enhance Alibaba's ability to drive consumers to the products they are searching for.   As such, trends based on customers' searches, browsing and purchases are closely monitored by Alibaba.

- "We use data analytics to help sellers target consumers and increase the rate of conversion from visits to transactions." *Id.*, at 173.

- "Our data analytic and data management capabilities allow us to anticipate buyer needs and tailor product offering displays, matching buyers with the most relevant merchants." *Id.,* at 175.

- "We provide sellers with data analytics that enable them to more effectively target their offerings and marketing efforts to increase the rate they convert shoppers to buyers." *Id.*, at 176.

**Alibaba Vouches For and Provides Funding to Known Counterfeiters**

244. Alibaba also closely monitored, reviewed and vouched for their top merchants. Alibaba verifies certain merchants on Alibaba.com as "Gold Suppliers."  To qualify as a "Gold Supplier," a merchant must pass the Alibaba's onsite check and pay membership fees.  Upon becoming a "Gold Supplier," the merchant can display a special "Gold Supplier" icon which communicates to consumers that Alibaba.com has investigated the merchant and confirmed that the goods sold by that merchant are legitimate and lawful.  According to the Registration Statement at 105, in 2014, revenue for Alibaba's global wholesale marketplaces—Alibaba.com—are primarily earned from the sale of Gold Supplier memberships, which allow wholesalers to host premium storefronts, with product listings on the marketplace, as well as value-added services, such as product showcase, custom clearance, value-added tax, or VAT, refund and other import/export business solutions.

245. Certain merchants are "Assessed Suppliers."  "Assessed Suppliers" are Gold Suppliers that have been inspected onsite by Alibaba through a third-party inspection company. Assessed Suppliers offer information obtained from their factory audits, assessment reports, verified videos, and verified main products.  Alibaba.com uses this designation to communicate to its e-commerce platform customers and to investors that it has investigated such merchants to confirm that goods these merchants sell are legitimate and lawful.

246.    According to the Gucci Action the offer and sale of counterfeit items on Alibaba.com by merchants vetted, inspected and approved by Alibaba were significant:[30]

247.    As of June 4-6, 2014, at least 290 sellers were offering counterfeit Gucci products on Alibaba.  These merchants included:

a)      Hangzhou Yanbei Trading Co. Ltd., a merchant listed on Alibaba.com as both a "Gold Supplier" and an "Assessed Supplier"—offered fake Gucci handbag at $2-$5 per unit with a minimum order of 2,000 units up to 50,000 units.  The retail price for the genuine handbag is $795.

b)      Gold Supplier and Assessed Supplier, Bothwiner Fashion Accessory Co. Ltd., offered for sale a fake Gucci cosmetic bag on Alibaba.com at $3.50-$11.00 a unit with a minimum order of 500 units and up to 10,000 units a month. The retail price for the genuine cosmetic bag is $380.

c)      Gold Supplier and Assessed Supplier, Guangzhou Yongxing Leather Goods Mfg., offered for sale a fake Gucci wallet on Alibaba.com for minimum order of 300 united and up to 50,000 units per month sourced by "Direct Chinese factory."

d)      Gold Supplier and Assessed Supplier, Dongguan Huawang Leather Co., Ltd. offered 46 items as "leather for Gucci bags, belts, and shoes" at wholesale quantities on Alibaba.com.

---

[30] The Gucci Action refers to the lawsuit entitled *Gucci America, Inc. et al. v. Alibaba Group Holding Ltd., et al.*, No. 15 CV 3784 (ALC) pending in this Court.  The Gucci Action alleges claims against Alibaba under the Lanham Act and RICO in connection with the sale of counterfeit goods on its e-commerce platforms. The complaint and other documents contained in the court record in the Gucci Action are incorporated by reference herein.

e) Gold Supplier and Assessed Supplier, Shen Zhen Aiers Watch Co. Ltd., offered a "replica" Gucci watch at $0-100 per piece for a minimum of 500 pieces per order, and the seller offered to supply up to 30,000 pieces per month. The authentic watch retails for $990.

f) Gold Supplier and Assessed Supplier, Shenzhen Meigeer Watch Co. Ltd., offered a fake Gucci watch at $10-$80 per piece for a minimum of 300 pieces per order and 200,000 pieces per month on Alibaba.com. The authentic watch retails for $960.

g) Gold Supplier and "onsite check" supplier Shenzhen Babylon Watch Co. Ltd., offered fake luxury watches including Gucci, for $15-28 per price, with a minimum of 500 pieces per order and up to 20,000 pieces per month. The genuine Gucci watch retails for $895.

248. Alibaba also provides loans to small and medium sized enterprises ("SME") that sell merchandise on both Alibaba's wholesale and retail marketplaces and who often have trouble accessing credit from large banks. The loan durations range from 7 to 360 days and are extended based on transactional and behavioral data from sellers used to assess creditworthiness. The loans are unsecured and merchants are required to engage in three months of activity on the Alibaba marketplaces in order to qualify. As of December 31, 2013, the SME loan business had over 342,000 borrowers and total outstanding loan balance net of doubtful accounts of $2 billion.

249. According to the Gucci Action, the merchants identified in their suit, the Gold and Assessed Vendors selling infringing products were recipients of SME loans.

250.    The findings and conclusions of Plaintiffs' counsel's independent investigation are consistent with the findings in the Gucci Action.

251.    On June 23, 2015 Plaintiffs' counsel searched 1688.com (the Chinese version of Alibaba.com), and found a number of "Verified" merchants offering fakes at wholesale quantities.  "Verified" as used on 1688.com is a level above Assessed Supplier.  A Verified supplier includes everything an Assessed Supplier plus verified photos of the enterprise's operational address, manufacturing warehouses, and manufacturing equipment.

a)      深圳市宝安区石岩尚都传奇皮具厂 [Shenzhen City Bao'an District Shiyan Shangdu Legend Leather Goods Factory], a Verified seller, is offering fake Michael Kors Selma Saffiano Leather Medium Satchels for 118 RMB /unit if 1-4 units are ordered; 110 RMB/unit if 5-29 units are ordered; or 103 RMB /unit if no less than 30 units are ordered. The retail price for the genuine satchel is 4,000 RMB.  This seller also offered a fake Jet Set Travel Leather Medium Satchel at 115 RMB /unit if 1-2 units are ordered; 108 RMB /unit if 3-19 units are ordered; or 105 RMB /unit if no less than 20 units are ordered and a Jet Set Travel Saffiano Leather Top-Zip Tote 128 RMB /unit if 1-9 units are ordered; 118 RMB /unit if 10-99 units are ordered; or 116 RMB /unit if no less than 100 units are ordered.  The retail prices for the Jet Set Travel Leather Medium Satchel and Jet Set Travel Saffiano Leather Top-Zip Tote are 3,300 RMB and 3,100 RMB respectively.

b)      广州市花都区狮岭欣鑫新皮具厂 [Guangzhou City Huadu District Shiling Xinxin New Leather Goods Factory], a Verified seller, is offering a fake Chanel Boy Bag at wholesale quantities at 50 RMB /unit if 1-9 units are ordered; 48

RMB /unit if 10-49 units are ordered; or 46 RMB /unit if no less than 50 units are ordered. The retail price for the genuine Chanel Boy Bag is at least at USD $3,800 (approximately 23,592 RMB) depending on the material.

c)  广州尚好皮具有限公司 [Guangzhou Shanghao Leather Goods Company Limited], a Verified seller, is offering a fake Dior Cannage "Lady Dior" medium bag (nickname "Princess Diana Bag") in wholesale quantities at 20 RMB/unit. The retail price for such genuine handbag is no less than USD $3,900 (approximately 24,223RMB).

d)  义乌市玛琪娜皮具有限公司 [Yiwu City Maqina Leather Goods Company Limited], a Verified seller, is offering a fake Gucci Original GG Canvas North-South Tote Bag in wholesale quantities at 49 RMB /unit if 1-3 units are ordered; 47 RMB /unit if 4-9 units are ordered; or 45 RMB /unit if no less than 10 units are ordered. The retail price for the genuine handbag is USD $480 (approximately 2,980 RMB).

e)  广州市花都区狮岭艺思皮具厂 [Guangzhou City Huadu District Shiling Yisi Leather Goods Factor], a Verified seller, is offering a fake *Hermès Birkin* handbag in wholesale quantities at 108 RMB /unit if 1-19 units are ordered; 105 RMB /unit if 20-49 units are ordered; or 100 RMB /unit if no less than 50 units are ordered. The retail price for the genuine handbag varies from USD $10,900 (approximately 67,687 RMB) to USD $150,000 (approximately 931,470 RMB) depending on the materials of the bag.

f)  庞秀惠 [PANG Xiuhui], a Verified seller, is offering in wholesale quantities at least two different fake Louis Vuitton handbags which resemble Louis Vuitton

Lockit handbag in shape and their fabric is of Louis Vuitton's classic Monogram canvas pattern.  Both fake bags are priced at 149 RMB /unit if 1-49 units are ordered; 145 RMB /unit if 50-99 units are ordered; or 143 RMB /unit if no less than 100 units are ordered. The retail price for the genuine Louis Vuitton Lockit handbag varies from USD $2,870 (approximately 17,822 RMB) to USD $3,430 (approximately 21,300 RMB) depending on the size of the bag.

g) 广州马兰欧贸易有限公司 [Guangzhou Malan'ou Trading Company Limited], a Verified seller, is offering a fake *Hermès* Birkin handbag in wholesale quantities at 200 RMB /unit if 2-9 units are ordered; 195 RMB /unit if 10-49 units are ordered; or 190 RMB /unit if no less than 50 units are ordered .  The retail price for the genuine handbag varies from USD $10,900 (approximately 67,687 RMB) to USD $150,000 (approximately 931,470 RMB) depending on the materials of the bag.

h) 博罗县园洲镇虹盛制衣厂 [Boluo County Yuanzhou Town Hongsheng Garment Manufacturing Factory], a Verified seller, is offering fake Tommy Hilfiger Polo shirts in wholesale quantities at 26 RMB /unit if 70-149 units are ordered; or 25.6 RMB /unit if no less than 150 unites are ordered. The retail price for a genuine Tommy Hilfiger Polo shirt is about USD $60-$100 (approximately 372-620 RMB) depending on the design and the material of the shirt.

i) 深圳市龙岗区伟长兴服装厂[Shenzhen City Longgang District Weichangxing Garment Manufacturing Factory], an Assessed seller, is offering fake Ralph Lauren Polo shirts in wholesale quantities at 15 RMB /unit if 1-199 units are

ordered; 14 RMB /unit if 200-999 units are ordered; or 12.5 RMB /unit if more than 1,000 units are ordered.  The retail price for a genuine Ralph Lauren Polo shirt is about USD $100 (approximately 620 RMB) depending on the design and the material of the shirt.

j)  普宁市生利发服装经营部[Puning City Shenglifa Garment Business Division], a Verified seller, is offering fake Ralph Lauren Polo shirts in wholesale quantities at 13.8 RMB /unit if 1-20 units are ordered; 12.8 RMB /unit if 21-99 units are ordered; or 11.49 RMB /unit if more than 100 units are ordered.  The retail price for a genuine Ralph Lauren Polo shirt is about USD $100 (approximately 620 RMB) depending on the design and the material of the shirt.

k)  上海熙岱工贸有限公司[Shanghai Xidai Industrial &Trading Co. Ltd.], an Assessed seller, is offering fake Christain Louboutin Louis Pik Pik shoes in wholesale quantities at 259 RMB /pair if 1-5 pairs are ordered; 239 RMB /pair if 6-11 pairs are ordered; or 229 RMB /pair if more than 12 pairs are ordered. The retail price for a pair of genuine Christain Louboutin Louis Pik Pik shoes is USD $1,495 (approximately 9,269 RMB).

l)  丹徒区高桥镇荣大裘革制品厂[Dantu District Gaoqiao Town Rongda Fur & Leather Goods Manufacturing Factory], an Assessed seller, is offering fake TOD'S Gommino Driving Shoes in wholesale quantities at 80 RMB /pair if 1-49 pairs are ordered; 78 RMB /pair if 50-99 pairs are ordered; or 75 RMB /pair if 100 pairs are ordered.  The retail price for a pair of genuine TOD'S Gommino Driving Shoes is USD $425 (approximately 2,635 RMB).

**Alibaba's Technology Intentionally Directs Consumers to Purchase Counterfeits**

252.    Alibaba has intentionally programmed their search engines to automatically suggest search terms that direct customers to obviously counterfeit products.  The counterfeit related search terms that Alibaba programs its search engines to suggest to customers are derived from the vast amount of data Alibaba continuously analyzes.  This shows that Alibaba is intentionally facilitating the offer and sale of counterfeit products on its e-commerce platforms.  Indeed the sale of counterfeit and other non-genuine goods represents at least half of Alibaba's business.

253.    The SAIC confirmed this fact in a January 23, 2015 report which, after conducting a random check of products in various product categories on Tmall and Taobao found that non-genuine products comprised 62.75% of Taobao and 14.29% of Tmall.

254.    A former senior manager of Taobao, Xi Liao admitted in an interview with Plaintiffs' investigator in June 2015, that those results obtained by the SAIC included non-genuine and sub-standard products that were not "branded" counterfeits and that "branded" counterfeit products should now comprise less than half of Taobao's business.  Indeed, in a conference call with a Nomura Securities analyst he referred to counterfeit products as one of Alibaba's two product categories.  The other being authentic branded products.

255.    On June 22, 2015 Plaintiffs' counsel conducted searches on Taobao which resulted in the search engine automatically suggesting search terms for counterfeit products.

256.    For example, Plaintiffs' counsel searched the term: "香奈儿 [Xiang Nai Er]"which translates to Chanel.  This generated a drop-down list of related words, which included "香奈儿女包高仿" which translates to Approximate Replica of Chanel women's bags.

257.   And Plaintiffs' counsel searched for the term:   "仿品[Fang Pin] " which translates to replica and a  drop-down list automatically showing related words, "仿品"( replica),  仿品牌包 (replica of branded bags),  仿品牌女包  (replica of  women's branded bags),  仿品牌鞋子 (replica of branded shoes),  仿品牌运动鞋 (replica of branded sports shoes),  仿品牌 (replica of brands),  仿品牌女装 (replica of women's branded clothing),  仿品牌t恤 (replica of branded T shirts),  仿品牌太阳镜 (replica of branded sunglasses),  仿品包 (replica bags),  仿品女装 (replica women's clothing).

258.   On June 22, 2015 Plaintiffs' counsel conducted searches on Alibaba.com for the English term "replica" and a drop-down list automatically appeared showing related words, "replica bbs wheels; replica bbs wheels in car wheels; replica alloy wheels; replica watches high quality; replica designer furniture; replica fermob luxembourg chair; replica watches luxury branded; replica hans wegner chair; replica guitar; replica coins; replica butterfly chair."

259.   "Replica" is a euphemism for "counterfeit."   On June 29, 2015 Plaintiffs' counsel conducted searched on 1688.com: We searched for "仿品牌女包"（replica of women's branded bags), and the search engine produced approximately 612 results  for counterfeit bags for sale, of which 473 results (i.e. 77.3％) were from Verified sellers.

260.   On June 29, 2015, Plaintiffs' counsel conducted searches for "铂金包 "(Birkin bag）" on 1688.com, and the search engine produced 100 pages (the maximum page allowed by 1688.com system) of search results of *Hermès* Birkin handbag with each page containing 60 products. Prices varied from 35 RMB to 4,000 RMB..   At the bottom of the first page, 1688.com specifically recommended five fake Birkin bags priced from 190 RMB to 568 RMB that appeared identical to an authentic *Hermès* Birkin handbag in appearance. Additionally, at

the bottom of each search page   1688.com had recommended more search terms to help customers refine their searches in the form of a question in Chinese. For example, on the first page, 1688.com asked "are you looking for Birkin bag true leather, Birkin bag grained in Lychee texture, crocodile Birkin bag, Birkin bag original, mini Birkin bag, Birkin bag silk scarf, birkin (in English) Birkin bag, calf Birkin bag" and also listed other merchants listing other fake Chanel Boy bag, Dior Cannage "Lady Dior" bag, Louis Vuitton classic Monogram canvas bag.

261.   Similarly, the allegations in the Gucci Action demonstrate that Alibaba's Marketplaces programmed its proprietary technology to direct consumers to purchase counterfeit goods:

a)      "Alibaba Defendants and/or their systems and algorithms were intentionally designed to cause consumers to be offered Counterfeit Products when they search for brand names…."  When the term "Gucci" was used, the search results would prominently display counterfeit products because "Alibaba Defendants intended these results because they inserted the keyword 'Gucci' into the metadata on the HTML code of web pages generated by such searches …"

b)      When the term "replica," a known euphemism for "counterfeit," was used as a search term, the word "wristwatches" was added by Alibaba to the metadata for that search. This searched caused counterfeit watches to be displayed.

c)      When the term "knockoff," was used, the word "handbags" was added by Alibaba to the metadata.

d)      Alibaba also programmed their search engines provide suggested search terms directly tied to the fake products.  For example, an Assessed Seller sold fake Gucci leather by

advertising in its listing that it sold "artificial leather" for manufacturing "Gucci" handbags. Alibaba programmed its search engine to automatically generate the keyword phrase "artificial leather" to searches for "Gucci" which then directly led customers to the Assessed Seller selling the fake Gucci leather.

e)      Alibaba also allows prospective purchasers to make a request to a merchant on Alibaba.com.  The request form contains a box to check if the purchaser wants to be notified of other sellers of the same product.  Gucci's agent contacted one merchant selling counterfeit Gucci branded packaging, on Alibaba.com, leaving the notification box checked.   Later Gucci's agent was contacted by a representative of Alibaba, an "AlisourcePro Rep, offering to pair Gucci's agent with other merchants selling mass quantities of counterfeit branded packaging.

f)      Alibaba also suggest merchants to its customers based on keywords customers have previously searched.

g)      Aliexpress.com also suggested to Gucci's agent based on their agent's prior purchase of a fake Gucci bag, that Gucci'a agent might be interested in an AliExpress merchant selling a different fake Gucci bag.

262.    Alibaba through its proprietary Alimama marketing platform directs users to counterfeit products based on the particular keywords that consumer has previously entered. Alimama also sells keywords to its merchants to direct consumer searches to their merchants' listings.   Merchants can bid on particular keywords and for every click-through, Alimama earns a fee.  According to the Gucci Action:

a)      Alimama sold Gucci marks and even keywords sounding similar to Gucci, such as "cucci" or "guchi."

b)      Search results for the term "Gucci" yielded 119,000 listings on Taobao on June 26, 2014.

c)      Search results for the term "Gucci" yelled 984 listings on Alibaba.com

d)      A significant portion of these search results are sellers who are not selling authentic Gucci products or are making other infringing uses of the Gucci mark.

263.    Similarly, on June 29, 2015, Plaintiffs' counsel conducted searches on Taobao for the term "机车包" (Motorcycle Bag, which is a very well-known name in China for Balenciaga Motorcycle Bag) and found results similar to that of these reported in the Gucci action. The search engine produced 100 pages (the maximum page allowed by Taobao system) of search results of Motorcycle Bags with each page containing 60 products. Approximately 43 fake Balenciaga Motorcycle bags (the other 17 were unrelated bags) priced from 66 RMB to 438 RMB were shown on the first five pages. An authentic Balenciaga Motorcycle bag is priced at USD 1,395 (approximately 8,862 RMB) or more, thus based upon the results returned therefrom, it is estimated looking through the first five pages of search results, it is estimated 14.3% of the 100-page results are Balenciaga counterfeits.

**Counterfeits are in Plain Sight on Taobao**

264.    Counterfeits were also readily located on Taobao.  According to the Gucci Action:

a)      Between May 16, 2014 and June 16, 2014, more than 7,000 pairs of counterfeit Gucci shoes were sold on Taobao.com.  1,342 different vendors offering counterfeit Gucci shoes were identified by Gucci in Taobao Marketplace during the same period.

85

b)      During the same period, more than 37,000 counterfeit Gucci bags were sold on Taobao.  2,731 different vendors were offering counterfeit Gucci bags.

c)      As of June 4-6, 2014, there were at least 697 sellers of Gucci products offering more than 1,400 counterfeit products.  During the same time 707 sellers of "Bottega Veneta" products of more than 4,600 counterfeit products.

265.    Plaintiffs' counsel conducted searches on Taobao on June 29, 2015, which readily located counterfeit products being offered for sale.  For example search "小香包 (Xiao Xiang Bao, a Chinese nickname for Chanel bag) yielded 100 pages (the maximum page allowed by Taobao system) of search results of Chanel bags with each page containing 60 products. Approximately 212 out of 300 (the other 88 were unrelated bags) search results on the first 5 pages were fake Chanel bags priced from 15 RMB to 1,600 RMB. An authentic classic Chanel 2.55 new flap bag is typically priced at USD $4,900 (approximately 30,420 RMB) or more. Thus based upon the results returned therefrom, it is estimated looking through the first five pages of search results, it is estimated 70.7% of the 100-page results are Chanel counterfeits.

266.    These findings are also corroborated by the findings of the SAIC in its January 23, 2015 report titled "*Results of Targeted Monitoring of E-Commerce for the Second Half of 2014 Released by SAIC.*"

**Alibaba's Lax Enforcement Designed to Create a Soft Landing**

267.    While Alibaba has made many public statements that it is doing its very best to eliminate the sale of counterfeit merchandise on its e-commerce platforms, these public statements are just window dressing to placate Western business interests and provide

"plausible deniability" that allowed Alibaba to court Western institutional investors to invest in its IPO.

268.    Alibaba does not want to eliminate all counterfeits as counterfeits is one of its two primary product categories and accounts for a large portion of its sales (at least half), which are designed to meet its customers' demand for counterfeits.  While Alibaba's peers such as ebay and Amazon typically take down infringing listing within a matter of hours, Alibaba's policies are intentionally designed to keep counterfeiters on as long as possible so that Alibaba can continue to earn lucrative fees from the merchants selling counterfeit items.  On June 16, 2014 Alibaba issued a press release announcing a "three strikes" policy on Alibaba.com and AliExpress.com for merchants selling counterfeit goods.  After the first strike, the merchant would receive a warning.  After the second strike, all product listings would be removed from the merchant's store front and all listings would be removed from search results for 7 days.  After the third strike, the merchant would be banned from the platform.

269.    The "three strike" policy is not designed to prevent the sale of counterfeit goods.  This policy allows merchants to continue to sell counterfeit products as long as they are not caught selling products that infringe on the identical trademarks on three different dates.  If a manufacturer is caught selling fake Louis Vuitton handbag one day infringing on one mark and then another Louis Vuitton handbag another day infringing on another mark, Alibaba does not consider that merchant to have earned two strikes – only one strike.  Alibaba considers one report of counterfeit offerings to be one "strike" no matter how many individual counterfeit products the merchant is offering at that time.  Stated differently, Alibaba will continue to

allow a merchant to sell counterfeit products even after receiving a report of it listing thousands of counterfeits offered for sale.

270.   In December 2013, Alibaba purportedly updated their "strategy to monitor allegedly online infringing listings" on Taobao.  This new strategy replaced a prior strategy that admittedly had a "lack of significant long lasting results" and "[d]ifficulty finding direct solutions." Alibaba Group, Updated on Taobao IP Protection, at 6.  The new strategy purports to (1) monitor on a brand and item-specific basis; (2) evaluate search results; (3) target products that can be easily found by consumers; and (4) increase costs associated with selling counterfeit goods (the "Listing Monitoring Strategy").

271.   Alibaba intentionally designed the Listing Monitoring Strategy such that it does not effectively prevent counterfeiters as demonstrated by the fact that the SAIC found that over 60% of Taobao's products are non-genuine.

272.   According the to the Gucci Action:

a)     Alibaba assists merchants in evading takedown notices and enforcement of trademark rights by delaying unreasonably in responding to complaint that are filed by a brand owner and by taking insufficient or nonresponsive steps in response.

b)     For example, by way of illustration, while complaints to other online shopping sites "usually result in listings removed in 24 hours,  it sometimes takes weeks for the [Alibaba Marketplaces] site[s] to react because the complaint often get rejected by their system automatically".

273.   The Gucci Action finding corroborate that SAIC findings in the White Paper that Alibaba would tip off vendors that the SAIC was about to execute a warrant or other enforcement action, rendering the SAIC's attempts at law enforcement ineffectual.

274.   Plaintiffs' counsel conducted searches of PRC local court records involving infringing merchants, which revealed that certain sellers, even after being convicted criminally for selling infringing products, are still selling on the Alibaba marketplaces.

a)   November 21, 2014, The Higher People's Court of Guangdong Province issued an appellate decision ((2014) Yue Gao Fa Min San Zhong Zi No. 80), affirming a lower court's decision to enjoin Appellant Tmall from tortiously harming Mr. HAO Jun, a patent owner for a portable amplifier, for continuing to host 武汉安凯欣商贸有限公司 (Wuhan Ankaixin Business and Trading Company Limited), store on Tmall.   The appellate court held that Tmall was held to a higher standard for preventing the infringing conduct once Tmall received HAO Jun's complaint. However, "due to its negligence in the management", Tmall let the infringing company change its store name   and continue to sell the infringing products afterwards despite the declaration made by Tmall that electronic products sold at Tmall were authentic and came with legitimate official receipts, three guarantees (repair, replacement or compensation of faulty products) and nationwide after sale services.

b)   On April 7, 2015 the Guangdong Province Guangzhou City Yuexiu District Court issued an criminal ruling ((2015) Sui Yue Fa Xing Chu Zi No. 480) against Mr. Chen convicting him of Selling Registered Trademark Counterfeits and sentenced   him for three year term with 4 year probation and fined him

190,000 RMB (approximately USD $ 30,613) for selling fake Calvin Klein underwear between the end of 2014 through December 17, 2014 on 1688.com under the name of 广州市永裕源针纺有限公司 (Guangzhou City Yongyuyuan Textile Company Limited).  When Mr. Chen was detained on December 17, 2014, 18,000 pieces of Calvin Klein underwear which were worth 90,000 RMB were also confiscated. According to the court decision, Mr. Chen sold 34,7305.54 RMB worth of counterfeit Calvin Klein underwear  from January 1, 2014 to December 12, 2014.  However, Guangzhou City Yongyuyuan Textile Company Limited is still actively operating on 1688.com as of June 15, 2015, selling underwear.

c)  On April 8, 2015 the Zhejiang Province Ningbo City Yinzhou District Court issued a criminal ruling ((2015) Yong Yin Zhi Xing Chu ZI No. 2) against a Taobao vendor Mr. Zhong convicting him of Selling Registered Trademark Counterfeits.  Mr. Zhong was sentenced to three year term with 51 months of months of probation and a fine of 140,000 RMB (approximately USD $ 22,557).  According to the court decision, Mr.  Zhong sold counterfeit Paul Frank (Julius the Monkey) counterfeits on Alibaba and Taobao.com through their stores named ""小公主外贸铺" (Little Princess' Foreign Product Shop)("Store A") & "小公主の外贸铺"(The Foreign Product Shop of The Little Princess" ("Store B") respectively between at least August 2013 and June 2014.  Local officials confiscated over 9,054 counterfeit Paul Frank items at Mr. Zhong's warehouse. Despite this conviction, Store A is still operating on Taobao as of June 15, 2015.  Store B is now selling counterfeit Teenie Weenie

90

items on Taobao. Plaintiffs' counsel reviewed Store B on Taobao on June 15, 2015, which revealed that one of the three items that were offered for sale were women's tights called "小熊原单"（Little Bear Original), suggesting this was an authentic "Teenie Weenie" item.

## PLAINTIFFS' CLASS ACTION ALLEGATIONS

275.    Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Alibaba ADS or call options on Alibaba ADS and sellers of Alibaba ADS put options during the Class Period (the "Class"), and were damaged thereby. Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

276.    The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Alibaba securities were actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiffs at this time and can be ascertained only through appropriate discovery, Plaintiffs believe that there are thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Alibaba or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

277.     Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

278.     Plaintiffs will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

279.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are: (a) whether the federal securities laws were violated by Defendants' acts as alleged herein; (b) whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Alibaba; (c) whether the Individual Defendants caused Alibaba to issue false and misleading financial statements during the Class Period; (d) whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements; (e) whether the prices of Alibaba ADS or options during the Class Period were artificially inflated because of the defendants' conduct complained of herein; and (f) whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

280.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

**APPLICABILITY OF PRESUMPTION OF RELIANCE:**
***AFFILIATED UTE***

281.    Defendants' statements during the Class Period were misleading for omitting to disclose information concerning the July SAIC Meeting and Red Shield which rendered statements in the Registration Statement misleading.

282.    Neither plaintiffs nor the Class (defined herein) need prove reliance – either individually or as a class – because under the circumstances of this case, which primarily are based on omissions of material fact as described above, positive proof of reliance is not a prerequisite to recovery, pursuant to the ruling of the United States Supreme Court in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 1456, 31 L. Ed. 2d 741 (1972). All that is necessary is that the facts that Alibaba withheld be material in the sense that a reasonable investor might have considered the omitted information important in deciding whether to buy or sell the subject security.

**APPLICATION OF PRESUMPTION OF RELIANCE:**
**FRAUD ON THE MARKET**

283.    Plaintiffs will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things: (a) Defendants made public statements that were rendered misleading because they failed to disclose material facts necessary to prevent such statement from being misleading during the Class Period; (b) the omissions were material; (c) Alibaba securities were traded in efficient markets during the Class Period.

284.    Alibaba's securities traded in efficient markets during the Class Period for the following reasons: (i) the securities were traded on NYSE; (ii) on average shares representing

more than 2.0% of the securities' float were traded weekly during the Class Period; (iii) Alibaba securities traded on the NYSE; (iv) More than eight analysts covered Alibaba during the Class Period; (v) Alibaba met the criteria for eligibility to file an S-3 Registration Statement during the Class Period; (vi) Alibaba timely filed all required annual, quarterly and material event reports with the SEC during the Class Period; (vii) Alibaba regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; (viii) the price of Alibaba securities responded quickly to incorporate and reflect new public information concerning Alibaba during the Class Period.

**NO SAFE HARBOR**

285.    Alibaba's verbal "Safe Harbor" warnings accompanying its oral forward-looking statements ("FLS") issued during the Class Period, and those in its IPO Registration Statement, were ineffective to insulate those statements from liability.

286.    Defendants are also liable for any false or misleading FLS pleaded because, at the time each FLS was made, the speaker knew the FLS was false or misleading and the FLS was authorized and/or approved by an executive officer of Alibaba who knew that the FLS was false. None of the historic or present tense statements made by Defendants were assumptions underlying or relating to any plan, projection or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or

forecasts made by Defendants expressly related to or stated to be dependent on those historic or present tense statements when made.

## COUNT I

### For Violations of §10(b) of the Exchange Act and Rule 10b-5
### Against All Defendants

287.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

288.    This Count is asserted against defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule l0b-5 promulgated thereunder by the SEC.

289.    During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiffs and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Alibaba securities; and (iii) cause Plaintiffs and other members of the Class to purchase Alibaba securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

290.    Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Alibaba securities. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Alibaba's finances and business prospects.

291.    By virtue of their positions at Alibaba, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiffs and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants. Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth. In addition, each defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

292.    Information showing that defendants acted knowingly or with reckless disregard or the truth is peculiarly within defendants' knowledge and control. As the senior managers and/or directors of Alibaba, the Individual Defendants had knowledge of the details of Alibaba internal affairs.

293.    The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of

Alibaba. As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Alibaba's businesses, operations, future financial condition and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market prices of Alibaba securities were artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning Alibaba's business and financial condition which were concealed by Defendants, Plaintiffs and the other members of the Class purchased Alibaba securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by defendants, and were damaged thereby.

294.    During the Class Period, Alibaba ADSs were traded on an active and efficient market. Plaintiffs and the other members of the Class, relying on the materially false and misleading statements described herein, which the defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased Alibaba securities at prices artificially inflated by Defendants' wrongful conduct. Had Plaintiffs and the other members of the Class known the truth, they would not have purchased said securities, or would not have purchased them at the inflated prices that were paid. At the time of the purchases by Plaintiffs and the Class, the true value of Alibaba securities was substantially lower than the prices paid by Plaintiffs and the other members of the Class. The market price of Alibaba securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

295.   By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

296.   As a direct and proximate result of defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

297.   This action was timely filed within two years of discovery of the misleading statements and within five years of the dates of purchase of the subject securities.

### COUNT II

### For Violations of §20(a) of the Exchange Act
### Against All Defendants

298.   Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

299.   During the Class Period, the Individual Defendants participated in the operation and management of Alibaba, and conducted and participated, directly and indirectly, in the conduct of Alibaba's business affairs. Because of their senior positions, they knew the adverse non-public information about Alibaba, and the regulatory risks and issues raised by the SAIC.

300.   As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Alibaba's financial condition and results of operations, and to correct promptly any public statements issued by Alibaba's which had become materially false or misleading.

301.    Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Alibaba disseminated in the marketplace during the Class Period concerning Alibaba's results of operations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Alibaba to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of Alibaba within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Alibaba securities.

302.    Each of the Individual Defendants, therefore, acted as a controlling person of Alibaba. By reason of their senior management positions and/or being directors of Alibaba, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, Alibaba to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of Alibaba and possessed the power to control the specific activities which comprise the primary violations about which Plaintiffs and the other members of the Class complain.

303.    By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Alibaba.

304.    This action was timely filed within two years of discovery of the misleading statements and within five years of the dates of purchase of the subject securities.

**PRAYER FOR RELIEF**

A.    Determining that the instant action may be considered a class action under Rule 23 or the Federal Rules of Civil Procedure, and certifying Plaintiffs as Class representatives;

B.      Requiring defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.      Awarding Plaintiffs and the other members of the Class prejudgment and post judgment interest; and

D.      Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiffs hereby demand a trial by jury.

Dated:  June 30, 2015

THE ROSEN LAW FIRM P.A.

/s/ Laurence Rosen
_____
Laurence Rosen
Phillip Kim
Jonathan Horne
275 Madison Avenue, 34th Floor
New York, NY 10016
Telephone: (212) 686-1060
Facsimile: (212) 202-3827
lrosen@rosenlegal.com
pkim@rosenlegal.com
jhorne@rosenlegal.com

Lead Counsel for Plaintiffs and the Class

## CERTIFICATE OF SERVICE

I hereby certify that on this, the 30th day of June, 2015, a true and correct copy of the foregoing document was served by CM/ECF to the parties registered to the Court's CM/ECF system.


/s/ Laurence Rosen

## <u>PSLRA CERTIFICATIONS</u>

Certifications of Named Plaintiffs:

Abel Amoros
Arthur Gabriel
Gang Liu
Raymond Lee

# Certification and Authorization of Named Plaintiff Pursuant to Federal Securities Laws

The individual or institution listed below (the "Plaintiff") authorizes and, upon execution of the accompanying retainer agreement by The Rosen Law Firm P.A., retains The Rosen Law Firm P.A. to file an action under the federal securities laws to recover damages and to seek other relief against Alibaba Group Holdings Limited. The Rosen Law Firm P.A. will prosecute the action on a contingent fee basis and will advance all costs and expenses. The Alibaba Group Holdings Limited. Retention Agreement provided to the Plaintiff is incorporated by reference, upon execution by The Rosen Law Firm P.A.

**First name:** Abel
**Middle initial:**
**Last name:** Amoros
**Address:**
**City:**
**State:**
**Zip:**
**Country:**
**Facsimile:**
**Phone:**
**Email:**

Plaintiff certifies that:

1. Plaintiff has reviewed the complaint and authorized its filing.

2. Plaintiff did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3. Plaintiff is willing to serve as a representative party on behalf of a class, including providing testimony at deposition and trial, if necessary.

4. Plaintiff represents and warrants that he/she/it is fully authorized to enter into and execute this certification.

5. Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

6. Plaintiff has made no transaction(s) during the Class Period in the debt or equity securities that are the subject of this action except those set forth below:

Acquisitions:

| Type of Security | Buy Date | # of Shares | Price per Share |
|---|---|---|---|
| Common Stock | 11/17/2014 | 2000 | 115.20 |

7. I have not served as a representative party on behalf of a class under the federal security laws during the last three years, except if detailed below. [ ]

I declare under penalty of perjury, under the laws of the United States, that the information entered is accurate:          **YES**

**Certification for Abel Amoros (cont.)**

By clicking on the button below, I intend to sign and execute
this agreement and retain the Rosen Law Firm, P.A. to
proceed on Plaintiff's behalf, on a contingent fee basis.        **YES**

Signed pursuant to California Civil Code Section 1633.1, et seq. - and the Uniform Electronic
Transactions Act as adopted by the various states and territories of the United States.

Date of signing: 02/19/2015

## CERTIFICATION

The individual or institution listed below (the "Plaintiff") authorizes the Rosen Law Firm, P.A. to file an action or amend a current action under the federal securities laws to recover damages and to seek other relief against the present and former officers and directors of Alibaba Group Holdings Limited ("BABA"). The Rosen Law Firm, P.A. agrees to prosecute the action on a contingent fee basis not to exceed one-third of any recovery and will advance all costs and expenses. Any legal fees and expenses will be determined by, and payable, only upon order of the U.S. District Court.

Plaintiff declares, as to the claims asserted under the federal securities laws, that:

1.      I have reviewed the complaint against BABA's current and former officers and directors and I retain the Rosen Law Firm, P.A. as counsel in this action for all purposes.

2.      I did not engage in transactions in the securities that are the subject of this action at the direction of plaintiff's counsel or in order to participate in this or any other litigation under the securities laws of the United States.

3.      I am willing to serve as a lead plaintiff either individually or as part of a group. A lead plaintiff is a representative party who acts on behalf of other class members in directing the action, and whose duties may include testifying at deposition and trial.

4.      The following is a list of all of the purchases and sales I have made in BABA securities during the class period set forth in the complaint.  I have made no transactions during the class period in the debt or equity securities that are the subject of this lawsuit except those set forth below.

| Number       of Shares Purchased or Sold | Date(s) Purchased | Price Paid Per Share | Date(s) Sold (if applicable) | Price Sold Per Share |
|---|---|---|---|---|
| see attached |  | $ |  | $ |
|  |  | $ |  | $ |
|  |  | $ |  | $ |
|  |  | $ |  | $ |
|  |  | $ |  | $ |
|  |  | $ |  | $ |
|  |  | $ |  | $ |
|  |  | $ |  | $ |
|  |  | $ |  | $ |
|  |  | $ |  | $ |
|  |  | $ |  | $ |
|  |  | $ |  | $ |
|  |  | $ |  | $ |

PLEASE FAX CERTIFICATION TO ROSEN LAW FIRM at (212) 202-3827
OR EMAIL TO INFO@ROSENLEGAL.COM OR SEND BY U.S. MAIL TO:
THE ROSEN LAW FIRM PA
275 MADISON AVENUE, 34th FLOOR
NEW YORK, NY 10016

5.    I have not, within the three years preceding the date of this certification, sought to serve or served as a representative party on behalf of a class in an action involving alleged violations of the federal securities laws, except: for the following company(ies):

6.    I will not accept any payment for serving as a representative party beyond my pro rata share of any recovery, except reasonable costs and expenses, such as travel expenses and lost wages directly related to the class representation, as ordered or approved by the court pursuant to law.

I declare under penalty of perjury that the foregoing is true and correct. Executed this **23rd** day of ___June___, 2015.

Signature: _____

Name: Arthur Gabriel

Address:

Phone:

E-mail:

Item. 4 (continue from prior page if needed)

| Number of Shares Purchased or Sold | Date(s) Purchased | Price Paid Per Share | Date(s) Sold (if applicable) | Price Sold Per Share |
|---|---|---|---|---|
|  |  | $ |  | $ |
|  |  | $ |  | $ |
|  |  | $ |  | $ |
|  |  | $ |  | $ |
|  |  | $ |  | $ |
|  |  | $ |  | $ |
|  |  | $ |  | $ |
|  |  | $ |  | $ |
|  |  | $ |  | $ |
|  |  | $ |  | $ |
|  |  | $ |  | $ |
|  |  | $ |  | $ |

PLEASE FAX CERTIFICATION TO ROSEN LAW FIRM at (212) 202-3827                              2
OR EMAIL TO INFO@ROSENLEGAL.COM OR SEND BY U.S. MAIL TO:
THE ROSEN LAW FIRM PA
275 MADISON AVENUE, 34th FLOOR
NEW YORK, NY 10016

| Purchases | | | Sales | | |
|---|---|---|---|---|---|
| Date | Qty | Price per share | Date | Qty | Price per share |
| 1/13/2015 | 200 | ($101.83) | 1/12/2015 | 289 | $101.74 |
| 1/13/2015 | 100 | ($101.83) | 1/12/2015 | 156 | $101.76 |
| 1/13/2015 | 100 | ($101.83) | 1/12/2015 | 100 | $101.76 |
| 1/13/2015 | 100 | ($101.83) | 1/12/2015 | 60 | $101.76 |
| 1/13/2015 | 100 | ($101.83) | 12/9/2014 | 1200 | $104.17 |
| 1/13/2015 | 100 | ($101.83) | | | |
| 12/23/2014 | 1200 | ($105.68) | | | |
| 11/20/2014 | 1100 | ($107.40) | | | |
| 11/20/2014 | 1100 | ($107.40) | | | |
| 11/19/2014 | 3000 | ($108.30) | | | |
| 11/19/2014 | 3000 | ($108.30) | | | |
| 11/12/2014 | 3800 | ($115.72) | | | |
| 11/11/2014 | 4000 | ($115.50) | | | |
| 11/11/2014 | 4000 | ($115.50) | | | |

# Certification and Authorization of Named Plaintiff Pursuant to Federal Securities Laws

The individual or institution listed below (the "Plaintiff") authorizes and, upon execution of the accompanying retainer agreement by The Rosen Law Firm P.A., retains The Rosen Law Firm P.A. to file an action under the federal securities laws to recover damages and to seek other relief against Alibaba Group Holdings Limited. The Rosen Law Firm P.A. will prosecute the action on a contingent fee basis and will advance all costs and expenses. The Alibaba Group Holdings Limited. Retention Agreement provided to the Plaintiff is incorporated by reference, upon execution by The Rosen Law Firm P.A.

**First name:** Raymond
**Middle initial:**
**Last name:** Lee
**Address:**
**City:**
**State:**
**Zip:**
**Country:**
**Facsimile:**
**Phone:**
**Email:**



Plaintiff certifies that:

1. Plaintiff has reviewed the complaint and authorized its filing.

2. Plaintiff did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3. Plaintiff is willing to serve as a representative party on behalf of a class, including providing testimony at deposition and trial, if necessary.

4. Plaintiff represents and warrants that he/she/it is fully authorized to enter into and execute this certification.

5. Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

6. Plaintiff has made no transaction(s) during the Class Period in the debt or equity securities that are the subject of this action except those set forth below:

Acquisitions:

| Type of Security | Buy Date | # of Shares | Price per Share |
|---|---|---|---|
| Common Stock | 10 November 2014 | 1000 | 117.28 |
| Common Stock | 10 November 2014 | 1000 | 117.29 |
| Common Stock | 10 November 2014 | 2000 | 117.28 |
| Common Stock | 10 November 2014 | 2000 | 117.29 |
| Common Stock | 10 November 2014 | 2000 | 117.29 |
| Common Stock | 10 November 2014 | 2000 | 116.28 |
| Common Stock | 10 November 2014 | 2000 | 117.28 |
| Common Stock | 10 November 2014 | 1000 | 116.28 |
| Common Stock | 14 November 2014 | 5000 | 114.00 |
| Common Stock | 14 November 2014 | 2000 | 114.00 |
| Common Stock | 14 November 2014 | 1000 | 114.00 |

**Certification for Raymond Lee (cont.)**

| | | |
|---|---|---|
| Common Stock20 November 20141000 | 111.55 | |
| Common Stock14 November 20142000 | 114.00 | |
| Common Stock11 November 20142000 | 115.80 | |
| Common Stock10 November 20141000 | 116.28 | |
| Common Stock10 November 20142000 | 116.20 | |
| Common Stock20 November 20141000 | 111.55 | |
| Common Stock26 November 20142000 | 112.90 | |
| Common Stock28 November 20141000 | 112.30 | |
| Common Stock01 December 20141000 | 106.60 | |

Sales:

| Type of Security | Sale Date | # of Shares | Price per Share |
|---|---|---|---|
| Common Stock6 March 2015 | 1000 | 85.30 | |
| Common Stock6 March 2015 | 1000 | 85.70 | |
| Common Stock6 March 2015 | 2000 | 85.20 | |
| Common Stock6 March 2015 | 2000 | 84.90 | |
| Common Stock6 March 2015 | 2000 | 84.80 | |
| Common Stock9 March 2015 | 2000 | 83.00 | |
| Common Stock9 March 2015 | 2000 | 83.00 | |
| Common Stock9 March 2015 | 1000 | 83.00 | |
| Common Stock9 March 2015 | 5000 | 83.20 | |
| Common Stock9 March 2015 | 2000 | 83.41 | |
| Common Stock9 March 2015 | 1000 | 83.55 | |
| Common Stock9 March 2015 | 1000 | 83.55 | |
| Common Stock9 March 2015 | 2000 | 83.30 | |
| Common Stock9 March 2015 | 2000 | 83.10 | |
| Common Stock9 March 2015 | 1000 | 83.10 | |
| Common Stock9 March 2015 | 2000 | 83.10 | |

7.  I have not served as a representative party on behalf of a class under the federal security laws
    during the last three years, except if detailed below. [ ]

I declare under penalty of perjury, under the laws of the
United States, that the information entered is accurate:          **YES**

By clicking on the button below, I intend to sign and execute
this agreement and retain the Rosen Law Firm, P.A. to
proceed on Plaintiff's behalf, on a contingent fee basis.          **YES**

Signed pursuant to California Civil Code Section 1633.1, et seq. - and the Uniform Electronic
Transactions Act as adopted by the various states and territories of the United States.

Date of signing: 03/11/2015

## CERTIFICATION OF NAMED PLAINTIFF
## PURSUANT TO FEDERAL SECURITIES LAWS

I, Gang Liu, duly certify and say, as to the claims asserted under the federal securities laws, that:

1.    I have reviewed a complaint filed in this action.

2.    I did not purchase the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action.

3.    I am willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.    My transaction(s) in Alibaba Group Holding Limited securities which are the subject of this litigation during the class period (are) set forth in the chart attached hereto.

5.    Within the last 3 years, I have not sought to serve nor have I served as a class representative in any federal securities fraud case.

6.    I will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except as ordered or approved by the court, including any award for reasonable costs and expenses (including lost wages) directly relating to the representation of the class.

I hereby certify, under penalty of perjury under the laws of the United States of America, that the foregoing is true and correct. Executed this $16$ day of March 2015.

_____

GANG LIU