**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| CHRISTINE ASIA CO., LTD., et al., | No.: 1:15-md-02631-CM |
| Plaintiffs, | Related cases: |
| v. | 1:15-cv-00759-CM<br>1:15-cv-00811-CM |
| | 1:15-cv-00991-CM |
| ALIBABA GROUP HOLDING LIMITED, et al., | 1:15-cv-01405-CM |
| | 1:15-cv-05020-CM |
| Defendants. | 1:15-cv-04991-CM |
| | 1:15-cv-05002-CM |

**MEMORANDUM OF LAW IN SUPPORT OF**
**DEFENDANTS' MOTION TO DISMISS**
**PLAINTIFFS' CONSOLIDATED CLASS ACTION COMPLAINT**

Jonathan K. Youngwood
jyoungwood@stblaw.com
425 Lexington Avenue
New York, New York  10017
Telephone: (212) 455-3539
Facsimile:  (212) 455-2502

James G. Kreissman
jkreissman@stblaw.com
Simona G. Strauss
sstrauss@stblaw.com
Stephen P. Blake
sblake@stblaw.com
2475 Hanover Street
Palo Alto, California  94304
Telephone: (650) 251-5000
Facsimile: (650) 251-5002

*Counsel for Defendants Alibaba Group Holding Limited, Jack Yun Ma, Joseph C. Tsai, Jonathan Zhaoxi Lu, and Maggie Wei Wu*

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................ 1

FACTUAL BACKGROUND .................................................................................. 3

ARGUMENT ....................................................................................................... 11

I.    Plaintiffs Fail To State A Claim Under Section 10(b) ............................... 12

    A.    Plaintiffs Fail to State a Claim Based on the July 16 Meeting Allegations ...................................................................................13

        1.    Plaintiffs allege no material omissions related to the July 16 Meeting .........................................................................13

        2.    Plaintiffs fail to allege a false statement related to the July 16 Meeting ...........................................................20

        3.    Plaintiffs fail to plead facts giving rise to a strong inference of scienter ............................................................22

            (a)    Plaintiffs fail to allege scienter by motive and opportunity ...........................................................22

            (b)    Plaintiffs fail to allege conscious misbehavior or recklessness ..........................................................24

    B.    Plaintiffs Fail to State a Claim Based on the Red Shield Allegations ............26

        1.    Failure to disclose Red Shield was not a material omission ...............26

        2.    Failure to allege duty to disclose Red Shield .......................................27

        3.    Plaintiffs fail to plead loss causation based on the Red Shield Program ...........................................................29

        4.    Plaintiffs fail to plead facts giving rise to a strong inference of scienter ...........................................................30

    C.    Plaintiffs Fail to State a Claim Based on Alibaba Allegedly Receiving Material Revenue from or Facilitating the Sale of Non-Genuine Merchandise ...................................................................30

        1.    Plaintiffs fail to plead loss causation ...................................................31

        2.    Plaintiffs fail to allege a material omission because they do not adequately plead the truth of the omitted information ........................32

        3.    Plaintiffs fail to allege any materially false statements .......................38

        4.    Plaintiffs fail to allege facts giving rise to a strong inference of scienter ...........................................................39

II.     Plaintiffs Fail To State A Claim Under Section 20(a) ................................................. 40

CONCLUSION ......................................................................................................................... 40

## <u>TABLE OF AUTHORITIES</u>

**Federal Cases**

*Abuhamdan v. Blyth, Inc.*,
    9 F. Supp. 3d 175 (D. Conn. 2014) ................................................................................ 34, 35

*Acito v. IMCERA Grp. Inc.*,
    47 F.3d 47 (2d Cir. 1995) ..................................................................... 15, 19, 20, 26

*Amorosa v. AOL Time Warner Inc.*,
    409 F. App'x 412 (2d Cir. 2011) .................................................................................. 30

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ......................................................................................................... 11

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) ......................................................................................................... 11

*Blackmoss Invs. Inc. v. ACA Capital Holdings Inc.*,
    No. 07 Civ. 10528, 2010 WL 148617 (S.D.N.Y. Jan. 14, 2010) ............................... 18

*Boguslavsky v. Kaplan*,
    159 F.3d 715 (2d Cir. 1998) ........................................................................................ 40

*Campo v. Sears Holdings*,
    635 F. Supp. 2d 323 (S.D.N.Y. 2009) ................................................................. 12, 33, 35

*CP Solutions Pte v. General Elec.*,
    470 F. Supp. 2d 151 (D. Conn. 2007) ......................................................................... 12

*ECA & Local 134 IBEW Joint Pension Trust of Chi. v. JP Morgan Chase Co.*,
    553 F.3d 187 (2d Cir. 2009) ........................................................................................ 22

*Garber v. Legg Mason, Inc.*,
    537 F. Supp. 2d 597 (S.D.N.Y. 2008), *aff'd*, 347 F. App'x 665
    (2d Cir. 2009) .......................................................................................................... passim

*Geiger v. Solomon-Page Grp.*,
    933 F. Supp. 1180 (S.D.N.Y. 1996) ............................................................................ 24

*In re AIG Advisor Grp. Sec. Litig.*,
    No. 06-cv-1625, 2007 WL 2750676 (E.D.N.Y. Sept. 20, 2007) ............................... 35

*In re AOL, Inc. Repurchase Offer Litig.*,
    966 F. Supp. 2d 307 (S.D.N.Y. 2013) ......................................................................... 14

*In re AXIS Capital Holdings Ltd. Sec. Litig.*,
    456 F. Supp. 2d 576 (S.D.N.Y. 2006) ......................................................................... 38

*In re Bank of Am. AIG Disclosure Sec. Litig.*,
   980 F. Supp. 2d 564 (S.D.N.Y. 2013), *aff'd*, 566 F. App'x 93 (2d Cir. 2014)................. 18, 26

*In re BISYS Sec. Litig.*,
   397 F. Supp. 2d 430 (S.D.N.Y. 2005) .................................................................... 23

*In re Canandaigua Sec. Litig.*,
   944 F. Supp. 1202 (S.D.N.Y. 1996) ................................................................. 15, 29

*In re Genzyme Corp.*,
   No. 09-11267-GAO, 2012 WL 1076124 (D. Mass. Mar. 30, 2012) ...................................... 19

*In re J.P. Jeanneret Assocs.*,
   769 F. Supp. 2d 340 (S.D.N.Y. 2011) .................................................................... 40

*In re Lululemon Sec. Litig.*,
   14 F. Supp. 3d 553 (S.D.N.Y. 2014) ................................................................. 25, 39

*In re Merrill Lynch Research Reports Sec. Litig.*,
   218 F.R.D. 76 (S.D.N.Y. 2003) ........................................................................... 34

*In re Omnicom Grp. Sec. Litig.*,
   597 F.3d 501 (2d Cir. 2010) ......................................................................... 29, 30

*In re Optionable Sec. Litig.*,
   577 F. Supp. 2d 681 (S.D.N.Y. 2008) ............................................................... 27, 38

*In re Rhodia Sec. Litig.*,
   531 F. Supp. 2d 527 (S.D.N.Y. 2007) .................................................................... 30

*In re Sanofi Sec. Litig. v. Meeker*,
   No. 13 Civ. 8806, 2015 WL 365702 (S.D.N.Y. Jan. 28, 2015)........................................19-20

*In re Scholastic Corp. Sec. Litig.*,
   252 F.3d 63 (2d Cir. 2001) ................................................................................ 23

*In re Take-Two Interactive Sec. Litig.*,
   551 F. Supp. 2d 247 (S.D.N.Y. 2008) ............................................................... 23, 24

*In re Top Tankers Inc. Sec. Litig.*,
   528 F. Supp. 2d 408 (S.D.N.Y. 2007) .................................................................... 18

*In re UBS AG Sec. Litig.*,
   No. 07 Civ. 11225(RJS), 2012 WL 4471265 (S.D.N.Y. Sept. 28, 2012),
   *aff'd sub nom. City of Pontiac Policemen's & Firemen's Ret. Sys. v.*
   *UBS AG*, 752 F.3d 173 (2d Cir. 2014)................................................................... 37

*Ironworkers Local 580 v. Linn Energy, LLC,*
   29 F. Supp. 3d 400 (S.D.N.Y. 2014) .................................................................... 21

*Johnson v. Sequans Commc'ns S.A.,*
   No. 11 Civ. 6341, 2013 WL 214297 (S.D.N.Y. Jan. 17, 2013)................................. 24

*Kalnit v. Eichler,*
   264 F.3d 131 (2d Cir. 2001) ............................................................................... 22, 24

*Kinsey v. Cendant Corp.,*
   No. 04 Civ. 0582, 2004 WL 2591946 (S.D.N.Y. Nov. 16, 2004) ........................... 25

*Koplyay v. Cirrus Logic Inc.,*
   No. 13 Civ. 0790, 2013 WL 6233908 (S.D.N.Y. Dec. 2, 2013)................................ 23

*Lentell v. Merrill Lynch & Co.,*
   396 F.3d 161 (2d Cir. 2005) ............................................................................... 12, 29

*McKenna v. Smart Techs. Inc.,*
   No. 11 Civ. 7673, 2012 WL 1131935 (S.D.N.Y. Apr. 3, 2012)................................ 33

*Medcalf v. Thompson Hine,*
   No. 13 CIV 7609 ER, 2015 WL 463809 (S.D.N.Y. Feb. 4, 2015)............................ 12

*Milano v. Perot Sys. Corp.,*
   No. 3:02-CV-1269-D, 2006 WL 929325 (N.D. Tex. Mar. 31, 2006) ....................... 19

*Mitchell v. Home,*
   377 F. Supp. 2d 361 (S.D.N.Y. 2005) .................................................................... 12

*Oughtred v. E*Trade Fin. Corp.,*
   No. 08 Civ. 3295(SHS), 2011 WL 1210198 (S.D.N.Y. Mar. 31, 2011) ............. 24, 25

*Plumbers, Pipefitters & Mes Local Union 392 Pension Fund v.*
   *Fairfax Fin. Holdings Ltd.,* 886 F. Supp. 2d 328 (S.D.N.Y. 2012)....................31-32

*Richman v. Goldman Sachs,*
   868 F. Supp. 2d 261 (S.D.N.Y. 2012) .............................................................. 20, 25

*Robbins v. Moore Medical Corp.,*
   894 F. Supp. 661 (S.D.N.Y. 1995) ........................................................................ 19

*S.E.C. v. BankAtlantic Bancorp, Inc.,*
   285 F.R.D. 661 (S.D. Fla. 2012).............................................................................. 18

*San Leandro Emergency Med. Grp. Plan v. Philip Morris Cos.,*
   75 F.3d 801 (2d Cir. 1996) .............................................................................20, 23-24

*Scott v. Gen. Motors Co.* ,
   46 F. Supp. 3d 387 (S.D.N.Y. 2014), *aff'd*, No. 14-3770-cv,
   2015 WL 3405373 (2d Cir. May 28, 2015) ........................................................... 32

*Steinberg v. Ericsson LM Tel.*,
   No. 07 CV. 9615, 2008 WL 5170640 (S.D.N.Y. Dec. 10, 2008) ............................ 12

*Tellabs v. Makor Issues & Rights, Ltd.*,
   551 U.S. 308 (2007) ......................................................................................... 22, 25

*Thesling v. Bioenvision, Inc.*,
   374 F. App'x 141 (2d Cir. 2010) ........................................................................... 13

*TSC Indus. v. Northway*,
   426 U.S. 438 (1976) .............................................................................................. 20

*Vigil v. Gen. Nutrition Corp.*,
   No. 15-cv-0079, 2015 WL 2338982 (S.D. Cal. May 13, 2015) ............................. 34

*White v. H&R Block*,
   No. 02 Civ. 8965, 2004 WL 1698628 (S.D.N.Y. July 28, 2004) ........................... 26

**Federal Statutes**

15 U.S.C. § 78u-4(b)(1)(B) ............................................................................... 12, 27

15 U.S.C. § 78u-4(b)(2)(A) ............................................................................... 12, 22

17 C.F.R. § 229.503 ........................................................................................... 18-19

Fed. R. Civ. P. 9(b) ........................................................................................... 11-12

Fed. R. Civ. P. 12(b)(6) .......................................................................................... 11

## PRELIMINARY STATEMENT

Alibaba Group Holding Limited ("Alibaba") is the world's largest e-commerce company.

Among other businesses, Alibaba hosts e-commerce platforms where third parties buy and sell

goods.  Lead Plaintiffs Christine Asia Co. Ltd and William Tai ("Plaintiffs) allege that Alibaba

and four of its officers defrauded investors by failing to disclose the following:

- during a July 16, 2014 administrative guidance meeting (months before its IPO), Chinese regulators expressed concern about possible legal violations on certain Alibaba e-commerce platforms and threatened Alibaba with significant penalties if it did not take steps to address the identified issues (the "July 16 Meeting");

- from June to November 2014, Alibaba's regulators were engaged in an initiative to eliminate the sale of counterfeit and certain other goods on e-commerce platforms (the "Red Shield Program"); and

- because a material portion of Alibaba's revenue was allegedly derived from third-party merchants' sales of counterfeit goods on its platforms (which sales Alibaba allegedly facilitated), Alibaba was "bound to" suffer a material decline in its financial performance because it would either (i) lose revenues derived indirectly from counterfeit sales or (ii) be fined for failing to take the necessary steps to combat the counterfeiting.

Plaintiffs' claims fail for a litany of reasons.

**No Materially False or Misleading Statement**:  Alibaba's Registration Statement, filed

in its IPO, provided more than sufficient disclosure to investors about the fact that the Company

(i) was subject to a variety of Chinese laws and regulations, including new laws passed shortly

before its IPO, (ii) expected regulatory scrutiny of e-commerce in China to increase, (iii) had

been and would likely continue to be subject to allegations of civil and criminal liability related

to the sale of counterfeit goods on its platforms, and (iv) had been subject to PRC regulatory

inquiries regarding these issues.  Notwithstanding these disclosures, Plaintiffs allege that the Red

Shield Program and the July 16 Meeting were so significant to the Company that they merited

explicit disclosure.  Plaintiffs' own allegations contradict that conclusion:

1

- the Red Shield Program, which was an initiative to enforce laws already in existence, was publicly disclosed and widely reported prior to Alibaba's IPO;

- the July 16 Meeting was a voluntary meeting in which Alibaba's regulators provided Alibaba with informal guidance;

- regulators cannot levy penalties if administrative guidance is accepted;

- Alibaba accepted the SAIC's administrative guidance; and

- Alibaba has been neither fined nor otherwise penalized with respect to the matters raised at the meeting in the ensuing 12 months.

As such, Plaintiffs cannot allege that Alibaba failed to disclose material information.

Plaintiffs also fail to plead *facts* suggesting that a material portion of Alibaba's revenue was derived from third-party sales of counterfeit goods.  Without such a well-pleaded allegation, Plaintiffs' dependent claim that Alibaba was bound to suffer financial harm similarly fails. Moreover, because Alibaba has grown and prospered since its IPO, Plaintiffs' claim is even weaker than an impermissible fraud-by-hindsight pleading; here, hindsight demonstrates the *absence* of either the material penalties or the financial impacts Plaintiffs claim were inevitable.

**No Scienter**:  Plaintiffs also fail to allege particularized facts giving rise to a strong inference that any Defendant acted with scienter.  First, Plaintiffs cannot plead "motive and opportunity" based on (i) a corporate interest in having a successful equity or bond offering, or (ii) sales by two of the four individual defendants, neither of which sales are alleged to be "unusual."  Second, Plaintiffs fail to plead any facts giving rise to a strong inference that any of the defendants was aware of any misrepresentation or omission or was in any way reckless in failing to have such awareness.  The far more compelling inference to be drawn is that the allegedly "concealed" information was not disclosed because it was either not so dramatic and important as to trigger a need for more specific disclosure (*e.g.*, the Red Shield Program and July 16 Meeting) or because it was not even true (*e.g.*, that a material portion of Alibaba's revenues

2

relate to third-party sales of counterfeit goods).

**No Loss Causation**:  Finally, Plaintiffs fail to plead loss causation for the majority of their allegations.  Plaintiffs' claimed "corrective disclosure" was the January 2015 publication of minutes from the July 16 Meeting.  That document, however, says nothing about the (public) Red Shield Program.  Nor does it state that Alibaba derived a material portion of its revenue from third-party sales of counterfeit merchandise, let alone that Alibaba would inevitably suffer material revenue loss if such sales were curtailed or pay significant fines if they were not.

## FACTUAL BACKGROUND[1]

**The Company**:  Alibaba operates online marketplaces, including Taobao, Tmall, Alibaba.com, AliExpress, 1688.com, and Juhuasuan, that allow third parties to sell directly to customers.  Compl. ¶¶ 35-36.  Alibaba does "not sell directly to customers and [does] not compete against the [third-party] merchants on [its] marketplaces."  Registration Statement ("RS," Youngwood Ex. V) at 172; *see also* Compl. ¶¶ 35-36.  From June 2013 to June 2014, Taobao, Tmall, and Juhuasuan alone connected 8.5 million active sellers with 279 million active buyers, resulting in 14.5 billion orders totaling RMB1,833 billion (US$296 billion).  RS at 1.  Alibaba trades on the New York Stock Exchange and is widely covered by analysts and the media.  Compl. ¶¶ 27, 284.

**Risk of Sales of Counterfeit Goods**:  Alibaba, like all operators of online marketplaces, faces the risk that third-party merchants will sell counterfeit goods on its platforms.  RS at 37-38.  Indeed, since its inception, Alibaba has been criticized for counterfeit sales on its marketplaces.  *See, e.g.*, Compl. ¶¶ 41-44.  As Alibaba disclosed, both Alibaba.com and Taobao were named as "notorious markets" by the U.S. Trade Representative from 2008-2011.  *Id.*; RS at 38.  The sale

---

[1] The Factual Background is based on Plaintiffs' complaint and exhibits, documents incorporated by reference, and information subject to judicial notice.  None of the facts is admitted to be true.

of counterfeit goods on Alibaba platforms, and its impact on Alibaba, has also been widely

covered by the media.  *See* Youngwood Exs. A-D (select news coverage of counterfeit issues).

In July 2014, shortly before Alibaba's IPO, a number of luxury brands in the Kering

Group, including Gucci, filed a widely publicized lawsuit against Alibaba, citing the presence of

counterfeit goods on Alibaba's marketplaces and accusing Alibaba of facilitating those sales (the

"2014 *Gucci* Action").  *See id*. Ex. E (2014 *Gucci* complaint); *id*. Exs. C-D (news coverage).[2]

Alibaba has acknowledged that third-party sales of counterfeit goods in its marketplaces

pose a significant challenge, *see*, *e.g.*, Compl. ¶ 178 (Defendant Ma referring to counterfeits as a

"cancer"); *id*. ¶ 186, and has made detailed disclosures (discussed below) to investors concerning

its efforts to fight counterfeit sales and associated risks.

**Regulation of E-commerce in China**:  Alibaba's Registration Statement disclosed that

its "online and mobile commerce" businesses are "highly regulated" in China, RS at 39, and that

regulations were still "develop[ing]."  *Id*. at 218.  Between 2010 and 2013, the online shopping

market in China quadrupled (*id.* at 169), and in 2014, Chinese regulators promulgated new e-

commerce laws and regulations with provisions applicable to online platform operators like

Alibaba.  *Id*. at 218, 220-21.  The "Administrative Measures for Online Trading" (the

"Administrative Measures," also termed "Regulations of Electronic Commerce" by Plaintiffs,

Compl. Ex 1 at 12, 13) and the amended "PRC Consumer Rights and Interests Protection Law"

went into effect on March 15, 2014 (collectively the "2014 Laws").  *See* Compl. ¶¶ 147, 149; *see*

*also* Youngwood Exs. F-G.  Alibaba's IPO disclosures describe these laws and highlight that

they "impose more stringent requirements and obligations" on Alibaba.  RS at 218, 220-21.

---

[2] The 2014 *Gucci* Action was voluntarily dismissed and then refiled in May 2015 (the "2015
*Gucci* Action").  Plaintiffs cite extensively to the 2015 *Gucci* Action complaint, *see, e.g.*, Compl.
¶¶ 177(c), 246-49, but ignore the existence of, and coverage regarding, the 2014 *Gucci* Action.

As these new laws went into effect, China's State Administration for Industry and Commerce ("SAIC"), one of Alibaba's regulators and the agency that promulgated the 2014 Laws, continued (i) engaging with regulated e-commerce companies such as "Alibaba and its competitors such as Tencent and Baidu," Compl. ¶ 58, (ii) enforcement activities against "online sales of fake and shoddy goods," *id*. ¶ 163, and (iii) the reporting of data obtained through e-commerce market surveys.  *Id*. ¶ 190; *see also* Youngwood Ex. H (annual SAIC priorities).

Plaintiffs focus on one aspect of the SAIC's activities, the 2014 Red Shield Program. Compl. ¶¶ 57-62, 163-65.  The Red Shield Program was publicly announced by the SAIC on June 12, 2014, *id*. ¶¶ 58, 163—over three months before Alibaba's IPO, and was widely covered in the Chinese media.  *See, e.g.*, Youngwood Exs. I-K.  Notably, the Red Shield Program did not impose any new obligations on e-commerce companies or constitute a new law or regulation.  As Plaintiffs allege, this initiative sought "the cooperation of the platform operators like Alibaba," Compl. ¶ 165, to assist in enforcement against third-party sellers as part of a "special program" to enforce existing law.  *Id*. ¶¶ 57-59; *see also* Youngwood Ex. I (Red Shield Notice).  The program ran from "July to November 2014," Compl. ¶ 163, with a final report to be published in December 2014.  *Id*. ¶ 62.  Plaintiffs do not allege that Alibaba was investigated, fined or penalized as part of this initiative, or that a final report critical of Alibaba was ever issued.

Plaintiffs also focus heavily on the SAIC's informal interaction with its regulated companies through "administrative guidance."  *Id*. ¶¶ 76-90, Exs. 2-3.  Administrative guidance is "voluntar[y]" and "non-compulsory," Compl. ¶¶ 6, 79, 88; *i.e.*, "[n]o compulsory measures . . . are allowed to force [acceptance of , and] . . . [n]o administrative penalty shall be aggravated [for] refus[al] to accept the administrative guidance."  Compl. Ex. 3 at 14.  Moreover, as Plaintiffs acknowledge, "where objectives of administrative regulation can be achieved by non-

compulsory measures, . . . compulsory measures shall not be established."  Compl. ¶ 89.  The SAIC and its local AICs provide guidance as a means of "advising, tutoring, reminding, [and] admonishing" a company to "conduct its business in compliance with law."  *Id*. Ex. 3 at 14, 18; Compl. ¶¶ 79-80.  As such, administrative guidance differs significantly from compulsory procedures, such as those that could be applied to impose "administrative penalties" under PRC law.  *See* Compl. ¶ 89 (citing PRC "Administrative Compulsory Law" (Youngwood Ex. L) and PRC "Administrative Penalty Law," cited therein (*id*. Ex. M)).

Administrative guidance proceedings are a ubiquitous feature of the Chinese regulatory landscape.  Indeed, "AICs conducted more than 10,000 administrative guidance [proceedings] in 2014."  Youngwood Ex. N.  Through administrative guidance, the SAIC and its local affiliates "guide[] administrative counterparts to act or refrain from acting by non-compulsory means within the purview of [AICs'] powers and authority."  Compl. Ex. 2 at 9.  Such guidance imposes no new legal obligations, but rather must be "within the scope of [the SAIC's] statutory power and shall not exceed the scope of its statutory power."  *Id*. at 13.

**July 16, 2014 SAIC Administrative Guidance Meeting**:  On July 16, 2014, two months before Alibaba's IPO, certain Alibaba executives and managers met with representatives from the SAIC and certain local AICs for an administrative guidance meeting.  Compl. ¶¶ 7, 63-64.  None of the Individual Defendants is alleged to have attended this meeting.  Although Plaintiffs characterize the July 16 Meeting as "unusual and unprecedented," *id*. ¶ 5, they do not allege how frequently the SAIC conducted administrative guidance meetings with Alibaba, either before or after its IPO.  They also do not allege how many participants, and of what seniorities, are typically present at such meetings, from either the SAIC or Alibaba.  Similarly, while Plaintiffs allege that there were "multiple steps" taken by the SAIC before, at and after the July 16

Meeting, *id*. ¶ 94, they do not allege what steps are typically taken for such meetings.

During the July 16 Meeting, the SAIC allegedly raised concerns about a variety of business practices and potential violations of PRC law on Alibaba's Taobao and Tmall platforms. *Id*. ¶ 64. The five topics it highlighted were: (i) unlicensed vendors, (ii) the sale of counterfeit and other prohibited items, (iii) consumer protection issues concerning advertising, sales and promotion activities, (iv) flawed ratings of merchants and products, and (v) lax internal controls that may have led to certain merchants getting preferential treatment. *Id*. ¶ 70 & Compl. Ex. 1 at 13-18. Each of these issues is also a subject of the 2014 Laws. Youngwood Ex. F-G.

The July 16 Meeting, like all administrative guidance meetings, was non-compulsory, and is not alleged to have been part of a formal SAIC investigation of Alibaba. Indeed, the SAIC disclosed that the "purpose of this event was to supervise Alibaba Group [to] strengthen [its] self-regulation . . . ." Compl. ¶ 230. As such, the SAIC made no formal "findings" of wrongdoing, but rather discussed its observations and used some colorful language to advise and admonish the Company to cooperate with the SAIC to improve the e-commerce industry and to comply with the 2014 Laws. Compl. Ex. 1 at 12-13, 25. In connection with the admonishment, a representative of the SAIC "threatened" significant penalties, thousands of times per year, if Alibaba did not accept the guidance. Compl. ¶¶ 11, 72. During the meeting, the SAIC sought and received input from the AICs and Alibaba, *id*. Ex. 1 at 21-23, and both the Zhejiang AIC and SAIC indicated that their next steps involved further "study" and "analy[sis]." *Id*. at 22, 25.

The SAIC requested that Alibaba use the guidance it received "to improve its awareness," *id*. at 12, "continue to improve its internal control policies," *id*. at 19, and "continue to focus on problems and resolve hardcore problems." *Id*. at 20. Alibaba "accepted the [SAIC's] administrative guidance," Compl. ¶ 10, and agreed to "take the initiative to redress problems,"

*id*. Ex. 1 at 21, "improve pertinent measures and enhance communications," *id.*, and "actively

cooperate with the regulatory agencies to jointly resolve thorny regulatory issues" while

"conduct[ing] business pursuant to law and regulations." *Id*. at 22. In short, Alibaba allegedly

promised to "take proper measures in accordance with pertinent laws and regulations to address

the deficiencies pointed out." Compl. ¶ 75. Thus, according to the subsequently published

"white paper," the SAIC, through the July 16 Meeting, "generally achieved its pre-set goal" of

making Alibaba aware of the SAIC's concerns and reaching agreement with Alibaba "to

promptly take measures to redress the problems." Compl. Ex. 1 at 23-24.

Plaintiffs make the unsupported claim that if Alibaba had failed to accept the guidance,

the SAIC "very likely" would have severely penalized it. Compl. ¶ 81. However, Plaintiffs do

not allege that Alibaba failed to timely take necessary measures in response to the guidance, or

that it failed to work cooperatively with the SAIC in the two months between the meeting and

the IPO on "proper remedial measures." *Id*. Ex. 1 at 24. Indeed, despite the fact that more than

one year has passed since the July 16 Meeting, Plaintiffs do not allege that the SAIC has

commenced proceedings against, fined, or otherwise penalized Alibaba in any way.

**Alibaba's September 19, 2014 IPO**:  Alibaba's IPO took place more than two months

after the July 16 Meeting.  Alibaba's Registration Statement made detailed disclosures to

investors about its business and strategies, the competitive and regulatory environment in which

it operates, and the key risks facing its business.  Alibaba's disclosures also made clear that it

was subject to new stringent PRC regulations, and that regulatory enforcement was increasing:

- "[N]ewly issued measures [including the 2014 Laws] impose ***more stringent requirements and obligations*** on . . . marketplace platform providers."

- "[I]n recent years, the PRC government [is] ***increasingly focused*** on consumer protection. . . ."

- "PRC government authorities are ***likely to continue to . . . enhance enforcement***

of existing laws, rules and regulations."

RS at 218, 43, 39 (emphasis added). Alibaba's disclosures also described its risks and duties

related to the 2014 Laws for each of the principal areas discussed during the July 16 Meeting:

| **SAIC Category** | **Related Company Disclosure** |
|---|---|
| "1. Lax Vendor Access" (unlicensed vendors). Compl. Ex. 1 at 13-14. | "[M]arketplace platform providers are obligated [under the 2014 Laws] to examine the legal status of each third-party merchant selling products or services on the platform and display on a prominent location on the web page of such merchant the information stated in the merchant's business license or a link to such business license, and a group buying website operator must only allow a third-party merchant with a proper business license to sell products or services on its platform." RS at 218. |
| "2. Lax product information review" (sale of counterfeit or prohibited items). *Id*. at 14. | "[U]nder the Administrative Measures . . . we must adopt measures to ensure safe online transactions, protect consumers' rights and prevent trademark infringement." *Id*. at 222. |
| "3. Chaotic management of sales activities" and "4. Flawed credit review" (consumer protection issues and flawed ratings of merchants and products). *Id*. at 14-17. | "[We are] subject to a variety of consumer protection laws, including the [2014 Laws]. . . . [W]e, as platform operators, are required to implement rules governing transactions on our platform, monitor the information posted by sellers . . . and report any violations. . . . Failure to comply with these consumer protection laws could subject us to administrative sanctions . . . ." *Id*. at 220-21. |
| "5. Lax management and regulation of internal staff" (lax internal controls that may lead to merchants receiving favorable treatment). *Id*. at 17. | Company acknowledges risk related to "illegal, fraudulent or collusive activities by [its] employees" and specifically disclosed that "[former] employees had accepted payments from sellers in order to receive preferential treatment." *Id*. at 38. |

Alibaba further disclosed that it had "been subject to PRC . . . government inquiries and

investigations, including those related to website content and alleged third-party intellectual

property infringement," and that it "***expect[ed] to face increased scrutiny***, which will, at a

minimum, result in [its] having to increase [its] investment in compliance and related capabilities

and systems." RS at 39-40 (emphasis added).

Alibaba likewise described key areas of risk related to third-party sales on its platforms:

- "We have received . . . and we anticipate we will receive in the future,

communications alleging that items offered or sold [on] our online marketplaces by third parties . . . infringe . . . intellectual property rights."  RS at 37.

- "We have been and may continue to be subject to allegations of civil or criminal liability based on allegedly unlawful activities carried out by third parties [on] our online marketplaces.  We also have been and may continue to be subject to allegations that we were participants in or facilitators of such . . . activities."  *Id.*

- "Continued public perception that counterfeit or pirated items are commonplace on our marketplaces . . . , even if factually incorrect, could . . . result in regulatory pressure or action against us."  *Id.* at 38.

- "We . . . periodically receive complaints" about "fraud perpetrated and fictitious transactions conducted on our marketplaces. . . ."  *Id.*

- "We may be subject to claims under consumer protection laws . . . [and] we could be subject to . . . action by regulators . . . ."  *Id.* at 43.

While Alibaba disclosed in great detail a variety of measures it was taking to address these issues, *id.* at 37-38, 209-10, it also cautioned that it could give no assurance as to the efficacy of these measures.  *Id.* at 37-38.  Finally, Alibaba told investors that the "high volume of transactions taking place on [its] marketplaces and publicity about [its] business creates the possibility of heightened attention . . . . [and that] allegations, regardless of their veracity, may result in . . . negative publicity . . . government inquiry or harm [to] reputation."  *Id.* at 39.

**SAIC Publication of Notes from July 16 Meeting**:  On January 28, 2015, a self-described "white paper," which purported to describe the July 16 Meeting, was briefly published on the SAIC's website.  Compl. ¶ 15 & Ex. 1.  Although it was published more than six months after the July 16 Meeting, the "white paper" did not include any information, allegations, conclusions, or data about Alibaba that post-dated the meeting.  The document also did not announce or threaten an investigation, or suggest any fines or penalties against Alibaba.  It simply made public certain details about the July 16 Meeting.  Later the same day, the SAIC removed the "white paper" from its website.  Compl. ¶ 200.  Two days later, it clarified that the

purpose of the July 16 Meeting was "to supervise Alibaba Group [to] strengthen [its] self-regulation, purify the environment of online shopping, as well as safeguard legitimate rights and interests of consumers and businesses" and explained that the document is "the minutes of the meeting by nature instead of a white paper" and that "they have no judicial effect." *Id*. ¶ 230.

On January 28, 2015, following the SAIC's posting and removal of the "white paper," Alibaba's share price dropped 4.4% to $98.45. *Id*. ¶ 207.  This suit against Alibaba and four Individual Defendants (Jack Ma, Alibaba's co-founder and Executive Chairman; Joseph Tsai, Alibaba's co-founder and Executive Vice Chairman; Jonathan Lu, Alibaba's former Chief Executive Officer; and Maggie Wu, Alibaba's Chief Financial Officer) followed. *Id*. ¶¶ 28-31.

**Alibaba's Subsequent Performance**:  On January 29, 2015, Alibaba reported its financial results for the quarter ended December 31, 2014 ("Q3"), Compl. ¶ 209, announcing 40% year-over-year ("YoY") revenue growth and 34% YoY earnings growth.  Youngwood Ex. O (Q3 2015 Press Release).  In the next quarter, Alibaba continued to report strong results, 45% YoY revenue and 25% YoY earnings growth.  *Id*. Ex. P (Q4 2015 Press Release).

## ARGUMENT

To survive a Rule 12(b)(6) motion to dismiss, "a complaint must contain sufficient factual matter . . . to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A claim has facial plausibility only when plaintiff pleads factual content that allows the Court to draw the reasonable inference that the defendant is liable for the misconduct alleged.  *Id*.  "[B]ald contentions, unsupported characterizations, and legal conclusions are not well-pleaded allegations" and will not defeat a motion to dismiss.  *Garber v. Legg Mason, Inc.*, 537 F. Supp. 2d 597, 610 (S.D.N.Y. 2008) (citation omitted), *aff'd*, 347 F. App'x 665 (2d Cir. 2009).

Rule 9(b) imposes a heightened pleading standard for plaintiffs asserting securities fraud

claims, requiring them to "state with particularity the circumstances constituting fraud." Fed. R. Civ. Proc. 9(b). In addition, under the PSLRA, the complaint must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1)(B). The complaint also must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2)(A).

The court may consider (i) the full text of documents that are quoted in or attached to the Complaint, *Campo v. Sears Holdings*, 635 F. Supp. 2d 323, 328-29 (S.D.N.Y. 2009); (ii) foreign law, *CP Solutions Pte v. General Elec.*, 470 F. Supp. 2d 151, 152 n.1 (D. Conn. 2007); (iii) public articles, analyst reports, court filings, and press releases (for the fact of publication), *Garber*, 537 F. Supp. 2d at 612 n.4; *Steinberg v. Ericsson LM Tel.*, No. 07 CV. 9615, 2008 WL 5170640, at *10 n.5 (S.D.N.Y. Dec. 10, 2008); *Medcalf v. Thompson Hine*, No. 13 CIV. 7609 ER, 2015 WL 463809, at *4 (S.D.N.Y. Feb. 4, 2015); *Mitchell v. Home*, 377 F. Supp. 2d 361, 367 n.1 (S.D.N.Y. 2005) (McMahon, J.); and (iv) SEC filings, *Campo*, 635 F. Supp. 2d at 328.

## I.      PLAINTIFFS FAIL TO STATE A CLAIM UNDER SECTION 10(b)

To state a Section 10(b) claim, a plaintiff must allege (1) misstatements or omissions of material fact, (2) scienter, (3) the purchase or sale of securities, (4) reliance, and (5) transaction and loss causation. *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 172 (2d Cir. 2005).

The Complaint focuses on the alleged omission of material information. Plaintiffs advance three separate omission/misrepresentation theories:

- Two months before its IPO, Alibaba executives had met with the SAIC, which threatened financial penalties based on violations of PRC laws on Alibaba's e-commerce platforms (the "July 16 Meeting Allegations") (Compl. ¶ 102);

- "[T]he SAIC had commenced the 'Red Shield and Web Sword' special program to clean up rampant abuses in Alibaba's ecommerce platforms. . .[and] considered Alibaba one of its main targets" (the "Red Shield Allegations") (*id*. ¶ 103); and

- "[A] material portion of Alibaba's consolidated revenues and earnings were derived from the sale of non-genuine merchandise" due in part to actions taken by Alibaba, and that either (i) its "financial performance was reasonably likely to be materially impacted as a consequence of yielding to SAIC pressure to fully bring its operations within the ambit of the law," or (ii) "if Alibaba did not adequately bring its operations in line to the satisfaction of the SAIC, then it would be subject to regulatory action that would materially impact its business." *Id*. ¶ 104.

A.   <u>**Plaintiffs Fail to State a Claim Based on the July 16 Meeting Allegations**</u>

Plaintiffs' central claim is that Alibaba failed to disclose the July 16 Meeting.  *See, e.g.*, Compl. ¶¶ 4-5, 102.  This claim fails both because Plaintiffs allege no actionable false statement or omission and because Plaintiffs fail to allege facts giving rise to a strong inference of scienter.

1.   **Plaintiffs allege no material omissions related to the July 16 Meeting**

To state a 10(b) claim based on an omission, a plaintiff must show that the defendant had a duty to disclose the allegedly concealed information.  *Thesling v. Bioenvision, Inc.*, 374 F. App'x 141, 143 (2d Cir. 2010).  Such a duty may arise only when (i) the information is necessary in order to make statements made, in the light of the circumstances under which they were made, not misleading, or (ii) an independent affirmative legal disclosure obligation exists.  *Id.*  Here, Alibaba had no duty to disclose under either prong of this test.

<u>No statements rendered misleading</u>:  Plaintiffs claim that several Alibaba statements were misleading because Alibaba did not explicitly disclose the July 16 Meeting.  However, Plaintiffs' own allegations show that the July 16 Meeting (i) was a voluntary administrative guidance meeting; (ii) at which the SAIC advised Alibaba of issues it believed needed to be addressed; (iii) Alibaba agreed to address them; and (iv) Alibaba has not been subject to fines or other sanctions as a result of the meeting or the issues that were discussed.  *See supra* pp. 6-8.

Moreover, Alibaba *did* disclose significant information about its regulatory environment

13

and related risks.  It disclosed that it has been subject to government inquiries and investigations, that authorities were "likely to continue to . . . enhance enforcement of laws," and that it "expect[ed] to face increased [regulatory] scrutiny."  RS at 39.  Alibaba further detailed the myriad laws to which it was subject (*id*. at 40-41, 216-228) and the "uncertainties" related to its compliance with "recently enacted laws, rules and regulations."  *Id*. at 53.  It also stated that it "[has] been and may continue to be subject to allegations of civil and criminal liability," *id*. at 37, detailing various areas where conduct of third parties or even its own employees had or could expose it to liability.  Given this background, Plaintiffs' omission claim must fail.

Plaintiffs suggest that Alibaba's statement that "the regulatory and legal system in China is complex and developing, and future regulations may impose additional requirements on our business" was misleading because "it implied that there was no present or imminent threat that the Chinese government would impose additional regulatory requirements or penalties on Alibaba," as allegedly threatened in the July 16 Meeting.[3]  Compl. ¶¶ 106-07.  In so doing, Plaintiffs ignore the fact that administrative guidance is provided only in accordance with *existing* law and does not impose additional regulatory requirements.  *See supra* pp. 4-6. Plaintiffs also fail to adequately allege an imminent threat of penalty at the end of the meeting, let alone two months later, at the time of the IPO, when the first statements at issue were made. Indeed, the "white paper" relied on by Plaintiffs explicitly states that the July 16 Meeting achieved its goals and the Company agreed to take the requested actions.  *See supra* pp. 6-8.

---

[3] Plaintiffs repeatedly allege that a representative of the SAIC threatened to penalize Alibaba "1% of daily sales amounts" or "several thousand times a year" if Alibaba did not heed its administrative guidance.  *See, e.g.*, Compl. ¶¶ 72, 91, 97, Ex. 7.  Allegations of this threat, taken from microblog posts purporting to recount information from "some participants of the meeting," are not well-pleaded under the PSLRA.  *See, e.g.*, *In re AOL, Inc. Repurchase Offer Litig.*, 966 F. Supp. 2d 307, 314 (S.D.N.Y. 2013) (discounting blog post for "fail[ure] to provide any basis on which it could be inferred that [source] would [have] access to [relevant] information").

Nothing in the Complaint contradicts this statement.  Accordingly, Plaintiffs' conclusion that

severe fines were "imminent" is an unsupported (and incorrect) conclusion, not a well-pleaded

factual allegation.  *See Acito v. IMCERA Grp., Inc.*, 47 F.3d 47, 52-53, 55 (2d Cir. 1995) (where

defendant "made commitments to [regulator] to correct [identified] deficiencies," "one cannot

infer that it was a 'foregone conclusion' that . . . adverse consequences would ensue," despite

regulator's warning of penalties for non-compliance).

　　　　Plaintiffs next suggest that Alibaba's statement about the sale of counterfeit goods on its

platforms was misleading because it did not disclose that the SAIC had recently accused it of

violating the law by allowing such goods to be sold.  Compl. ¶¶ 112-13.  This claim is specious.

Alibaba's statement, standing on its own, was sufficient to advise investors that it already had

been subject to such claims and expected to continue to be subject to them in the future:

> We have received in the past, and we anticipate we will receive in the future,
> communications alleging that items offered or sold through our online marketplaces by
> third parties . . . infringe . . .  intellectual property rights. . . . We have been and may
> continue to be subject to allegations of civil or criminal liability based on [such] allegedly
> unlawful activities . . . .  We also have been and may continue to be subject to allegations
> that we were participants in or facilitators of such allegedly unlawful activities.

RS at 37.  Having made this disclosure, Alibaba had no obligation to state that the July 16

Meeting was an example of this issue arising, particularly in an administrative guidance meeting

resulting in no fines or penalties.  *See In re Canandaigua Sec. Litig.*, 944 F. Supp. 1202, 1209

(S.D.N.Y. 1996) ("Plaintiffs merely sound the familiar refrain that any comment by a

corporation imposes an affirmative duty to disclose all marginally-related material information.

There is no such obligation or duty.").

　　　　Plaintiffs similarly allege that Alibaba's statement that it "may be subject to claims under

consumer protection laws" was misleading because it did not disclose that the SAIC already had

found Alibaba to be in violation of such laws.  Compl. ¶¶ 125-26.  Once again, this claim fails

because the SAIC made no investigative findings that Alibaba had violated any laws, but instead met with Alibaba to provide administrative guidance and seek cooperation from the Company.

Plaintiffs also challenge Alibaba's statements listing the measures it had implemented in its fight against counterfeit products and fictitious transactions, asserting that the statements were misleading because Alibaba had not disclosed that the SAIC "had warned Alibaba that the measures against counterfeit products [and fictitious transactions] were insufficient and ineffective." *Id.* ¶¶ 127-30.  Plaintiffs do not allege, however, that Alibaba made any claims about the effectiveness of its measures.  To the contrary, Alibaba explicitly disclosed that such measures "may not always be successful."  RS at 37.  Thus, any criticism of Alibaba's practices by the SAIC does not render the statements misleading.  Moreover, the statements cannot be misleading because Plaintiffs do not allege (i) whether Alibaba implemented additional measures between the July 16 Meeting and its IPO two months later, or (ii) whether the SAIC continued to believe that Alibaba's measures were insufficient at the time of, or after, the IPO.[4]

Plaintiffs then claim that Alibaba's statement that it is "not currently a party to any material legal or administrative proceedings" was misleading because "the July SAIC Meeting was a formal administrative law enforcement proceeding mandating that Alibaba stop violating PRC laws and regulations."  Compl. ¶¶ 141-42.  Plaintiffs offer no support for this conclusion.

---

[4] Plaintiffs also contend Alibaba's disclosures were misleading because they did not disclose certain incidents of employee misconduct mentioned by the SAIC and covered in the news.  *See* Compl. ¶¶ 118-20, 177(b), 228-29.  However, Alibaba's IPO disclosures sufficiently addressed these issues.  Alibaba explicitly disclosed the incident mentioned by the SAIC, Compl. Ex. 1 at 16, stating "certain of our employees had accepted payments from sellers [for] preferential treatment" and that these employees had been dismissed.  RS at 38.  Alibaba also advised investors of risks associated with employee misconduct, and warned "we cannot assure you that such controls and policies will prevent [misconduct] by our employees or that similar incidents will not occur in the future."  *Id.* at 38.  This adequately apprised investors of the risk of isolated incidents of employee misconduct such as that highlighted by Plaintiffs.  Compl. ¶ 228.

Administrative guidance is, as Plaintiffs acknowledge, non-compulsory and thus cannot "mandate" anything.  Plaintiffs also allege no well-pleaded facts suggesting the July 16 Meeting was part of an ongoing investigation, let alone a material legal or administrative proceeding. They certainly do not allege any ongoing "proceeding" as of the time of Alibaba's IPO.

Plaintiffs next characterize Alibaba's statements about the regulation of advertising services, online and mobile commerce, consumer rights protection, and anti-counterfeiting as misleading because those statements, while setting forth the regulatory framework and obligations, and potential penalties and sanction for violation, did not disclose that the SAIC had informed Alibaba during the July 16 Meeting that it was in violation of those laws and thus faced an imminent threat of fines.  Compl. ¶¶ 144, 146-52.  As discussed above, Alibaba disclosed that it had been subject to allegations of violations and did not affirmatively state that it was in compliance with all laws.  In addition, following the dialogue with the SAIC and the agreed-upon plan that resulted from the meeting, Alibaba did not face an imminent threat of fines.

Finally, Plaintiffs point to a post-IPO statement in Alibaba's December 23, 2014 press release that "[i]n our years of combating this [counterfeiting] problem, we have built cooperative relationships with various government bodies . . . ."  *Id*. ¶ 186.  Plaintiffs suggest that the statement was misleading because it failed to disclose the administrative guidance provided during the July 16 Meeting.  *Id*. ¶ 187.  To the contrary, the July 16 Meeting—at which Alibaba received and accepted administrative guidance—only *reinforced* the statement Alibaba made about working cooperatively with its regulators.  *See* Compl. Ex. 1 at 22.

**No independent legal duty**:  Having disclosed that it had been subject to government inquiries and faced increased regulatory scrutiny, Alibaba had no independent duty to disclose the July 16 Meeting.  First, contrary to Plaintiffs' claim, Compl. ¶¶ 154-55, Alibaba, as a foreign

private issuer, is not subject to Reg. S-K. *In re Top Tankers, Inc. Sec. Litig.*, 528 F. Supp. 2d 408, 416 (S.D.N.Y. 2007) (McMahon, J.). Instead, Alibaba's disclosures are governed by Form 20-F Item 5(d), which, similarly requires companies to discuss "any known trends" or "uncertainties" that are "reasonably likely to have a material effect" on financial results.

To the extent the July 16 Meeting was part of a trend of enhanced regulatory scrutiny with respect to counterfeit sales, Alibaba clearly disclosed this trend. *See supra* pp. 8-10. However, to the extent Plaintiffs contend that the specific meeting was required to be disclosed as a "trend" under Item 5(d), they are mistaken. From that perspective, the July 16 Meeting was an isolated occurrence. *See S.E.C. v. BankAtlantic Bancorp, Inc.*, 285 F.R.D. 661, 667 (S.D. Fla. 2012) ("[A] single event does not a trend make."). Moreover, if the meeting were somehow the *beginning* of a new "trend," Plaintiffs fail to allege that any such trend was "known" by the time of Alibaba's IPO in September, two months after the meeting. *See Blackmoss Invs. Inc. v. ACA Capital Holdings, Inc.*, No. 07 Civ. 10528, 2010 WL 148617, at *9-10 (S.D.N.Y. Jan. 14, 2010) (rejecting Item 303 claim based on plaintiffs' failure to allege sufficient facts to establish defendants' knowledge of any trend based on two-month period) (collecting cases).

Plaintiffs also cannot allege that the July 16 Meeting was "reasonably likely" to have a "material effect" on Alibaba's financial performance because Plaintiffs do not allege that Alibaba was fined or penalized, either before or after the IPO. *See, e.g.*, *In re Bank of Am. AIG Disclosure Sec. Litig.*, 980 F. Supp. 2d 564, 584 (S.D.N.Y. 2013) (no "trend" disclosure required because plaintiffs failed to sufficiently allege that potential litigation was "'reasonably likely' to generate any loss, let alone a material loss"), *aff'd*, 566 F. App'x 93 (2d Cir. 2014).

Additionally, contrary to Plaintiffs' claim, Alibaba did not have an obligation to disclose the July 16 Meeting pursuant to Item 503, which requires registrants to provide a "Risk Factors"

18

section that includes a "discussion of the most significant factors that make the offering speculative or risky." 17 C.F.R. § 229.503.  Item 503 did not require disclosure of the July 16 Meeting because, as discussed above, Alibaba's detailed risk factors clearly informed investors of risks related to increasing regulatory scrutiny and of the various issues raised at the July 16 Meeting.  *See supra* pp. 8-10.  Moreover, because, as Plaintiffs allege, Alibaba "accepted the administrative guidance" at the July 16 Meeting, Alibaba did not face an imminent threat of material penalties.  *See Acito*, 47 F.3d at 52-53 (no obligation to disclose multiple FDA inspections identifying deficiencies where defendant had "made commitments to the FDA to correct the [identified] deficiencies" and thus "one cannot infer that it was a 'foregone conclusion' that . . . adverse consequences would ensue"); *Milano v. Perot Sys. Corp.*, No. 3:02-CV-1269-D, 2006 WL 929325, at *19 (N.D. Tex. Mar. 31, 2006) (no Item 503 duty where, because "nothing had come of ISO's charges of breach of contract" one year before IPO, "it would not have been unreasonable for [company] to conclude that its [allegedly unlawful conduct] did not pose any of the 'most significant factors' making [its] IPO risky").

Finally, nothing about the meeting itself created any other duty of disclosure.  It is well-established that a company is under no duty to disclose day-to-day interactions with its regulators.  *Robbins v. Moore Medical Corp.*, 894 F. Supp. 661, 674 (S.D.N.Y. 1995).  Similarly, there is no duty to disclose critical comments a representative of a regulator may make about a company's conduct.  This is especially true with respect to interim statements by a regulator because such statements are often "meant to prod a company into taking corrective steps before any more substantial agency action is necessary."  *In re Genzyme Corp.*, No. 09-11267-GAO, 2012 WL 1076124, at *10, *12 (D. Mass. Mar. 30, 2012) (no duty to disclose FDA observations of compliance problems); *see also In re Sanofi Sec. Litig.*, No. 13 Civ. 8806, 2015 WL 365702,

19

at *27 (S.D.N.Y. Jan. 28, 2015) (regulator statements made as part of "dialogue," "ongoing discussions," or "process" need not be disclosed because they do not "express a binding agency decision").  Indeed, absent an affirmative denial of such proceedings or the like, companies need not disclose specific regulator interactions even if those interactions could result in punitive sanctions.  *See Acito*, 47 F.3d at 50, 53 (no obligation to disclose FDA inspections revealing numerous manufacturing deficiencies).

For this reason, a company need not necessarily disclose even the receipt of an SEC Wells Notice.  *See Richman v. Goldman Sachs*, 868 F. Supp. 2d 261, 269-70, 273-74 (S.D.N.Y. 2012) ("no court has ever held that a company's failure to disclose receipt of a Wells Notice constitutes an actionable omission under § 10(b)").  Here, unlike in *Richman*, there was no Wells Notice equivalent, no government investigation, no imposition of a penalty, and no adverse regulatory decision.  Instead, Plaintiffs allege only a single, voluntary meeting with Alibaba's known regulator that, according to the "white paper," "generally achieved its pre-set goal" in that Alibaba planned to "actively cooperate" with the regulator.  Under such circumstances, disclosure of this meeting, rather than being required, would risk "bury[ing] the shareholders in an avalanche of trivial information."  *San Leandro Emergency Med. Grp. Plan v. Philip Morris Cos.*, 75 F.3d 801, 810 (2d Cir. 1996) (quoting *TSC Indus. v. Northway*, 426 U.S. 438 (1976)).[5]

### 2.    Plaintiffs fail to allege a false statement related to the July 16 Meeting

Plaintiffs do not allege that the Registration Statement contained any false statements (as opposed to omissions) about the July 16 Meeting.  However, Plaintiffs claim that Defendant Tsai made false statements on this topic on January 29, 2015.  Tsai stated as follows:

---

[5] Consistent with the lack of duty, we are not aware—following a diligent search—of *any* China-based company listed on a U.S. stock exchange that has ever disclosed an administrative guidance meeting, either under Item 5(d), Item 503 or otherwise.

> [L]ike all international companies across the globe we from time to time meet
> with regulators in the normal course of business.  The meeting last July was no
> different, and at this meeting we discussed working together to create a process to
> address key areas of consumer protection and orderly . . . online commerce.

Youngwood Ex. O.  Plaintiffs allege that in his statement Tsai "suggested that the July SAIC

Meeting was just another routine meeting."  Compl. ¶ 221.  In addition to the fact that Plaintiffs

inaccurately quote Tsai, his statement is not false.  It is undisputed that the July 16 Meeting was

a meeting with regulators that occurred in the course of Alibaba's business.  It is also true that

during the meeting Alibaba and its regulators discussed—and agreed upon—a process to address

concerns about certain aspects of the Company's business.  Plaintiffs claim Tsai's statement was

false because the July 16 Meeting was "unusual and unprecedented," *id*. ¶¶ 5, 7, 92, 222, but

they plead no facts to compare the meeting to Alibaba's other meetings with the SAIC (*e.g.*, who

and how many executives attend).  As such, they fail to allege the "unprecedented" nature of the

meeting.  *Ironworkers Local 580 v. Linn Energy, LLC*, 29 F. Supp. 3d 400, 424 (S.D.N.Y. 2014)

(labels and conclusions are not well-pleaded facts).

Plaintiffs next argue that Tsai misleadingly claimed "Alibaba did not review the SAIC

White Paper until January 28" when, in fact, "senior management of Alibaba had full knowledge

of the matters contained in the White Paper and knew that the SAIC and AICs would prepare a

formal record of the administrative proceedings" and that "meeting minutes would be drafted

and memorialized in a report as is standard practice when the SAIC delivers administrative

guidance."  Compl. ¶ 223.  Plaintiffs plead no facts to support their claim that Alibaba knew that

minutes or a report would be drafted or that doing so was standard practice.  Moreover, no

reasonable investor would find it material when Alibaba first saw the "white paper."

Finally, Plaintiffs argue that Tsai falsely stated that "Alibaba never requested the SAIC to

delay publication of the report until after its IPO."  *Id*. ¶ 224.  (Indeed, Tsai stated that "Alibaba

has never requested the SAIC to delay the publication of any report.")  Plaintiffs fail to allege any facts suggesting that this statement was false.  Instead, Plaintiffs offer unsupported assumptions and inferences to suggest (but not actually allege) that Alibaba requested the report be delayed until after the IPO.  They claim that because administrative guidance meetings are typically open to the public, but the July 16 Meeting was held behind closed doors, the SAIC must have deviated from PRC law only because "Alibaba executives explained the potential risks that the SAIC administrative guidance might pose to the IPO."  *Id.* ¶¶ 224-26.  Such sheer speculation cannot support a claim of falsity.  *Kalnit v. Eichler*, 264 F.3d 131, 142 (2d Cir. 2001) ("A plaintiff cannot base securities fraud claims on speculation and conclusory allegations.").

### 3.  Plaintiffs fail to plead facts giving rise to a strong inference of scienter

Plaintiffs have the burden to plead "with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  15 U.S.C. § 78u-4(b)(2)(A).  An inference of scienter is "strong" only if "a reasonable person would deem [it] cogent and at least as compelling as any opposing inference one could draw from the facts alleged."  *Tellabs v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007).  A plaintiff can plead scienter "by alleging facts to show either (1) that defendants had the motive and opportunity to commit fraud, or (2) strong circumstantial evidence of conscious misbehavior or recklessness."  *ECA & Local 134 IBEW Joint Pension Trust of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 198 (2d Cir. 2009).  When a plaintiff's case revolves around omissions (rather than affirmative misrepresentations), an inference of scienter is less appropriate.  *Tellabs*, 551 U.S. at 326.

### (a)  Plaintiffs fail to allege scienter by motive and opportunity

Plaintiffs attempt to establish scienter by claiming that Defendants Ma and Tsai had a motive to commit fraud based on their stock sales in the IPO and the Company had a motive based on its IPO and bond offering.  Compl. ¶¶ 235-37.  These allegations fail.

22

**Individual Defendants**:  Insider trading allegations support motive and opportunity only if the trading is "unusual."  *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 74 (2d Cir. 2001).  It is plaintiffs' burden to plead how defendants' stock sales are unusual, not defendants' burden to disprove scienter.  *Koplyay v. Cirrus Logic, Inc.*, No. 13 Civ. 0790, 2013 WL 6233908, at *5, *8 (S.D.N.Y. Dec. 2, 2013) (McMahon, J.).  To consider whether trading is unusual, courts consider (i) the amount of net profits realized, (ii) the percentage of holdings sold, (iii) the number of insiders selling, and (iv) the timing of the sales.  *Id.* at *5; *Scholastic*, 252 F.3d at 74-75.

Plaintiffs fail to meet their burden to show "unusual" trading because they allege only gross proceeds based on Ma's and Tsai's sales in the IPO.  Compl. ¶¶ 28-29.  However, "gross proceeds, standing alone, tell us very little" about an insider's likely intent, and "[t]here is no *per se* rule . . . that sale of a particular monetary amount" is unusual.  *In re BISYS Sec. Litig.*, 397 F. Supp. 2d 430, 444-45 (S.D.N.Y. 2005) (plaintiffs fail to allege scienter because, *inter alia*, they "do not provide any information about what portion of their respective total stock holdings each defendant sold").  Indeed, "dollar amount cannot be considered in isolation," *Scholastic*, 252 F.3d at 75, and "a finding of motive" based on unusual trading "cannot be predicated solely upon the gross proceeds of alleged insider stock sales."  *In re Take-Two Interactive Sec. Litig.*, 551 F. Supp. 2d 247, 275 (S.D.N.Y. 2008).  Because Plaintiffs fail to allege *any* other reason that Ma's and Tsai's stock sales were "unusual," they fail to plead scienter by motive and opportunity.

Further, because Plaintiffs allege *no* trading or other motive allegations with respect to Defendants Lu or Wu, Plaintiffs have failed to plead scienter with respect to these defendants.

**Alibaba**:  It is well established that Plaintiffs cannot plead corporate scienter by alleging a desire to complete equity and debt offerings on favorable terms.  *See, e.g.*, *San Leandro Emergency*, 75 F.3d at 814 (rejecting scienter based on argument that company wanted high

stock price to improve its credit rating and thus obtain favorable pricing on bond offering);

*Johnson v. Sequans Commc'ns S.A.*, No. 11 Civ. 6341, 2013 WL 214297, at *18 (S.D.N.Y. Jan.

17, 2013) (no motive for fraud from company's desire "to conduct the IPO at an inflated price");

*Geiger v. Solomon-Page Grp.*, 933 F. Supp. 1180, 1189-90 (S.D.N.Y. 1996) (rejecting scienter

based on company's motive to ensure success of IPO and raise as much money as possible).

(b)     **Plaintiffs fail to allege conscious misbehavior or recklessness**

Plaintiffs also fail to plead facts giving rise to a strong inference that Defendants

knowingly or recklessly made false or misleading statements.  Although Plaintiffs conclude that

"each defendant knew or recklessly disregarded that material facts were being misrepresented or

omitted as described above," Compl. ¶ 291, they fail to plead any *facts* supporting their assertion.

*Kalnit*, 264 F.3d at 142 (affirming dismissal of 10(b) claim for failure to adequately plead

"defendants' knowledge of facts or access to information contradicting their public statements").

**Individual Defendants**:  Plaintiffs' *sole* allegation with regard to Defendant Wu is that

she is Alibaba's Chief Financial Officer.  Such a boilerplate assertion clearly fails to support

scienter.  *See, e.g.*, *Take-Two*, 551 F. Supp. 2d at 274 ("[T]he scienter inquiry focuses principally

upon the knowledge or recklessness of individual defendants, not upon their corporate roles.").

Plaintiffs fare no better as to Defendants Ma, Tsai, or Lu.  Because Plaintiffs do not allege that

any of the Individual Defendants attended the July 16 Meeting or were even aware of it, they

have not pleaded facts giving rise to a strong inference of scienter.  Plaintiffs' boilerplate scienter

allegations, Compl. ¶¶ 291-92, also fail because they are impermissible "collective scienter"

pleading that does not address each defendant individually.  *See, e.g.*, *Take-Two*, 551 F. Supp. 2d

at 274 (collective scienter "patently insufficient"); *Oughtred v. E*Trade Fin. Corp.*, No. 08 Civ.

3295(SHS), 2011 WL 1210198, at *12 (S.D.N.Y. Mar. 31, 2011).

**Alibaba**:  Because they fail to plead scienter with respect to the Individual Defendants or

24

any "'individual corporate officer making [any] statement'" alleged to be false or misleading, Plaintiffs also fail to establish that Alibaba acted with corporate scienter. *See Kinsey v. Cendant Corp.*, No. 04 Civ. 0582, 2004 WL 2591946, at *13 (S.D.N.Y. Nov. 16, 2004) (citations omitted). Indeed, nowhere do Plaintiffs allege (*e.g.*, through confidential witnesses or documents) how *anyone* at Alibaba reacted to the July 16 Meeting. Thus, although Plaintiffs characterize the meeting in dire terms, they plead no facts from which an inference can be drawn that *anyone* at Alibaba—including the individuals who attended the meeting—held a similar view. *See In re Lululemon Sec. Litig.*, 14 F. Supp. 3d 553, 582 (S.D.N.Y. 2014) (management can reasonably expect that problems and deficiencies can be resolved, and can "be confident about their stewardship and the prospects of the business that they manage") (quotation omitted).

Finally, Plaintiffs' well-pleaded allegations are not "*at least as likely as* any plausible opposing inference." *Tellabs*, 551 U.S. at 328. It was far from "obvious" that any disclosure of the July 16 Meeting was required given the Company's detailed disclosures about its increasingly strict regulatory environment and the risks inherent therein. *See Richman*, 868 F. Supp. 2d at 276 (holding that plaintiffs failed to plead scienter based on defendant's failure to disclose receipt of Wells Notices because there was no "obvious duty to disclose" them, and noting that "[t]he requirement that the duty be 'obvious' ensures that fraudulent intent will not be imputed to a company every time a public statement lacks detail"); *see also supra* pp. 8-10. To the contrary, the far more compelling inference is that the meeting was not considered "so important and dramatic" as to require disclosure. *Oughtred*, 2011 WL 1210198, at *6.

Here, even if fines for non-compliance were threatened during the July 16 Meeting, the meeting concluded with Alibaba accepting the SAIC's guidance. That fact alone suggests that the more compelling inference is *not* that Alibaba sought to conceal information, but that no one

25

at the Company believed there was additional information that needed to be disclosed.  *See Acito*, 47 F.3d at 55 (FDA warnings regarding potential penalties for future inspection failures "do not support an inference that [company] management believed that the plant would suffer any of those penalties" given company assurances that deficiencies would be corrected); *Bank of Am.*, 980 F. Supp. 2d at 587 (no scienter based on failure to disclose imminent potential lawsuits where pleadings disclosed rising litigation risk and identified risk in general area where litigation ultimately filed; "much more compelling conclusion is that the defendants did not think that there was any need for public disclosure in view of the information already in the marketplace").

## B.   Plaintiffs Fail to State a Claim Based on the Red Shield Allegations

Plaintiffs also allege that Alibaba failed to disclose the Red Shield Program and its purported implications for the Company.  *See, e.g.*, Compl. ¶¶ 103, 107.  This claim fails because (i) Plaintiffs allege no actionable omission; (ii) Plaintiffs fail to plead facts giving rise to loss causation; and (iii) Plaintiffs fail to allege facts giving rise to a strong inference of scienter.

### 1.   Failure to disclose Red Shield was not a material omission

The SAIC publicly announced the launch of the Red Shield Program three months before Alibaba's IPO.  Compl. ¶ 58.  This announcement was widely publicized.  *See supra* p. 5.  Thus, the fact that Alibaba did not explicitly disclose the program cannot be material, particularly in light of its disclosures about increasing regulatory scrutiny.  *See, e.g., White v. H&R Block*, No. 02 Civ. 8965, 2004 WL 1698628, at *12 (S.D.N.Y. July 28, 2004) (omitted information immaterial "if the information is already known to the market"); *Garber*, 537 F. Supp. 2d at 611 ("securities laws do not require disclosure of information that is publicly known").

Plaintiffs appear to claim that Alibaba should have explicitly disclosed the Red Shield Program because the SAIC had "explained to Alibaba that it was one of the main targets of Red Shield 2014" during the July 16 Meeting.  Compl. ¶ 166.  Putting aside the fact that the program

targeted *sellers* of counterfeit goods, not platform operators who cooperated with the initiative, *see supra* p. 5, this allegation is not well-pleaded.  Plaintiffs cite no support for this "information and belief" allegation.  *See* Compl. at 1 (allegations not based on personal knowledge made on "information and belief").  This claim is thus speculation masquerading as fact and, under the PSLRA, should not be taken as true for purposes of this motion.  15 U.S.C. § 78u-4(b)(1)(B) ("complaint shall state with particularity all facts on which [claim of information and] belief is formed"); *In re Optionable Sec. Litig.*, 577 F. Supp. 2d 681, 691 (S.D.N.Y. 2008) (because there was "no source for [plaintiffs'] claim that [BMO executive's] son worked as a summer intern at Optionable," court could not infer that "Optionable had scheme to misprice BMO's options").

### 2.     Failure to allege duty to disclose Red Shield

**No statements rendered misleading**:  Plaintiffs claim that statements in Alibaba's Registration Statement were misleading because they failed to disclose the Red Shield Program:

- "[T]he regulatory and legal system in China is complex and developing, and future regulations may impose additional requirements on our business,"

- "We may increasingly become a target for public scrutiny, including complaints to regulatory agencies, negative media coverage, including social media and malicious reports, all of which could severely damage our reputation and materially and adversely affect our business and prospects," and

- "We operate in an increasingly complex legal and regulatory environment [and] are subject to a variety of PRC and foreign laws, rules and regulations across a number of aspects of our business."

Compl. ¶¶ 106-07, 121-22, 141, 143.  However, each of these warnings is entirely *consistent* with the commencement of the Red Shield Program, which was already in effect and publicly disclosed when Alibaba made these statements.  Moreover, Plaintiffs' selective quotations ignore disclosures elsewhere in the Registration Statement, which told investors that Alibaba was facing increased enforcement scrutiny.  As Alibaba disclosed, "PRC government authorities are likely to continue to . . . enhance enforcement of existing laws," and "in recent years, the PRC

government [has] increasingly focused on consumer protection." RS at 39-43. Given these disclosures, a reasonable investor did not need the name of a particular SAIC initiative.

Plaintiffs next allege that an excerpt on advertising laws from the "Regulation" section of Alibaba's Registration Statement should have disclosed the Red Shield Program. Compl. ¶¶ 144-45. Plaintiffs appear to suggest that the Red Shield Program needed to be disclosed because it was a new regulation. That is incorrect. The Red Shield Program was not a regulation at all; it was a regulator's program to enforce existing law. *See supra* p. 5. Given Alibaba's extensive disclosure of the laws and regulations that impacted its business and the increasingly active regulatory environment, RS at 216-28, it had no obligation to say more. *See supra* pp. 4, 8-10.

Finally, Plaintiffs claim that several statements Alibaba made on November 13 and December 23, 2014 (months after Alibaba's IPO) were misleading for failure to disclose "the implementation of Red Shield 2014 special program" (Compl. ¶¶ 182-83, 186-87):

- "The PRC market in which the Company operates poses certain macro-economic and regulatory risks and uncertainties."

- "If new or more extensive restrictions were imposed on the segments in which the Company is permitted to operate, the Company could be required to sell or cease to operate or invest in some or all of its current businesses in the PRC."

- "In our years of combating this [counterfeiting] problem, we have built cooperative relationships with various government bodies to combat counterfeiting at its source in order to safeguard the interests of consumers."

Discussing the Red Shield Program was not required to make any of these statements complete.

**No independent legal duty**: Plaintiffs had no independent legal duty to specifically disclose the Red Shield Program. First, as discussed *supra*, Alibaba was not subject to Item 303 of Regulation S-K. Alibaba also had no obligation to disclosure Red Shield as a "known trend" or "uncertainty" under Item 5(d) because the Red Shield Program was not a disclosable trend beyond the trend that Alibaba disclosed (*i.e.*, likely increased regulatory enforcement activity).

"[T]here are cognizable, definitive limits to the disclosure required by S–K 303," which "emphasis [is] on financial condition and operational results." *Canandaigua*, 944 F. Supp. at 1210 (reviewing Item 303 disclosure obligations). The Red Shield Program does not fall within that description. Moreover, such trends need only be disclosed if they are "known" to management at the time a registration statement is filed. *See Garber*, 537 F. Supp. 2d at 614 (dismissing Item 303 trend claims because plaintiffs failed to adequately allege that the "trend" was "known" at that time). Here, when Alibaba filed the Registration Statement, the July 16 Meeting had concluded with its "pre-set goal" met, Compl. Ex. 1 at 23, and no fines or penalties had been assessed. Under those circumstances, Plaintiffs have not alleged that Alibaba's management *knew* that the Red Shield Program posed any sort of trend or uncertainty. Finally, even if the Red Shield Program could be deemed to be a known trend, Plaintiffs do not allege that it was "reasonably likely" to have a material effect on Alibaba's financial condition. (Indeed, it did not.)

Alibaba also did not have an obligation to disclose the Red Shield Program as an Item 503 "risk factor." The Company's 55-page risk factor and regulatory disclosure, RS at 25-68, 216-28, which discussed the escalation of regulatory enforcement, was more than sufficient.

### 3.     Plaintiffs fail to plead loss causation based on the Red Shield Program

To state a 10(b) claim, a plaintiff must plead loss causation, "the causal link between the alleged misconduct and the economic harm ultimately suffered by the plaintiff." *Lentell*, 396 F.3d at 172 (internal quotation marks and citation omitted). Loss causation can be alleged through a corrective disclosure that reveals the fraud. *In re Omnicom Grp. Sec. Litig.*, 597 F.3d 501, 511 (2d Cir. 2010). Plaintiffs' alleged corrective disclosure—the January 28, 2015 "white paper," Compl. ¶¶ 20, 215—is insufficient to plead loss causation with respect to the Red Shield Allegations. Loss causation is pleaded "only if the public disclosure causing injury addressed

29

the specific fact allegedly concealed." *In re Rhodia S.A. Sec. Litig.*, 531 F. Supp. 2d 527, 545 (S.D.N.Y. 2007).  Here, because the "white paper" did not mention the Red Shield Program at all, Plaintiffs' claim fails.  *Amorosa v. AOL Time Warner Inc.*, 409 F. App'x 412, 416 (2d Cir. 2011) (affirming dismissal for failure to plead loss causation because plaintiff did not allege any corrective disclosure of alleged false and misleading statements).

Moreover, there can be no loss causation if the information is already "known to the market." *Omnicom*, 597 F.3d at 511.  The SAIC itself had disclosed its Red Shield Program months before the alleged corrective disclosure.  *See supra* p. 5.  Thus, *even if* the "white paper" had mentioned the Red Shield Program, it would not have served as a corrective disclosure.

**4.    Plaintiffs fail to plead facts giving rise to a strong inference of scienter**

Plaintiffs fail to plead facts giving rise to a strong inference that either Alibaba or any of the Individual Defendants had the motive and opportunity to commit fraud.  *See supra* I.A.3.a. Plaintiffs also fail to plead facts giving rise to a strong inference that either the Individual Defendants or Alibaba knowingly or recklessly made false or misleading statements about the Red Shield Program, relying instead on boilerplate allegations.  *See supra* I.B.2.  Indeed, Plaintiffs allege no facts showing that the Individual Defendants or *any* Company officer believed specific disclosure of the Red Shield Program was required.  Moreover, because the Red Shield Program was public and caused no harm to the Company, the absence of scienter is a far more compelling inference than any suggestion of fraudulent conduct.

**C.    Plaintiffs Fail to State a Claim Based on Alibaba Allegedly Receiving Material Revenue from or Facilitating the Sale of Non-Genuine Merchandise**

Plaintiffs contend that Alibaba failed to inform investors that "a material portion of [its] consolidated revenues and earnings were derived from the sale of non-genuine merchandise," Compl. ¶ 104 (the "Material Counterfeit Revenue Allegations"), and that, given the allegedly

pervasive nature of such sales, Alibaba (i) would suffer a material decrease in revenue if it complied with the SAIC's guidance from the July 16 Meeting or (ii) would be subjected to large fines for failure to comply (the "Inevitable Impact Allegations").  Plaintiffs further allege that Alibaba facilitated the sale of counterfeit items on its platforms (the "Counterfeit Facilitation Allegations").  Plaintiffs fail to adequately plead loss causation, falsity or scienter.

### 1.    Plaintiffs fail to plead loss causation

**Material Counterfeit Revenue Allegations**: Plaintiffs fail to plead loss causation with respect to these allegations because they cannot allege that the "white paper" revealed that a material portion of Alibaba's revenue related to third-party sales of non-genuine merchandise on its platforms.  Although the "white paper" indicated that the SAIC believed in July 2014 that some merchants sold counterfeits on Alibaba's platforms, it did not state that such activity made up a material portion of Alibaba's business.  The "white paper" therefore cannot be a corrective disclosure on this point.  *See Garber*, 537 F. Supp. 2d at 617 (no loss causation where alleged corrective disclosures did not disclose alleged omissions).  Moreover, although the "white paper" stated that counterfeit goods were sold on Alibaba's platforms, this was not a corrective disclosure because (i) Alibaba's Registration Statement disclosed the issue of counterfeit goods; (ii) the issue was widely reported in the media and financial community, *see supra* pp. 3-4, and (ii) as Plaintiffs claim, "Counterfeits are in Plain Sight on Taobao."  Compl. at 85.

**Inevitable Impact Allegations**:  The "white paper" cannot be a corrective disclosure with respect to the Inevitable Impact Allegations because it did not state or imply that Alibaba would experience a material decrease in revenue as a result of either accepting the SAIC's guidance or paying any fines for failing to do so.  Plaintiffs thus fail to allege a "sufficient nexus" between the disclosure and the alleged fraud.  *See Plumbers, Pipefitters & Mes Local Union 392 Pension Fund v. Fairfax Fin. Holdings Ltd.*, 886 F. Supp. 2d 328, 337-38 (S.D.N.Y.

2012) (insufficient allegation of loss causation because press release disclosing SEC

investigation did not disclose improper accounting methods).

      **Counterfeit Facilitation Allegations**:  Finally, Plaintiffs fail to plead loss causation with

respect to the Counterfeit Facilitation Allegations because those allegations were publicly

disclosed in the 2014 *Gucci* Action (before Alibaba's IPO).  *See* Appendix A (comparison of

Plaintiffs' allegations to *Gucci* allegations).  The "white paper" thus could not have constituted a

corrective disclosure when it was released in January 2015.  Moreover, the "white paper" does

not even mention a number of the Counterfeit Facilitation Allegations, including those relating to

search functionality, small business loans, and Gold Supplier status.

             **2.**      **Plaintiffs fail to allege a material omission because they do not
adequately plead the truth of the omitted information**

      **Material Counterfeit Revenue Allegations**:  Plaintiffs contend that a number of

statements in Alibaba's Registration Statement were "materially misleading" because they failed

to disclose that "a material portion of Alibaba's consolidated revenues and earnings" were

derived from the sale of counterfeit goods.  Compl. ¶¶ 104, 128.  Indeed, Plaintiffs allege that "a

*majority* of the products being sold on Taobao and Tmall were counterfeit or non-genuine."  *Id.* ¶

111 (emphasis added); *id.* ¶ 252 ("at least half of").  Plaintiffs cannot plead an omission with

respect to this claim because it is not based on credible, particularized allegations.  *See Scott v.

Gen. Motors Co.*, 46 F. Supp. 3d 387, 398 (S.D.N.Y. 2014) (dismissing claim of "channel

stuffing" as an inventory practice where plaintiffs provide no plausible factual allegations to

support claim), *aff'd*, No. 14-3770-cv, 2015 WL 3405373 (2d Cir. May 28, 2015).

      Plaintiffs first rely on a former Taobao Product Manager ("CW 1") whose "primary

responsibilities were to develop and improve Taobao [advertising and search marketing]

algorithms."  Compl. ¶ 137.  According to CW 1, "during her tenure" from 2010 to 2013,

Taobao "ignored counterfeits" unless a brand persistently complained.  *Id.* ¶ 138.  CW 1 also stated that counterfeit sellers "paid top dollar for keywords," and that "Taobao earned so much of its revenues from keyword bidding."  *Id.* ¶ 139.  Even if true, these allegations fail to support the Material Counterfeit Revenue Allegations because (i) they do not quantify the amount of revenue that Taobao, let alone Alibaba as a whole, generated as a result of third-party counterfeit sales; (ii) CW 1 speaks only to Taobao's operations "during her tenure," which ended almost a year before Alibaba's IPO, *see Campo*, 635 F. Supp. 2d at 335 (rejecting allegations of witnesses who left company prior to class period); and (iii) Plaintiffs fail to allege with particularity that CW 1, who developed algorithms, was in a position to know Taobao's policies towards counterfeit sales or what portion of its or Alibaba's revenue was derived from such sales.  *See McKenna v. Smart Techs. Inc.*, No. 11 Civ. 7673, 2012 WL 1131935, at *11 (S.D.N.Y. Apr. 3, 2012) (rejecting allegations from confidential witnesses not alleged to have specific relevant knowledge).

Plaintiffs next rely on Xi Liao, a "former third party development manager of Taobao's pay-for-performance ('P4P') advertising department from 2009-2013."  Compl. ¶ 134.  Plaintiffs allege that Liao estimated that "the proportion of counterfeit goods sold on Taobao" in June 2015 "should be under 50%".  *Id.* ¶ 136.  This statement cannot support Plaintiffs' claims because (i) Liao stopped working at Taobao in 2013, more than a year before the IPO; (ii) Liao does not claim what percentage of Taobao's or Alibaba's revenue was related to the sale of counterfeit goods at the time of the IPO; (iii) Liao provides no basis for his (irrelevant) June 2015 estimate; (iv) Liao does not explain if "under 50%" means 1%, 49% or another amount; and (v) there is no reason to believe a third party development manager (with unspecified duties) would know the percentage of revenue Taobao or Alibaba as a whole derived from counterfeit sales.

Plaintiffs also rely heavily on untested allegations from the complaint filed in the 2015

33

*Gucci* Action.  Compl. ¶¶ 246-47.  Plaintiffs cannot rely on unproven allegations made in

another complaint to provide a factual basis for their own allegations.  *In re Merrill Lynch*

*Research Reports Sec. Litig.*, 218 F.R.D. 76, 78 (S.D.N.Y. 2003) (striking all allegations in

securities fraud complaint that referred to or relied on complaints in unresolved actions).

Moreover, the *Gucci* allegations do not support the Material Counterfeit Revenue Allegations.

Plaintiffs assert that "[a]s of June 4-6, at least 290 sellers were offering counterfeit Gucci

products on Alibaba."  Compl. ¶ 247.  Because Alibaba has approximately *8.5 million* sellers

(RS at 1), an allegation that 290 merchants sold counterfeit Gucci goods cannot, without more,

establish that Alibaba derived a material portion of its revenue from counterfeit sales.  *See*

*Abuhamdan v. Blyth, Inc.*, 9 F. Supp. 3d 175, 202 (D. Conn. 2014) (dismissing claim about

"majority" of sales where plaintiffs failed to plead facts showing relevant sales were a majority).

      The SAIC's January 23, 2015 press release, Compl. Ex. 6, which announced that its

monitoring program detected a 62.75% rate of "counterfeit and non-genuine products" on

Taobao, also fails to support Plaintiffs' Material Counterfeit Revenue Allegations.  The survey

was admittedly "targeted" and focused only on likely counterfeits: "[s]amples of well-known

trademarks and foreign trademarks."  *Id.* at 9.  Accordingly, it sampled only 51 products on

Taobao.  *Id.* at 10-11.  Such an exceedingly small and selective set pales in comparison to the

"over 1 billion product and service listings" on Alibaba's marketplaces.  RS at 175; *see also*

*Vigil v. Gen. Nutrition Corp.*, No. 15-cv-0079, 2015 WL 2338982, at *14 (S.D. Cal. May 13,

2015) (dismissing implausible allegations based on studies given clear "mismatch between the

representations and the studies").  Moreover, the survey was not limited to counterfeit goods, but

also included "non-genuine products," a classification including "refurbished products," sellers

lacking specific "certification[s]"/"[]license[s],"and "label[ing] issues."  Compl. Ex. 6 at 11-14.

Accordingly, this data cannot support the Material Counterfeit Revenue Allegations.

Finally, Plaintiffs' counsel's sampling of goods on Alibaba's website, Compl. ¶¶ 251, 255, 258, 263-65, and review of court records, *id*. ¶ 274, do not support the Material Counterfeit Revenue Allegations.  This is only anecdotal evidence of a small number of allegedly counterfeit product listings.  Plaintiffs allege that when counsel searched the Chinese version of Alibaba.com, they found twelve merchants that "offer[ed] fakes."  *Id*. ¶ 251.  Plaintiffs' counsel also ran searches for terms such as "replica," "Birkin bag" and "Motorcycle bag" and allegedly found additional products counsel believed to be "counterfeit."  *Id*. ¶¶ 259, 260, 263.  These results fail to quantify Alibaba's revenue related to counterfeit sales.  *See In re AIG Advisor Grp. Sec. Litig.*, No. 06-cv-1625, 2007 WL 2750676, at *3-4 (E.D.N.Y. Sept. 20, 2007) (rejecting claim of material impact based on improper, unsupported data extrapolation); *Campo*, 635 F. Supp. 2d at 331 (rejecting conclusion based on exceedingly small fraction of data as "absurd").

**Inevitable Impact Allegations**:  The Inevitable Impact Allegations necessarily require the truth of the Material Counterfeit Revenue Allegations.  Because Plaintiffs fail to plead facts sufficient to show that a majority or a material portion of Alibaba's revenue related to counterfeit sales, they have failed to plead that Alibaba necessarily had to choose between loss of a material portion of its revenue following compliance with SAIC guidance or material government fines and penalties for failure to follow the SAIC's directives.  Accordingly, Plaintiffs' bald assertion that complying with the SAIC's administrative guidance was "bound to have a negative effective on revenue, earnings and share price," Compl. ¶ 117, cannot be accepted as true.  *See, e.g.*, *Abuhamdan*, 9 F. Supp. 3d at 203 (finding allegation that sales growth was illusory because it was driven by sales to promoters rather than customers "conclusory and speculative" because plaintiffs failed to plead facts showing that a majority of sales were to promoters).  Moreover,

this allegation is implausible on its face given the fact that Plaintiffs allege that Alibaba accepted

the SAIC's administrative guidance, and yet Alibaba's revenues have grown by 54% (US$2.74

billion), 40% (US$4.22 billion) and 45% (US$2.811 billion) per quarter (on a year-over-year

basis) since the July 16 Meeting.  Youngwood Exs. O-Q (Q2, Q3 and Q4 2015 Releases).

Finally, Plaintiffs quote no analysts suggesting a "material impact" on Alibaba's revenues

following the "white paper's" release.  Indeed, Plaintiffs cite analysts who suggest the opposite:

"[w]e believe Alibaba can grow revenues and profits substantially over the next several years,"

*id*. Ex. R (BMO), and "we continue to view the fundamentals at quite attractive," *id*. Ex. S

(Evercore).  Although Plaintiffs suggest Nomura believed that anti-counterfeiting efforts "would

have certain impact on [Alibaba's] advertising revenues," this statement was made by Mr. Xi—

who lacks the requisite knowledge (*supra* I.C.2); Nomura itself believed that concerns about

Alibaba's fundamentals were "unwarranted" and reiterated its "Buy rating."  *Id*. Ex. T.

**Counterfeit Facilitation Allegations**:  Plaintiffs allege that Alibaba failed to disclose

that it (i) optimized its search engines to search for counterfeit goods, Compl. ¶¶ 133, 153, 242-

43, 252, (ii) verified counterfeiters as Gold Suppliers and Assessed Suppliers, *id*. ¶¶ 244-47, (iii)

provided loans to merchants that sold counterfeit products, *id*. ¶¶ 248, 249, and (iv) assisted

merchants in evading takedown notices and enforcement of trademark rights.  *Id*. ¶ 272.

As a preliminary matter, accepting *arguendo* the facilitation allegations as true, there was

no duty to disclose information that was already in the public domain.  *See supra* I.B.1.  The

Counterfeit Facilitation Allegations were publicly alleged in the 2014 *Gucci* complaint and

widely reported in the media.  *See supra* p. 4; Appendix A.  The specificity of the Gucci

complaint rendered any possible omission on this point by Alibaba immaterial as a matter of law.

*See, e.g.*, Youngwood Ex. E ¶ 121("[T]he Alibaba Defendants and/or their systems and

algorithms are intentionally designed to cause consumers to be offered Counterfeit Products when they search for brand names . . . using the search functionality of the Alibaba Defendants."). *See, e.g.*, *In re UBS AG Sec. Litig.*, No. 07 Civ. 11225(RJS), 2012 WL 4471265, at *33 (S.D.N.Y. Sept. 28, 2012) ("Indeed, because the articles collectively revealed the existence of the DOJ and SEC investigations . . . and the risk that the danger to UBS would grow considerably, there was not a *substantial* likelihood that the disclosure of the omitted fact[s] would have been viewed by the reasonable investor as having significantly altered the total mix of information made available.") (citation and internal quotation marks omitted), *aff'd sub nom*. *City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173 (2d Cir. 2014).

Even if they could rely on the allegations in a trademark infringement action, Plaintiffs fail to adequately plead with the requisite particularity that Alibaba "is intentionally facilitating the offer and sale of counterfeit products on its e-commerce platforms." Compl. ¶ 252.

(i) *Optimized search engines*: Plaintiffs allege that Alibaba's platforms suggest search terms to direct customers towards counterfeit goods and imply that Alibaba is intentionally encouraging this conduct. *Id*.; *see also id*. ¶¶ 256-58. However, the Complaint merely alleges that "Alibaba's search engine suggests terms and provides search results that are a reflection of [] each customer's prior sales and searches on the platform" "in an effort to connect consumers to products [that] Alibaba believe[s] consumers are searching for." *Id*. ¶ 242. This allegation effectively states that Alibaba's platform makes suggestions to customers based on their own prior shopping patterns, not that Alibaba intentionally directs customers to counterfeit products.

(ii) *Gold and Assessed Suppliers*: Plaintiffs claim that Alibaba facilitated sales of counterfeit goods by knowingly labeling counterfeit merchants as Gold Suppliers and Assessed Suppliers, which Plaintiffs claim "communicates to consumers that Alibaba.com has investigated

the merchant and confirmed that the goods sold by that merchant are legitimate and lawful."
Compl. ¶¶ 244-45.  Plaintiffs fail to cite any factual source to support their assertion that Alibaba
vouches for the goods of such suppliers.  Accordingly, these allegations are not well-pleaded and
should not be accepted as true.  *See Optionable*, 577 F. Supp. 2d at 689.

(iii) *Loans to Small and Medium Sized Enterprises ("SME")*:  Plaintiffs claim Alibaba
makes loans to Gold and Assessed Suppliers that sell infringing products.  Compl. ¶¶ 248-49.
However, Plaintiffs do not claim Alibaba *targeted* counterfeit goods seller for loans.  Providing a
benefit to all qualifying merchants is not "facilitation" of improper acts by a subset of that group.

(iv) *Assisting merchants in evading takedowns and enforcement*:  Plaintiffs also claim
that "Alibaba assists merchants in evading takedown notices and enforcement of trademark
rights by delaying unreasonably in responding to [brand owner] complaint[s] . . . and by taking
insufficient or nonresponsive steps in response."  Compl. ¶ 272(a).  Plaintiffs' conclusion that
Alibaba's approach is "unreasonable" and its steps "insufficient" is entitled to no weight, as is
the labelling of such conduct as "facilitation."  *See In re AXIS Capital Holdings Ltd. Sec. Litig.*,
456 F. Supp. 2d 576, 585-86 (S.D.N.Y. 2006) (alleged anti-competitive scheme did not establish
falsity because it was not pleaded with particularity and was merely conclusory).  Moreover, the
allegation is not actionable because Alibaba disclosed its practices, and told investors that,
"because many sellers doing business on our marketplaces depend on us for their livelihood, we
have generally eschewed a 'shoot-first, ask questions later' approach."  RS at 210.

### 3.    Plaintiffs fail to allege any materially false statements

Plaintiffs do not allege that Defendants made any untrue statements related to the
Material Counterfeit Revenue Allegations or the Inevitable Impact Allegations, resting those
allegations entirely on omissions.  Plaintiffs make the following claims with respect to allegedly
false statements in support of their Counterfeit Facilitation Allegations:

- the Registration Statement contained a "false misleading" risk disclosure listing Alibaba's "measures against fictitious transactions," Compl. ¶¶ 129-30;

- the Registration Statement falsely stated that Alibaba maintains a "'no tolerance' policy with regard to counterfeit and fictitious activities," *id.* ¶¶ 131-32;

- Alibaba falsely stated on January 8, 2015 that it "takes the issue of IPR infringement very seriously" and was working "to enhance IPR protection . . . in order to tackle the problem of counterfeiting effectively," *id.* ¶¶ 188-89, and

- Defendant Tsai on January 29, 2015 falsely "listed a number of different methods Alibaba took to eliminate counterfeit products," and stated that "we work very hard to enforce them," *id.* ¶¶ 220, 227.

Plaintiffs base falsity on their claim that Alibaba "knowingly tolerated and even facilitated" counterfeit sales. *Id.* ¶ 227; *see also id.* ¶¶ 130, 132, 189(a). However, Plaintiffs do not adequately plead the falsity of the affirmative statements because the Complaint lacks *well-pleaded* facts that Alibaba did not take infringement issues seriously, that it was not taking steps (including those listed by Tsai) to address counterfeiting, or that it was actively facilitating counterfeit sales. *See supra* I.A.3.b; *see also Lululemon*, 14 F. Supp. 3d at 583 (no falsity where not alleged that steps identified to resolve quality issues "were not in fact taken").

### 4. Plaintiffs fail to allege facts giving rise to a strong inference of scienter

Plaintiffs fail to allege facts giving rise to a strong inference of scienter as to either the Individual Defendants or the Company based on motive and opportunity. *See supra* I.A.3.a.

Plaintiffs also fail to allege specific facts showing the Individual Defendants or the Company knowingly or recklessly failed to disclose the Material Counterfeit Revenue, Inevitable Impact or Counterfeit Facilitation Allegations. First, Plaintiffs do not plead the truth of the allegedly omitted information through well-pleaded facts. *See supra* I.C.2. Second, even if the information were true, Plaintiffs offer no facts showing any of the Individual Defendants or anyone at Alibaba responsible for making any of the allegedly false or misleading statements acted knowingly or recklessly. Plaintiffs do not allege that any of the Individual Defendants had

any information to suggest that Alibaba received a material portion of its revenue from counterfeit goods, that there would be an inevitable impact on that revenue based on Alibaba's response to the SAIC's guidance, or that certain employees were facilitating merchants' sales of counterfeit goods.  Nor have Plaintiffs identified any reports or statements in the possession of the Individual Defendants (or anyone else at Alibaba) that would have demonstrated the falsity of the allegedly misleading statements or omissions.  Instead, Plaintiffs merely conclude that the Individual Defendants had knowledge or were reckless "[b]y virtue of their positions at Alibaba."  Compl. ¶ 291.  Such boilerplate is clearly insufficient to plead scienter.

## II.      PLAINTIFFS FAIL TO STATE A CLAIM UNDER SECTION 20(a)

To state a Section 20(a) claim, plaintiff must plead: "(1) a primary violation . . . ; (2) control of the primary violator by the defendant; and (3) 'that the controlling person was in some meaningful sense a culpable participant' in the primary violation."  *Boguslavsky v. Kaplan*, 159 F.3d 715, 720 (2d Cir. 1998).  Plaintiffs' claim fails because they plead no actionable underlying primary violation and do not plead scienter for purposes of "culpable" participation.  *See In re J.P. Jeanneret Assocs.*, 769 F. Supp. 2d 340, 367 (S.D.N.Y. 2011) (McMahon, J.) (dismissing Section 20(a) claims against individual defendants not alleged to have acted with scienter).

<u>**CONCLUSION**</u>

Plaintiffs had five months to investigate their claims yet failed to plead actionable facts.  Accordingly, Defendants respectfully request the dismissal of the Complaint with prejudice.

DATED:  July 31, 2015                       SIMPSON THACHER & BARTLETT LLP

                                            By:   /s/ *Jonathan K. Youngwood*
                                                   Jonathan K. Youngwood

                                            *Counsel for Defendants Alibaba Group Holding Limited, Jack Yun Ma, Joseph C. Tsai, Jonathan Zhaoxi Lu, and Maggie Wei Wu*

40