**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE ALIBABA GROUP HOLDING LIMITED SECURITIES LITIGATION | Case No. 1:15-md-02631-CM |

**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**
**CONSOLIDATED CLASS ACTION COMPLAINT**

314759.1 ALIBABA

## TABLE OF CONTENTS

I.    INTRODUCTION ...................................................................................................1

II.   STATEMENT OF FACTS ......................................................................................3

     A.    The Chinese Regulatory and Law Enforcement Environment ................................3

         1.    The SAIC Is a Powerful Agency with Plenary Authority Over Alibaba...................................................................................................3

         2.    "Administrative Guidance" As an Important Law Enforcement Tool ........3

         3.    "Red Shield" and the SAIC Campaign to Clean Up Online Commerce .....3

     B.    The Rise of Alibaba: Notorious Counterfeit Marketer and an Historic U.S. IPO ............................................................................................................4

         1.    Alibaba's Notoriety in the Counterfeit Market and Efforts to Scrub its Image in Advance of the IPO.......................................................................4

         2.    Defendants Raise $32 Billion in the IPO and Follow-On Offering.............4

         3.    Alibaba Continues to Reap Rewards from Counterfeits.............................5

     C.    The July 16, 2014, SAIC Meeting and Critical Administrative Guidance .............7

     D.    The SAIC Publishes the White Paper, Stuns the Market, in January 2015 ............9

III.   APPLICABLE LEGAL STANDARDS DISFAVOR DEFENDANTS' MOTION..........10

IV.   THE COMPLAINT ALLEGES FALSITY ...................................................................11

     A.    Applicable Falsity Pleading Standards ................................................................11

     B.    Plaintiffs Identify Defendants' Misrepresentations and Omissions, as well as the Reasons Why Statements Were False and Misleading ....................................12

     C.    The Omitted Information Was Material ................................................................14

         1.    The July 16 Meeting, As Implementation of the Red Shield Program and Ongoing Administrative Guidance by the SAIC, Was Highly Unusual ......................................................................................................14

         2.    The SAIC and Alibaba Treated the July 16 Meeting, and the Administrative Guidance Issued Therein, As Highly Important ...............15

3.      Post-IPO, Counterfeiting Still Accounted for a Material Part of Alibaba's Business, Such That the Administrative Guidance Would Materially Affect Operations ..................................................16

4.      The July 16 Meeting and Administrative Guidance Posed a Material Risk to Alibaba's Finances .......................................................18

D.     Defendants Had a Duty to Disclose the Omitted Information ..............................20

1.      Defendants Had a Duty to Disclose the July 16 Meeting and Administrative Guidance to Prevent Their Statements from Misleading Investors ..........................................................................20

2.      Defendants Had a Statutory Duty to Disclose ...........................22

3.      Defendants Had a Duty to Disclose as a Seller of Stock ...........................23

E.      Defendants' Supposed Risk Disclosures Were Themselves False and Misleading..................................................................................................24

F.      The Truth on the Market Defense Does Not Apply...............................................26

V.      PLAINTIFFS ALLEGE A STRONG INFERENCE OF SCIENTER..............................28

A.     Applicable Scienter Pleading Standards ................................................................28

B.     Plaintiffs Allege Strong Circumstantial Evidence of Defendants' Knowledge or Recklessness ......................................................................................................29

1.      Defendants Knew or Should Have Known Facts, or Had Access to Information, Suggesting That Their Public Statements Were Not Accurate ....................................................................................29

2.      The Core Operations Doctrine Supports a Strong Inference of Scienter ......................................................................................31

3.      Scienter Can Be Imputed to Alibaba Through Its Corporate Agents ........32

4.      Scienter Can Be Imputed to the Individual Defendants as Members of the Alibaba Partnership...............................................................33

5.      The Individual Defendants' Signatures on SEC Filings ...........................33

C.     Plaintiffs Have Adequately Alleged Defendants' Motive and Opportunity..........34

1.      Defendants Ma and Tsai Had Motive for Personal Gain ...........................34

2.      All Defendants Had Motive to Protect Alibaba's Historic IPO................37

       D.      Lack of a Competing Inference Supports Plaintiffs' Scienter Allegations............38

VI.     THE COMPLAINT SUFFICIENTLY ALLEGES LOSS CAUSATION........................38

VII.    PLAINTIFFS STATE A CLAIM UNDER §20(a)............................................................40

VIII.   CONCLUSION..................................................................................................................40

## TABLE OF AUTHORITIES

CASES

*Aldridge v. A.T. CrossCorp.*,
    284 F.3d 72 (1st Cir. 2002) ................................................................................. 31

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ........................................................................................... 11

*Basic Inc. v. Levinson*,
    485 U.S. 224 (1988) ..................................................................................... 11, 18

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) ........................................................................................... 11

*Blue v. Doral Fin. Corp.*,
    Civil No. 14-1393(GAG), 2015 WL 4476163 (D.P.R. 2015) ............................ 17

*Caiola v. Citibank, N.A.*,
    295 F.3d 312 (2d Cir. 2002) ............................................................................... 20

*Carpenters Pension Trust Fund of St. Louis v. Barclays PLC*,
    750 F.3d 227 (2d Cir. 2014) ............................................................................... 38

*Carpenters Pension Trust Fund of St. Louis, St. Clair Shores Police & Fire Ret. Sys v. Barclays PLC*,
    56 F. Supp. 3d 549 (S.D.N.Y. 2014) ................................................................. 32

*Castellano v. Young & Rubicam, Inc.*,
    257 F.3d 171 (2d Cir. 2001) ............................................................................... 18

*Cosmas v. Hassett*,
    886 F.2d 8 (2d Cir. 1989) ............................................................................ 29, 31

*City of Roseville Emps.' Ret. Sys. v. EnergySolutions, Inc.*,
    814 F. Supp. 2d 395 (S.D.N.Y. 2011) ............................................................... 36

*Denney v. Jenkens & Gilchrist*,
    362 F. Supp. 2d 407 (S.D.N.Y.  2004) ............................................................... 33

*Dura Pharm., Inc. v. Broudo*,
    544 U.S. 336 (2005) ........................................................................................... 38

*ECA, Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*,
    553 F.3d 187 (2d Cir. 2009) .................................................................................... 12, 13, 34, 35

*Foman v. Davis*,
    371 U.S. 178 (1962) ......................................................................................................... 40

*Freudenberg v. E\*Trade Fin. Corp.*,
    712 F. Supp. 2d 171 (S.D.N.Y. 2010) ........................................................................... 38

*Ganino v. Citizens Utilities Co.*,
    228 F.3d 154 (2d Cir. 2000) ....................................................................................... 26, 28

*Geiger v. Solomon-Page Grp., Ltd.*,
    933 F. Supp. 1180 (S.D.N.Y. 1996) ............................................................................... 35

*Glazer v. Formica Corp.*,
    964 F.2d 149 (2nd Cir. 1992) ......................................................................................... 20

*Green v. Hamilton Int'l Corp.*,
    437 F. Supp. 723 (S.D.N.Y. 1977) ................................................................................. 24

*Halperin v. eBanker USA.com, Inc.*,
    295 F.3d 352 (2d Cir. 2002) ........................................................................................... 12

*Howard v. Everex Sys., Inc.*,
    228 F.3d 1057 (9th Cir. 2000) ....................................................................................... 34

*Hutchins v. NBTY, Inc.*,
    No. CV 10–2159 (LDW) (WDW), 2012 WL 1078823 (E.D.N.Y. Mar. 30, 2012) ......... 29

*In re Alliance Pharm. Corp. Sec. Litig.*,
    279 F. Supp. 2d 171 (S.D.N.Y. 2003) ........................................................................... 18

*In re Am. Bank Note Holographics, Inc. Sec. Litig.*,
    93 F. Supp. 2d 424 (S.D.N.Y. 2000) ............................................................................. 37

*In re Ambac Fin. Grp., Inc. Sec. Litig.*,
    693 F. Supp. 2d 241 (S.D.N.Y. 2010) ....................................................................... 32, 38

*In re Ancor Commc'ns., Inc. Sec. Litig.*,
    22 F. Supp. 2d 999 (D. Minn. 1998) .............................................................................. 31

*In re Apollo Grp. Inc. Sec. Litig.*,
    395 F. Supp. 2d 906 (D. Az. 2005) ................................................................................ 31

*In re Apple Computer Sec. Litig.*,
886 F.2d 1109 (9th Cir. 1989) ........................................................................ 27

*In re Atlas Air Worlwide Holdings, Inc. Sec. Litig.*,
324 F. Supp. 2d 474 (S.D.N.Y. 2004) .............................................................. 29

*In re Barrick Gold Sec. Litig.*,
13 CIV. 3851 SAS, 2015 WL 1514597 (S.D.N.Y. Apr. 1, 2015) ...................... 26, 29

*In re BISYS Sec. Litig.*,
397 F. Supp. 2d 430 (S.D.N.Y. 2005) .............................................................. 36

*In re BP p.l.c. Sec. Litig.*,
843 F. Supp. 2d 712 (S.D. Tex. 2012) .............................................................. 26

*In re Cabletron Sys., Inc.*,
311 F.3d 11 (1st Cir. 2002) ......................................................................... 33, 37

*In re Citigroup Inc. Sec. Litig.*,
753 F. Supp. 2d, 206 (S.D.N.Y. 2010) .............................................................. 32

*In re Dynex Capital, Inc. Sec. Litig.*,
No. 05 Civ. 1897(HB), 2009 WL 3380621 (S.D.N.Y. Oct. 19, 2009) ................... 32

*In re EVCI Colleges Holding Corp. Sec. Litig.*,
469 F. Supp. 2d 88 (S.D.N.Y. 2006) ............................................................. 25, 30

*In re Facebook, Inc. IPO Sec. & Derivative Litig.*,
986 F. Supp. 2d 487 (S.D.N.Y. 2013) ................................................. 19, 22, 23, 25

*In re Fairway Grp. Holding Corp. Sec. Litig.*,
No. 14 CIV. 0950 LAK, 2015 WL 249508 (S.D.N.Y. Jan. 20, 2015) ................... 35

*In re Forest Labs. Sec. Litig.*,
No. 05 CIV. 2827 (RMB), 2006 WL 5616712 (S.D.N.Y. July 21, 2006) ........... 35, 36

*In re Fuwei Films Sec. Litig.*,
634 F. Supp. 2d 419 (S.D.N.Y. 2009) .............................................................. 27

*In re Hi-Crush Partners L.P. Sec. Litig.*,
No. 12 Civ. 8557(CM), 2013 WL 6233561 (S.D.N.Y. Dec. 2, 2013) ......... 28, 31, 32

*In re Huffy Corp. Sec. Litig.*,
577 F. Supp. 2d 968 (S.D. Ohio 2008) .............................................................. 31

*In re Indep. Energy Holdings, PLC Sec. Litig.*,
   154 F. Supp. 2d 741 (S.D.N.Y. 2001) ........................................................ 37

*In re JPMorgan Chase & Co. Sec. Litig.*,
   No. 12 Civ. 03852(GBD), 2014 WL 1297446 (S.D.N.Y. Mar. 31, 2014) .............................. 29

*In re Livent, Inc. Noteholders Sec. Litig.*,
   174 F. Supp. 2d 144 (S.D.N.Y. 2001) ........................................................ 36

*In re Longtop Fin. Techs. Ltd.*,
   2012 WL 2512280 (S.D.N.Y. June 28, 2012) .................................................. 40

*In re Longwei Petroleum Inv. Holding Ltd. Sec. Litig.*,
   No. 13 CV 214(HB), 2014 WL 285103 (S.D.N.Y. Jan. 27, 2014) .................................. 40

*In re Marsh & McLennan Cos., Inc. Sec. Litig.*,
   501 F. Supp. 2d 452 (S.D.N.Y. 2006) ..................................................... 16, 32

*In re Omnicom Grp., Inc. Sec. Litig.*,
   597 F.3d 501 (2d Cir. 2010) ................................................................ 38

*In re Oxford Health Plans, Inc.*,
   187 F.R.D. 133 (S.D.N.Y. 1999) ............................................................ 36

*In re Prudential Securities Inc. Ltd. Partnerships Litig.*,
   930 F. Supp. 68 (S.D.N.Y. 1996) ........................................................... 25

*In re Refco, Inc. Sec. Litig.*,
   503 F. Supp. 2d 611 (S.D.N.Y. 2007) ....................................................... 36

*In re Sanofi-Aventis Sec. Litig.*,
   774 F. Supp. 2d 549 (S.D.N.Y. 2011) ..................................................... 28, 29

*In re Scholastic Corp. Sec. Litig.*,
   252 F.3d 63 (2d Cir. 2001) ................................................................ 35

*In re Take-Two Interactive Sec. Litig.*,
   551 F. Supp. 2d 247 (S.D.N.Y. 2008) ..................................................... 30, 35

*In re Time Warner Inc. Sec. Litig.*,
   9 F.3d 259 (2d Cir. 1993) ................................................................. 20

*In re Van der Moolen Holding N.V. Sec. Litig.*,
   405 F. Supp. 2d 388 (S.D.N.Y. 2005) ....................................................... 25

*In re Vivendi Universal, S.A. Sec. Litig.*,
  634 F. Supp. 2d 352 (S.D.N.Y. 2009)........................................................... 39

*In re WorldCom, Inc. Sec. Litig.*,
  352 F. Supp. 2d 472 (S.D.N.Y. 2005)........................................................... 32

*Johnson v. Sequans Commc'ns S.A.*,
  11 CIV. 6341 PAC, 2013 WL 214297 (S.D.N.Y. Jan. 17, 2013)........................... 35

*King Cnty., Wash. v. IKB Deutsche Industriebank AG*,
  708 F. Supp. 2d 334 (S.D.N.Y. 2010)........................................................... 38

*Kronfeld v. Trans World Airlines, Inc.*,
  832 F.2d 726 (2d Cir. 1987)........................................................................ 27

*Lentell v. Merrill Lynch & Co.*,
  396 F.3d 161 (2d Cir. 2005) .................................................................. 38, 39

*Lilly v. State Teachers Ret. Sys. of Ohio Pension Fund*,
  608 F.2d 55 (2d Cir. 1979)......................................................................... 15

*Lin v. Interactive Brokers Grp., Inc.*,
  574 F. Supp. 2d 408 (S.D.N.Y. 2008)....................................................... 12, 22, 23, 25

*List v. Fashion Park, Inc.*,
  340 F.2d 457 (2d Cir. 1965)........................................................................ 13

*Makor Issues & Rights, Ltd. v. Tellabs Inc.*,
  513 F.3d 702 (7th Cir. 2008) ................................................................. 29, 32

*Mateo v. Bristow*,
  No. 12 CIV. 5052 RJS, 2013 WL 3863865 (S.D.N.Y. July 16, 2013)..................... 11

*Matrixx Initiatives, Inc. v. Siracusano*,
  131 S.Ct. 1309 (2011)........................................................................... 10, 11

*McCormick v. Fund Am. Cos., Inc.*,
  26 F.3d 869 (9th Cir. 1994) ........................................................................ 24

*Metz v. U.S. Life Ins. Co. in the City of New York*,
  662 F.3d 600 (2d Cir. 2011)........................................................................ 10

*Meyer Pincus & Assoc., P.C. v. Oppenheimer & Co.*,
  936 F.2d 759 (2d Cir. 1991)........................................................................ 12

*Meyer v. Jinkosolar Holdings Co., Ltd.*,
   761 F.3d 245 (2d Cir. 2014) ................................................................ 12, 20, 21, 25

*New Orleans Emps. Ret. Sys. v. Celestica, Inc.*,
   455 F.App'x 10 (2d Cir. 2011) .................................................................... 20, 30

*No. 84 Employer-Teamster Joint Council Pension Trust Fund v. Am. W. Holding Corp.*,
   320 F.3d 920 (9th Cir. 2003) ........................................................................... 22

*Novak v. Kasaks*,
   216 F.3d 300 (2d Cir. 2000) ..................................................................... passim

*Panther Partners Inc. v. Ikanos Commc'ns, Inc.*,
   681 F.3d 114 (2d Cir. 2012) ............................................................................ 23

*Penn. Pub. Sch. Emps.' Ret. Sys. v. Bank of Am. Corp.*,
   874 F. Supp. 2d 341 (S.D.N.Y. 2012) ............................................................. 32

*Pontiac Gen. Emps. Ret. Sys. v. Lockheed Martin Corp.*,
   875 F. Supp. 2d 359 (S.D.N.Y. 2012) ....................................................... 20, 29

*Press v. Chem. Inv. Servs. Corp.*,
   166 F.3d 529 (2d Cir. 1999) ............................................................................ 34

*Richman v. Goldman Sachs Grp., Inc.*,
   868 F. Supp. 2d 261 (S.D.N.Y. 2012) ............................................................. 22

*Rombach v. Chang*,
   355 F.3d 164 (2d Cir. 2004) ............................................................................ 25

*S.E.C. v. Mayhew*,
   121 F.3d 44 (2d Cir. 1997) ........................................................................ 12, 15

*San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Cos., Inc.*,
   75 F.3d 801 (2d Cir. 1996) .............................................................................. 35

*Shapiro v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
   495 F.2d 228 (2d Cir. 1974) ............................................................................ 23

*Shaw v. Digital Equip. Corp.*,
   82 F.3d 1194 (1st Cir. 1996) ...................................................................... 23-24

*Simon v. Abiomed, Inc.*,
   37 F. Supp. 3d 499 (D. Mass. 2014) ............................................................... 17

*Stevelman v. Alias Research Inc.*,
174 F.3d 79 (2d Cir. 1999) ............................................................................................. 35

*Stratte-McClure v. Morgan Stanley*,
776 F.3d 94 (2d Cir. 2015) ............................................................................................. 22

*Strougo v. Barclays PLC*,
14-CV-5797 SAS, 2015 WL 1883201 (S.D.N.Y. Apr. 24, 2015) ........................................... 26

*Teamsters Local 445 Freight Division Pension Fund v. Dynex Capital Inc.*,
531 F.3d 190 (2d Cir. 2008) ..................................................................................... 28, 32

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
551 U.S. 308 (2007) ........................................................................................ 12, 28, 38

*United Paperworkers Int'l Union v. Int'l Paper Co.*,
985 F.2d 1190 (2d Cir. 1993) .......................................................................................... 27

*Van Dongen v. CNinsure Inc.*,
951 F. Supp. 2d 457 (S.D.N.Y. 2013) ........................................................................... 37, 38

*Vanleeuwen v. Keyuan Petrochemicals, Inc.*,
No. 03 Civ. 8284(RWS), 2014 WL 3891351 (S.D.N.Y. Aug. 8, 2014) ................................... 40

*White v. H&R Block, Inc.*,
No. 02 CIV. 8965 (MBM), 2004 WL 1698628 (S.D.N.Y. July 28, 2004) ................................ 27

*Zola v. Gordon*,
685 F. Supp. 354 (S.D.N.Y. 1988) .................................................................................... 33

STATUTES

15 U.S.C. § 78u .............................................................................................. 11, 23, 27

RULES

Fed. R. Civ. P. 8(a)(2) .................................................................................................. 38, 40

Fed. R. Civ. P 12(g) ......................................................................................................... 11

Fed. R. Civ. P. 15(a)(2) .................................................................................................... 40

REGULATIONS

17 C.F.R. § 229.503(c) ........................................................................................... 23

17 C.F.R. § 240.10b-5 ............................................................................................ 13

17 C.F.R. 229.10 .................................................................................................... 22

17 CFR 229.303 ..................................................................................................... 22

27 CFR 229.10 ....................................................................................................... 22

OTHER AUTHORITIES

*In Re Comm'n Guidance Regarding MD&A of Fin. Condition & Results of Operation*,
   Release No. 8350, 2003 WL 22996757 (Dec. 19, 2003) ...................................... 22

Lead Plaintiffs William Tai and Christine Asia Co., Ltd., along with named plaintiffs Abel Amoros, Arthur Gabriel, Raymond Lee, and Gang Liu (collectively "Plaintiffs"), hereby oppose Defendants'[1] motion to dismiss (Dkt. Nos. 16 (the "Motion") and 17 ("Def. Br.")). For the reasons set forth herein, the Motion, seeking dismissal of Plaintiffs' Consolidated Class Action Complaint (Dkt. No. 6, the "Complaint"),[2] should be denied in its entirety.

## I.      INTRODUCTION

Plaintiffs bring this action on behalf of themselves and others who purchased or acquired Alibaba American Depositary Shares ("ADS"), or purchased call options or sold put options on Alibaba ADS, during the period from September 19, 2014, through and including January 29, 2015 (the "Class Period"). Plaintiffs seek to recover damages for violations of §§ 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder.

This case centers on Defendants' failure to disclose material adverse information in advance of and following Alibaba's massive $25 billion initial public offering in September 2014 (the "IPO"), from which Defendant Tsai reaped over ***$353 million*** in proceeds and Defendant Ma pocketed over ***$1 billion dollars***, catapulting Ma to become the richest man in China. Specifically, Defendants failed to disclose that on July 16, 2014, Alibaba was subject to an unusual and unprecedented proceeding administered by China's State Administration of Industry and Commerce ("SAIC") along with seven provincial Administrations of Industry and Commerce ("AICs"), China's powerful regulators of businesses and economic activity (the "July 16 Meeting").

At this meeting, the SAIC administered harsh "Administrative Guidance" – a form of formal Chinese law enforcement – to Alibaba. Specifically, the SAIC warned a contingent of high-ranking Alibaba executives and representatives that the Company lacked appropriate internal controls and that its e-commerce platforms operated "in contravention of national laws, regulations, and policies"

---

[1] Defendants are: Alibaba Group Holding Limited ("Alibaba" or "the Company"); Jack Ma ("Ma"), founder and Executive Chairman of the Board; Joseph Tsai ("Tsai"), co-founder and Executive Vice Chairman; Jonathan Zhaoxi Lu ("Lu"), CEO and director; and Maggie Wei Wu ("Wu"), CFO.

[2] Unless otherwise noted, citations herein to "¶__" refer to Plaintiffs' Complaint and capitalized terms herein have the same meaning as set forth in the Complaint.

by engaging in, *inter alia*, the sale of counterfeit and illegal products, improper sales practices, obstruction of justice, bribery, and allowing vendors to engage in consumer fraud. Accordingly, the SAIC ordered Alibaba to take immediate steps to improve its controls, to combat counterfeiting, and to come into legal compliance. This Administrative Guidance was likely to materially impact Alibaba's finances and operations by means of: (i) penalties for non-compliance, including the threat of thousands fines of upwards of $8.1 million each and the revocation of Alibaba's business license; and/or (ii) costs of compliance in the form of lost sales and advertising revenues associated with the sale of counterfeit goods – one of Alibaba's main profit engines.

After the close of trading on January 27, 2015, the Chinese government published a scathing report that, for the first time, outlined the events of the July 16 Meeting and detailed the Administrative Guidance provided to Alibaba, including the numerous legal violations the SAIC claimed Alibaba had committed or facilitated (the "White Paper"). On this news, the Company's ADS price declined over 13% in a two-day period, erasing over $33 billion in shareholder equity.

Defendants' Motion is premised on their untenable characterization of the July 16 Meeting as a non-event. *See, e.g.*, Def. Br. at 2, 25-26. Based on their blithe dismissal of the materiality of the July 16 Meeting and Administrative Guidance, Defendants all but ignore their duty to disclose this material information in the IPO offering documents and other Class Period statements pursuant to SEC Regulation S-K, and in order to otherwise prevent their statements from being inaccurate, incomplete, or misleading. Alternatively, despite the fact that Defendants *did not once* mention the July 16 Meeting in the IPO Registration Statement (or otherwise during the Class Period), Defendants now claim that they *had* adequately disclosed the potential risk of negative governmental actions to Alibaba's business. *See, e.g.*, Def. Br. at 9. As set forth herein, Defendants' vague risk warnings were grossly inadequate and were themselves false and misleading.

Try as they may, Defendants' litany of unpersuasive excuses for their conduct and recitation of purportedly exculpatory facts does not alter that the Complaint adequately states claims for securities fraud. Defendants' Motion should be denied in its entirety.

## II.     STATEMENT OF FACTS

### A.     The Chinese Regulatory and Law Enforcement Environment

#### 1.     The SAIC Is a Powerful Agency with Plenary Authority Over Alibaba

Charged with regulatory and law enforcement authority over all Chinese businesses, the SAIC is a powerful governmental ministry that wields great influence over the Chinese economy. ¶¶51-53. As part of its regulatory function, the SAIC oversees and coordinates numerous provincial and municipal level AICs. ¶56. The Department of Market Regulation (the "Department") – which issued the White Paper – is one of 17 departments of the SAIC, and is responsible for initiating special campaigns to address marketplace problems, and, significantly here, regulating all online transactions. ¶55.

#### 2.     "Administrative Guidance" As an Important Law Enforcement Tool

Chinese law provides that compulsory measures should not be used where goals can be achieved through non-compulsory measures. ¶¶88-89. Accordingly, Administrative Guidance is utilized extensively by the SAIC as a method of non-compulsory law enforcement by which the government can secure legal compliance of regulated entities. ¶¶76-77, 80, 88. However, where a regulated entity fails or refuses to comply with Administrative Guidance, it will quickly be the subject of compulsory law enforcement measures, including administrative penalties. ¶¶81, 90-91. The importance of Administrative Guidance as an effective form of law enforcement has been repeatedly confirmed by the Chinese government and prominent Chinese legal academics. ¶¶82-87.

#### 3.     "Red Shield" and the SAIC Campaign to Clean Up Online Commerce

In the months leading up to Alibaba's September 2014 IPO, the SAIC had become increasingly alarmed by the proliferation of abusive and illegal practices that permeated e-commerce in China. ¶58. Accordingly, on June 12, 2014, the SAIC launched operation Red Shield Web Sword ("Red Shield") to address these practices by: (a) employing "intensified," "harsher," and "forceful" law enforcement against violators; and (b) prompting third-party platform operators, like Alibaba, to carry out self-examination and self-correction. ¶165. To be sure, Red Shield was a key Chinese law enforcement initiative which charged the SAIC with extraordinary power to take down serious

violators, and the SAIC made its intention to ratchet up its enforcement efforts clear. ¶¶59-61; Rosen Decl. Ex. B.

**B.      The Rise of Alibaba: Notorious Counterfeit Marketer and an Historic U.S. IPO**

      **1.      Alibaba's Notoriety in the Counterfeit Market and Efforts to Scrub its Image in Advance of the IPO**

Alibaba was formed in 1999 as a business-to-business ("B2B") platform connecting Chinese manufacturers and foreign domestic buyers. ¶40. Alibaba soon expanded its focus to consumer markets, with the addition of Taobao in 2003 and TMall in 2008. *Id.* From inception, counterfeit goods accounted for a substantial part of both Alibaba's B2B and consumer businesses. ¶41-43. Alibaba served as a hub connecting counterfeit wholesale sellers to retail sellers, with the International Anti-Counterfeiting Coalition reporting that "counterfeiters from all over the world converge on the alibaba.com site." ¶42. From 2008 to 2011, the United States Trade Representative (the "USTR") repeatedly named Alibaba and Taobao "Notorious Markets" – a designation marking abundant piracy, counterfeiting, and other violations of intellectual property rights. ¶44.

In 2012, Alibaba spent nearly half a million dollars and hired a former USTR general counsel to lobby the White House, Capitol Hill, and the USTR to remove Taobao's designation as a Notorious Market. ¶45. Money well spent, the lobbying efforts proved successful when the USTR agreed to remove Taobao from its Notorious Markets report in December 2012. ¶46. Having scrubbed clean Alibaba's tarnished image, in September 2013, Defendants announced that the entire Alibaba group would be listed on a U.S. stock exchange. ¶¶49-50.

      **2.      Defendants Raise $32 Billion in the IPO and Follow-On Offering**

The IPO Registration Statement became effective on September 18, 2014, and the final Prospectus for the IPO (which forms part of the Registration Statement) was filed on September 22, 2014. ¶¶100-01. In the IPO, Alibaba sold 368,122,000 ADSs priced at $68 per ADS, raising $25 billion. ¶¶99, 101, 235. The IPO proved to be the largest in history, with Alibaba receiving $10 billion and early investors (including Defendants Ma and Tsai) receiving returns totaling $15 billion. ¶¶3, 235. In November 2014, Defendants announced that an additional $8 billion of Alibaba senior

unsecured notes of varying maturities (the "Notes") would be offered for sale to the U.S. investing public in an SEC-exempt offering. ¶¶236-37 (the Notes together with the IPO, the "Offerings").

### 3.    Alibaba Continues to Reap Rewards From Counterfeits

Unfortunately, Defendants focused their "clean-up" efforts on Alibaba's image more than its legal compliance. Unbeknownst to investors, both prior to and after the IPO, Alibaba continued to facilitate and rely substantially on sales of counterfeit goods. In addition to sales revenue derived directly from counterfeit goods, Alibaba draws substantial advertising revenues based on sales.[3] Thus, were the Company to truly crack down on counterfeits, both its gross merchandise sales value and advertising revenues would decrease.

As confirmed by CW1,[4] while Alibaba ostensibly employed anti-counterfeit policies and practices,[5] counterfeits were largely ignored (or, in fact, were supported). ¶138. Take, for example, Taobao, which accounts for about 55% of Alibaba's total gross merchandise value sold. ¶38. Because counterfeit sellers paid top dollar for the right to use certain keywords to drive sales, and because advertising revenues depended on sales figures, Taobao's attitude was "Okay, pay for the keyword and go for it" to meet revenue goals. ¶139. The central importance of counterfeit goods is supported by a report issued by an analyst at Nomura Securities in February 2015 (the "Nomura Report"), based in part upon an interview conducted with Xi Liao, the third party development manager for Taobao's P4P advertising department from 2009-2013. ¶¶134-35; Declaration of Laurence M. Rosen ("Rosen Decl."), at Ex. B. According to Mr. Liao, Alibaba treated counterfeits as a product category with its own specific, strong market demand.[6] Thus, Alibaba would arrange its

---

[3] Nearly half of Alibaba's revenues come from pay-for-performance ("P4P") and display marketing fees, both of which are forms of advertisement. ¶39.

[4] CW1 was a Taobao Product Manager between February 2010 and November 2013, with responsibility for developing and improving Taobao algorithms, particularly in advertising. ¶137.

[5] Among such practices was Alibaba's categorization of merchants into tiers. Two of the highest tiers are Gold and Assessed Suppliers. ¶244. To reach either tier, a merchant must pay Alibaba a membership fee and pass an onsite inspection. ¶¶244-45. As set forth below, even these "assurances" proved meaningless.

[6] *See* Rosen Decl. (Nomura Report), Ex. B (Mr. Liao explains, "[t]he percentage of fake goods on Taobao is unlikely to significantly decrease because the platform reflects the market's actual demand."); ¶134.

platform to allow counterfeit merchants to sell counterfeits to these customers to obtain revenues from these merchants' advertisements. ¶¶134-36.

In May 2015, a group of brand owners (including luxury brands Gucci, Balenciaga, Bottega Veneta, and Yves Saint Laurent) sued Alibaba for facilitating sales of counterfeit products in the action styled *Gucci America, Inc., v. Alibaba Group Holding, Ltd.*, 15-cv-3784 (S.D.N.Y.) (the "*Gucci* action"). The *Gucci* action charged, *inter alia*, that: counterfeits are prevalent throughout Taobao (¶264); that Alibaba programmed its proprietary technology to direct consumers to purchase counterfeit goods (¶¶261-62); that even Alibaba's "certified" suppliers routinely sold counterfeits[7] (¶¶246-47); and that that Alibaba employed deliberately lax enforcement to allow merchants to continue selling counterfeit goods even after they are identified, including that Alibaba unreasonably delayed acting on brand owners' complaints, automatically rejecting some (¶272).

The *Gucci* allegations are confirmed by Plaintiffs' counsel's investigation, which similarly revealed that merchants continued to sell counterfeit goods through Alibaba even after they had been convicted or enjoined during or after the Class Period (*e.g.*, ¶¶251, 256-57, 260, 263, 265, 274), as well as outside reports, which showed that counterfeits and other unlawful products continue to proliferate on Alibaba's platforms. For example, in a January 23, 2015, report on a random check of well-known branded products, the SAIC reported that it had found that about 63% of Taobao's products were non-genuine,[8] the highest rate of any platform. ¶¶190, 253. Similarly, the American Apparel & Footwear Association, whose members contribute $361 billion in annual U.S. retail sales, reported that Taobao's violations have only *increased* since its designation as a Notorious Market was stricken. ¶177(c).

---

[7] Notably, these merchants offered their merchandise at prices far below the market. ¶¶247, 251.

[8] Defendants make much of the fact that "non-genuine" includes defective, uncertified, unlicensed, and illegal products. *E.g.*, Def. Br. at 34. But this clarification only supports Plaintiffs' position: as all samples were selected from well-known brands, the fact that a product was defective or unlicensed suggests that it was counterfeited, since brands do not typically allow defective products to be sold.

### C.      The July 16, 2014, SAIC Meeting and Critical Administrative Guidance

Prior to the IPO – and unbeknownst to investors – Alibaba was a principal target of Red Shield and the subject of strict Administrative Guidance. ¶166. Defendants knew as much, however, when Alibaba was summoned to the July 16 Meeting with the SAIC. ¶¶63, 94.

The July 16 Meeting was unprecedented. Before the meeting, the SAIC and seven regional and provincial AICs formed a joint administrative guidance working team, which conducted extensive research and study. ¶¶63, 69, 94(i). The meeting was chaired by the Director General of the Department, Liu Hongliang. ¶65. Alibaba's Chief Risk Officer and Alibaba Partner,[9] Xiaofeng Shao, attended the meeting, along with several principal officers of Alibaba and the senior manager of each of Alibaba's core business units. ¶¶7, 66. And, though SAIC meetings are usually open to the public, the July 16 Meeting was held behind closed doors to avoid exposing negative information that might affect the impending IPO. ¶¶7, 67.

At the July 16 Meeting, the SAIC explained to Alibaba that it was one of the main targets of Red Shield (¶166),[10] and that Alibaba's legal violations had "snowball[ed] into a serious problem," namely, "Alibaba['s] greatest credibility crisis since its incorporation." ¶68. As part of its Administrative Guidance, the SAIC raised a number of specific violations, including, *inter alia*:

- **Unlicensed vendors**: allowing vendors to operate under false names and false business licenses and to illegally use trademarks and names owned by other businesses (¶70(i));

- **Counterfeits and illegal products**: knowingly aiding, abetting, and facilitating merchants' sales of counterfeit, fake, substandard, and illegal products, as well as setting unreasonable procedural hurdles for customers to lodge complaints of the same (¶70(ii));

- **Improper sales practices**: false advertising, illegal raffles, abusing monopoly power, violating consumer rights, commercial bribery, and tolerating illegal activities (¶70(iii));

- **Consumer fraud**: systematically aiding merchants in creating false positive reviews, deleting negative reviews, and creating false transactions to fool customers into thinking a product is popular (¶70(iv));

---

[9] *See* Rosen Decl. Ex. C-3 (Registration Statement), at 232.

[10] Indeed, the purposes of Red Shield align perfectly with the Administrative Guidance issued to Alibaba. *Compare* Red Shield Notice (Rosen Decl. Ex. A & ¶58) *with* White Paper (Dkt. No. 6-1 & ¶¶8, 70).

- **Obstruction of justice**: tipping off merchants to imminent SAIC raids (¶70(v)), and deliberately setting up a difficult complaint process to discourage consumers from protecting their rights and prevent law enforcement (¶8(h)); and

- **Bribery**: taking bribes from merchants to boost their search rankings and provide more advantageous advertising positioning (¶8(d)).

Director General Liu specifically told Alibaba that its monitoring and enforcement efforts were deficient, that its internal control policies were defective, and that its e-commerce platforms operated "in contravention of national laws, regulations, and policies." ¶71. As investors later learned, Director Liu warned Alibaba senior executives that the SAIC was prepared to levy penalties "1,000 times or even several thousand times a year, with each fine amounting to 1% of Alibaba's daily sales amounts [or $8.1 million]." ¶¶11, 72.[11]  For its part, Alibaba admitted that the SAIC's criticisms were on point and its demands that Alibaba take immediate action were well grounded. ¶¶73-75. Alibaba conceded that "the greatest risk" facing the Company "originate[d] from three areas: counterfeits, intellectual property rights, and hyped up credibility claims." ¶173. Accordingly, Alibaba purported to accept the SAIC's administrative guidance and promised to take proper measures to rectify the significant issues. ¶¶10, 73-75, 222.

After the July 16 Meeting, the provincial AIC of Zhejiang (the site of Alibaba's headquarters) held a special meeting to review the July 16 Meeting and decided to submit a report to the Zhejiang Provincial Government. ¶94(iii). According to the White Paper, the Department noted that the July 16 Meeting had "made [Alibaba] clearly aware of e-commerce regulatory agencies' severe concern and censure as to the long existing misconduct on the platforms in Alibaba family." Dkt. No. 6-1 at 23. The Zhejiang Provincial AIC also created a plan to appear at Alibaba's offices in furtherance of the Administrative Guidance. ¶94(iv).

---

[11] *See* ¶11, n. 2 (Daily sales amounts are the gross merchandise value of goods sold on Alibaba's platforms daily, which amounted to $296 billion in 2014. ($296 billion sales annually ÷ 365) x 1% = approximately $8.1 million).  Moreover, whereas a fine of 1.0% of daily sales amounts levied on a daily basis would mean fines of $2.96 billion annually, and where Alibaba's fiscal 2014 revenue was $8.4 billion, the threatened fines constituted approximately 35% of Alibaba's fiscal 2014 revenue. "Thousands of fines" would be significantly greater.

**D.      The SAIC Publishes the White Paper, Stuns the Market, in January 2015**

Defendants enjoyed the success of Alibaba's inflated share price throughout the fall of 2014 and into early 2015, with shares reaching a Class Period high of $120 in intraday trading on November 13, 2014. ¶14. Then, at approximately 6:49 p.m. (EST) on January 27, 2015, the SAIC published the White Paper by posting it on its website. ¶¶94(v), 191. The White Paper summarized the entire Administrative Guidance proceeding, including the events of the July 16 Meeting, the Administrative Guidance provided to Alibaba, and detailed the numerous unlawful acts and violations the SAIC claimed Alibaba had committed or facilitated. ¶192. The White Paper demonstrated that even though Alibaba no longer was designated a Notorious Market, it continued to tolerate, and even encourage, counterfeiting, as well as other unlawful sales practices, and that it indeed relied upon these unlawful practices to increase its sales volume and revenue.

Western media first picked up on the White Paper a few hours later, at approximately 9:40 p.m. (EST) on January 27, 2015, with two additional articles published that night and in the early morning hours of January 28. ¶¶196-98. In an effort to limit the damage caused by the White Paper, Alibaba immediately fought back, releasing a statement criticizing Director General Liu and the SAIC for "misconduct in the process of law enforcement." ¶199. At the same time, Alibaba pledged to hire more people and improve its technologies to fight counterfeits and further claimed (falsely) that Alibaba itself was a victim of counterfeits. *Id.* Alibaba also used its considerable wealth and influence to pressure the SAIC to remove the White Paper from the SAIC website, and as a result, at approximately at 5:00 a.m. (EST) on January 28, 2015, the SAIC removed the White Paper, and the links in the news articles that had been published therefore went dead. ¶¶196 (at n.22), 200.

With the news of the White Paper just starting to sink in on January 28, 2015 (*see* ¶¶194, 200, 205-06), Alibaba's stock price fell $4.49/ADS (or 4.4% from its previous close), to close at $98.45/ADS, on unusually high volume of over 42 million shares traded. ¶207.

Then, between the close of trading on January 28, and its close on January 29, more dire news was announced. At 11:15 p.m. (EST) on January 28, 2015, Chinese news media reported that several participants in the July SAIC Meeting revealed that Director General Liu had threatened to

impose extraordinarily high penalties (namely, up to several thousand penalties a year, each worth 1% of Alibaba's daily sales amounts, or $8.1 million each). ¶208. These threatened penalties were not mentioned in the White Paper itself. Moreover, in a press release and earnings call held on January 29, Defendants confirmed the authenticity of the White Paper and that it referred to an actual meeting that had been held between Alibaba and the SAIC (the July 16 Meeting). ¶210.

Analysts were shocked that Alibaba failed to disclose the July 16 Meeting. For example, Sam Hamadeh, CEO of IPO research firm PrivCo, claimed that "there's no question the narrative would have started to change [had Alibaba disclosed the July 16 Meeting], there would have been questions at their road show." ¶218. At least three analysts cited the revelations set forth in the White Paper in either downgrading Alibaba or reducing their price target. ¶¶211(a)-(c), 214 (BMO specifically attributed the price decreases on January 28 and 29 to the White Paper). Others noted the White Paper without quantifying its impact, including analysts who predicted that the SAIC's targeting Alibaba would likely decrease its advertising revenue (¶211(d)), while others claimed Alibaba's poor relationship with the SAIC would impair its financial performance going forward (¶211(e)-(f)).

On this news, Alibaba's stock price fell an additional $8.64 to close at $89.81 on January 29, 2015, a one day decline of almost 9%, again on unusually high volume of more than 76.5 million shares traded. ¶213. This marked a two-day total decline in the price of Alibaba's ADS of over 13%, eliminating approximately $33 billion in shareholder equity in one fell swoop. ¶¶ 20, 215. At least one Chinese news outlet cited the revelations contained in the White Paper as the cause of the $33 billion decline in Alibaba's market capitalization. ¶216. On January 30, 2015, the SEC launched a non-public investigation into whether Alibaba violated the federal securities laws by failing to disclose the July 16 Meeting in its public filings. ¶219.

## III.   APPLICABLE LEGAL STANDARDS DISFAVOR DEFENDANTS' MOTION

On a Rule 12(b)(6) motion, the Court must "accept all factual allegations as true and draw all reasonable inferences in favor of the plaintiff." *Metz v. U.S. Life Ins. Co. in the City of New York*,

662 F.3d 600, 602 (2d Cir. 2011).[12] To survive a motion to dismiss, a complaint need only "contain sufficient factual matter…to 'state a claim that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Matrixx Initiatives, Inc. v. Siracusano*, 131 S.Ct. 1309, 1322-23 (2011) (same). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678; *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 545 (2007) (a complaint need only contain "enough fact[s] to raise a reasonable expectation that discovery will reveal evidence" supporting the claims).

To state a claim under § 10(b) and Rule 10b-5, a plaintiff must allege: (1) a material misrepresentation or omission ("falsity"); (2) scienter; (3) a connection with the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation. *Matrixx*, 131 S. Ct. at 1317. Here, Defendants contest only falsity, scienter, and loss causation (in part).[13] As to these and all required elements, the Complaint is sufficient.

## IV.   THE COMPLAINT ALLEGES FALSITY

### A.    Applicable Falsity Pleading Standards

Whereas the "fundamental purpose" of the Exchange Act is to implement "a philosophy of full disclosure," Defendants are liable under §10(b) for affirmative misstatements and material omissions. *Basic Inc. v. Levinson*, 485 U.S. 224, 230 (1988) ("There cannot be honest markets without honest publicity. Manipulation and dishonest practices of the market place thrive upon mystery and secrecy."). Under Rule 9(b) and the PSLRA, a plaintiff adequately pleads falsity by "specify[ing] each statement alleged to have been misleading" and "the reason or reasons why the statement is misleading." 15 U.S.C. §78u-4(b)(1)(B).

The misstatements or omissions alleged also must be material, and materiality is satisfied if there is a substantial likelihood that a reasonable investor would have viewed disclosure of an omitted fact "as having significantly altered the 'total mix' of information made available." *Basic*,

---

[12] Internal citations and quotations are omitted throughout unless otherwise stated.

[13] Defendants waived their right to challenge the other elements §10(b), and these non-contested elements are not addressed herein. *See* Fed. R. Civ. P 12(g); *Mateo v. Bristow*, No. 12 CIV. 5052 RJS, 2013 WL 3863865, at *8 (S.D.N.Y. July 16, 2013) (collecting cases).

485 U.S. at 232; *S.E.C. v. Mayhew*, 121 F.3d 44, 52 (2d Cir. 1997) (A fact is material if "in reasonable and objective contemplation [it] *might* affect the value of the corporation's stock or securities."). Moreover, the Court must consider the Complaint holistically, reviewing Defendants' statements and omissions in context and taken together. *Meyer v. Jinkosolar Holdings Co., Ltd.*, 761 F.3d 245, 250-51 (2d Cir. 2014) ("The literal truth of an isolated statement is insufficient; the proper inquiry requires an examination of defendants' representations, taken together and in context."); *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322-23 (2007).[14]

Finally, "[b]ecause materiality is a mixed question of law and fact[,] a complaint may not properly be dismissed...on the ground that the alleged misstatements or omissions are not material *unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ* on the question of their importance." *ECA, Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 197 (2d Cir. 2009) (emphasis added). Indeed, Defendants cannot say that "no reasonable investor" would have found the omitted information – *i.e.*, the July 16 Meeting and Administrative Guidance – to be important to their investing decisions.

### B. Plaintiffs Identify Defendants' Misrepresentations and Omissions, As Well As the Reasons Why Statements Were False and Misleading

During the Class Period, Defendants never disclosed the crucial July 16 Meeting or Administrative Guidance. Specifically, Defendants failed to disclose that Alibaba: (i) was the target of a substantial Chinese governmental campaign (Red Shield); (ii) was summoned by the SAIC to the July 16 Meeting where the SAIC accused Alibaba of rampant violations of law; (iii) faced its greatest credibility crisis in its history, as asserted by the SAIC; (iv) had essentially agreed with the SAIC by admitting the violations, acknowledging that counterfeits and violations of consumer laws were the greatest challenges it faced, and accepting the Administrative Guidance; (v) knowingly and intentionally allowed the sale of counterfeits and other illegal actions to prosper on its platforms; and

---

[14] *See also Lin v. Interactive Brokers Grp., Inc.*, 574 F. Supp. 2d 408, 417 (S.D.N.Y. 2008) (citing *Halperin v. eBanker USA.com, Inc.*, 295 F.3d 352, 357 (2d Cir. 2002) (same)); *Meyer Pincus & Assoc., P.C. v. Oppenheimer & Co.*, 936 F.2d 759, 762 (2d Cir. 1991) (A prospectus violates federal securities laws if it does not disclose "material objective factual matters," or buries those matters beneath other information, or treats them cavalierly).

(vi) faced a material threat to its finances and operations as a result of the Administrative Guidance, either in the form of penalties for non-compliance or lost revenues associated with compliance. *E.g.*, ¶¶5, 102-04, 113, 115, 119, 122.

Instead, Defendants only disclosed generic information and woefully inadequate "risk disclosures," including that: Alibaba faced regulation (¶¶125, 144, 147); regulations or enforcement of regulations *could* increase (¶¶121, 125, 147, 149, 151); Alibaba may not be able to prevent all violations of the law (¶¶118, 125); and following the law is costly, but if it did not, Alibaba *could* face consequences (¶¶112, 114, 116). *See also* Sec. IV.E, *infra* (inadequate disclosures).

Defendants also falsely claimed that Alibaba was not subject to any legal or administrative proceedings. ¶141. This was at best a "half-truth," if not an outright lie.[15] As the White Paper makes clear, the SAIC's Administrative Guidance continued after the July 16 Meeting, with the SAIC and AIC continuing to investigate, evaluate and report on Alibaba's compliance, and AIC planning to conduct additional Administrative Guidance at Alibaba headquarters. ¶94.

Defendants also affirmatively misrepresented both Alibaba's efforts to comply with the law and the effectiveness of these efforts during the Class Period, touting Alibaba's strict policies against counterfeits and its commitment to IP protection.[16] In reality, however, *at least half of Taobao's sales during the relevant period were counterfeit* according to the SAIC and several former Taobao managers. ¶¶134-39, 228-29, 253-54. The foregoing statements were further rendered false and misleading, of course, in light of Defendants' failure to disclose the directly relevant and central

---

[15] *List v. Fashion Park, Inc.*, 340 F.2d 457, 462 (2d Cir. 1965) (misleading "half-truths" are actionable); *see also* 17 C.F.R. § 240.10b-5.

[16] *E.g.*, ¶¶127, 129, 131 (Registration Statement espousing sweeping measures against illegal practices and ensuring investors that Alibaba "maintain[s] a 'no tolerance' policy with regard to counterfeit and fictitious activities on our marketplaces"); ¶178 (9/28/14 60 Minutes interview with Defendant Ma comparing Alibaba to a doctor curing the cancer of counterfeits); ¶184 (11/19/14 Chinese World Internet Conference, with Ma assuring investors that Taobao did not offer counterfeit goods); ¶186 (12/23/14 Lu assertion that Alibaba was actively deterring counterfeit sales and vague reference to "cooperative relationships with various government bodies to combat counterfeiting"); ¶188 (1/8/15 Press Release proclaiming that Alibaba "takes the issue of IPR infringement very seriously and we are constantly working with partners and stakeholders to enhance IPR protection on our platforms in order to tackle the problem of counterfeiting effectively."); ¶227 (1/29/15 Tsai statement that Alibaba had taken great pains to eliminate counterfeit products, claiming "[t]hese policies and procedures are tough and we work very hard to enforce them.").

facts of the July 16 Meeting and the Administrative Guidance. *See* Secs. IV.C (materiality) & IV.D (duty to disclose), *infra*.

### C.      The Omitted Information Was Material

The Complaint's detailed allegations of the importance of the July 16 Meeting and the Administrative Guidance to Alibaba's business and financial performance demonstrate that these were material events that should have been disclosed to investors. One need look no further than the swiftness and severity of Alibaba's share price drops following disclosure of the White Paper to confirm the materiality of the then-previously omitted information. Put another way, it is clear that investors considered the Administrative Guidance ordered upon Alibaba at the July 16 Meeting to be an important part of the "total mix" of information available.

### 1.      The July 16 Meeting, As Implementation of the Red Shield Program and Ongoing Administrative Guidance by the SAIC, Was Highly Unusual

As set forth in Sec. II.A.3 above, Red Shield was a significant law enforcement initiative implemented by the SAIC. With the July 16 Meeting being held a mere month after the launch of the program, it is clear that Alibaba was one of its first targets. There can be no doubt that Defendants understood that under the Administrative Guidance issued to Alibaba during the July 16 Meeting as part of the Red Shield program, Alibaba would immediately face materially higher levels of regulatory scrutiny, costs for regulatory compliance (including lower sales and advertising revenues resulting from complying with the laws), and risks for penalties.

The July 16 Meeting was unusually high level, with the Director General of SAIC's Bureau of Market Regulation and heads of seven AICs in attendance, along with senior executives of Alibaba. ¶7.[17] The amount of pre-meeting research and investigation conducted by the Department of Market Regulation and five AICs, as well as the special post-meeting review and report conducted by Zhejiang Provincial AIC and the fact that Zhejiang Provincial AIC planned to go to Alibaba

---

[17] Of the 189 administrative guidance proceedings listed on the SAIC's website as of June 25, 2015, no other one involved such an array of high level officials in one meeting. ¶93. No other listed administrative guidance proceeding is comparable in terms of scope and depth to the Administrative Guidance issued to Alibaba at the July 16 Meeting. ¶95.

Group offices to conduct additional Administrative Guidance, further underscores the significance of the July 16 Meeting. ¶94. Finally, for the first time following its issuance of Administrative Guidance, the SAIC published a "White Paper" (a formal precedential government document) relating to the July 16 Meeting. ¶¶233-34.

Indeed, contrary to Defendants' protestation (*see* Def. Br. at 13), Red Shield, the July 16 Meeting, and the Administrative Guidance were not "one off" events that concluded happily for Alibaba. Together they represented an extremely heightened level of scrutiny of Alibaba's business by a central corporate regulator in China. Indeed, Administrative Guidance is widely understood to be an "offer you can't refuse" from the most powerful ministry regulating businesses in China; there is nothing "voluntary" or "informal" about Administrative Guidance – and there was *especially* nothing voluntary or informal about the Administrative Guidance issued by SAIC to Alibaba during the July 16 Meeting. ¶¶90-92.

> ## 2.     The SAIC and Alibaba Treated the July 16 Meeting, and the Administrative Guidance Issued Therein, As Highly Important

The fact that the SAIC and Alibaba treated the July 16 Meeting, at the time of the meeting, as highly important further supports these were material facts. *Mayhew*, 121 F.3d at 52 ("[A] major factor in determining whether information was material is the importance attached to it by those who knew about it."); *Lilly v. State Teachers Ret. Sys. of Ohio Pension Fund*, 608 F.2d 55, 58 (2d Cir. 1979) ("[T]he manner in which the information was regarded by those privy to it and the importance attached to the information by the recipients...were entirely consistent with a conclusion that the information was material information.").

Here, the SAIC maintained that Alibaba's violations of law were of extreme importance, admonishing Alibaba that its illegal practices are "leading Alibaba to its greatest credibility crisis since its incorporation" and that Alibaba "sets a bad example with negative influence on other law-abiding e-commerce companies, making itself a target of a torrent of blame from public opinion and creating tremendous pressure on market regulatory agencies." ¶¶8, 68. For its part, Alibaba admitted at the July 16 Meeting that SAIC's criticisms were right on point, and its demands that Alibaba take

immediate action were well-grounded. ¶¶75, 172.

Defendants' current suggestion that the July 16 Meeting was voluntary on Alibaba's part and informal (Def. Br. at 2, 13), and their attempts to diminish its importance (*id*. at 25-26) are unsupported by fact and directly contradict the well-pled allegations of the Complaint (which must be accepted as true). Indeed, both the SAIC and Defendants were keenly aware that the July 16 Meeting and Administrative Guidance were of utmost importance in that they had the very real potential to disrupt Alibaba's historic IPO. Thus, despite Chinese law that requires such meetings to be open to the public, the July 16 Meeting was held in secret to avoid imperiling the IPO. ¶¶7, 67, 224, n.28.[18]

Recognizing the materiality of this information to the market, after the White Paper was issued, Alibaba importuned the SAIC to remove it from the SAIC website. ¶200. Driving home the materiality of the information to investors, Defendant Tsai spent most of the January 29, 2015, investor conference call trying to allay investors' concerns and fears about the White Paper, and Alibaba even filed a Form 6-K with the SEC, containing a three page statement by Tsai trying to explain away the illegal conduct the SAIC identified in the White Paper. *See* Dkt. No. 18-17.

### 3. Post-IPO, Counterfeiting Still Accounted for a Material Part of Alibaba's Business, Such That the Administrative Guidance Would Materially Affect Operations

As recounted above, the regulatory environment for Alibaba had changed dramatically under Red Shield. The SAIC found that Alibaba was violating Chinese law by selling an unacceptably large amount of counterfeit and non-genuine products on its websites, determining 62.7% of Taobao's products and 14.3% of TMall's were non-genuine ¶253. Counterfeits, meanwhile, actually constituted one of Alibaba's two main product categories (¶253-54, 134-136), a fact that would be material to any reasonable investor. *See In re Marsh & McLennan Cos., Inc. Sec. Litig*., 501 F. Supp.

---

[18] As Defendants knew, but Western investors predictably did not, even if Alibaba had not requested that the July 16 Meeting take place behind closed doors, that the SAIC did so was inherently irregular, and Alibaba knew this was done as a favor to it. ¶¶224-26.

2d 452, 468-69 (S.D.N.Y. 2006) (holding that a reasonable investor would find it material that issuer was generating sizable earnings from improper business practices and jeopardizing its reputation).

Disputing the well-pled allegations of the Complaint, Defendants offer yet another contradictory scenario by asserting that sales of counterfeit products were not material.[19] However, Nomura Securities published an interview with Xi Liao, the former third party development manager of Taobao's P4P advertising department from 2009-2013, who indicated that counterfeit merchandise is essentially its own product category at Alibaba, with its own target customers, and that it contributes substantially to total sales. ¶¶134-136; Rosen Decl. Ex. B.

Defendants attack Mr. Liao's statements because he left at the end of 2013, just 9 months before the IPO. But Defendants offer no reason to believe that the situation at Alibaba had changed; in fact, given the SAIC's factual findings concerning Alibaba's sales of counterfeit products and the findings in the White Paper that over 62.7% of Taobao's product sales were non-genuine, the more likely inference is that counterfeit sales continued to abound. Moreover, "[a] witness need not have been at the company for the entire, or indeed any, of an asserted class period to have probative information." *Simon v. Abiomed, Inc.*, 37 F. Supp. 3d 499, 515 (D. Mass. 2014) (where witness left employment prior to class period, he was partly corroborated by other sources and thus provided sufficiently detailed and plausible allegations applicable to class period misstatements), *accord Blue v. Doral Fin. Corp.*, Civil No. 14-1393(GAG), 2015 WL 4476163, at *31 (D.P.R. 2015).[20]

Mr. Liao's statements on counterfeiting at Alibaba are further corroborated by CW1, a Taobao Product Manager between February 2010 and November 2013. CW1 stated that Taobao ignored counterfeits unless a brand vociferously and persistently complained (at which point, Taobao *might* take action, for example, by reviewing the top 100 sites carrying the brand's products). ¶138. CW1 explained that because Taobao earned so much of its revenues from keyword bidding and

---

[19] *Compare* Def. Br. at 32-35 *with* ¶¶253-54, 134-136.

[20] Additionally, Mr. Liao continued to run a related business as CEO of Fan Xi Tech, a certified Taobao partner whose clients spend substantial sums advertising on Alibaba, which continued to give him access to information concerning Alibaba's sales of counterfeit goods. Indeed, Nomura Securities, who underwrote the IPO, believed Xi Liao was an expert on such matters related to Alibaba, which is why Nomura interviewed him. Rosen Decl. Ex. B.

counterfeit sellers paid top dollar for keywords, Taobao's attitude was "Okay, pay for the keyword and go for it." ¶139. According to CW1, even though Taobao had formal rules prohibiting the sale of counterfeit goods, "[o]ften times the pressure of making the revenue outweighed that." *Id.*

In sum, prior to its IPO, and continuing to the present, Alibaba has facilitated and encouraged the sale of counterfeit goods on its website by programming its search function to automatically suggest the purchase of obviously counterfeit products and directs consumers to vendors selling obviously counterfeit goods. ¶¶228-29, 252-76. The SAIC's demands that Alibaba change these practices posed the material risk of a major upset to the Company's operations.

### 4. The July 16 Meeting and Administrative Guidance Posed a Material Risk to Alibaba's Finances

The required changes to Alibaba's business practices posed a material and immediate risk to its finances. Following the July 16 Meeting and continuing throughout the Class Period, the revenue stream from sales and advertising associated with counterfeit goods was in jeopardy. To be sure, Alibaba's practice of facilitating or turning a blind eye to the rampant violations of law on its website, including the sale of illegal products, false advertising, phony product reviews and vendor ratings – all of which helped generate a material part of its revenue – would have to cease, or Alibaba faced serious fines. ¶104.[21]

---

[21] Defendants retort that the SAIC could not levy fines against Alibaba because it had "accepted the administrative guidance" and pledged to remedy its ongoing violations of law. Def. Br. at 19. This misses the point completely. The Administrative Guidance was not a one-time event in which Alibaba was sanctioned and the matter dropped. Alibaba's compliance mandates were ongoing, and the SAIC and AICs continued to monitor Alibaba's progress. If Alibaba failed to remedy its violations, both the PRC administrative guidance law and the White Paper make clear that the SAIC would impose heavy fines and other penalties – without the need for any judicial or administrative hearings. ¶81, 84, n.14, ¶¶88-91.

Moreover, the fact that SAIC has not yet penalized Alibaba for its violations of law does not render Red Shield and the July 16 Meeting immaterial. "The determination of materiality is to be made upon all the facts as of the time of the transaction, and not upon a 20–20 hindsight view long after the event." *In re Alliance Pharm. Corp. Sec. Litig.*, 279 F. Supp. 2d 171, 191 (S.D.N.Y. 2003).

As to Defendants' assertion that there was little *risk* of SAIC imposing harsh penalties, "in *Basic,* the Supreme Court held that when contingent or speculative events are at issue, the materiality of those events depends on 'the probability that the [event] will be consummated, and its significance to the issuer of the securities.'" *Castellano v. Young & Rubicam, Inc.*, 257 F.3d 171, 185 (2d Cir. 2001) (quoting *Basic,* 485 U.S. at 250).

Nomura Securities quoted Mr. Liao saying that "[a]s Alibaba steps up its monitoring effort with regards to the counterfeit product issue, there is likely to be certain impact on its advertising revenue." ¶¶134-135; Rosen Decl. Ex. B. Other analysts stated similar views, recognizing the very real threat the information posed to Alibaba's share price. The New York Times warned of damage to Alibaba's relationships with investors, brands, and the government. ¶202. On January 29, 2015, the South China Morning Post reported that Alibaba and Ma faced "grilling over [Alibaba's] e-commerce site," "spurred by a government regulator's blistering accusation of widespread fraud and other illegal activities at the company's popular online shopping platform." ¶203.

Here, the July 16 Meeting raised the substantial risk that Alibaba would suffer reduced sales and advertising revenues or face massive fines. *See* n.11, *supra*. One way or the other, Alibaba was likely to suffer a meaningful financial impact. Given the seriousness of either outcome, the SAIC's Administrative Guidance was a material event for investors.

Indeed, because of the information revealed by the White Paper, many analysts lowered their price targets for Alibaba, "reflecting a lower target multiple, owing primarily to the increased uncertainty around the regulatory outlook for the company, coupled with the slower-than-expected revenue growth." ¶211. Meanwhile, several analysts believed the SAIC regulatory initiatives targeting Alibaba would have the likely effect of decreasing Alibaba's advertising revenue, that its costs of regulatory compliance would increase, hurting net income, and that there existed an unquantifiable political risk to Alibaba's business. ¶¶211-12, 214, 218. That so many market commentators believed that the information about the July 16 Meeting as recounted in the White Paper posed a threat to Alibaba's business and would have a material impact on its operations and revenues is strong evidence of its materiality. *See In re Facebook, Inc. IPO Sec. & Derivative Litig.*, 986 F. Supp. 2d 487, 520 (S.D.N.Y. 2013) (reactions of securities analysts supported an inference of materiality at the motion to dismiss stage). Indeed, Alibaba failed to meet its revenue guidance for the fourth quarter of 2014, which is consistent with analysts' expectations that compliance with the SAIC's Administrative Guidance would lead to lower revenue. ¶213.

Investors themselves confirmed the materiality of the July 16 Meeting and Administrative Guidance as reflected in the precipitous drop in price of Alibaba stock following the release of the White Paper. ¶¶207-216. *New Orleans Emps. Ret. Sys. v. Celestica, Inc.*, 455 F.App'x 10, 16 (2d Cir. 2011) (allegations of a "precipitous decrease in share price that occurred after [the issuer] disclosed the tru[th]" support an inference of materiality at the motion to dismiss stage); *Facebook*, 986 F. Supp. 2d at 520, n.31 ("At the motion to dismiss stage, allegation of sharply negative market reaction can be used to support other allegations of materiality."); *Pontiac Gen. Emps. Ret. Sys. v. Lockheed Martin Corp.*, 875 F. Supp. 2d 359, 368 (S.D.N.Y. 2012) (misstatements not immaterial as a matter of law where the issuer's share price declined by almost 10% after corrective disclosure).

### D.     Defendants Had a Duty to Disclose the Omitted Information

Falsity can be alleged based on a defendant's failure to disclose material information. In general, however, "[a] corporation is not required to disclose a fact merely because a reasonable investor would very much like to know that fact." *In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259, 267 (2d Cir. 1993). Rather, an issuer or insider has a duty to disclose information when: (1) selling stock; (2) a statute or regulation requires disclosure; or (3) necessary to prevent its current or prior statements from being inaccurate, incomplete or misleading. *Glazer v. Formica Corp.*, 964 F.2d 149, 157 (2nd Cir. 1992). Here, Defendants had a duty to disclose the July 16 Meeting and Administrative Guidance under all three bases.

### 1.     Defendants Had a Duty to Disclose the July 16 Meeting and Administrative Guidance to Prevent Their Statements from Misleading Investors

In arguing that Plaintiffs have failed to plead falsity because Defendants have violated no duty of disclosure (*e.g.*, Def. Br. at 13-20), Defendants ignore the well-established tenet that "once a company speaks on an issue or topic, there is a duty to tell the whole truth." *Jinkosolar*, 761 F.3d at 250. Indeed, once a company speaks on an issue or topic, there is a duty to tell the whole truth. *See Caiola v. Citibank, N.A.,* 295 F.3d 312, 331 (2d Cir. 2002) ("[T]he lack of an independent duty is not...a defense to...liability because upon choosing to speak, one must speak truthfully about material issues. Once Citibank chose to discuss its hedging strategy, it had a duty to be both accurate and

complete."). Here, Defendants ventured to speak on the topics of counterfeiting, their efforts against it, and their legal compliance. Once they did so, they had a duty to tell the whole truth, including the Company's receipt of harsh Administrative Guidance at the July 16 Meeting. Their failure to do so rendered their statements materially misleading.

Defendants try to further disclaim their duty to disclose by parsing Plaintiffs' allegations into their own three "categories" of alleged misstatements: the July 16 Meeting (Def. Br. at 13-24); Red Shield (*id.* at 26-30); and counterfeiting (*id.* at 30-39). By so doing, Defendants attempt to prevent the Court from appreciating the significance of the events that transpired in the three months leading up to Alibaba's IPO – which translated into omissions carrying over long past the IPO and throughout the Class Period. Their approach must be rejected. Rather, the effects on Alibaba of Red Shield, the July 16 Meeting, and the Administrative Guidance must be evaluated together and considered in the context of the business climate in China. *Jinkosolar*, 761 F.3d at 250-51.

Contrary to Defendants' characterization, Plaintiffs do not offer Red Shield as a stand-alone theory of liability. Rather, Plaintiffs' Red Shield-related allegations underscore the materiality of the July 16 Meeting and Administrative Guidance, adding context to Defendants' duty to disclose. Indeed, on June 12, 2014 (three months before Alibaba's IPO), the SAIC informed Alibaba (and other e-commerce companies) that through Red Shield, it would be cracking down on illegal practices on e-commerce platforms as one of the SAIC's top priorities and that law enforcement would increase dramatically. ¶¶58, 163-65; Rosen Decl. Ex. A (Red Shield Notice). It was no coincidence that the July 16 Meeting took place only one month later; Alibaba was a prime target.[22]

Defendants also attempt to justify their failure to disclose the July 16 Meeting based on the court's decision in *Richman* holding that an issuer need not disclose receipt of a Wells Notice. Def.

---

[22] Moreover, Defendants' suggestion that the July 16 Meeting was unrelated to the Red Shield program directly contradicts the Complaint, which alleges that the July 16 Meeting was a direct consequence of the SAIC's efforts to implement Red Shield. ¶¶165-67. As the White Paper summarized, the July 16 Meeting constituted Administrative Guidance with the purpose of "further prompt[ing] Alibaba Group to squarely face and resolve numerous persistent illegal practices of its electronic commerce platforms." Dkt. No. 6-1 (White Paper). This was the exact goal of Red Shield. Indeed, Red Shield was intended to "intensively investigate and strictly punish" the same violations of law that the SAIC told Alibaba at the July 16 Meeting it must cease and desist from. *Compare* ¶58 (quoting Red Shield Notice) *with* ¶¶8, 70, Dkt. No. 6-1 (White Paper).

Br. at 20, 25 (citing *Richman v. Goldman Sachs Grp., Inc.*, 868 F. Supp. 2d 261, 272 (S.D.N.Y. 2012)). But a Wells Notice is simply an indication that the SEC is *planning* some type of enforcement action. Here, the SAIC *actually took* enforcement action against Alibaba. The July 16 Meeting and Administrative Guidance constituted a "formal law enforcement proceeding." ¶¶5-6, 76-97. At the meeting, the SAIC directed Alibaba to cease and desist from further illegal activity, and Alibaba admitted, and agreed to desist from further, violations. ¶¶8-10.[23] Thus, here, Alibaba was not merely *threatened* with the risk of administrative law enforcement proceedings, it actually was *subjected* to law enforcement proceedings during and after the July 16 Meeting, the substance of which should have been disclosed.

### 2. Defendants Had a Statutory Duty to Disclose

SEC Regulation S-K (27 CFR 229.10) applies to all registration statements, including those filed by foreign registrants such as Alibaba on Form F-1, "to the extent provided in the forms to be used for registration under the [Securities] Act." 17 C.F.R. 229.10; ¶154. Both Item 5(d) of Form 20-F, Part 1, for foreign registrants, and Item 303 of Regulation S-K require disclosure of any trend, demand, event, uncertainty, or commitment that is known and reasonably likely to have a material effect on a company's finances or operations. *See Stratte-McClure v. Morgan Stanley*, 776 F.3d 94, 101 (2d Cir. 2015).[24] As a foreign private registrant, Alibaba was further obligated under Item 303 to disclose the July 16 Meeting and Administrative Guidance because such pertinent Chinese governmental policy "could materially affect, directly or indirectly, [its] operations or investments by United States nationals." 17 CFR 229.303, *Instructions to paragraph 303(a)*:11. There is no known corresponding specific requirement for domestic companies. *Id*. Where the materiality of an

---

[23] The SAIC's investigation of Alibaba, culminating in its issuing Administrative Guidance at the July 16 Meeting under threat of severe financial penalties, and Alibaba's "acceptance" of the Administrative Guidance, is analogous to the FAA investigation and settlement agreement the Ninth Circuit found material in *No. 84 Employer-Teamster Joint Council Pension Trust Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 935 (9th Cir. 2003) (Undisclosed aircraft maintenance issues, FAA investigation, and FAA settlement agreement were material facts).

[24] The SEC has specifically noted that Part I, Item 5(d) of Form 20-F "call[s] for the same disclosure as Item 303 of Regulation S-K." ¶156; *In Re Comm'n Guidance Regarding MD&A of Fin. Condition & Results of Operation*, Release No. 8350, 2003 WL 22996757, at *1 n.1 (Dec. 19, 2003) (the "2003 SEC Release").

item under Item 5(d) or Item 303 is in doubt, disclosure is required. *See Facebook*, 986 F. Supp. 2d at 510. Finally, Item 503 of Regulation S-K requires disclosure of "the most significant factors that make the offering speculative or risky." 17 C.F.R. § 229.503(c); *Lin*, 574 F. Supp. 2d at 419.

Thus, under Items 5(d), 303, and 503, Defendants were required to disclose not only Red Shield, the July 16 Meeting, and the Administrative Guidance, they also were obligated to disclose the reasonably likely impact of these events on Alibaba's future performance. While Defendants disclosed a variety of vague *risks* that *might* affect the Company's business, they never disclosed the specific risks that *already had come to pass*. *See* Sec. IV.E, *infra* (inadequate disclosures). Indeed, whereas the July 16 Meeting and Administrative Guidance presented Defendants with a Hobbesian choice: either conform Alibaba's operations to the law (which would materially reduce revenue and income growth), or pay crippling fines (which would materially reduce revenue and growth), Defendants *knew* that Alibaba's finances and operations were reasonably likely to be materially impacted. Their failure to disclose these *specific* material events violated their statutory duty to disclose.[25]

### 3.      Defendants Had a Duty to Disclose As a Seller of Stock

Finally, as sellers of stock in the Offerings, Alibaba, Ma and Tsai had a duty to disclose all material information, *i.e.* facts that would affect investors' perception of the value of Alibaba securities. *Shapiro v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 495 F.2d 228, 237 (2d Cir. 1974) (defendants owed a duty to disclose not only to the purchasers of the actual shares sold by defendants, but to all persons who purchased the company's stock during the class period). Moreover, a company's duty to disclose is as clear as a selling insider's. *See Shaw v. Digital Equip.*

---

[25] *See Panther Partners Inc. v. Ikanos Commc'ns, Inc.*, 681 F.3d 114, 122 (2d Cir. 2012) (issuer's disclosure of a negative trend of increasing customer complaints violated Item 303 where issuer failed to disclose specific facts describing the trend and uncertainties and their potential impact, *even where* issuer could not determine with precision what that that impact would be); *Facebook*, 986 F. Supp. 2d at 510-11 (disclosure of worrisome mobile trend inadequate where "Facebook used generalized and indefinite terms…when describing the impact [the trend] could have had on the Company's revenues and financial results. Such terms fail to constitute sufficient disclosure where Facebook *knew* of the certainty of the trends in mobile usage.").

*Corp.*, 82 F.3d 1194, 1203-04 (1st Cir. 1996), *abrogated on other grounds by* 15 U.S.C. § 78u–4(b)(2), ("disclose or abstain from trading" rule applies to individuals and corporation alike).[26]

### E.    Defendants' Supposed Risk Disclosures Were Themselves False and Misleading

Seeking to insulate themselves from liability, Defendants pepper their motion with reference to number of generic risk disclosures stating, for example, that Alibaba was subject to particular laws governing its operations and that there was a *risk* that it might be subject to regulatory action. *See* Def. Br. at 4, 8-10, 14, 16, 28-29. Defendants' inadequate, incomplete, and misleading "disclosures" are quoted extensively in the Complaint, and excerpted herein as follows:

- "the regulatory and legal system in China is complex and developing, and future regulations may impose additional requirements on our business." ¶106; *see also* ¶¶141, 147;

- "we cannot assure you that [our internal] controls and policies will prevent fraud or illegal activity by our employees or that similar incidents will not occur in the future." ¶118;

- "There is no assurance that we would not become a target for public scrutiny in the future or such scrutiny and public exposure would not severely damage our reputation as well as our business and prospects." ¶121;

- "[maintaining brand confidence] is critical to [Alibaba's] success, and any failure to do so could severely damage [its] reputation and brand, which would have a material adverse effect on [its] business, financial condition and results of operations." ¶108;

- "we are required to report to SAIC…any violation of applicable laws, regulations or SAIC rules by sellers or service providers, …and to take appropriate remedial measures, including ceasing to provide services to such sellers or service providers…. [W]e could be subject to damages and reputational damage as well as action by regulators, which could have a material adverse effect on our business, financial condition and results of operations." ¶125; *see also* ¶144;

- "Failure to comply with…consumer protection laws could subject us to administrative sanctions…as well as potential civil or criminal liabilities." ¶149 (emphasis added);

- "[Alibaba] may be subject to joint liability if it is aware that an Internet user is infringing upon the intellectual property rights of others through its Internet services, such as selling counterfeit products, and fails to take necessary measures to stop that activity." ¶151.

---

[26] *See also Shapiro*, 495 F.2d at 237; *Green v. Hamilton Int'l Corp.*, 437 F. Supp. 723, 728 (S.D.N.Y. 1977) ("there can be no doubt that the prohibition against 'insider' trading extends to a corporation"); *McCormick v. Fund Am. Cos., Inc.*, 26 F.3d 869, 876 (9th Cir. 1994) (collecting cases) ("[T]he corporate issuer in possession of material nonpublic information, must, like other insiders in the same situation, disclose that information to its shareholders or refrain from trading with them.").

- "We have received in the past, and we anticipate we will receive in the future, communications alleging that items offered or sold through our online marketplaces by third parties…infringe third-party copyrights, trademarks and patents or other intellectual property rights…. We have been and may continue to be subject to allegations of civil or criminal liability based on allegedly unlawful activities carried out by third parties through our online marketplaces. ¶112.

These statements were materially misleading because they implied that there existed only an *unquantifiable risk* that regulatory requirements could increase, a *risk* that Alibaba could be found to be in violation of the law, a *risk* that counterfeits *could* slip through the cracks, or a *risk* that Alibaba could be exposed to serious liability. In fact, Red Shield already had created a much stricter and riskier regulatory burden on Alibaba. And the SAIC already had told Alibaba during the July 16 Meeting and Administrative Guidance its conclusions that counterfeits were *rampant*, that Alibaba was in serious violation of laws, and that Alibaba faced very real and serious fines or loss of revenue as a result. *See, e.g.*, ¶¶107, 119-20, 122-24, 126, 142-43, 145-46, 148, 150, 152. Indeed, the "risks" already had come to pass and Defendants' omission of these specific known risks from their disclosures render those disclosures meaningless and misleading. *Lin*, 574 F. Supp. 2d at 417 ("[N]o amount of general cautionary language can protect a company from failure to disclose a specific, known risk or a risk that has already occurred."); *In re Van der Moolen Holding N.V. Sec. Litig.*, 405 F. Supp. 2d 388, 400, 415 (S.D.N.Y. 2005) (statements warning that business "could" be negatively impacted "if" it failed to comply with industry regulations were materially misleading where the company was in violation of regulations at the time it issued warnings); *Jinkosolar*, 761 F.3d at 249-50 ("failure to disclose that the prophylactic steps were then failing to prevent serious ongoing pollution problems rendered that description [of environmental laws governing the issuer] misleading); *Facebook*, 986 F. Supp. 2d at 516 (disclosure of known specific risk required).[27]

---

[27] *See also In re EVCI Colleges Holding Corp. Sec. Litig.*, 469 F. Supp. 2d 88, 103 & n.2 (S.D.N.Y. 2006) ("To warn that the untoward may occur when the event is contingent is prudent; to caution that it is only possible for the unfavorable events to happen when they have already happened is deceit."); *In re Prudential Securities Inc. Ltd. Partnerships Litig.*, 930 F. Supp. 68, 72 (S.D.N.Y. 1996) (safe harbor provision provides "no protection to someone who warns his hiking companion to walk slowly because there might be a ditch ahead when he knows with near certainly that the Grand Canyon lies one foot away"); *Rombach v. Chang*, 355 F.3d 164, 173 (2d Cir. 2004) ("Cautionary words about future risk cannot insulate from liability the failure to disclose that the risk has transpired.").

Furthermore, Defendants' lauding of Alibaba's anti-counterfeiting efforts (prior to the IPO and continuing throughout the Class Period) in the name of consumer and IP protection (*see, e.g.,* ¶¶118, 127, 129, 131, 151, 178), only gave false assurances to the market. *Jinkosolar*, 761 F.3d at 251 ("All of the above may be technically true. However, the description of [efforts to comply with laws] gave comfort to investors that reasonably effective steps were being taken to comply with applicable [SAIC] regulations.").[28]

### F.    The Truth on the Market Defense Does Not Apply

Defendants assert the truth on the market defense as to (i) the public disclosure of the Red Shield Notice on the SAIC website in China, in Chinese on June 12, 2014, and (ii) Western media reports and a lawsuit prior to the date of Alibaba's IPO asserting that there were rampant sales of counterfeit products on Alibaba's websites. *See* Def. Br. at 3-4, 32, 36-37.

First, the Complaint does not allege that the Registration Statement was false and misleading solely for failing to disclose that sales of counterfeit goods were rampant on Alibaba's websites. It alleges that Defendants' statements were false and misleading for failing to disclose that the Red Shield program and the July 16 Meeting resulted in serious Administrative Guidance requiring Alibaba to cease wide-spread illegal sales (including counterfeits), and that Alibaba's financial performance and operations were reasonably likely to be materially impacted as a consequence. ¶104. Moreover, the news reports of counterfeit sales on Alibaba's platforms all suggested that Alibaba, based on Defendants' own representations, was making good faith efforts to prevent sales of counterfeit goods. This was reiterated in the Registration Statement, which acknowledged the counterfeit problem, but detailed a plethora of measures that Alibaba had implemented to rectify it (while omitting the July 16 Meeting and Administrative Guidance). Thus, that the general public may have been aware of a counterfeit problem at Alibaba does nothing to eliminate the misleading

---

[28] *See also Strougo v. Barclays PLC*, 14-CV-5797 SAS, 2015 WL 1883201, at *9 (S.D.N.Y. Apr. 24, 2015) (statements concerning safeguards and controls rendered misleading for failure to disclose issuer's controls inadequate and it tolerated or encouraged illegal business practices); *In re BP p.l.c. Sec. Litig.*, 843 F. Supp. 2d 712, 759, 773-76 (S.D. Tex. 2012) (issuer created false impression that safety measures and other reforms were adequate to address risks); *In re Barrick Gold Sec. Litig.*, 13 CIV. 3851 SAS, 2015 WL 1514597, at *11 (S.D.N.Y. Apr. 1, 2015) (statement of compliance with environmental laws was materially misleading).

nature of the Registration Statement and Defendants' other Class Period omissions, especially where neither the scope of the problem nor Alibaba's known legal violations was disclosed.

"The truth-on-the-market defense is intensely fact-specific and is rarely an appropriate basis for dismissing a § 10(b) complaint for failure to plead materiality." *Ganino v. Citizens Utilities Co.*, 228 F.3d 154, 167 (2d Cir. 2000) (corrective information must be conveyed with a "degree of intensity and credibility sufficient to counter-balance effectively any misleading information") (quoting *In re Apple Computer Sec. Litig.*, 886 F.2d 1109, 1116 (9th Cir. 1989)). Indeed, "[t]here are serious limitations on a corporation's ability to charge its stockholders with knowledge of information omitted from a document such as a proxy statement or prospectus on the basis that the information is public knowledge and otherwise available to them." *Kronfeld v. Trans World Airlines, Inc.*, 832 F.2d 726, 736 (2d Cir. 1987). "Corporate documents that have not been distributed to the shareholders…should rarely be considered part of the total mix of information reasonably available to those shareholders." *United Paperworkers Int'l Union v. Int'l Paper Co.*, 985 F.2d 1190, 1199 (2d Cir. 1993) ("sporadic news reports" did not constitute truth on market).

The Red Shield Notice was issued on the SAIC website in Chinese. It did not mention Alibaba. There is no reason that Alibaba investors would have been alerted to its existence. Indeed it was the duty of Alibaba and its underwriters to ferret out and disclose the Red Shield Notice to investors in the IPO. The case cited by Defendants, *White v. H&R Block, Inc.*, No. 02 CIV. 8965 (MBM), 2004 WL 1698628, at *12 (S.D.N.Y. July 28, 2004) is inapposite because there "the truth was available in the market with more intensity and credibility than was any purported misstatement from defendants." In a closely analogous case, Judge Sullivan held that "that the publication of three newspaper articles – in Chinese – does not transform the information contained within the articles into 'matters of general public knowledge' that may properly be imputed to [the issuer's] stockholders. Accordingly, the Court holds that these articles do not excuse Defendants, as a matter of law, from their respective duties to disclose the allegedly misleading information identified by Plaintiffs in this case." *In re Fuwei Films Sec. Litig.*, 634 F. Supp. 2d 419, 437-38 (S.D.N.Y. 2009).

## V.     PLAINTIFFS ALLEGE A STRONG INFERENCE OF SCIENTER

### A.     Applicable Scienter Pleading Standards

The PSLRA requires plaintiffs to allege facts which give rise to a "strong inference" that the defendants acted with scienter. 15 U.S.C.A. § 78u–4(b)(2). In the Second Circuit, scienter is satisfied where plaintiffs allege: (a) "motive and opportunity to commit fraud," or (b) "strong circumstantial evidence of conscious misbehavior or recklessness." *Novak v. Kasaks*, 216 F.3d 300, 307 (2d Cir. 2000). Recklessness amounts to actionable scienter if the conduct was "highly unreasonable" and an "extreme departure from the standards of ordinary care." *Id.* at 308 (citations omitted). Recklessness can be shown by alleging that the defendants "knew facts or had access to information suggesting that their public statements were not accurate [or] failed to check information they had a duty to monitor." *Id.* at 311.[29]

Scienter is adequately alleged if the facts, taken as true, give rise to an inference that Defendants intentionally or recklessly misled the public which is *at least as* compelling as an inference that Defendants acted non-culpably. *Tellabs*, 551 U.S. at 324. The inference of scienter need not be more likely than any plausible opposing inference; in such an instance, the tie goes to the plaintiff. *Id.* at 324. The proper inquiry "is whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Id.* at 322-23 & 326 (allegations are to be read "holistically"). Moreover, scienter allegations "need not be irrefutable, *i.e.*, of the 'smoking-gun' genre, or even the 'most plausible of competing inferences.'" *Id.* at 324. Nor is a plaintiff required to plead scienter with "great specificity." *Ganino*, 228 F.3d at 169.

Finally, the Second Circuit has made clear that a plaintiff may plead a strong inference of scienter against a corporate entity without doing so against any one individual defendant. *Teamsters Local 445 Freight Division Pension Fund v. Dynex Capital Inc.*, 531 F.3d 190, 195 (2d Cir. 2008)

---

[29] *See also In re Hi-Crush Partners L.P. Sec. Litig.*, No. 12 Civ. 8557(CM), 2013 WL 6233561, at *21 (S.D.N.Y. Dec. 2, 2013) (same); *In re Sanofi-Aventis Sec. Litig.*, 774 F. Supp. 2d 549, 571 (S.D.N.Y. 2011) ("[S]ecurities fraud claims typically have sufficed to state a claim based on recklessness when they have specifically alleged defendants' knowledge of facts or access to information contradicting their public statements.").

(holding that "it is possible to raise the required inference with regard to a corporate defendant without doing so with regard to a specific individual defendant"). Citing the Seventh Circuit's holding in *Tellabs* (following the Supreme Court's remand), the Court in *Dynex* held that "it is possible to draw a strong inference of corporate scienter without being able to name the individuals who concocted and disseminated the fraud." *Dynex*, 531 F.3d at 195-96 (citing *Makor Issues & Rights, Ltd. v. Tellabs Inc.* ("*Tellabs II*"), 513 F.3d 702, 710 (7th Cir. 2008).

**B.**     **Plaintiffs Allege Strong Circumstantial Evidence of Defendants' Knowledge or Recklessness**

**1.**     **Defendants Knew or Should Have Known Facts, or Had Access to Information, Suggesting that Their Public Statements Were Not Accurate**

A strong inference of scienter is routinely found where, as here, defendants omit certain important, yet negative, information that they knew *or should have known* while at the same time reporting favorable news. *See, e.g., In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*, 324 F. Supp. 2d 474, 489-91 (S.D.N.Y. 2004) (where "a plaintiff can plead that a defendant made false or misleading statements when contradictory facts of critical importance to the company either were apparent, **or should have been apparent**, an inference arises that high-level officers and directors had knowledge of those facts by virtue of their positions with the company") (emphasis added) ((citing *Cosmas v. Hassett,* 886 F.2d 8, 13 (2d Cir. 1989) (imputing knowledge of new Chinese import restrictions to the Company's directors because the restrictions affected "a potentially significant source of income for the company")).[30]

---

[30] *See also In re JPMorgan Chase & Co. Sec. Litig.*, No. 12 Civ. 03852(GBD), 2014 WL 1297446, at *8-*9 (S.D.N.Y. Mar. 31, 2014) (scienter alleged where individual and corporate defendants had access to information regarding losses in bank's synthetic credit portfolio that rendered public statements which omitted this information incomplete, inaccurate, and misinformed investors); *Hutchins v. NBTY, Inc.*, No. CV 10–2159 (LDW) (WDW), 2012 WL 1078823, at *6 (E.D.N.Y. Mar. 30, 2012) (scienter alleged based on defendants' failure to disclose material adverse information concerning the company's largest customer and the potential resulting adverse impact on costs, sales, pricing, operating leverage and profitability, while making positive statements about the same); *Pontiac*, 875 F. Supp. 2d at 374-75 (scienter inferred as to executive in charge of the division whose misconduct was at the heart of investor's claims); *Barrick Gold*, 2015 WL 1514597, at *6, *12, *14 (scienter alleged where defendants had access to information in the form of monthly reports indicating that project was not compliant with applicable environmental regulations and monthly reports revealing that the company was subject to material weaknesses in internal controls, "[u]nder

Here, Defendants' ongoing omission of the July 16 Meeting and Administrative Guidance constitutes recklessness sufficient to support a strong inference of scienter. In their motion, Defendants claim that Plaintiffs failed to allege that the Individual Defendants attended or were aware of the meeting (Def. Br. at 24) and/or that anyone at the Company who did attend the meeting took it seriously (*id.* at 25).[31] As the highest level corporate executives, however, it defies logic to believe that the Individual Defendants were not aware of the July 16 Meeting and the harsh Administrative Guidance issued by the SAIC. Plaintiffs specifically allege facts showing the Individual Defendants' knowledge of or access to information regarding the July 16 Meeting, including the importance of the Meeting, the severity of concerns raised by SAIC in their Administrative Guidance, its potential to disrupt the IPO, and the potential sanctions for failure to comply with the SAIC's guidance or, alternatively, the high costs of compliance. Indeed, the Meeting and Administrative Guidance constituted a *formal law enforcement proceeding*, with the SAIC informing Alibaba representatives that the Company was in violation of the law, and that the Company faced major penalties – each fine of at least 1% of daily sales amounts (upwards of $8.1 million per day) – should it fail to conform to the Administrative Guidance. Ma, in particular, was a principal shareholder and he possessed and exercised utmost control over the Company. *See* Rosen Decl. Ex. C-1 (Registration Statement), at 11, 52. Meanwhile, the "business unit" heads who attended the July 16 Meeting each report directly to Alibaba's Chief Executive Officer (Lu) or Chief Financial Officer (Wu). ¶¶7, 32, 66. Thus, the Complaint adequately alleges that the Individual Defendants knew or had access to this information.

Moreover, the Individual Defendants' *actual* knowledge is not necessary to allege scienter; rather, scienter is sufficiently alleged if the facts support a finding that the Individual Defendants had

---

such circumstances, defendants knew or, more importantly, should have known that they were misrepresenting material facts related to the corporation.") (quoting *Novak*, 216 F.3d at 308).

[31] Defendants rely upon *In re Take-Two Interactive Sec. Litig.*, 551 F. Supp. 2d 247 (S.D.N.Y. 2008), to insist that scienter can only be shown by alleging the attendance at, or actual personal awareness of, the July 16 Meeting by each Individual Defendant. Def. Br. at 24. Contrary to Defendants' assertions, as set forth above, scienter is satisfied if the Individual Defendants knew *or should have known*, *or had access to information* suggesting, that their public statements were misleading.

"access to" or "should have known" about the July 16 Meeting. *EVCI*, 469 F. Supp. 2d at 99 (scienter alleged where CEO and CFO "knew or should have known about" material information that threatened company's planned expansion). Furthermore, that the Individual Defendants publicly spoke positively about Alibaba's anti-counterfeiting and compliance efforts,[32] all the while issuing inadequate risk disclosures and concealing the substance of the July 16 Meeting and Administrative Guidance, supports a strong inference of scienter in this case. *In re Apollo Grp. Inc. Sec. Litig.*, 395 F. Supp. 2d 906, 921-22 (D. Az. 2005) (allegations that individual defendants knew about negative information contained in government report, yet spoke positively about the program review process prior to the release of the report, are sufficient to adequately plead scienter).

### 2.  The Core Operations Doctrine Supports a Strong Inference of Scienter

A corporation and its insiders will be charged with knowledge of information concerning the "core operations" of a business. *Hi-Crush*, 2013 WL 6233561, at *26 ("core operations doctrine" permits an inference that a company and its senior executives have knowledge of information concerning the "core operations" of a business) (citations omitted).[33] "Core operations" include matters "critical to the long term viability" of the company and events affecting a "significant source of income." *Cosmas*, 886 F.2d at 13; *Hi-Crush*, 2013 WL 6233561, at *26.

The ongoing omission here (the July 16 Meeting and Administrative Guidance) related directly to the core of Alibaba's business (e-commerce counterfeiting and compliance issues). Moreover, counterfeits were one of Alibaba's two main "product categories" and a significant source

---

[32] *See, e.g.*, ¶178 (9/28/14 60 Minutes interview where Ma likens himself and Alibaba to a doctor trying to defeat the "cancer" of counterfeiting); ¶184 (11/19/14 conference speech where Ma specifically disclaims the existence of any counterfeit goods on the Company's e-commerce platforms); ¶186 (12/23/14 press release touting "cooperative relationships with various government bodies to combat counterfeiting"); ¶188 (1/8/15 press release asserting that Alibaba was actively monitoring and deterring counterfeit sales and other fraudulent activity on its platforms).

[33] *See also In re Huffy Corp. Sec. Litig.*, 577 F. Supp. 2d 968, 1000 (S.D. Ohio 2008) ("Courts have held that the more central a fact is to a company's core operations the more likely its executive acted with scienter."); (*In re Ancor Commc'ns., Inc. Sec. Litig.*, 22 F. Supp. 2d 999, 1005 (D. Minn. 1998) ("[F]acts critical to a business's core operations or an *important transaction* generally are so apparent that their knowledge may be attributed to the company and its key officers."); *Aldridge v. A.T. CrossCorp.*, 284 F.3d 72, 83 (1st Cir. 2002) (scienter supported by corporate officers' understanding that rollout of new product was "important to their own survival and that of the company").

of revenue. ¶134-39. That the information had the potential to derail the Company's $25 billion IPO, cause Alibaba to incur heavy fines, and materially impact the Company's finances and operations vis-à-vis lost sales and advertising revenues, especially in light of the fact that it *did* ultimately cause a substantial share price decline upon its disclosure, only further supports an inference of Defendants' scienter in this case.

### 3.       Scienter Can Be Imputed to Alibaba Through Its Corporate Agents

To allege scienter of a corporate defendant in the Second Circuit, "a plaintiff need not name a specific individual who acted with the requisite scienter – she need only plead facts that 'create a strong inference that *someone whose intent could be imputed* to the corporation' did so." *Hi-Crush*, 2013 WL 6233561, at *25 (quoting *Dynex*, 531 F.3d at 195) (emphasis added). Moreover, that "someone" need not be individually identified or named as a defendant. *Id.* at 195-96; *see also Carpenters Pension Trust Fund of St. Louis, St. Clair Shores Police & Fire Ret. Sys v. Barclays PLC* ("*Barclays*"), 56 F. Supp. 3d 549, 554 (S.D.N.Y. 2014); *In re Ambac Fin. Grp., Inc. Sec. Litig.*, 693 F. Supp. 2d 241, 265 (S.D.N.Y. 2010) (citing *In re Dynex Capital, Inc. Sec. Litig.* ("*Dynex II*"), No. 05 Civ. 1897(HB), 2009 WL 3380621, at *11 (S.D.N.Y. Oct. 19, 2009) for the proposition that "Courts routinely impute to the corporation the intent of officers and directors acting within the scope of their authority.").[34] In *Tellabs*, the Seventh Circuit reasoned: "Suppose General Motors announced that it had sold one million SUVs in 2006, and the actual number was zero. There would be a strong inference of corporate scienter, since so dramatic an announcement would have been

---

[34] *See also In re WorldCom, Inc. Sec. Litig.*, 352 F. Supp. 2d 472, 497 (S.D.N.Y. 2005) ("To carry their burden of showing that a corporate defendant acted with scienter, plaintiffs in securities fraud cases need not prove that any one individual employee of a corporate defendant also acted with scienter. Proof of a corporation's collective knowledge and intent is sufficient."); *Marsh*, 501 F. Supp. 2d at 481-82 (noting that "there is no requirement 'that the same individual who made an alleged misstatement on behalf of a corporation personally possessed the required scienter.'") (citations omitted); *Penn. Pub. Sch. Emps.' Ret. Sys. v. Bank of Am. Corp.*, 874 F. Supp. 2d 341, 363 (S.D.N.Y. 2012) (imputing to corporation scienter of senior managers who saw or had access to audit reports revealing serious errors and weaknesses); *In re Citigroup Inc. Sec. Litig.*, 753 F. Supp. 2d, 206, 236-37 (S.D.N.Y. 2010) (plaintiffs adequately alleged scienter in terms of corporate recklessness where company officials failed to appreciate – and failed to disclose – risks associated with CDOs).

approved by corporate officials sufficiently knowledgeable about the company to know that the announcement was false." 513 F.3d at 710.

The July 16 Meeting was similarly so "dramatic" an event that corporate scienter is properly inferred to Alibaba. Moreover, C-Level executives, including Chief Risk Officer and Alibaba Partner Xiaofeng Shao,  along with senior managers of each of Alibaba's e-commerce platforms, attended the July 16 Meeting and accepted the administrative guidance instructed by SAIC. ¶¶7, 66. Mr. Shao was and is a partner in the Alibaba Partnership (Rosen Decl. Ex. C-3, at 232), and the Alibaba Partnership directly controls the Board of Directors of Alibaba (*id.* Ex. C-1, at 9, 47). *See also* ¶7. Thus, Plaintiffs have alleged that individuals "whose intent could be imputed to the corporation" had specific knowledge of the July 16 Meeting, and their scienter is properly imputed to the Company.

### 4.    Scienter Can Be Imputed to the Individual Defendants as Members of the Alibaba Partnership

The Registration Statement discloses the "exclusive right" of the Alibaba Partnership to nominate Alibaba Board members for shareholder approval, thus demonstrating its control over the Company. Rosen Decl. Ex. C-1 at 9, 47 ("we expect the Alibaba Partnership nominees will receive a majority of votes cast at any meeting for the election of directors and will be elected as directors."). Plaintiffs allege that an Alibaba Partner, Mr. Shao, was present at the July 16 Meeting and directly received the SAIC's Administrative Guidance. ¶167. His knowledge is properly imputed to the other Individual Defendants, each of whom was and is his partner in the Alibaba Partnership.[35] *Denney v. Jenkens & Gilchrist*, 362 F. Supp. 2d 407, 414, n. 33 (S.D.N.Y.  2004) ("[w]ell established concepts of partnership doctrine impute the knowledge and actions of one partner to all others.") (collecting cases); *Zola v. Gordon*, 685 F. Supp. 354, 371 (S.D.N.Y. 1988) ("As Irving Zola was a partner…the knowledge of his partners is imputed to him.").

### 5.    The Individual Defendants' Signatures on SEC Filings

Defendants' signatures on SEC filings alleged to contain misleading statements and omissions are supportive of scienter. *See, e.g., In re Cabletron Sys., Inc.*, 311 F.3d 11, 41 (1st Cir.

---

[35] *See* Rosen Decl. Ex. C (Registration Statement), at 232 (Shao, Ma, Tsai, Lu, and Wu are Alibaba Partners).

2002) (defendants' signatures on Form 10-K "accept[ing] responsibility for its contents" was indicative of scienter) (citing *Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1061-62 (9th Cir. 2000) (holding outside directors responsible for SEC filings they signed)). Plaintiffs here allege that the Registration Statement and subsequent SEC filings made during the Class Period contained false and misleading information and material omissions. The Individual Defendants' attestations as to the correctness of those filings are further indicative of scienter.[36]

### C.    Plaintiffs Have Adequately Alleged Defendants' Motive and Opportunity

Scienter based on motive and opportunity can be shown by alleging that defendants "benefitted in some concrete and personal way from the purported fraud." *ECA, Local 134 IBEW*, 553 F.3d at 198 (quoting *Novak*, 216 F.3d at 307-08). With regard to the facts necessary to plead motive, the Second Circuit "has been lenient in allowing scienter…based on fairly tenuous inferences." *Press v. Chem. Inv. Servs. Corp.*, 166 F.3d 529, 538 (2d Cir. 1999) (citation omitted) (scienter alleged based on motive of defendants to use "float" of funds). Because intent is a factual issue best reserved for the trier of fact, the court in *Press* explained that it was "not inclined to create a nearly impossible pleading standard when the 'intent' of a corporation is at issue."

### 1.    Defendants Ma and Tsai Had Motive for Personal Gain

Defendants Ma and Tsai earned concrete and personal benefits from the IPO that were "massive by any measure." After the full exercise of the over-allotment option, Defendant Ma sold approximately 15.5 million ADSs in the IPO (12,750,000 ADSs plus 2,708,345 ADSs from the over-allotment option). ¶28; Rosen Decl. Ex. C-3 (Registration Statement) at 250, 254. Ma received $867 million in gross proceeds apart from the exercise of the over-allotment option, and a combined total of over **$1 billion** in gross proceeds in the IPO with the over-allotment, catapulting him to become the richest man in China. *Id.*; ¶184. Defendant Tsai sold approximately 5.2 million ADSs in the IPO (4,250,000 ADSs plus 902,782 ADSs from the over-allotment option). *See* ¶29; Rosen Decl., Ex. C-

---

[36] The operative Registration Statement (and each prior version) was signed by Defendants Ma, Tsai, Lu, and Wu.  Moreover, the October 3, 2014, Form S-8 was signed by Defendants Ma, Tsai, Lu, and Wu. And the November 4, November 13, November 24, and January 29 Forms 6-K were signed by Defendant Wu.

3 at 250, 254.[37] Tsai received $289 million in gross proceeds apart from the exercise of the over-allotment option, and a combined total of over **353 million** in gross proceeds in the IPO with the over-allotment. *Id*.[38] Defendants' attempt to undercut these incredible sums merely because they represent "gross proceeds" misses the mark. *See* Def. Br. at 23-24.[39] A showing of motive and opportunity "is generally met when corporate insiders allegedly make a misrepresentation in order to sell their own shares at a profit." *ECA*, 553 F.3d at 198 (quoting *Novak*, 216 F.3d at 308); *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 74 (2d Cir. 2001). Here, given that Ma and Tsai received founder's stock, nearly all of the gross proceeds represented profit. Rosen Decl. Ex. C-3, at 235, 251.

Courts have held that public offerings can provide individual motive for fraud, particularly where individual defendants stand to gain significant payouts. *In re Fairway Grp. Holding Corp. Sec. Litig.*, No. 14 CIV. 0950 LAK, 2015 WL 249508, at *14 (S.D.N.Y. Jan. 20, 2015) (holding that the defendants benefitted in a "direct, personal and concrete way from the fraud" where "defendants were able to raise millions of dollars in the offering, nearly recouping their entire $150 million investment in Fairway….").

Additionally, courts may infer bad faith and scienter when negative corporate news is withheld while "unusual insider sales" are made. *In re Forest Labs. Sec. Litig.*, No. 05 CIV. 2827

---

[37] The over-allotment was exercised in full on the same day as the IPO at $68 per ADS. *See* Form 6-K filed 11/13/14, Ex. 99.3, at p. F-15.

[38] While Alibaba did not disclose stock ownership for Defendants Lu and Wu, their possible lack of stock ownership does not weaken the inference of scienter. *See Stevelman v. Alias Research Inc.*, 174 F.3d 79, 85-86 (2d Cir. 1999) (motive alleged despite precedent suggesting that fraud benefitting only one defendant weakens scienter where the stock sales occurred after misrepresentations were made) (citing *San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Cos., Inc.*, 75 F.3d 801, 814 (2d Cir. 1996)).

[39] Defendants misread *Take-Two* as espousing a *per se* rule that gross proceeds alone can never provide sufficient inference of motive. Def. Br. at 23. The *Take-Two* court questioned whether the timing of the sales was suspicious where defendants made other comparably large sales prior to the class period. 551 F. Supp. 2d at 275. Unlike *Take-Two*, Ma and Tsai did not make prior sales, the IPO was the largest opportunity for them to unload shares, and Alibaba executives were aware of pending SAIC enforcement actions.

Moreover, this case is unlike *Johnson v. Sequans Commc'ns S.A.* (cited at Def. Br. 24), where no motive aside from capital raising in the IPO was alleged and only one defendant sold a small amount of shares. No. 11 CIV. 6341 PAC, 2013 WL 214297, at *19 (S.D.N.Y. Jan. 17, 2013). Finally, Defendants' reliance on *Geiger v. Solomon-Page Grp., Ltd.*, (Def. Br. at 24) is irrelevant because there, the alleged misstatements were immaterial. 933 F. Supp. 1180, 1189 (S.D.N.Y. 1996).

(RMB), 2006 WL 5616712, at *11 (S.D.N.Y. July 21, 2006) (quoting *Scholastic*, 252 F.3d at 74). Courts have considered a number of factors in deciding whether trades are unusual, including: (a) the "amount of profit from the sales"; (b) the percentage of holdings sold; (c) the change in volume of insider sales; and (d) the number of insiders selling. *Id.* (quoting *Scholastic*, 252 F.3d at 74-75).

Courts within the Second Circuit have found insider profits from an IPO to be adequate allegations of individual motive. While there is no per se rule that a "sale of a particular monetary amount or percentage of total holdings is unusual," the act of "selling shortly before the public disclosure of negative information" is an "indication that defendants were withholding information from the market." *In re BISYS Sec. Litig.*, 397 F. Supp. 2d 430, 444 (S.D.N.Y. 2005). When defendants profit from stock sales through an IPO, particularly with a "green shoe" or over-allotment option, this "direct compensation" is "a concrete benefit directly flowing from the alleged fraud, and is accordingly sufficient to give rise to a strong inference of motive." *In re Refco, Inc. Sec. Litig.*, 503 F. Supp. 2d 611, 646 (S.D.N.Y. 2007) (finding that proceeds of $349,800 and $201,135 to two defendants who supplied over-allotment shares in the IPO was sufficient to infer motive). *See also City of Roseville Emps.' Ret. Sys. v. EnergySolutions, Inc.*, 814 F. Supp. 2d 395, 421 (S.D.N.Y. 2011) (collective profits of $463 million from an IPO, and $764 million from a follow-on offering provided a "concrete and massive economic benefit that accrued to the defendants….").

Moreover, even where – as here – the percentage of holdings sold is not itself outrageous, courts have found the amount to be "unusual" where corporate insiders netted a "massive" amount of profits. *See In re Forest*, 2006 WL 5616712, at *5 (finding motive where insiders sold over five million shares for over $300 million in profits, even though one individual defendant sold only 11% of his holdings); *In re Oxford Health Plans, Inc.*, 187 F.R.D. 133, 140 (S.D.N.Y. 1999) (finding even when the percentage of holdings sold might be lower, "large volume trades" totaling $78 million profit to the individual defendants, were "massive by any measure."). Defendants Ma's and Tsai's sales here are "massive" by any measure.

### 2.     All Defendants Had Motive to Protect Alibaba's Historic IPO

Ensuring success in and following public offerings can provide a motive for fraud. *See In re Am. Bank Note Holographics, Inc. Sec. Litig.*, 93 F. Supp. 2d 424, 444 (S.D.N.Y. 2000) (Defendant ABN "had the most to win by inflating the price of the IPO, and was thus motivated to make statements or omit facts that would result in a higher price").[40] Similarly, while a naked desire to increase company profits does not establish motive, the desire to create or preserve extraordinary financial benefits can establish the requisite motive for fraud. *In re Indep. Energy Holdings, PLC Sec. Litig.*, 154 F. Supp. 2d 741, 766 (S.D.N.Y. 2001), *abrogated on other grounds by In re IPO Sec. Litig.*, 241 F. Supp. 2d 281 (S.D.N.Y. 2003), (scienter of underwriter alleged where firm was motivated to help corporate parent realize "enormous financial benefits" from a successful offering, including the extinguishment of liability on $65 million line of credit). Further, concealing a potential negative impact on a company's financial health can provide a motive for fraud. *See, e.g., Cabletron*, 311 F.3d at 39 (finding concealment of facts that would tend to indicate potential deterioration of company's financial health was "a significant motive" to commit fraud); *Barclays*, 56 F. Supp. 3d at 554 ("the Complaint also plausibly alleges Barclays's motive – to counter negative perceptions about its borrowing costs and, more generally, its financial condition.").

Defendants' motive is clear; Alibaba's $25 billion IPO was the largest IPO in history and Defendants did not want to jeopardize it. ¶3. Indeed, the White Paper specifically stated that the SAIC held off on disclosing details of the meeting so as not to affect the IPO. *See* ¶¶198, 202; Dkt. No. 6-1 (White Paper), at 11. Defendants maintained the inflation push on the Company's stock price following the IPO by continuing to omit from their public statements any mention of the July 16 Meeting and Administrative Guidance, and by continuing to conceal known counterfeit-related problems.

---

[40] *See also Van Dongen v. CNinsure Inc.*, 951 F. Supp. 2d 457, 474 (S.D.N.Y. 2013) (motive adequately alleged where concealing certain information allowed defendants to raise significantly more in the public offering than if the news had been disclosed); *In re Livent, Inc. Noteholders Sec. Litig.*, 174 F. Supp. 2d 144, 152 (S.D.N.Y. 2001) (ruling that plaintiffs properly alleged that CIBC Oppenheimer Securities Corp. had motive to mislead investors in connection with securities offering, where proceeds therefrom would be used to repay "Livent's considerable debt to CIBC").

**D.      Lack of a Competing Inference Supports Plaintiffs' Scienter Allegations**

The only hint of a "competing inference" that Defendants offer is to downplay the significance of the July 16 Meeting and the issues that counterfeit goods posed to the Company, and to downplay the threat of fines. *See, e.g.*, Def. Br. at 2. In light of Plaintiffs' allegations as to the seriousness of this Meeting to both the Company and the Chinese government, as well as the potential material impact of the threatened fines and/or compliance on the Company's finances and operations, Defendants' so-called competing inference based on their recasting the Meeting and Administrative Guidance as "no big deal" must be rejected. At a minimum, on this motion, the Court should not deem Defendants' purported alternative inferences as "more compelling" than Plaintiffs' allegations in support of scienter. *Tellabs*, 551 U.S. at 322, 324.[41]

**VI.      THE COMPLAINT SUFFICIENTLY ALLEGES LOSS CAUSATION**

Loss causation is subject to the notice pleading requirements of Fed. R. Civ. P. 8(a)(2). *King Cnty., Wash. v. IKB Deutsche Industriebank AG*, 708 F. Supp. 2d 334, 339 (S.D.N.Y. 2010). A "short and plain statement" that provides notice of a "causal connection" between the material misrepresentation and the loss is sufficient. *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 346-47 (2005). This causal connection can be alleged in the form of a corrective disclosure,[42] or where the loss was a "foreseeable materialization of the risk" concealed by a defendant's misstatements or omissions. *Carpenters Pension Trust Fund of St. Louis v. Barclays PLC*, 750 F.3d 227, 232-33 (2d Cir. 2014) (citing *In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 511, 513 (2d Cir. 2010));

---

[41] *Van Dongen v. CNinsure Inc.*, 951 F. Supp. 2d 457, 473 (S.D.N.Y. 2013) ("Just as it fell short in the context of falsity, Defendants' argument is insufficient to amount to a more compelling inference regarding scienter than the one proffered by Lead Plaintiffs."); *Ambac*, 693 F. Supp. 2d at 269-70 (while "defendants' characterization of events is certainly one inference that can be drawn from the alleged facts.... taking the facts in the light most favorable to the plaintiffs, this does not amount to a more compelling inference than that proffered by plaintiffs based on the facts alleged")."

[42] *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 173 (2d Cir. 2005) (loss causation adequately alleged where "the misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the security.") Defendants interpret this to require an exacting corrective disclosure. Def. Br. at 29-30, 31-32. However, it is well-settled that a corrective disclosure need not be a "'mirror image' tantamount to a confession of fraud." *Freudenberg v. E*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 202 (S.D.N.Y. 2010). Even so, the revelation of the July 16 Meeting in the White Paper meets this demanding standard.

*Lentell*, 396 F.3d at 173. Moreover, materialized risks under the latter theory "need only disclose part of the truth that was previously concealed by the fraud." *Id.* Since the loss-inducing event need only fall within the zone of risk concealed by the misrepresentations, loss causation "does not…require plaintiffs to establish a one-to-one correspondence between concealed facts and the materialization of the risk." *In re Vivendi Universal, S.A. Sec. Litig.*, 634 F. Supp. 2d 352, 367 (S.D.N.Y. 2009). Thus, unlike a corrective disclosure, loss-inducing events that materialize the risk "do not identify specific company statements as false or misleading." *Id.* at 364.

Here, the Complaint alleges a series of partial corrective disclosures over two trading days, with corresponding share price drops on each of January 28 and January 29, 2015. Significantly, Defendants do not challenge (and thus concede) loss causation with respect to these price drops following the White Paper's disclosure of the July 16 Meeting and Administrative Guidance, and the additional related news disclosed in the evening of January 28 and on January 29. Indeed, the market's swift reaction shows loss causation in this case. *Lentell*, 396 F.3d at 173; ¶¶205-16.

Rather, Defendants challenge loss causation only with respect to Red Shield and counterfeiting. Def. Br. at 29, 31. In isolating the Red Shield and counterfeiting allegations from the July 16 Meeting, Administrative Guidance, and White Paper, Defendants again misapprehend or misrepresent Plaintiffs' claims. Their attempt to parse out stand-alone allegations must be rejected. As set forth in Sec. IV.D.3, *supra*, the allegations relating to Red Shield and Defendants' facilitation of the sale of a substantial amount of counterfeit goods underscore Plaintiffs' central allegation, to wit, that Defendants had a duty to disclose the July 16 Meeting and Administrative Guidance. In any event, Plaintiffs also plead loss causation based on the materialization of risks concealed by Defendants' material omissions of Red Shield and counterfeiting that are inextricably tied to the July 16 Meeting and Administrative Guidance, *see generally* ¶¶191-218, such that the alleged price drops need not be tied to any Red Shield- or counterfeiting-specific allegations.

Indeed, Defendants' omissions of the July 16 Meeting and Administrative Guidance concealed the risks, *inter alia*, that: Alibaba was informed by the SAIC that it was in violation of a number of Chinese laws, including that Alibaba sold and facilitated the sale of counterfeit goods;

and Alibaba was a prime target under Red Shield and, as such, it was directly threatened with monetary and other penalties and faced lost revenues, including significant costs of compliance, lost sales and advertising revenues, and fundamental disruption to its business as a result of the Red Shield program and Administrative Guidance propounded pursuant to it. *E.g.*, ¶¶11, 72, 104. These risks materialized upon the January 27, 2015, release of the White Paper and translated into massive losses over the following days, establishing loss causation under the materialization of risk theory. *See Freudenberg*, 712 F. Supp. 2d at 202; *Vivendi*, 634 F. Supp. 2d at 367.

## VII.    PLAINTIFFS STATE A CLAIM UNDER §20(a)

As Plaintiffs have alleged a primary violation of §10(b), Plaintiffs also state a claim under §20(a) claim. Plaintiffs have alleged control (in that each Defendant was either an Alibaba director or executive and signed, at minimum, the Registration Statement and its amendments), as well as culpable participation by alleging scienter. *See, e.g., Vanleeuwen v. Keyuan Petrochemicals, Inc.*, No. 03 Civ. 8284(RWS), 2014 WL 3891351, at *5 (S.D.N.Y. Aug. 8, 2014); *In re Longwei Petroleum Inv. Holding Ltd. Sec. Litig.*, No. 13 CV 214(HB), 2014 WL 285103, at *6 (S.D.N.Y. Jan. 27, 2014). Each defendant was also a partner in the Alibaba partnership which controlled the board of directors, and hence the policies and affairs of the Company. Rosen Decl. Ex. C-3 (Registration Statement), at 232. Because these elements are subject to the notice pleading requirements of Fed. R. Civ. P. 8(a)(2), these allegations are sufficient. *In re Longtop Fin. Techs. Ltd.*, 2012 WL 2512280, at *12 (S.D.N.Y. June 28, 2012)).

## VIII.    CONCLUSION

For all of the foregoing reasons, Plaintiff respectfully submits that Defendants' motion to dismiss should be denied in its entirety. Alternatively, if the Court is inclined to grant any part of the Motion, Plaintiffs request leave to amend. Fed. R. Civ. P. 15(a)(2); *Foman v. Davis*, 371 U.S. 178 (1962).

Dated:  August 28, 2015                THE ROSEN LAW FIRM P.A.


                                       By:  _s/ Laurence Rosen_____
                                       Laurence Rosen
                                       Phillip Kim
                                       Jonathan Horne
                                       275 Madison Avenue, 34th Floor
                                       New York, NY 10016
                                       Telephone: (212) 686-1060
                                       Facsimile: (212) 202-3827

                                       *Lead Counsel for Plaintiffs and the Class*

**PROOF OF SERVICE BY ELECTRONIC POSTING PURSUANT TO SOUTHERN
DISTRICT OF NEW YORK ECF AND LOCAL RULES AND BY MAIL
ON ALL KNOWN NON-REGISTERED PARTIES**

I, the undersigned say:

I am not a party to the above case, and am over eighteen years old.

On August 28, 2015, I served true and correct copies of **PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS CONSOLIDATED CLASS ACTION COMPLAINT**, by posting the document electronically to the ECF website of the United States District Court for the Southern District of New York, for receipt electronically by the parties listed on the Court's Service List.

I affirm under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed this 28th day of August, 2015, at New York, New York.

*s/ Laurence M. Rosen*
Laurence M. Rosen

## Mailing Information for a Case 1:15-md-02631-CM

### Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Adam M. Apton**
  aapton@zlk.com

- **Stephen Patrick Blake**
  sblake@stblaw.com

- **Mary Katherine Blasy**
  mblasy@rgrdlaw.com,e_file_ny@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Peter E. Borkon**
  peterb@hbsslaw.com

- **Donald A Broggi**
  dbroggi@scott-scott.com

- **Patrick Vincent Dahlstrom**
  pdahlstrom@pomlaw.com

- **Amber L. Eck**
  ambere@zhlaw.com

- **Robert Craig Finkel**
  rfinkel@wolfpopper.com,cdunleavy@wolfpopper.com,mgianfagna@wolfpopper.com,nmackiel@wolfpopper.com

- **Lionel Z. Glancy**
  lglancy@glancylaw.com,csadler@glancylaw.com,pbinkow@glancylaw.com,info@glancylaw.com,rprongay@glancylaw.com

- **Joseph Peter Guglielmo**
  jguglielmo@scott-scott.com,edewan@scott-scott.com,tcrockett@scott-scott.com,ichilaia@scott-scott.com,aslaughter@scott-scott.com

- **John T Jasnoch**
  jjasnoch@scott-scott.com

- **Phillip Kim**
  pkim@rosenlegal.com

- **Phillip Kim**
  pkim@rosenlegal.com

- **James G Kreissman**
  jkreissman@stblaw.com

- **James Glenn Kreissman**
  jkreissman@stblaw.com,managingclerk@stblaw.com

- **Jeremy Alan Lieberman**
  jalieberman@pomlaw.com,disaacson@pomlaw.com,abarbosa@pomlaw.com

- **Long Z Liu**
  office@theliulawfirm.com

- **Francis Paul McConville**
  fmcconville@labaton.com

- **Danielle S Myers**
  dmyers@rgrdlaw.com

- **Jennifer Pafiti**
  jpafiti@pomlaw.com

- **Lesley Frank Portnoy**
  LPortnoy@glancylaw.com

- **Robert Vincent Prongay**
  rprongay@glancylaw.com,echang@glancylaw.com

- **Fei-Lu Qian**
  fqian@wolfpopper.com

- **Laurence M Rosen**
  lrosen@rosenlegal.com

- **Laurence Matthew Rosen**
  lrosen@rosenlegal.com

- **David Avi Rosenfeld**
  drosenfeld@rgrdlaw.com,e_file_ny@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Samuel Howard Rudman**
  srudman@rgrdlaw.com,e_file_ny@rgrdlaw.com,mblasy@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Kevin F Ruf**
  kevinruf@gmail.com

- **Joshua H Saltzman**
  jsaltzman@kaplanfox.com

- **David R. Scott**
  david.scott@scott-scott.com

- **Simona Gurevich Strauss**
  sstrauss@stblaw.com,managingclerk@stblaw.com

- **Matthew L Tuccillo**
  mltuccillo@pomlaw.com,disaacson@pomlaw.com

- **George S Wang**
  gwang@stblaw.com,managingclerk@stblaw.com

- **Jonathan K. Youngwood**
  jyoungwood@stblaw.com,managingclerk@stblaw.com,nanderson@stblaw.com

- **Jason Allen Zweig**
  jasonz@hbsslaw.com,peterb@hbsslaw.com,rebeccah@hbsslaw.com,tomm@hbsslaw.com,chi_filings@hbsslaw.com,reed@hbsslaw.com,nicolleg@hbsslaw.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

```
Reed                    R. Kathrein
Hagens Berman Sobol Shapiro LLP
715 Hearst Avenue
Suite 202
Berkeley, CA 94710
```