**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

IN RE ALIBABA GROUP HOLDING
LIMITED SECURITIES LITIGATION

Civil Action 1:15-md-02631 (CM)

**MEMORANDUM OF LAW IN SUPPORT OF**
**MOTION FOR CLASS CERTIFICATION AND APPOINTMENT OF**
**CLASS REPRESENTATIVES AND CLASS COUNSEL**

## <u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT ............................................................................................ 1

BACKGROUND AND PROCEDURAL HISTORY .................................................... 3

ARGUMENT ........................................................................................................................ 5

    I.      Applicable Standards Favor Class Certification In This Securities Action ............ 5

    II.     The Requirements Of Rule 23(a) Are Satisfied ..................................................... 6

         A.     Numerosity Is Established ......................................................... 6

         B.     Commonality Is Established ...................................................... 7

         C.     Typicality Is Established ............................................................ 8

         D.     Adequacy Is Established ............................................................ 8

    III.    The Predominance And Superiority Requirements Of Rule 23(b)(3) Are
        Satisfied ................................................................................................................ 10

         A.     Common Questions Of Law And Fact Predominate ............... 10

              1.     The *Affiliated Ute* Presumption Of Reliance Applies ................... 11

              2.     Plaintiffs Are Entitled To A Presumption Of Reliance Under
                  *Basic* ................................................................................... 12

                  (a)     Alibaba's Listing On The NYSE Shows Market
                      Efficiency ........................................................... 13

                  (b)     The *Cammer* Factors Show Market Efficiency ............... 13

                  (c)     The *Unger/Krogman* Factors Further Support A Finding Of
                      Market Efficiency ........................................... 20

              3.     The Fraud-on-the-Market Presumption Of Reliance Also Applies
                To Alibaba's Options ..................................................... 21

              4.     Potential Individual Questions Of Damages Do Not Predominate 22

             5.     The Same Common Issues Predominate As To The § 20(a)
                Claims ............................................................................. 23

    B. A Class Action Is Superior To Other Methods Of Adjudication..............23

IV. The Class Is Ascertainable ................................................................................24

V. The Rosen Firm Should be Appointed Class Counsel Under Rule 23(g)............24

CONCLUSION ................................................................................................................25

# TABLE OF AUTHORITIES

## CASES

*Affiliated Ute Citizens of Utah v. U.S.,*
  406 U.S. 128 (1972) ............................................................................................. 2, 11

*Amchem Prods., Inc. v. Winsdor,*
  521 U.S. 591 (1997) ..................................................................................... 2, 5, 10, 23

*Amgen Inc. v. Conn. Ret. Plans & Trust Funds,*
  568 U.S. 455 (2013) ............................................................................................. 2, 10

*Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.,*
  222 F.3d 52 (2d Cir. 2000) ......................................................................................... 9

*Basic Inc. v. Levinson,*
  485 U.S. 224 (1988) ..................................................................................... 3, 5, 10, 12

*Billhofer v. Flamel Techs., S.A.,*
  281 F.R.D. 150 (S.D.N.Y. 2012) ............................................................................... 21

*Bricklayers and Trowel Trades v. Credit Suisse LLC,*
  752 F.3d 82 (1st Cir. 2014) ................................................................................. 18, 19

*Brown v. Kelly,*
  609 F.3d 467 (2d Cir. 2010) ..................................................................................... 10

*Cammer v. Bloom,*
  711 F. Supp. 1264 (D.N.J. 1989) ...................................................................... *passim*

*Carpenters Pension Trust Fund of St. Louis v. Barclays PLC,*
  310 F.R.D. 69 (S.D.N.Y. 2015) ........................................................................... 13, 14

*Christine Asia Co. Ltd. v. Ma,*
  2017 WL 6003340 (2d Cir. Dec. 5, 2017) ........................................................... 5, 9, 11

*Comcast Corp. v. Behrend,*
  569 U.S. 27 (2013) ................................................................................................... 22

*Consol. Rail Corp. v. Town of Hyde Park,*
  47 F.3d 473 (2d Cir. 1995) ......................................................................................... 6

*Deutschman v. Beneficial Corp.,*
  841 F.2d 502 (3d Cir. 1988) ..................................................................................... 21

*Dodona I, LLC v. Goldman, Sachs & Co.*,
    296 F.RD. 261 (S.D.N.Y. 2014) ................................................................. 6

*Fogarazzo v. Lehman Bros., Inc.*,
    232 F.R.D. 176 (S.D.N.Y. 2005) ............................................................... 7

*Fogarazzo v. Lehman Bros., Inc.*,
    263 F.R.D. 90 (S.D.N.Y. 2009) ............................................................... 24

*Green v. Wolf Corp.*,
    406 F.2d 291 (2d Cir. 1968) ..................................................................... 6

*In re Alstom SA Sec. Litig.*,
    253 F.R.D. 266 (S.D.N.Y. 2008) ............................................................. 16

*In re Am. Int'l Grp., Inc. Sec. Litig.*,
    689 F.3d 229 (2d Cir. 2011) ..................................................................... 2

*In re Barrick Gold Sec. Litig.*,
    314 F.R.D. 91 (S.D.N.Y. 2016) ......................................................... 10, 22

*In re Blech Sec. Litig.*,
    187 F.R.D. 97 (S.D.N.Y. 1999) ............................................................... 24

*In re Dynex Capital, Inc. Sec. Litig.*,
    2011 WL 781215 (S.D.N.Y. Mar. 7, 2011) ............................................. 12

*In re Facebook, Inc., IPO Sec. & Deriv. Litig.*,
    986 F. Supp. 2d 428 (S.D.N.Y. 2013) ..................................................... 11

*In re Goldman Sachs Grp., Inc. Sec. Litig.*,
    2015 WL 5613150 (S.D.N.Y. Sept. 24, 2015) ........................................ 22

*In re Independent Energy Holdings PLC Sec. Litig.*,
    210 F.R.D. 476 (S.D.N.Y. 2002) ............................................................... 6

*In re Initial Pub. Offering Sec. Litig.*,
    260 F.R.D. 81 (S.D.N.Y. 2009) ............................................................... 16

*Erica P. John Fund, Inc. v. Halliburton Co.*,
    563 U.S. 804 (2011) ........................................................................... 5, 10

*Halliburton Co. v. Erica P. John Fund, Inc.*,
    134 S. Ct. 2398 (2014) ........................................................................... 12

*In re Merck & Co., Inc. Sec., Deriv. & "ERISA" Litig.*,
   2013 WL 396117 (D.N.J. Jan. 30, 2013) ........................................... 23

*In re Methyl Tertiary Butyl Ether ("MTBE") Prods. Liab. Litig.*,
   241 F.R.D. 435 (S.D.N.Y. 2007) ...................................................... 23

*In re Moody's Corp. Sec. Litig.*,
   274 F.R.D. 480 (S.D.N.Y. 2011) ...................................................... 13

*In re NTL, Inc. Sec. Litig.*,
   2006 WL 330113 (S.D.N.Y. Feb. 14, 2006) ........................................ 7

*In re NYSE Specialists Sec. Litig.*,
   260 F.R.D. 55 (S.D.N.Y. 2009) ..................................................... 6, 7

*In re Petrobras Sec. Litig.*,
   312 F.R.D. 354 (S.D.N.Y. 2016) ................................................. 19, 24

*In re Petrobras Secs.*,
   862 F.3d 250 (2d Cir. 2017) ................................................... *passim*

*In re Pfizer Inc. Sec. Litig.*,
   282 F.R.D. 38 (S.D.N.Y. 2012) ...................................................... 10

*In re Priceline.com Inc.*,
   236 F.R.D. 89 (S.D.N.Y. 2006) ...................................................... 22

*In re Smith Barney Transfer Agent Litig.*,
   290 F.R.D. 42 (S.D.N.Y. 2013) .................................................. 6, 11

*In re Virtus Inv. Partners, Inc. Sec. Litig.*,
   2017 WL 2062985 (S.D.N.Y. May 15, 2017) ...................................... 6

*In re Visa Check/MasterMoney Antitrust Litig.*,
   280 F.3d 124 (2d Cir. 2001) .......................................................... 24

*In re Winstar Commc'ns Sec. Litig.*,
   290 F.R.D. 437 (S.D.N.Y. 2013) .............................................. 7, 15, 16

*In re Xcelera.com Sec. Litig.*,
   430 F.3d 503 (1st Cir. 2005) ......................................................... 15

*Krogman v. Sterritt*,
   202 F.R.D. 467 (N.D. Tex. 2001) ............................................... 20, 21

*Litton Indus., Inc. v. Lehman Bros. Kuhn Loeb Inc.*,
    967 F.2d 742 (2d Cir. 1992) ................................................................................ 11

*McIntire v. China MediaExpress Holdings, Inc.*,
    38 F. Supp. 3d 415 (S.D.N.Y. 2014) ............................................................ *passim*

*Phillips Petroleum Co. v. Shutts*,
    472 U.S. 797 (1985) ....................................................................................... 23

*Pub. Emps.' Ret. Sys. of Miss. v. Merrill Lynch & Co., Inc.*,
    277 F.R.D. 97 (S.D.N.Y. 2011) ...................................................................... 7

*Robidoux v. Celani*,
    987 F.2d 931 (2d Cir. 1993) ............................................................................ 8

*Spagnola v. Chubb Corp.*,
    264 F.R.D. 76 (S.D.N.Y. 2010) ...................................................................... 23

*Stratte-McClure v. Morgan Stanley*,
    776 F.3d 94 (2d Cir. 2015) .............................................................................. 5

*Strougo v. Barclays PLC*,
    312 F.R.D. 307 (S.D.N.Y. 2016) .............................................................. 10, 13

*Teachers' Ret. Sys. of La. v. ACLN Ltd.*,
    2004 WL 2997957 (S.D.N.Y. Dec. 27, 2004) ........................................ 6, 7, 8

*Teamsters Local 445 Freight Div. Pension Fund v. Bombardier, Inc.*,
    546 F.3d 196 (2d Cir. 2008) .......................................................................... 14

*Todd v. STAAR Surgical Co.*,
    2017 WL 821662 (C.D. Cal. Jan. 5, 2017) .................................................... 15

*Trinidad v. Breakaway Courier Sys., Inc.*,
    2007 WL 103073 (S.D.N.Y. Jan. 12, 2007) .................................................... 8

*Tsereteli v. Residential Asset Securitization Trust 2006-A8*,
    283 F.R.D. 199 (S.D.N.Y. 2012) .................................................................... 6

*Unger v. Amedisys*,
    401 F.3d 316 (5th Cir. 2005) ......................................................................... 20

*Waggoner v. Barclays PLC*,
    875 F.3d 79 (2d Cir. 2017) ......................................................................... *passim*

*Wallace v. Intralinks*,
  302 F.R.D. 310 (S.D.N.Y. 2014) ..................................................................... 8, 22, 23

<u>RULES</u>

Fed. R. Civ. P. 23 ..................................................................................... *passim*

Lead Plaintiffs William Tai ("Tai") and Christine Asia Co., Ltd. ("Christine Asia") (together, "Lead Plaintiffs") and additional named plaintiffs Abel Amoros, Arthur Gabriel, Raymond Lee, and Gang Liu (together with Lead Plaintiffs, "Plaintiffs" or the proposed "Class Representatives") respectfully submit this memorandum of law in support of their motion for class certification pursuant to Federal Rule of Civil Procedure 23, seeking (i) certification of the Class as defined herein; (ii) the appointment of Plaintiffs as Class Representatives; and (iii) the appointment of The Rosen Law Firm, P.A. (the "Rosen Firm") as Class Counsel.

## PRELIMINARY STATEMENT

Plaintiffs are pursuing claims on behalf of a class of Alibaba Group Holding Limit ("Alibaba" or the "Company") investors under §§ 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") against defendants Alibaba; Jack Ma ("Ma"), Alibaba's co-founder and Chief Executive Chairman of the Board; Joseph Tsai ("Tsai"), Alibaba's co-founder and Executive Vice Chairman of the Board; Jonathan Zhaoxi Lu ("Lu"), Alibaba's Chief Executive Officer ("CEO") and member of the Board of Directors; and Maggie Wei Wu ("Wu"), Alibaba's Chief Financial Officer ("CFO") (Alibaba, Ma, Tsai, Lu, and Wu are referred to collectively as "Defendants"). The proposed Class is defined as:

> All persons and/or entities that purchased or otherwise acquired Alibaba Group Holding Limited American Depository Shares ("ADS"), or purchased call options or sold put options on Alibaba ADS, during the period September 19, 2014, through January 28, 2015, inclusive (the "Class Period"), other than those shares purchased directly in the September 19, 2014 Initial Public Offering.

> Excluded from the Class are: (a) persons who suffered no compensable losses; and (b) Defendants; the present and former officers and directors of Alibaba at all relevant times; members of their immediate families and their legal representatives, heirs, successors, or assigns; and any entity in which any of the Defendants, or any person excluded under this subsection (b), has or had a controlling interest at any time.

Both the United States Supreme Court and the Second Circuit have long held that securities cases are especially well-suited to class-wide adjudication, and that the class action mechanism is an important tool to enforcing securities laws.  *See, e.g.*, *Amchem Prods., Inc. v. Winsdor*, 521 U.S. 591, 624 (1997); *Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 568 U.S. 455, 478 (2013); *In re Am. Int'l Grp., Inc. Sec. Litig.*, 689 F.3d 229, 240 (2d Cir. 2011) (noting that the predominance test of Rule 23 is "readily met" in cases alleging securities fraud).

Consistent with this precedent, certification is appropriate here as the proposed Class satisfies all of the requirements of certification under Fed. R. Civ. P. 23.  Alibaba securities were widely held and traded on the New York Stock Exchange ("NYSE") during the Class Period, such that the proposed Class numbers in the many thousands, satisfying Rule 23(a)(1)'s numerosity requirement.  The nature of the proposed Class Representatives' injuries, which resulted from Defendants' common course of conduct, is identical to that of the proposed Class members such that no Class Representative suffers from a conflict of interest that would impede the vigorous prosecution of this action, satisfying the commonality, typicality, and adequacy requirements of Rule 23(a)(2)-(4).  Moreover, the Rosen Firm, P.A. ("Lead Counsel") possesses the requisite experience and resources to successfully prosecute this matter as a class action, further supporting adequacy under Rule 23(a)(4), as well as appointment of the Rosen Firm as Class Counsel under Rule 23(g).

This action also satisfies Rule 23(b)(3)'s requirements of predominance and superiority. Each of the elements of Plaintiffs' § 10(b) and § 20(a) claims are susceptible to Class-wide proof based upon common facts. Specifically, the Class is entitled to a presumption of reliance pursuant to the Supreme Court's ruling in *Affiliated Ute Citizens of Utah v. U.S.*, 406 U.S. 128 (1972) ("*Affiliated Ute*") as this is primarily an omissions case.  Namely, Defendants failed to

disclose the circumstances of a July 16, 2014 meeting among senior members of Alibaba's management and the Chinese State Administration for Industry and Commerce ("SAIC") that was held just two months before the Company's record-setting $25 billion Initial Public Offering (the "IPO"). Separately, the predominance requirement is also independently satisfied because the Class is entitled to a presumption of reliance based on the *Basic v. Levinson* "fraud-on-the-market" doctrine as Alibaba's ADSs and options traded in an efficient market. *Basic Inc. v. Levinson*, 485 U.S. 224 (1988); *In re Petrobras Secs.*, 862 F.3d 250, 276-78 (2d Cir. 2017) (noting that "the Supreme Court has suggested that the burden required to establish market efficiency 'is not an onerous one.'") (citations omitted); *Waggoner v. Barclays PLC ("Waggoner")*, 875 F.3d 79, 97 (2d Cir. 2017) (same). *See also* Report on Market Efficiency, David I. Tabak, Ph.D. (the "Tabak Report"), at ¶¶3, 18-64, 77.[1] Thus, any potential individual questions of reliance do not predominate over common issues in this case. Moreover, the Tabak Report explains how the calculation of damages is susceptible to a Class-wide methodology. *Id.* at ¶¶4, 78-84. Finally, a class action is a superior means of litigating Class members' claims because it is easily manageable, provides redress to investors who would otherwise be unable to pursue individual claims, and least taxes judicial resources.

In sum, for the reasons set forth herein, Plaintiffs respectfully request that their Motion for Class Certification be granted in its entirety.

<u>**BACKGROUND AND PROCEDURAL HISTORY**</u>

Founded in 1999, Alibaba is a Chinese multinational e-commerce and tech conglomerate that is the world's largest retailer and one of the world's largest Internet companies. Two months before its $25 billion IPO in September 2014, Alibaba was summoned to an

---

[1] The Tabak Report is attached as Exhibit 1 to the Declaration of Laurence Rosen (the "Rosen Decl."), filed concurrently herewith.

unprecedented meeting with high-level Chinese regulators at the SAIC to discuss rampant counterfeit sales and other violations plaguing its e-commerce platforms (the "July 2014 Meeting").   At the meeting, regulators admonished Alibaba for its violations, issued "administrative guidance" akin to a cease and desist order, and threatened Alibaba with massive penalties if it did not change its practices.

When Alibaba filed its IPO Registration Statement two months later, however, it did not disclose the July 2014 Meeting, or any material facts pertaining thereto, such as the SAIC's investigation into Alibaba's business practices regarding counterfeiting and pirated goods, Alibaba's alleged violations of Chinese laws and regulations, the administrative guidance given, or the substantial penalties the SAIC had threatened.  Alibaba's $25 billion IPO in September 2014 proved to be the largest in history.  Alibaba's founder, Defendant Jack Ma, alone took home $867 million and became the richest man in China.  With the facts surrounding the July 2014 Meeting concealed, Alibaba's stock price remained inflated for months after the IPO.

News of the circumstances surrounding the July 2014 Meeting finally broke on January 28, 2015, when the SAIC briefly published a "White Paper" on its website summarizing the serious concerns it had communicated to Alibaba.  Analysts and investors were alarmed, and Alibaba's stock price dropped 13% over the next two trading days in response, from a closing price of $102.94 on January 27, 2015 to close at $89.81 on January 29, 2015.  Plaintiffs then brought this action on behalf of themselves and similarly-situated investors.

The first of six related shareholder actions against Alibaba was filed on January 30, 2015. By order dated May 1, 2015, the actions were consolidated, Tai and Christine Asia were appointed Lead Plaintiffs, and the Rosen Firm was appointed Lead Counsel.  Lead Plaintiffs filed their Consolidated Amended Complaint on July 1, 2015. Dkt. No. 6 (the "CAC").  Defendants

moved to dismiss the CAC on July 31, 2015. Dkt. Nos. 16-18. After briefing, the Court granted the motion to dismiss in full in an amended decision and order dated June 27, 2016. Dkt. No. 32. Plaintiffs appealed and the Second Circuit Court of Appeals reversed, holding that the omitted facts relating to the July 2014 Meeting "constituted material information of substantial interest to prospective investors in the company's planned initial public offering ('IPO')." *Christine Asia Co. Ltd. v. Ma*, 2017 WL 6003340, at *2 (2d Cir. Dec. 5, 2017) (citing *Basic*, 485 U.S. at 231-32). The Second Circuit explained that "Defendants had a duty to disclose these facts, in a manner that accurately conveyed the seriousness of the problems Alibaba faced, so as not to render Defendants' public disclosures 'inaccurate, incomplete, or misleading.'" *Id.* (citing *Stratte-McClure v. Morgan Stanley*, 776 F.3d 94, 101 (2d Cir. 2015)).

On February 14, 2018, the Court "So Ordered" the parties' stipulation that "the operative omission of material fact alleged in this case is that Defendants failed to disclose the existence, content and significance of the July 16, 2014 administrative guidance meeting allegedly described in the 'White Paper Regarding the Administrative Guidance Provided to Alibaba Group.'" Dkt. No. 46, at ¶1.

## ARGUMENT

### I. Applicable Standards Favor Class Certification In This Securities Action

The Supreme Court has long recognized that securities fraud claims are particularly well-suited for class treatment. *Amchem*, 521 U.S. at 625 (noting that predominance of common issues "is a test readily met in certain cases alleging . . . securities fraud").[2] And the Supreme Court continues to favor class certification in securities fraud cases. *See Erica P. John Fund, Inc. v. Halliburton Co.* ("*Halliburton I*"), 563 U.S. 804, 812-13 (2011) (vacating appellate court denial

---

[2] Unless otherwise noted, internal quotations and citations are omitted and emphasis is added throughout.

of class certification); *Amgen*, 568 U.S. at 464-67 (affirming class certification).

"The Second Circuit has directed courts to adopt a liberal interpretation of Rule 23 in order to maximize the benefits to private parties and, in cases such as this that involve alleged manipulation of public markets, to maximize the benefits to the public provided by class actions." *Dodona I, LLC v. Goldman, Sachs & Co.*, 296 F.RD. 261, 266 (S.D.N.Y. 2014); *Green v. Wolf Corp.*, 406 F.2d 291, 298 (2d Cir. 1968) ("[I]f there is to be an error made, let it be in favor and not against the maintenance of the class action[.]").[3]

To be certified, a proposed class must satisfy the four prerequisites of Rule 23(a)— numerosity, commonality, typicality, and adequacy—as well as one of the three provisions in Rule 23(b). *Waggoner*, 875 F.3d at 93. Because these requirements are satisfied here, the Class should be certified.

## II.   The Requirements Of Rule 23(a) Are Satisfied

### A.   Numerosity Is Established

Rule 23(a)(1) is satisfied when a class is "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). In the Second Circuit, "[n]umerosity is presumed when a class consists of forty members or more." *In re NYSE Specialists Sec. Litig.*, 260 F.R.D. 55, 70 (S.D.N.Y. 2009) (citing *Consol. Rail Corp. v. Town of Hyde Park*, 47 F.3d 473, 483 (2d Cir. 1995)). "In securities fraud class actions relating to publicly owned and nationally listed corporations, the numerosity requirement may be satisfied by a showing that a large number of

---

[3] *See also In re Smith Barney Transfer Agent Litig.*, 290 F.R.D. 42, 45 (S.D.N.Y. 2013) (noting that claims brought under § 10(b) of the Exchange Act are "especially amenable to class certification"); *In re Virtus Inv. Partners, Inc. Sec. Litig.*, 2017 WL 2062985, at *2 (S.D.N.Y. May 15, 2017) (same); *Tsereteli v. Residential Asset Securitization Trust 2006-A8*, 283 F.R.D. 199, 206 (S.D.N.Y. 2012) ("violations of securities laws . . . are 'especially amenable' to class action certification and resolution."); *In re Independent Energy Holdings PLC Sec. Litig.*, 210 F.R.D. 476, 479 (S.D.N.Y. 2002) (class action treatment is "particularly appropriate" for securities fraud claims).

shares were outstanding and traded during the relevant period." *Teachers' Ret. Sys. of La. v. ACLN Ltd.*, 2004 WL 2997957, at *3 (S.D.N.Y. Dec. 27, 2004).

During the Class Period, Alibaba's ADSs were actively traded on the NYSE, with an average weekly trading volume of over 100 million ADSs. Tabak Report, at ¶19. On "the first day of trading alone, 272 million ADSs traded[.]" *Id.* Numerosity is easily satisfied here.

### B.     Commonality Is Established

Rule 23(a)(2) is satisfied when "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). This requirement "has been characterized as a 'low hurdle.'" *In re NTL, Inc. Sec. Litig.*, 2006 WL 330113, at *6 (S.D.N.Y. Feb. 14, 2006). "Even a single common legal or factual question will suffice." *NYSE Specialists*, 260 F.R.D. at 70. "In general, where putative class members have been injured by similar material misrepresentations and omissions, the commonality requirement is satisfied." *Fogarazzo v. Lehman Bros., Inc.*, 232 F.R.D. 176, 180 (S.D.N.Y. 2005).[4] Here, Defendants made uniform omissions of material fact to the Class, such that common questions in this litigation include:

- whether the alleged omissions concerning the July 2014 Meeting, including the fact and nature of the meeting, the administrative guidance issued, the penalties threatened, and the investigation by the SAIC into Alibaba's business practices, rendered the IPO Registration Statement and later public statements materially false or misleading;

- whether and to what extent the market price of Alibaba's ADSs was artificially inflated during the Class Period due to Defendants' omissions;

- whether Defendants acted with scienter;

- whether the members of the Class have sustained damages as a result of the alleged

---

[4] *Accord In re Winstar Commc'ns Sec. Litig.*, 290 F.R.D. 437, 443 (S.D.N.Y. 2013) (same); *see also Pub. Emps.' Ret. Sys. of Miss. v. Merrill Lynch & Co., Inc.*, 277 F.R.D. 97, 105 (S.D.N.Y. 2011) ("[C]ourts in this Circuit have held that the . . . commonality requirement is plainly satisfied where the alleged misrepresentations . . . relate to all the investors, as the existence and materiality of such misrepresentations obviously present important common issues.") (internal quotation marks and brackets omitted).

misconduct, and, if so, the proper measure thereof; and

- whether the Individual Defendants "controlled" Alibaba for purposes of Section 20(a) liability.

Given the numerous common questions of fact and law present in this case, the commonality requirement is established.

### C.  Typicality Is Established

Rule 23(a)(3) is satisfied when the claims of the Class Representatives are "typical" of those of the Class. Fed. R. Civ. P. 23(a)(3).  As with commonality, the test for typicality "is not demanding." *Wallace v. Intralinks*, 302 F.R.D. 310, 315 (S.D.N.Y. 2014).  "When it is alleged that the same unlawful conduct was directed at or affected both the named plaintiff and the class sought to be represented, the typicality requirement is usually met irrespective of minor variations in the fact patterns underlying individual claims." *Robidoux v. Celani*, 987 F.2d 931, 936-37 (2d Cir. 1993).  Thus, typicality "'should be determined with reference to the company's actions, not with respect to particularized defenses it might have against certain class members.'" *Trinidad v. Breakaway Courier Sys., Inc.*, 2007 WL 103073, at *6 (S.D.N.Y. Jan. 12, 2007).[5] Here, Plaintiffs' claims and legal theories are typical of the Class.  Each purchased Alibaba securities during the Class Period and suffered losses when the White Paper was disclosed.  As with other Class members, Plaintiffs' claims are based on Defendants' material omissions concerning the circumstances surrounding the July 2014 Meeting. As such, typicality is satisfied.

### D.  Adequacy Is Established

The final requirement of Rule 23(a) is that "the class representatives . . . fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4).  To meet this requirement,

---

[5] *See also ACLN*, 2004 WL 2997957, at *4 ("'When inquiring into the typicality requirement under Rule 23(a)(3), the focus must be on the defendants' behavior and not that of the plaintiffs.'").

the lead plaintiffs' counsel must be 'qualified, experienced, and generally able to conduct the proposed litigation,' and the class representatives must not have interests conflicting with the class. *See Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 222 F.3d 52, 60 (2d Cir. 2000).

The interests of the proposed Class Representatives are aligned with those of the Class. The proposed Class Representatives' claims are predicated on the same wrongful conduct that gives rise to the claims of the Class. The proposed Class Representatives have suffered sizable financial losses,[6] and all have demonstrated a commitment to prosecute this action on behalf of absent Class members. *See* Rosen Decl. Ex. 2 (Declaration of William Tai, individually and for Christine Asia); *id.* at Ex. 3 (Declaration of Abel Amoros); *id.* at Ex. 4 (Declaration of Arthur Gabriel); *id.* at Ex. 5 (Declaration of Raymond Lee); and *id.* at Ex. 6 (Declaration of Gang Liu). Each of the proposed Class Representatives has participated in the action by communicating by phone and by email with Lead Counsel, by monitoring the progress and status of the Action; reviewing pleadings, briefs, and other documents in this Action; and by following news about Alibaba.[7]   In addition, each has attested to his understanding of the duty, as a Class Representative, to act in the interests of all other investors who are members of the Class.[8]

Moreover, Plaintiffs retained counsel who are qualified, experienced, and generally able to conduct the proposed litigation. The Court has already recognized the Rosen Firm's extensive

---

[6] *See* PSLRA certifications of Abel Amoros, Arthur Gabriel, Raymond Lee, and Gang Liu appended to the CAC (Dkt No. 6, at 102-110); *see also* Related Case No. 15-cv-00759 Dkt. Nos. 15-2, 15-3, 18-2 & 18-3 (PSLRA certifications and loss charts of Tai and Christine Asia).

[7] Rosen Decl., Ex. 2 (Tai), at ¶9; Ex. 3 (Amaros), at ¶8; Ex. 4 (Gabriel), at ¶8; Ex. 5 (Lee), at ¶8; and Ex. 6 (Liu), at ¶8.

[8] Rosen Decl., Ex. 2 (Tai), at ¶¶7-8; Ex. 3 (Amaros), at ¶¶6-7; Ex. 4 (Gabriel), at ¶¶6-7; Ex. 5 (Lee), at ¶¶6-7; and Ex. 6 (Liu), at ¶¶6-7.

experience in the field of securities litigation,[9] and the Rosen Firm has vigorously pursued the Class's interests and advanced the Class's claims before this Court. *See also* Rosen Decl., Ex. 7 (Firm résumé of the Rosen Firm). In short, the adequacy requirement has been met because Plaintiffs' interests are not antagonistic of the Class and Plaintiffs' counsel are well-qualified and have demonstrated their competence prosecuting this case.

## III.   The Predominance And Superiority Requirements Of Rule 23(b)(3) Are Satisfied

### A.   Common Questions Of Law And Fact Predominate

"[T]he predominance requirement is met if the plaintiff can establish that the issues in the class action that are subject to generalized proof, and thus applicable to the class as a whole, . . . predominate over those issues that are subject only to individualized proof." *Brown v. Kelly*, 609 F.3d 467, 483 (2d Cir. 2010) (citation omitted). "Predominance is a test readily met in certain cases alleging securities fraud." *Amchem*, 521 U.S. at 625.

In cases under §10(b) of the Exchange Act, the elements of falsity, materiality, scienter, and loss causation are subject to class-wide proof.[10] Thus, "[w]hether common questions of law or fact predominate in a securities fraud action often turns on the element of reliance." *See Halliburton I*, 563 U.S. at 810.

Here, the predominance requirement is satisfied in two separate ways because reliance may be presumed on a class-wide basis pursuant to (a) the presumption of reliance applicable to omission claims under *Affiliated Ute*, and (b) the fraud-on-the-market presumption under *Basic*,

---

[9] *See* Order dated May 1, 2015 (Dkt. No. 12 in Case No. 15-cv-00811), at 26, appointing the Rosen Firm as Lead Counsel. On January 19, 2018, the Court approved additional counsel, Glancy Prongay & Murray LLP, to aid in the prosecution of this Action. Dkt. No. 44.

[10] *See Amgen*, 568 U.S. at 459 (materiality "is question common to all members of the class"); *In re Pfizer Inc. Sec. Litig.*, 282 F.R.D. 38, 52 (S.D.N.Y. 2012) (all elements of a Section 10(b) claim, "*other than reliance in cases that are not premised on fraud-on-the-market*, are subject to class wide proof in securities litigation") (emphasis added).

485 U.S. at 224.[11]  Each presumption is independently sufficient for class certification, and both apply here.

### 1.   The *Affiliated Ute* Presumption Of Reliance Applies

The Supreme Court has instructed that in cases "involving primarily a failure to disclose, positive proof of reliance is not a prerequisite to recovery." *Affiliated Ute*, 406 U.S. at 153, 92. Instead, "[a]ll that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in the making of [its] decision." *Affiliated Ute*, 406 U.S. at 131.  The Second Circuit has thus consistently held that reliance is presumed under *Affiliated Ute*, without a showing of market efficiency, where "a plaintiff's claim is based on a defendant's failure to disclose material information." *Litton Indus., Inc. v. Lehman Bros. Kuhn Loeb Inc.*, 967 F.2d 742, 748 (2d Cir. 1992) (citing *Affiliated Ute*, 406 U.S. at 154); *Waggoner*, 875 F.3d at 95-96 (reiterating that *Affiliated Ute* presumption of reliance applies in cases "*primarily*" alleging a material omission) (emphasis in original).[12]

Reliance here may be presumed because Plaintiffs' claims are primarily based on Defendants' omission of material facts relating to the July 2014 Meeting.  The Second Circuit recognized as much in holding that the CAC stated a claim, explaining that "alleged omitted facts constituted material information of substantial interest to prospective investors" and that

---

[11] *See generally Strougo v. Barclays PLC*, 312 F.R.D. 307 (S.D.N.Y. 2016) ("The predominance requirement is typically met in securities fraud class actions by plaintiffs' invocation of one of two presumptions developed by the Supreme Court . . . . the '*Basic* presumption' of reliance in fraudulent misrepresentation cases, and the '*Affiliated Ute* presumption' of reliance in fraudulent omission cases."); *In re Barrick Gold Sec. Litig.*, 314 F.R.D. 91, 101 (S.D.N.Y. 2016) (similar).

[12] The *Affiliated Ute* presumption is rooted in the reality that "as a practical matter [reliance on an omission] is impossible to prove." *In re Facebook, Inc., IPO Sec. & Deriv. Litig.*, 986 F. Supp. 2d 428, 469 (S.D.N.Y. 2013).  This is because "[w]hen a defendant's fraud consists primarily of omissions, requiring a plaintiff to show a speculative set of facts, *i.e.*, how he would have behaved if omitted material information had been disclosed, places an unrealistic evidentiary burden on the 10(b) plaintiff." *In re Smith Barney*, 290 F.R.D. at 47.

"Defendants had a duty to disclose these facts, in a manner that accurately conveyed the seriousness of the problems Alibaba faced[.]" *Christine Asia*, 2017 WL 6003340, at *2. Indeed, the parties have stipulated as much by identifying the operative claim in this case – omissions concerning the July 2014 Meeting. Dkt. No. 46, at ¶1. Plaintiffs are thus entitled the *Affiliated Ute* presumption of reliance. *See In re Dynex Capital, Inc. Sec. Litig.*, 2011 WL 781215, at *7 (S.D.N.Y. Mar. 7, 2011) (applying *Affiliated Ute* presumption since "the heart of the alleged deception is rooted not in statements, but in the fact that specific information about the quality of the collateral was withheld, and that information would have been important to a reasonable investor.").

### 2.    Plaintiffs Are Entitled To A Presumption Of Reliance Under *Basic*

Plaintiffs are also entitled to a presumption of reliance under the "fraud-on-the-market" theory espoused in *Basic*, 485 U.S. at 224. Pursuant to the *Basic* fraud-on-the-market doctrine, Plaintiffs may show reliance "by invoking a presumption that a public, material misrepresentation will distort the price of stock traded in an efficient market, and that anyone who purchases the stock at the market price may be considered to have done so in reliance on the misrepresentation." *Halliburton Co. v. Erica P. John Fund, Inc. ("Halliburton II")*, 134 S. Ct. 2398, 2417 (2014).

To invoke this presumption, Plaintiffs must show, based on a holistic analysis of the totality of evidence presented, that Alibaba's shares traded in an efficient market. *Petrobras*, 862 F.3d at 276-78 (affirming class certification where plaintiffs provided direct and indirect evidence of market efficiency, including an event study similar to that provided by Dr. Tabak here (*see* Sec. III.A.2(b), *infra*), and noting that courts have "consistently suggest[ed] that the burden [of showing market efficiency] is not an onerous one"); *Waggoner*, 875 F.3d at 89, 98-99 (holding that "that a plaintiff seeking to demonstrate market efficiency need not always present

direct evidence of price impact through event studies" and affirming class certification where plaintiffs provided "'indirect' indicia of an efficient market"). As set forth below, Plaintiffs have shown, based on the totality of the evidence presented, that Alibaba's securities traded in an efficient market, and Plaintiffs are therefore entitled to a presumption of reliance under *Basic*.

### (a)   Alibaba's Listing On The NYSE Shows Market Efficiency

Alibaba's ADSs trade on the NYSE. The Second Circuit has held that a stock's listing on the NYSE is strong evidence of market efficiency. *Waggoner*, 875 F.3d at 98-99 (noting that market efficiency shown and a presumption of reliance was warranted because Barclay's stock traded on the NYSE and Barclays was one of the largest financial institutions in the world). The NYSE is "the world's largest and most liquid stock exchange." *Carpenters Pension Trust Fund of St. Louis v. Barclays PLC*, 310 F.R.D. 69, 91 (S.D.N.Y. 2015). It has long been recognized by courts as a "paradigmatic efficient market." *In re Moody's Corp. Sec. Litig.*, 274 F.R.D. 480, 489 n.3 (S.D.N.Y. 2011) (explaining that the Supreme Court in *Basic* presumed that the shares at issue traded on a "well-developed, efficient, and information-hungry market" because they traded on the NYSE).

Even courts "reluctant to conclude that a stock was traded efficiently solely because it was traded on the NYSE" usually "agree that such listing is a good indicator of efficiency." *Carpenters*, 310 F.R.D. at 81. It would require, therefore, "unusual circumstances" for a security that trades on the NYSE to not trade efficiently. *Strougo*, 312 F.R.D. at 318. No such unusual circumstances exist here. Thus, Alibaba's listing on the NYSE is evidence of market efficiency that supports invoking the "fraud-on-the-market" presumption of reliance in this case.

### (b)   The *Cammer* Factors Show Market Efficiency

Neither the Supreme Court nor the Second Circuit has adopted a formal test for market

efficiency. *Petrobras*, 862 F.3d at 276.  Courts in the Second Circuit and elsewhere, however, routinely consider the non-exhaustive factors derived from *Cammer v. Bloom*, 711 F. Supp. 1264 (D.N.J. 1989), in determining whether a security trades in an efficient market.  *Petrobras*, 862 F.3d at 276-79.  Those factors include:

> (1) a large weekly trading volume; (2) the existence of a significant number of analyst reports; (3) the existence of market makers and arbitrageurs in the security; (4) the eligibility of the company to file an S–3 registration statement; and (5) a history of immediate movement of the stock price caused by unexpected corporate events or financial releases.

*McIntire v. China MediaExpress Holdings, Inc.*, 38 F. Supp. 3d 415, 431 (S.D.N.Y. 2014) (citing *Cammer*, 711 F. Supp. 1264 at 1285-87).[13]  The *Cammer* factors, however, are neither exclusive nor strictly required, and instead "are meant to be an analytical tool to assist in the evaluation of market efficiency, not a rigid checklist." *McIntire*, 38 F. Supp. 3d at 432.[14]  An analysis of each of the foregoing factors, evaluated both individually and collectively, shows that Alibaba's securities traded in an efficient market.

**Factor One – Alibaba's High Weekly Trading Volume:**

During the Class Period, Alibaba's ADSs had an average weekly trading volume of 4.29% of the outstanding shares.  Tabak Report, at ¶19.  That turnover rate is more than double the 2% threshold set by *Cammer* as giving rise to a "strong presumption" of market efficiency. *See Cammer*, 711 F. Supp. 2d at 1286.  Accordingly, Alibaba's weekly trading volume supports a strong presumption that its ADSs traded in an efficient market.

---

[13] *Teamsters Local 445 Freight Div. Pension Fund v. Bombardier, Inc.*, 546 F.3d 196, 204 n.11 (2d Cir. 2008) ("The *Cammer* factors have been routinely applied by district courts considering the efficiency of equity markets."); *Petrobras*, 862 F.3d at 276 (affirming finding of market efficiency pursuant to *Cammer* factors).

[14] *See also Carpenters*, 310 F.R.D. at 83 ("While the Second Circuit endorsed the use of the *Cammer* factors in *Bombardier*, it has not required their use or held that any one of them is dispositive.").

**Factor Two – Substantial Coverage By Financial Analysts:**

The presence of substantial analyst coverage on a security "supports a finding of market efficiency because it permits an inference that financial statements relating to a security are closely watched by investment professionals, who in turn inject their views on the company and the security into the market." *Winstar*, 290 F.R.D. at 446. This factor is measured alternatively by the *number of analysts* covering the company or security, or by the *number of analyst reports* published about the company or security, during the relevant period.[15] Courts also consider the extent of analyst coverage in connection with related factors, including the amount of news coverage on a company and the degree of institutional ownership.[16]

Here, up to twenty-six (26) analysts or analyst firms covered Alibaba during the Class Period, issuing at least 15 reports on the Company *per month* during the Class Period. Tabak Report, at ¶¶23-24 & Ex. 4b thereto. And a total of more than 140 analyst reports were issued during the Class Period. *Id.* By comparison, the *Cammer* court found efficiency where the security at issue (the common stock of Coated Sales, Inc.) was the subject of "[a]t least 15 research reports" during the entire one-year class period. 711 F. Supp. at 1283 n.30, 1287. *See also Winstar*, 290 F.R.D. at 446 (analyst coverage weighed in favor of efficiency of bond market where three analysts reported on company's bonds and additional analysts followed company's stock).

---

[15] *Compare, e.g., id.* ("the number of securities analysts") *with McIntire*, 38 F. Supp. 3d at 431("the existence of a significant number of analyst reports").

[16] *E.g., In re Xcelera.com Sec. Litig.*, 430 F.3d 503, 514-15 (1st Cir. 2005) (affirming district court's determination of market efficiency, where only one analyst followed the company's stock and issued only one report during a 16 month class period, but information about the company was widely distributed through other sources, including news articles, press releases, and SEC filings, and institutional investors invested in the stock); *Todd v. STAAR Surgical Co.*, 2017 WL 821662, at *7 (C.D. Cal. Jan. 5, 2017) (ownership of company's stock by major institutions bolstered determination that efficiency was indicated by second *Cammer* factor).

In addition to the analyst reports issued during the Class Period, eight reports were issued in September 2014 before Alibaba's trading even began on September 19, 2014. Tabak Report, at ¶24. Also, before the IPO, Yahoo had such a substantial investment in Alibaba that the bulk of Yahoo's value came from its stake in Alibaba. *Id.* at ¶25. As a result, analysts following Yahoo before the Alibaba IPO frequently analyzed and reported on Alibaba. *Id.*

### Factor Three – Market Makers, Institutional Investors, and Arbitrageurs:

The third *Cammer* factor concerns whether there are a sufficient number of market makers and/or arbitrageurs to facilitate the efficiency of the market. *See McIntire*, 38 F. Supp. 3d at 431-32. Courts have found the fact that a security trades on the NYSE in itself sufficient to satisfy this factor.[17] As Dr. Tabak explains, the NYSE "maintains a system where there is a 'designated market maker' (similar to what was previously known as a 'specialist') that is in charge of ensuring that there is a well-functioning market. Therefore the question about market makers for securities that trade on the [NYSE] is that there is always one particular entity tasked with that role, though there may be others that also act as market makers." Tabak Report, at ¶26.

Moreover, using institutional investors as a proxy for "major arbitrageurs who take a long position large enough to affect the price of a stock" (Tabak Report, at ¶27), both the size and changing holdings of institutional investors during the Class Period contributes to a finding of market efficiency here. *See* Tabak Report, at ¶¶28-31. Over 600 institutions held Alibaba ADSs throughout the Class Period. *Id.* at ¶28. As Dr. Tabak explains, that these institutions changed their holdings in consecutive quarter-end reports shows that institutions bought or sold in response to news about Alibaba, and the changing of these large positions had the potential to

---

[17] *See In re Initial Pub. Offering Sec. Litig.*, 260 F.R.D. 81, 100 (S.D.N.Y. 2009) (trading on the NYSE "provides the necessary evidence to satisfy this factor"); *In re Alstom SA Sec. Litig.*, 253 F.R.D. 266, 280 (S.D.N.Y. 2008) (similar).

impact the price of Alibaba's ADSs.  *Id.* & Ex. 5 thereto.  Therefore, the third *Cammer* factor supports efficiency.

### Factor Four – Alibaba Met the Float Requirement to File Form S-3:

Eligibility for S-3 registration with the SEC is an indicator of market efficiency because it is associated with characteristics that correlate with efficiency, including size, transparency, and the availability of relevant financial information.  *See Cammer*, 711 F. Supp. at 1284-85, Tabak Report, at ¶¶33-34.[18]  In order to be eligible for an S-3 registration, a company must be "seasoned," *i.e.*, it must have filed Exchange Act reports with the SEC for twelve months,[19] and it must meet a certain minimum threshold for public float.  *See Cammer*, 711 F. Supp. at 1284-85; Tabak Report, at ¶¶33-34.  The public float requirement has been loosened from the time of *Cammer* (decreasing from $150 million to $75 million), but Alibaba vastly exceeded both levels by *billions* of dollars throughout the entire Class Period.  Tabak Report, at ¶33 & Ex. 7 thereto (Alibaba's average public float of at least 270 million shares averaged a market value of over $27 *billion* during the Class Period).

### Factor Five – Alibaba's Share Price Reacted to News:

The fifth *Cammer* factor examines whether empirical evidence demonstrates "a cause and effect relationship between unexpected corporate events or financial releases and an immediate response in the stock price."  *Cammer*, 711 F. Supp. at 1287.  To make this showing, Plaintiffs submit the expert report of David I. Tabak, Ph.D., which sets forth a number of empirical tests that examine whether Alibaba's share price increased or decreased a statistically significant amount on "news" days more than on "non-news" days during the Class Period.  Tabak Report,

---

[18] As a foreign issuer, Alibaba would file Form F-3, which is substantially the same as Form S-3.

[19] Alibaba did not meet the requirement for being current in SEC filings for the past twelve months because at the time of the IPO it had been reporting for only four and a half months.  It first filed its F-1 with the SEC on May 6, 2014.

at ¶¶36-46.  Dr. Tabak found that it did, *i.e.*, the share price reacted to news, such that Alibaba's ADSs traded in an efficient market during the Class Period.  *Id.* at ¶¶3, 40-46 & Ex. 8a thereto.

More specifically, Dr. Tabak's event study analysis showed that the percentage of "news" days with statistically significant changes in the price of Alibaba's ADSs was statistically significantly greater than the percentage of "non-news" days with statistically significant price changes during the Class Period.  *Id.* at ¶¶40-46 & Ex. 8a thereto.  Dr. Tabak performed this event study analysis using an objective definition of news days, five different ways.

First, he defined news days only as earnings announcements. [20]  Tabak Report, at ¶¶39-40 & Ex. 8a thereto.  Second, he used a broader definition of news dates which included "any reported news mentioning Alibaba in the headline of articles in *Dow Jones Newswires*, obtained from Factiva, a well-recognized data vendor."  Tabak Report, at ¶39.  Next, because this broader definition of news days resulted in a high proportion of news days vs. non-news days during the Class Period (69 out of 88 days), Dr. Tabak "performed the analysis two more times by looking at a proxy for the amount of news each day by counting the number of stories in *Dow Jones Newswires*, a technique from the field of content analysis." [21]  Tabak Report, at ¶39.  He ordered the trading days by the number of news stories from high to low and created two proxies for days with high news content: (1) the days in the upper half of this ordered list and (2) the days in the top ten percent of this ordered list.  *Id.*  Lastly, he performed an additional event study.  Starting with the top ten percent of the news days, he reviewed the stories that appeared in the *Dow Jones*

---

[20]  Because there were only two earnings announcements in the Class Period and one fell on a date when a corrective disclosure concerning the White Paper occurred, the second earnings announcement date was excluded from the event study.  Tabak Report, at ¶38.  However, had it been included the case for efficiency was even greater as the dates of both earnings announcements saw statistically significant price movements.  Tabak Report, at ¶38 n.31.

[21]  Content analysis is based on the premise that the more often the news reports on a topic, the more important it is likely to be.  The use of content analysis was endorsed by the First Circuit in *Bricklayers and Trowel Trades v. Credit Suisse LLC*, 752 F.3d 82 (1st Cir. 2014).

*Newswires* and removed any that were solely reporting on Alibaba's ADS price movements or volume (*i.e.*, instances where the news was responding to the ADS price rather than the ADS price potentially responding to news), that appeared to be duplicates of previously reported news, or were deemed to be non-material because they reported data irrelevant to the value of the Company.  Tabak Report, at ¶39.

Exhibit 8a of the Tabak Report shows the results of the event study analyses.  Four of the five event study analyses demonstrated that the percentage of news days with a statistically significant price change was statistically significantly greater than non-news days.   Tabak Report, at ¶¶40-45 & Ex. 8a thereto.   The one event study that did not reach statistical significance was on the most broadly defined news days, in which 69 of 88 days had news. *See* Tabak Report, at ¶39.  Nonetheless, "just one, or 5.3 percent of the non-news days are associated with a statistically significant stock price movement in the ADSs, while 11.6 percent of the news days are associated with a statistically significant price movement.  While the difference in these figures results is not statistically significant at better than the standard five-percent level, this is due to the small number of non-news days.  In fact, as just 5.3 percent of the non-news days is associated with a statistically significant price movement, that result is exactly what would be expected due to chance at the five-percent significance level."  Tabak Report, at ¶44.  More importantly, "[w]hen the definition of news days is restricted to those days with high numbers of news stories, … shown in the third and fourth rows of Exhibit 8a, the percentage of news days associated with statistically significant returns increases and the results become statistically significant." *Id*.

Based on these tests, Dr. Tabak concluded that there was "overwhelming evidence that Alibaba's ADS prices responded to new information during the Class Period."  Tabak Report, at

46.[22] Accordingly, the fifth *Cammer* factor weighs in favor of a finding of market efficiency.

        (c)        **The *Unger/Krogman* Factors Further Support A Finding Of Market Efficiency**

Courts also consider three other factors identified in *Unger v. Amedisys*, 401 F.3d 316, 323 (5th Cir. 2005) and *Krogman v. Sterritt*, 202 F.R.D. 467, 478 (N.D. Tex. 2001): (1) market capitalization; (2) the stock's float; and (3) the bid-ask spread. *See also Petrobras*, 862 F.3d at 276 (acknowledging these "three additional" factors comprised part of the efficiency analysis).

The larger the market capitalization, the more likely the stock is to attract analyst and news media coverage, and gain the attention of investors, including large institutional investors. All of these characteristics promote market efficiency. Tabak Report, at ¶51. During the Class Period, the aggregate market value of Alibaba's ADSs was over $240 billion, making its market capitalization greater than at least 90% of all other publicly-traded companies in the United States. Tabak Report, at ¶51, n.44 & Ex. 7 thereto. Alibaba's market capitalization was sufficiently large to attract analyst and news coverage, and gain the attention of greater numbers of investors, all of which further promotes market efficiency. *Id.*; *McIntire*, 38 F. Supp. 3d at 433 (finding that a market capitalization ranging from $292 million to $585 million during the class period weighed in favor of finding an efficient market).

A stock's float is the number of shares outstanding, less shares held by insiders and affiliated corporate entities, which is generally the number of shares available for trading by

---

[22] These tests are directly analogous to the non-directional event studies conducted by Prof. Steven Feinstein in *Petrobras*, which the district court and the Second Circuit found to sufficiently show market efficiency, even without an alternative event study assessing whether the stock's price moved in the "correct" direction in response to events. *See In re Petrobras Sec. Litig.* (*"Petrobras I"*), 312 F.R.D. 354, 370 (S.D.N.Y. 2016) ("Whether the market, upon receiving new information, moved in the precise way analysts or experts would expect it to move is not the key to unlocking *Basic*'s presumption of reliance."); *Petrobras*, 862 F.3d at 279 (rejecting argument that courts must "rely on directional event studies and directional event studies alone").

outside investors in the open market. Tabak Report, at ¶33. Under *Krogman*, a large public float helps support a finding of an efficient market. During the Class Period, the market value of Alibaba's ADS float averaged over $27 billion. Tabak Report, at ¶¶33, 55.

The final *Unger/Krogman* factor is the bid-ask spread, which is the difference between the price at which market makers are offering to buy/sell the security. Tabak Report, at ¶52. The bid-ask spread will tend to be narrow for actively traded securities where information is readily available.[23] Moreover, a narrow bid-ask spread makes trading in the security less costly for investors, which can attract greater interest, coverage, and volume. Tabak Report, at ¶52. Here, the average bid-ask spread for Alibaba's ADSs during the Class Period was only 0.028% of the same day's closing price. Tabak Report, at ¶53. Approximately 75% of NYSE stocks had a larger mean bid-ask spread as a percent of their stock price. *Id.* *McIntire*, 38 F. Supp. 3d at 433 (a bid-ask spread of 0.27% supported market efficiency).

In sum, the three *Unger/Krogman* factors also strongly weigh in favor of finding that Alibaba's ADSs traded in an efficient market. *See, e.g.*, *Billhofer v. Flamel Techs., S.A.*, 281 F.R.D. 150, 160 (S.D.N.Y. 2012) ("[S]ubstantial market capitalization with a narrow bid-ask spread, and a large public float . . . strongly indicate . . . an efficient market such that the *Basic* presumption is appropriate.").[24]

### 3. The Fraud-on-the-Market Presumption Of Reliance Also Applies To Alibaba's Options

"The market price for options is directly responsive . . . to changes in the market price of

---

[23] Conversely, a large bid-ask spread is indicative of inefficiency. *Krogman*, 202 F.R.D. at 478.

[24] Lastly, Dr. Tabak tested Alibaba's stock trading history for autocorrelation to determine if it followed a "random walk" to ensure that traders could not use Alibaba's past ADS prices to predict the future size and direction of the ADS prices. Evidence that prices do not exhibit a random walk runs counter to an efficient market. Dr. Tabak determined there was no statistically significant autocorrelation, thus further demonstrating Alibaba's ADSs traded in an efficient market. Tabak Report, at ¶¶57-62 & Exs. 10a-10b thereto.

the underlying stock, and to information affecting that price." *See McIntire*, 38 F. Supp. 3d at 431-34 (applying the fraud-on-the-market presumption to options traders because the market for the company's stock was efficient and there were no special circumstances that would preclude applying the presumption to options traders) (quoting *Deutschman v. Beneficial Corp.*, 841 F.2d 502, 504 (3d Cir. 1988)).  Similarly here, since the market for Alibaba's ADSs is efficient, the market for options is also efficient, and purchasers of call options and sellers of put options are likewise entitled to the presumption of reliance.[25]  Indeed, Dr. Tabak tested Alibaba's options trading history and determined there no material violations of put-call parity (an accepted test of market efficiency for options) demonstrating that Alibaba's options traded in an efficient market. Tabak Report, at ¶76.

### 4.  Potential Individual Questions Of Damages Do Not Predominate

Following the Supreme Court's decision in *Comcast Corp. v. Behrend*, 569 U.S. 27 (2013), the Second Circuit has held that damages in securities cases present common questions because they can be calculated by measuring the price impact of company-specific information alleged to be a corrective disclosure on a class-wide basis. *See Waggoner*, 875 F.3d at 106 (holding that plaintiffs' damages model, which "examin[ed] the drop in price that occurred" when the "ongoing problems related to Barclay's management" were revealed, was "'directly linked with their underlying theory of classwide liability . . . and [was ] therefore in accord with the Supreme Court's . . . decision in *Comcast*.'").[26]

---

[25] *See also In re Priceline.com Inc.*, 236 F.R.D. 89, 100 (S.D.N.Y. 2006) (noting that options purchasers rely on "integrity of the price of the underlying shares").

[26] *See also Barrick Gold*, 314 F.R.D. at 106 ("as required by *Comcast*, plaintiffs' actual theory of damages (out-of-pocket damages) is entirely consistent with their theory of Section 10(b) liability and would be  measurable on a class-wide basis[,]" and noting that the calculation of damages called for the "application of a damages model across the entire class"); *In re Goldman Sachs Grp., Inc. Sec. Litig.*, 2015 WL 5613150, at *8 (S.D.N.Y. Sept. 24, 2015) ("[A]t the class

Here, damages can be readily calculated on a class-wide basis in this action using the same kind of generally accepted event study methodology. Tabak Report, at ¶¶78-79. Using such an event study, the artificial inflation caused by false statements and omissions can be measured on a class-wide basis by analyzing the change in the stock price caused by a corrective disclosure. *Id.* at ¶¶80-83. Once the daily levels of price inflation have been calculated for each day during the Class Period, a Class member's actual trading activity in the security can be used to calculate damages on an individual basis for each Class member in the claims administration process. *Id.* Because this methodology is consistent with the class-wide theory of liability and allows for measurement of damages on a class-wide basis, common issues predominate.

5.    **The Same Common Issues Predominate As To The § 20(a) Claims**

Plaintiffs' showing above that the § 10(b) claim meets the reliance presumption likewise shows that Plaintiffs' claim under § 20(a) is also satisfied. *In re Merck & Co., Inc. Sec., Deriv. & "ERISA" Litig.*, 2013 WL 396117, at *13 (D.N.J. Jan. 30, 2013) (finding that the same predominance analysis applies to § 20(a) claims as for Rule 10b-5 violations).

**B.    A Class Action Is Superior To Other Methods Of Adjudication**

Under Rule 23(b)(3), "[s]uperiority is established when 'a class action would achieve economies of time, effort, and expense, and promote uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results.'" *In re Methyl Tertiary Butyl Ether ("MTBE") Prods. Liab. Litig.*, 241 F.R.D. 435, 449 (S.D.N.Y. 2007) (*quoting Amchem*, 521 U.S. at 615). Superiority is typically found in cases in

---

certification stage, Plaintiffs must only show that their damages model 'actually measure[s] damages that result from the Class's asserted *theory* of injury.'"); *Wallace*, 302 F.R.D. at 318 ("Plaintiff's proposed determination of damages by event study appears to be a workable methodology of determining damages on a class-wide basis that conforms to its theory of liability, thus meeting the requirements of *Comcast*[.]").

which each individual class member's interest in the litigation is less than the anticipated cost of litigating individually. *See Spagnola v. Chubb Corp.*, 264 F.R.D. 76, 99 (S.D.N.Y. 2010).[27] The following factors are relevant to the superiority assessment:

> A) the class members' interests in individually controlling the prosecution . . . of separate actions; B) the extent and nature of any litigation concerning the controversy already begun by . . . class members; C) the desirability...of concentrating the litigation of the claims in the particular forum; and D) the likely difficulties to be encountered in managing a class action.

Fed. R. Civ. P. 23(b)(3). These factors all weigh in favor of class certification in this case.

Given that Alibaba is based in the People's Republic of China ("PRC"), that the number of relevant documents is large, and that most of the relevant documents are in Chinese, it would be prohibitively difficult and expensive to prosecute this case on an individual basis. The fraud here, like "[m]ost violations of the federal securities laws[,] . . . inflict[ed] economic injury on large numbers of geographically dispersed persons such that the cost of pursuing individual litigation to seek recovery is often not feasible." *In re Blech Sec. Litig.*, 187 F.R.D. 97, 107 (S.D.N.Y. 1999). Finally, securities class actions like this one generally raise no unusual manageability issues. *See, e.g.*, *Petrobras I*, 312 F.R.D. at 363 (citing *In re Visa Check/MasterMoney Antitrust Litig.*, 280 F.3d 124, 140 (2d Cir. 2001)). Thus, a class action is the superior method for the efficient adjudication of the Class's claims.

## IV. <u>The Class Is Ascertainable</u>

Finally, the Second Circuit recognizes that "Rule 23 contains an implicit threshold requirement that the members of a proposed class be readily identifiable[.]" *Petrobras*, 862 F.3d at 264. This "ascertainability requirement, as defined in this Circuit, asks district courts to

---

[27] The Supreme Court has recognized that "[c]lass actions . . . permit the plaintiffs to pool claims which would be uneconomical to litigate individually. . . . [M]ost of the plaintiffs would have no realistic day in court if a class action were not available." *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 809 (1985).

consider whether a proposed class is defined using objective criteria that establish a membership with definite boundaries." *Id.* at 269. The proposed Class is ascertainable because the identity of its members can be determined from the books and records maintained by Alibaba and its transfer agents. *See Fogarazzo v. Lehman Bros., Inc.*, 263 F.R.D. 90, 101 (S.D.N.Y. 2009); *Petrobras*, 862 F.3d at 269 (finding class ascertainable where "[t]he Classes include persons who acquired specific securities during a specific time period…since "[t]hese criteria—securities purchases identified by subject matter, timing, and location—are clearly objective.").

## V.      The Rosen Firm Should be Appointed Class Counsel Under Rule 23(g)

Rule 23(g)(1)(A) sets forth the factors to consider in appointing Class Counsel, including: (i) the work counsel has done in identifying or investigating claims in the action; (ii) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action; (iii) counsel's knowledge of the applicable law; and (iv) the resources counsel will commit to the case. Under these criteria, the Rosen Firm is eminently qualified. The Rosen Firm specializes in litigating securities fraud class actions under federal and state laws, and has recognized expertise and success in prosecuting securities class actions against PRC-based companies. *See* Rosen Decl. Ex. 7. In sum, Plaintiffs respectfully submit that the requirements of Rule 23(g) are met, and thus request that the Court approve the Rosen Firm as Class Counsel.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court grant the motion in its entirety.

Dated:  March 12, 2018                          THE ROSEN LAW FIRM P.A.


                                                By: *s/ Laurence Rosen*
                                                Laurence Rosen
                                                Phillip Kim
                                                Jonathan Horne
                                                275 Madison Avenue, 34th Floor
                                                New York, NY 10016
                                                Telephone: (212) 686-1060
                                                Facsimile: (212) 202-3827

                                                *Lead Counsel for Plaintiffs and the Class*

## CERTIFICATE OF SERVICE

I, the undersigned say:

I am not a party to the above case, and am over eighteen years old. On March 12, 2018, I served true and correct copies of the foregoing **MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR CLASS CERTIFICATION AND APPOINTMENT OF CLASS REPRESENTATIVES AND CLASS COUNSEL**, by posting the document electronically to the ECF website of the United States District Court for the Southern District of New York, for receipt electronically by the parties listed on the Court's Service List.

I affirm under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on March 12, 2018, at New York, New York.


*/s/ Laurence Rosen*

Laurence Rosen