## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| CHRISTINE ASIA CO., LTD., et al., <br><br> Plaintiffs, <br><br> v. <br><br> JACK YUN MA, et al., <br><br> Defendants. | No.: 1:15-md-02631 (CM) (SDA) <br><br> Related cases: <br> 1:15-cv-00759-CM <br> 1:15-cv-00811-CM <br> 1:15-cv-00991-CM <br> 1:15-cv-01405-CM <br> 1:15-cv-05020-CM <br> 1:15-cv-04991-CM <br> 1:15-cv-05002-CM |

## MEMORANDUM OF LAW IN SUPPORT OF
## PLAINTIFFS' MOTION FOR FINAL APPROVAL OF
## <u>CLASS ACTION SETTLEMENT AND PLAN OF ALLOCATION</u>

## TABLE OF CONTENTS

I.   INTRODUCTION ........................................................................................................1

II.  STANDARDS GOVERNING FINAL APPROVAL: RULE 23(e) AND
     *GRINNELL*................................................................................................................3

III. THE SETTLEMENT IS FAIR, REASONABLE, AND ADEQUATE ...........................5

    A.  The Settlement Is Procedurally Fair ........................................................5

        1.  Plaintiffs and Counsel Have Adequately Represented the Class................5

        2.  The Settlement Was Negotiated at Arm's Length .......................................6

    B.  The Settlement Is Substantively Fair: the Relief Provided Is Adequate,
        Taking into Account the Costs, Risks, and Delay of Continued Litigation............7

        1.  The Complexity, Expense, and Likely Duration of the Litigation .............8

        2.  Risks of Establishing Liability and Damages ..............................................9

        3.  Risks of Maintaining Class Action Status .................................................12

        4.  The Settlement Amount Is Within the Range of Reasonableness in
            Light of the Best Possible Recovery and Attendant Risks of
            Litigation...................................................................................................13

    C.  The Class's Reaction to the Settlement Supports Final Approval........................14

    D.  The Stage of Proceedings and Amount of Discovery Completed ........................17

    E.  Defendants' Ability to Withstand a Greater Judgment.........................................18

    F.  The Remaining Rule 23(e) Factors Support Final Approval ................................19

        1.  The Proposed Method of Distribution to the Class Is Effective
            (Rule 23(e)(2)(C)(ii)) ...............................................................................19

        2.  The Proposed Award of Attorneys' Fees Is Fair and Reasonable
            (Rule 23(e)(2)(C)(iii)) ..............................................................................19

        3.  Identification of Agreements in Connection with the Settlement
            (Rule 23(e)(2)(C)(iv) and Rule 23(e)(3)).................................................20

        4.  The Settlement Treats Class Members Equitably Relative to Each
            Other (Rule 23(e)(2)(D))..........................................................................20

IV.    THE PLAN OF ALLOCATION IS FAIR AND REASONABLE....................................20

V.     THE NOTICE PROGRAM SATISFIES RULE 23 AND DUE PROCESS .....................22

VI.    CONCLUSION..................................................................................................................24

# TABLE OF AUTHORITIES

<u>CASES</u>

*Annunziato v. Collecto, Inc.*,
   293 F.R.D. 329 (E.D.N.Y. 2013) ........................................................................... 12

*Carlson v. Xerox Corp.*,
   355 F. App'x 523 (2d Cir. 2009) .......................................................................... 17

*Christine Asia Co. Ltd. v. Ma*,
   718 F. App'x 20 (2d Cir. 2017) ...................................................................... 10, 14

*City of Detroit v. Grinnell Corp.*,
   495 F.2d 448 (2d Cir. 1974) ........................................................................ 3, 4, 7, 13

*City of Providence v. Aéropostale, Inc.*,
   No. 11 Civ. 7132(CM), 2014 WL 1883494 (S.D.N.Y. May 9, 2014) .................................. 6, 21

*D'Amato v. Deutsche Bank*,
   236 F.3d 78 (2d Cir. 2001) ..................................................................................... 6

*Denney v. Deutsche Bank AG*,
   443 F.3d 253 (2d Cir. 2006) ................................................................................... 5

*Dornberger v. Metro. Life Ins. Co.*,
   203 F.R.D. 118 (S.D.N.Y. 2001) ......................................................................... 24

*Erica P. John Fund, Inc. v. Halliburton Co.*,
   No. 3:02-cv-1152, 2018 WL 1942227 (N.D. Tex. Apr. 25, 2018) ............................................ 20

*Goldberger v. Integrated Res., Inc.*,
   209 F.3d 43 (2d Cir. 2000) ...................................................................................... 4

*In re AOL Time Warner, Inc.*,
   No. 02 CIV. 5575 (SWK), 2006 WL 903236 (S.D.N.Y. Apr. 6, 2006) ..................... 8, 9, 16, 17

*In re Bank of Am. Corp. Sec., Derivative, & Employee Ret. Income Sec. Act (ERISA) Litig.*,
   772 F.3d 125 (2d Cir. 2014) ................................................................................. 16

*In re Citigroup Inc. Bond Litig.*,
   296 F.R.D. 147 (S.D.N.Y. 2013) ........................................................................... 8

*In re Drexel Burnham Lambert Grp., Inc.*,
   130 B.R. 910 (S.D.N.Y. 1991) ............................................................................ 16

*In re Facebook, Inc. IPO Sec. & Derivative Litig.*,
    MDL No. 12-2389, 2015 WL 6971424 (S.D.N.Y. Nov. 9, 2015)................................ 17, 19, 20

*In re Giant Interactive Grp., Inc. Sec. Litig.*,
    279 F.R.D. 151 (S.D.N.Y. 2011) ...................................................................... 7, 21

*In re Gilat Satellite Networks, Ltd.*,
    No. CV-02-1510 (CPS), 2007 WL 2743675 (E.D.N.Y. Sept. 18, 2007)............................ 10, 12

*In re Glob. Crossing Sec. & ERISA Litig.*,
    225 F.R.D. 436 (S.D.N.Y. 2004) ................................................................... 4, 9, 17

*In re Indep. Energy Holdings PLC Sec. Litig.*,
    302 F. Supp. 2d 180 (S.D.N.Y. 2003)..................................................................... 16

*In re Luxottica Grp. S.p.A. Sec. Litig.*,
    233 F.R.D. 306 (E.D.N.Y. 2006) ............................................................................ 8

*In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.*,
    246 F.R.D. 156 (S.D.N.Y. 2007) .................................................................... *passim*

*In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.*,
    No. 02 MDL 1484 (JFK), 2007 WL 313474 (S.D.N.Y. Feb. 1, 2007)................................... 14

*In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*,
    330 F.R.D. 11 (E.D.N.Y. Jan. 28, 2019)................................................................. 4, 5

*In re Polaroid ERISA Litig.*,
    240 F.R.D. 65 (S.D.N.Y. 2006) ............................................................................. 5

*In re Prudential Sec. Inc. Ltd. P'ships Litig.*,
    163 F.R.D. 200 (S.D.N.Y. 1995) ........................................................................... 3

*In re Sumitomo Copper Litig.*,
    189 F.R.D. 274 (S.D.N.Y. 1999) ........................................................................... 8

*Maley v. Del Global Techs. Corp.*,
    186 F. Supp. 2d 358 (S.D.N.Y. 2002)...................................................................... 15

*Massiah v. MetroPlus Health Plan, Inc.*,
    No. 11-cv-05669 (BMC), 2012 WL 5874655 (E.D.N.Y. Nov. 20, 2012)................................. 13

*Meredith Corp. v. SESAC, LLC*,
    87 F. Supp. 3d 650 (S.D.N.Y. 2015)....................................................................... 20

*Newman v. Stein*,
    464 F.2d 689 (2d Cir. 1972) ............................................................................................ 13

*Shapiro v. JPMorgan Chase & Co.*,
    No. 11 Civ. 8331(CM), 2014 WL 1224666 (S.D.N.Y. Mar. 24, 2014) ............................ *passim*

*Virtus Inv. Ptnrs., Inc. Sec. Litig.*,
    No. 15-cv-1249, 2018 WL 6333657 (S.D.N.Y. Dec. 4, 2018) ......................................... 3

*Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*,
    396 F.3d 96 (2d Cir. 2005) ................................................................................... 3, 6, 17, 22

*Weinberger v. Kendrick*,
    698 F.2d 61 (2d Cir. 1982) ................................................................................................ 3

## STATUTES

15 U.S.C. § 78u–4(a)(7)(B) ................................................................................................ 16

## RULES

Fed. R. Civ. P. 23 ..................................................................................................... *passim*

Pursuant to Fed. R. Civ. P. 23(e), Class Representatives William Tai and Christine Asia Co., Ltd., Abel Amoros, Arthur Gabriel, Raymond Lee, and Gang Liu (collectively, "Plaintiffs"), on behalf of themselves and the certified Class, respectfully submit this memorandum of law in support of their motion for final approval of the proposed Settlement and Plan of Allocation.[1]

## I.    INTRODUCTION

After more than four years of contested litigation, with fact discovery completed and near the end of expert discovery, Plaintiffs have obtained a remarkable $250,000,000 all cash Settlement for the benefit of the Class.  As described below and in the Rosen Declaration, this is an excellent result, providing Class Members with a significant and certain recovery in a case that presented numerous complexities and risks.  The Settlement represents between 17% and 20% of the Class's maximum damages potentially recoverable, which is an extremely favorable result when compared to the approximately 2% median recovery in securities class action settlements with similar aggregate damages.  ¶9.  And the Settlement removes significant risks that lay ahead in summary judgment, trial, and any eventual appeal.  An adverse decision at any one of these litigation milestones could result in a zero—or substantially reduced—recovery. Moreover, the Settlement was reached only after extensive, arm's-length negotiations conducted by experienced counsel with the assistance of former Federal Judge Layn R. Phillips, which culminated in a mediator's proposal to settle the action for $250 million.  ¶¶107-108.

Counsel's substantial efforts and well-developed understanding of the strengths and weaknesses of the action informed the decision to settle.  These efforts, as detailed in the Rosen Declaration, included, among other things: (i) conducting a comprehensive legal and factual

---

[1] Unless otherwise noted, capitalized terms have the meanings set forth in the  Stipulation and Agreement of Settlement dated April 26, 2019 (ECF No. 123-1) (the "Stipulation") or in the concurrently-filed Declaration of Laurence M. Rosen ("Rosen Decl.").  Citations to "¶__" or "Ex. __" in this memorandum refer to paragraphs in, or exhibits to, the Rosen Declaration.

investigation into the claims asserted and drafting the Complaint; (ii) opposing Defendants' motion to dismiss; (iii) successfully navigating the appeal following the early dismissal of Plaintiffs' claims in full without leave to amend; (iv) obtaining class certification; (v) engaging in extensive discovery, including the strategic review and analysis of more than 1.1 million pages of documents, participation in numerous meet and confer sessions with defense counsel, taking 22 fact witness depositions, and defending the five Plaintiffs' depositions; (vi) retaining seven experts and assisting in the preparation of five opening expert reports, six rebuttal expert reports, and preparing for expert depositions; and (vii) engaging in settlement negotiations with Defendant's counsel, including two formal mediation sessions with Judge Phillips.  ¶¶1(a)-(z).[2]

Plaintiffs also request approval of the proposed Plan of Allocation of the Net Settlement Fund.  The Plan of Allocation was developed in conjunction with Plaintiffs' damages expert and is designed to fairly and equitably distribute the proceeds of the Settlement to eligible Class Members.  ¶¶150-160.  Plaintiffs respectfully submit that it is fair and it too should be approved.

Finally, the dissemination of the Notice constituted "the best notice. . .practicable under the circumstances" and thus satisfies Rule 23 and due process.  The Claims Administrator has mailed more than 1,000,000 Notice Packets to potential Class Members, published the Summary Notice in multiple news sources, and made the Notice, Claim Form, and other important documents available on a dedicated website.  Ex. 1 (Mulholland Decl. ¶¶11, 15, 17).  While the deadline to request exclusion or object to the Settlement has not yet passed, it is telling that only one objection and 30 requests for exclusion have been received.  *Id.* ¶¶20-24.

---

[2] The Rosen Declaration is an integral part of this submission and, for the sake of brevity in this memorandum, the Court is respectfully referred to it for a detailed description of the factual background and the nature of the claims asserted (¶¶15-21); the work done by Plaintiffs and Plaintiffs' Counsel to prosecute the action (¶¶22-111); the risks and uncertainties of the litigation (¶¶112-135); and the negotiations leading to the Settlement (¶¶100-110).

In sum, the Settlement is both procedurally and substantively fair, reasonable, and adequate. Accordingly, Plaintiffs respectfully request that the Court grant final approval of the Settlement and Plan of Allocation. Proposed orders are filed herewith.

## II.  STANDARDS GOVERNING FINAL APPROVAL: RULE 23(e) AND *GRINNELL*

Rule 23(e) requires court approval for any settlement of class action claims, and such approval should be granted "only after a hearing and only on finding that [a proposed settlement] is fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(2). This determination entails scrutiny of both the procedural and substantive aspects of the proposed settlement. *See In re Virtus Inv. Ptnrs., Inc. Sec. Litig.*, No. 15-cv-1249, 2018 WL 6333657, at *1 (S.D.N.Y. Dec. 4, 2018) ("[T]he settlement must be both procedurally and substantively fair.").[3]

As a matter of public policy, courts strongly favor the settlement of complex class action litigation. *See Wal-Mart Stores, Inc. v. Visa U.S.A., Inc*., 396 F.3d 96, 116 (2d Cir. 2005) ("We are mindful of the strong judicial policy in favor of settlements, particularly in the class action context."); *Weinberger v. Kendrick*, 698 F.2d 61, 73 (2d Cir. 1982) (noting the "general policy favoring the settlement of litigation"); *In re Prudential Sec. Inc. Ltd. P'ships Litig.*, 163 F.R.D. 200, 209 (S.D.N.Y. 1995) ("It is well established that there is an overriding public interest in settling and quieting litigation, and this is particularly true in class actions.").

Courts in the Second Circuit have long considered the following factors set forth in *City of Detroit v. Grinnell Corp*., 495 F.2d 448 (2d Cir. 1974), in evaluating whether a class action settlement is fair, reasonable, and adequate under Rule 23:

> (1) the complexity, expense and likely duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the class action through the

---

[3] Unless otherwise noted, all internal citations and quotations are omitted and emphasis is added.

trial; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery; [and] (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.

*Id.* at 463, *abrogated on other grounds by Goldberger v. Integrated Res., Inc.*, 209 F.3d 43 (2d Cir. 2000). Moreover, "not every factor must weigh in favor of [the] settlement, rather the court should consider the totality of these factors in light of the particular circumstances." *In re Glob. Crossing Sec. & ERISA Litig.*, 225 F.R.D. 436, 456 (S.D.N.Y. 2004).

Rule 23(e)(2), as amended on December 1, 2018, also instructs that the Court should determine whether the Settlement is "fair, reasonable, and adequate" after considering whether:

(A) the class representatives and class counsel have adequately represented the class;
(B) the proposal was negotiated at arm's length;
(C) the relief provided for the class is adequate, taking into account:
   (i) the costs, risks, and delay of trial and appeal;
   (ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims;
   (iii) the terms of any proposed award of attorney's fees, including timing of payment; and
   (iv) any agreement required to be identified under Rule 23(e)(3); and
(D) the proposal treats class members equitably relative to each other.

Fed. R. Civ. P. 23(e)(2).

The factors set forth in Rule 23(e)(2) are not intended to "displace" the Second Circuit's *Grinnell* factors, but "rather to focus the court and the lawyers on the core concerns of procedure and substance that should guide the decision whether to approve the proposal." Advisory Committee Notes to 2018 Amendments, 324 F.R.D. 904, 918 (Apr. 26, 2018); *see also In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 330 F.R.D. 11, 29 (E.D.N.Y. Jan. 28, 2019) ("The Court understands the new Rule 23(e) factors to add to, rather than displace, the *Grinnell* factors."). As demonstrated herein, the Settlement readily satisfies the factors set forth in Rule 23(e)(2) and *Grinnell* and, accordingly, warrants final approval.

III.     **THE SETTLEMENT IS FAIR, REASONABLE, AND ADEQUATE**

A.     **The Settlement Is Procedurally Fair**

Rule 23(e)(2)(A), requiring adequate representation, and Rule 23(e)(2)(B), requiring arm's-length negotiations, "constitute the 'procedural' analysis" of the fairness inquiry. *Payment Card*, 330 F.R.D at 29.  Each aspect of procedural fairness is satisfied here.

1.     **Plaintiffs and Counsel Have Adequately Represented the Class**

Representative plaintiffs provide adequate representation of a class where they have suffered the same injury as the class members, "vigorously pursu[ed] the claims of the class," and had "no interests antagonistic to the interests of other class members." *Denney v. Deutsche Bank AG*, 443 F.3d 253, 268 (2d Cir. 2006).[4]

Plaintiffs have adequately represented the Class here by vigorously pursuing their shared claims against Defendants, including by communicating with Lead Counsel on case developments, reviewing significant filings, engaging in discovery efforts, including sitting for deposition, and conferring with Lead Counsel throughout the settlement negotiations.  ¶¶207-208; Exs. 14-18.  Moreover, the Plaintiffs—investors who purchased Alibaba ADSs or transacted in Alibaba options during the Class Period and suffered damages as a result—have suffered the same injury as other Class Members, shared the interests of other Class Members in obtaining the largest possible recovery from Defendants, and had no interests antagonistic to the interests of other Class Members.  They have adequately represented the Class.

Plaintiffs' Counsel also have adequately represented the Class throughout the litigation. Plaintiffs' Counsel are highly qualified and experienced in securities and other complex

---

[4] *See also In re Polaroid ERISA Litig.*, 240 F.R.D. 65, 77 (S.D.N.Y. 2006) ("Where plaintiffs and class members share the common goal of maximizing recovery, there is no conflict of interest").

litigation, as set forth in their firm resumes.[5]   They vigorously prosecuted the action against skilled opposing counsel and achieved an excellent result.   Indeed, the Settlement was achieved only after Plaintiffs' Counsel thoroughly investigated the Class's claims, successfully navigated an appeal to the Second Circuit, obtained class certification, and completed fact discovery and nearly completed expert discovery.   ¶¶1(a)-(v), 24-99.   Based on their expertise, experience, and substantial work done in this case, Plaintiffs' Counsel, with a thorough understanding of the strengths and weaknesses of the action, respectfully recommend that final approval of the Settlement is in the best interests of the Class.   *Shapiro v. JPMorgan Chase & Co.*, No. 11 Civ. 8331(CM), 2014 WL 1224666, at *2 (S.D.N.Y. Mar. 24, 2014) (judgment of counsel "who have extensive experience in prosecuting complex class actions" is entitled to "great weight.").

### 2.      The Settlement Was Negotiated at Arm's Length

"Absent fraud or collusion, the court should be hesitant to substitute its judgment for that of the parties who negotiated the settlement."   *City of Providence v. Aéropostale, Inc.*, No. 11 Civ. 7132(CM), 2014 WL 1883494, at *4 (S.D.N.Y. May 9, 2014), *aff'd sub nom. Arbuthnot v. Pierson*, 607 F. App'x 73 (2d Cir. 2015).   Moreover, "[a] presumption of fairness, adequacy, and reasonableness may attach to a class settlement reached in arm's-length negotiations between experienced, capable counsel after meaningful discovery."   *Wal-Mart Stores*, 396 F.3d at 116. Courts have also recognized that the participation of an experienced, respected mediator weighs in favor of a proposed settlement's procedural fairness.   *See, e.g.*, *D'Amato v. Deutsche Bank*, 236 F.3d 78, 85 (2d Cir. 2001) ("mediator's involvement in . . . settlement negotiations helps to ensure that the proceedings were free of collusion and undue pressure.").

The Settlement here was reached only after protracted, arm's-length negotiations

---

[5] *See* Exs. 5-A (Rosen Law Firm resume), 6-A (Glancy Prongay & Murray firm resume), 7-A (MoloLamken firm resume), and 8-A (Levi & Korsinsky firm resume).

facilitated by an experienced and well-respected neutral.  Distinguished former federal Judge Layn R. Phillips mediated the Parties' settlement negotiations through two formal mediation sessions and ongoing communications that ultimately culminated in the Parties' acceptance of Judge Phillips' recommendation to settle the action for $250 million.  ¶¶100-108.  Moreover, Judge Phillips has signed a Declaration attesting to the integrity of the mediation process (Ex. 2 ¶¶7-17) and recommending the Settlement as in the best interests of the Class (Ex. 2 ¶¶18-20).  Courts in this District have favorably noted Judge Phillips' participation as a factor in granting final approval of securities class action settlements,[6] and his participation in the instant Settlement underscores that it is the product of non-collusive, arm's-length negotiations.

### B. The Settlement Is Substantively Fair: the Relief Provided Is Adequate, Taking into Account the Costs, Risks, and Delay of Continued Litigation

Rule 23(e)(2)(C) instructs the Court to consider whether "the relief provided for the class is adequate, taking into account . . . the costs, risks, and delay of trial and appeal" along with other relevant factors.  Fed. R. Civ. P. 23(e)(2)(C).  Rule 23(e)(2)(C)(i) essentially incorporates six of the traditional *Grinnell* factors: the complexity, expense, and likely duration of the litigation (first factor); the risks of establishing liability and damages (fourth and fifth factors); the risks of maintaining class action status through the trial (sixth factor); and the range of reasonableness of the settlement fund in light of the best possible recovery and the attendant risks of litigation (eighth and ninth factors).  *Grinnell*, 495 F.2d at 463.  As discussed below, each of these factors supports approval of the Settlement.

---

[6] *In re Giant Interactive Grp., Inc. Sec. Litig.*, 279 F.R.D. 151, 160 (S.D.N.Y. 2011) (settlement "procedurally fair" where it "was the product of prolonged, arms-length negotiation, including as facilitated by a respected mediator"—Judge Phillips); *In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.*, 246 F.R.D. 156, 163 (S.D.N.Y. 2007) ("*Merrill Lynch Research*").

### 1.     The Complexity, Expense, and Likely Duration of the Litigation

"Class action suits readily lend themselves to compromise because of the difficulties of proof, the uncertainties of the outcome, and the typical length of the litigation."  *In re Luxottica Grp. S.p.A. Sec. Litig.*, 233 F.R.D. 306, 310 (E.D.N.Y. 2006).[7]  Courts routinely recognize the "notorious complexity" of securities class actions, in particular.  *See, e.g.*, *In re AOL Time Warner, Inc. Sec. & "ERISA" Litig.*, No. MDL 1500, 02 Civ. 5575 (SWK), 2006 WL 903236, at *8 (S.D.N.Y. Apr. 6, 2006).  This action—involving complex issues of Chinese regulatory, administrative, intellectual property, and consumer protection law, Chinese politics and the Chinese business environment, e-commerce and counterfeiting in China, and due diligence standards for underwriting transactions involving Chinese companies—is no exception.  ¶¶169-173; *see also* ¶1(t), 95-96 (regarding experts and areas of expert testimony).  Putting aside the significant risk of proving liability and damages (*see* Sec. III.B.2, *infra*), this action was particularly complex and expensive, as a practical matter, given the nature of litigating against a foreign defendant, which required traveling to Hong Kong to depose Alibaba's witnesses through interpreters, and expensive and cumbersome translation of Chinese documents.  ¶¶52-53, 78, 164-164, 171-173.

This action settled after more than four years of vigorous litigation, near the end of expert discovery and shortly before summary judgment motions were to be filed.  Assuming Plaintiffs' claims survived summary judgment, litigating the action through trial and post-trial appeals would have undoubtedly been a long and expensive endeavor.  ¶¶114-133.

---

[7] *See also In re Citigroup Inc. Bond Litig*., 296 F.R.D. 147, 155 (S.D.N.Y. 2013) ("[T]he more complex, expensive, and time consuming the future litigation, the more beneficial settlement becomes as a matter of efficiency to the parties and to the Court."); *In re Sumitomo Copper Litig*., 189 F.R.D. 274, 281 (S.D.N.Y. 1999) (class action suits generally "have a well-deserved reputation as being most complex").

Were the litigation to continue, a potential recovery—if any—"would occur years from now, substantially delaying payment . . . to the Settlement Class." *Shapiro*, 2014 WL 1224666, at *8; *see also AOL Time Warner*, 2006 WL 903236, at *8 (settlement "circumvents the difficulty and uncertainty inherent in long, costly trials"). In contrast, the Settlement provides an immediate and substantial recovery for the Class—approximately 17%-20% of maximum damages—without exposing the Class to the risk, expense, and delay of continued litigation.

### 2.      Risks of Establishing Liability and Damages

In considering this factor, "the Court need only assess the risks of litigation against the certainty of recovery under the proposed settlement." *Global Crossing*, 225 F.R.D. at 459. While Lead Counsel believes that Plaintiffs' claims are meritorious, they also recognize that they faced substantial obstacles to proving liability and damages. When compared to the certainty of the significant benefit conferred by the Settlement, these risks militate against further litigation, and support a determination that the Settlement is fair, reasonable and adequate.

**Establishing Liability:** The Settlement was reached a short time before Defendants' anticipated summary judgment motion was due—an important milestone that posed significant risks to the survival of the Class's claims and could have resulted in dismissal or a material reduction in damages. ¶¶112-113. Of course, even if Plaintiffs' claims survived summary judgment, Plaintiffs bore the further risk of *proving* their claims to a jury at trial. ¶¶114-125.

Plaintiffs faced the very real risk that a jury would determine that Defendants made no material omission or false statement in Alibaba's Registration Statement or otherwise during the Class Period. Defendants argued vehemently that the July 16, 2014 administrative guidance meeting with the SAIC (the "July 2014 Meeting") was a routine regulatory interaction that resulted in Alibaba's voluntary efforts to improve its sales platforms, that the meeting was not a

material event, and that its disclosure was not required.  ¶115.  Moreover, to the extent that disclosure of any regulatory risk raised by the July 2014 Meeting was required, Defendants argued that such risks were thoroughly discussed in the Registration Statement.  ¶117.  The Court agreed with Defendants on both fronts at the motion to dismiss phase, and even after the appeal, Plaintiffs' ability to prove otherwise at trial was not a foregone conclusion.  For example, while an important allegation in Plaintiffs' case was the SAIC's threat of a large fine during the July 2014 Meeting, *see Christine Asia Co. Ltd. v. Ma*, 718 F. App'x 20, 22-23 (2d Cir. 2017), Defendants maintained that the alleged "threat" was not real (and thus not material), and thus there was no duty to disclose it.  ¶124, 129.  Indeed, since there ultimately was no adjudication of wrongdoing nor any fine levied against Alibaba stemming from the July 2014 Meeting, a jury may have been swayed by Defendants' arguments.  ¶178.

Even if Plaintiffs convinced a jury that the failure to disclose the July 2014 Meeting was a material omission, Plaintiffs also faced the risk that a jury would conclude that Defendants did not act with the requisite scienter.  ¶¶118-122.  Courts routinely recognize the difficulty of proving scienter.  *In re Gilat Satellite Networks, Ltd.*, No. CV-02-1510 (CPS), 2007 WL 2743675, at *11 (E.D.N.Y. Sept. 18, 2007) ("Establishing scienter is a difficult burden to meet[.]").  To prove scienter, Plaintiffs would need to convince a jury that Defendants intentionally omitted the July 2014 Meeting from the Registration Statement in order to mislead investors as to the risks posed by the event, or they did so with extreme recklessness.

As with falsity, although Plaintiffs uncovered significant evidence that they believe supported a finding of Defendants' scienter, Defendants would have presented substantial evidence in opposition.  For example, Alibaba has maintained that the Company did not purposely conceal the July 2014 Meeting because, according to Alibaba and its employees, the

meeting was a routine interaction with a regulator; it was not a material event intentionally hidden from investors.  ¶119.  Moreover, Defendants have consistently argued that Alibaba had no motive to conceal the Meeting or the administrative guidance provided by the SAIC because the changes Alibaba was making to its platforms in response to the SAIC's recommendations would only *improve* Alibaba's platforms and business.  ¶120.  Furthermore, Defendants argued that none of the Individual Defendants were present at the Meeting, nor were they aware of it; thus, Plaintiffs would not be able to prove that any of the Individual Defendants intentionally or recklessly concealed information about which they were not even aware.  ¶121.

The combination of the foregoing arguments may have swayed a jury to believe that even if the failure to disclose the July 2014 Meeting in the Registration Statement constituted a material omission, it was not done intentionally or recklessly by Defendants to mislead investors.

**Loss Causation and Damages:**  Even assuming that Plaintiffs overcame the above risks and successfully established liability, Plaintiffs would have confronted considerable challenges in establishing loss causation and damages.  Prior to reaching the Settlement, Plaintiffs already were forced to admit an inability to prove loss causation with respect to one of the corrective disclosure dates initially alleged in the action.  ¶127 (discussing inability to prove loss causation with respect to January 29, 2015 ADS price decline).

While Plaintiffs have a solid argument that loss causation would be proven for the $4.29 residual price drop on January 28, 2015 following the publication of the White Paper, Defendants raised numerous counter arguments.  For example, Defendants argued that the White Paper was not an accurate record of the SAIC's position at the July 2014 Meeting and was, instead, the action of an overzealous SAIC administrator *mis*-titled as a White Paper.  ¶129.  As such, Defendants argued, the White Paper was not a corrective disclosure at all.  Alternatively,

Defendants asserted that the unusual method of disclosure of the administrative guidance in an unsanctioned White Paper caused the share price decline, rather than the facts contained in the White Paper. *Id.* Defendants argued that if the unorthodox method of disclosure of the White Paper, as opposed to its contents, caused the price drop, Plaintiffs were not entitled to damages.

Defendants also asserted that the Registration Statement and other publicly available information had already disclosed the adverse information contained in the White Paper concerning counterfeit products and other potential violations on Alibaba's e-commerce platforms, such that there could be no provable loss causation associated with the January 28 price drop. ¶129. Lastly, Defendants contended that because the SAIC later retracted the White Paper, the January 28 share price decline was not fairly charged to Defendants as the SAIC had disowned it. *Id.* As a result of their various loss causation arguments, Defendants asserted that damages related to the failure to disclose the July 2014 Meeting were zero, or at most, some amount substantially less than the Settlement amount. *Id.*

The Parties developed and would have presented competing evidence on these issues, including competing expert evidence. While Plaintiffs believed they had the better arguments, the risk remained that Defendants could have defeated loss causation, or significantly diminished damages, for the one remaining alleged corrective disclosure date.

### 3.      Risks of Maintaining Class Action Status

The Court certified the Class on May 1, 2018. ECF No. 56. Still, Rule 23 provides that a class certification order may be altered or amended any time before a decision on the merits. Thus, while certification-related risks were not dire, a risk remained that the Class definition could be modified, or the Class decertified. Fed. R. Civ. P. 23(c)(1)(C); *Annunziato v. Collecto,*

*Inc.*, 293 F.R.D. 329, 340 (E.D.N.Y. 2013) ("[U]nder rule 23, district courts have the power to amend class definitions or decertify classes as necessary. . . .").

4. **The Settlement Amount Is Within the Range of Reasonableness in Light of the Best Possible Recovery and Attendant Risks of Litigation**

Courts often analyze the last two *Grinnell* factors together.  *See Grinnell*, 495 F.2d at 463.  In doing so, courts "consider and weigh the nature of the claim, the possible defenses, the situation of the parties, and the exercise of business judgment in determining whether the proposed settlement is reasonable."  *Id.* at 462.  This is not a "mathematical equation yielding a particularized sum."  *Massiah v. MetroPlus Health Plan, Inc.*, No. 11-cv-05669 (BMC), 2012 WL 5874655, at *5 (E.D.N.Y. Nov. 20, 2012).  Instead, "there is a range of reasonableness with respect to a settlement."  *Newman v. Stein*, 464 F.2d 689, 693 (2d Cir. 1972); *Shapiro*, 2014 WL 1224666, at *11 (settlement judged "not in comparison with the possible recovery in the best of all possible worlds, but rather in light of the strengths and weaknesses of plaintiffs' case").

Given the significant litigation risks described above, including the risks that the Class would recover a lesser amount—or nothing at all—if the action continued, the $250 million Settlement represents an excellent result for the Class.  The result is especially remarkable when considering that the Settlement Amount was entirely cash-funded by the Company.  ¶136.

Plaintiffs' expert estimated that maximum recoverable Class-wide damages in the Action are approximately $1,455,300,000, based on per share artificial inflation of $4.29 per ADS. ¶128.  The Settlement thus represents approximately 17% of maximum recoverable damages. As set forth above, however, Defendants presented alternative arguments attacking loss causation and arguing that recoverable damages are zero.  Moreover, Defendants argued that even assuming Plaintiffs were able to prove that all of the residual price decline on January 28, 2015 was caused by revelation of the previously concealed July 2014 Meeting, an alternative

aggregate damages model should apply.   ¶138.   Defendants argued that under this alternative model, (i) Plaintiffs' per-share damages were less than $4.29 per share based on a market model using different industry indices, and (ii) based on different trading assumptions for the ADSs purchased and sold during the Class Period, aggregate Class-wide damages were only at most $1.23 billion.  Under this scenario, the Settlement represents a 20% recovery.  *Id.*  The recovery under either scenario (*i.e.*, a 17% to 20% recovery) is thus an excellent result when viewed against the risks of continued litigation, and the real potential for a zero recovery.  ¶139.

Indeed, the recovery of between 17% to 20% of **maximum** damages **potentially** available is exceptional when compared to settlements in other cases alleging losses of a similar magnitude, that in 2018 recovered approximately 2%—or less—of alleged losses.   ¶9.[8] As discussed above, if Defendants were to prevail on any of their arguments regarding liability or damages, the Class might have recovered nothing, or significantly less than the Settlement Amount, many years in the future.  Given these risks, the Settlement is an extremely favorable outcome for the Class and it is certainly well within the range of reasonableness.  *See In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.*, No. 02 MDL 1484 (JFK), 2007 WL 313474, at *10 (S.D.N.Y. Feb. 1, 2007) (recovery of approximately 6.25% was "at the higher end of the range of reasonableness of recovery in class action[] securities litigations").

### C.      The Class's Reaction to the Settlement Supports Final Approval

The second *Grinnell* factor—the reaction of the Class—overlaps with Rules 23(e)(4), on the opportunity for exclusion, and 23(e)(5), on the opportunity to object.  As required by Rule

---

[8] Citing Ex. 11 (Cornerstone Research, *Securities Class Action Settlements 2018 Review and Analysis* (2019)), at p. 6 Fig. 5 (median percentage of recovery in cases alleging greater than $1 billion in damages was 2% in 2018); Ex. 12 (Stefan Boettrich and Svetlana Starykh, *Recent Trends in Securities Class Action Litigation: 2018 Full-Year Review* (NERA Jan. 29, 2019)) at p. 36, Fig. 28; *id*. at p. 35, Fig. 27 (median percentage of recovery in cases alleging between $1-$4.99 billion in damages is 1.2%).

23(e)(4) & (5), the Settlement affords Class Members the opportunity to request exclusion from, or object to, the Settlement.  Ex. 1-A (Notice at p. 1).  The Class's reaction to the Settlement—as exhibited by the small number of requests for exclusion and objections submitted versus the large volume of Claim Forms submitted—demonstrates strong support for the Settlement.

More than 1,000,000 Notice Packets have been distributed to potential Class Members. Ex. 1 (Mulholland Decl. ¶11).  So far, over 164,000 Claim Forms have been submitted, only 30 requests for exclusion have been received (14 of them valid), and only one objection has been submitted.  *Id.* ¶¶26, 22, 23; Ex. 1-H (chart of exclusion requests); Ex. 27 (objection).[9]  This overwhelmingly positive reaction strongly supports final approval of the Settlement.  *See, e.g.*, *Maley v. Del Global Techs. Corp.*, 186 F. Supp. 2d 358, 362 (S.D.N.Y. 2002) ("It is well-settled that the reaction of the class to the settlement is perhaps the most significant factor to be weighed in considering its adequacy.").

The one cursory objection to the Settlement received is wholly without merit.  Ex. 27. First, the objector failed to provide sufficient information or evidence to establish his standing as a Class Member, even after Lead Counsel sent him two separate letters requesting he do so. ¶149.[10]  Instead, he states "**upon belief and information**" that "he **acquired or sold** 100 Alibaba ADS during the Class Period."  Ex. 27 at 2.  It is axiomatic that only a Class Member may file an objection to the Settlement,[11] and it is standard practice for courts to require objectors to identify

---

[9]  The deadline to request exclusion from, or to object to any aspect of, the Settlement is September 25, 2019; if additional exclusions or objections are received after the date of this filing, they will be addressed on reply.

[10]  The Notice instructs that any objection "must include documents sufficient to prove membership in the Class, including the number of Alibaba ADS, Alibaba Call Options, and/or Alibaba Put Options that the objecting Class Member purchased, acquired and/or sold during the Class Period…, as well as the **dates** and **prices** of each such purchase/acquisition and/or sale." Ex. 1-A (Notice ¶60).

[11]  *See* Fed. R. Civ. P. 23(e)(5) ("Any *class member* may object to the [settlement] proposal….");

themselves and establish their membership in the class.  *Cf. Merrill Lynch Research*, 246 F.R.D. at 168-69 (resolving eleven objections).  This deficiency is fatal.

Second, the objection lacks any substance.  Mr. King takes a passing swipe at several aspects of the Settlement: (a) the amount of the recovery (claiming, incorrectly, that the Settlement constitutes only 1.9% of damages and is thus insufficient), (b) the adequacy of the Notice (claiming that it "it did not convey what the class members are giving up or the amount of attorneys' fees class counsel is requesting" and fails "to explain that class members could pursue fraud claims and punitive damages"), and (c) the objection procedure (claiming that it unfairly discourages objections because, *inter alia*, it requires evidence the objector purchased Alibaba shares and his contact information).  Ex. 27 at 2-3.

As to the Settlement Amount, it recovers approximately 17% to 20% of maximum recoverable damages, not 1.9% as the objector concludes based on a fundamental misunderstanding of damages.  The Settlement provides a recovery nearly 10 times greater than the median recovery in similarly-sized securities class action settlements.  ¶9.  It is clearly adequate.  Moreover, the Notice contains exactly what the PSLRA and relevant case law require relating to damages, an estimate of damaged shares and recovery per share.[12]  The Notice also states precisely what Class Members are releasing.  Ex. 1-A (Notice ¶¶35-40).  While the release covers any claim that was or could have been brought related to the purchase of Alibaba

---

*In re Drexel Burnham Lambert Grp., Inc*., 130 B.R. 910, 923 (S.D.N.Y. 1991), *aff'd*, 960 F.2d 285 (2d Cir. 1992) ("Only Class members have standing to object to the Settlement of a class action" because "[o]bjectors who are non-Class members lack standing to object to the fairness, reasonableness and adequacy of the Settlement."); *see also AOL Time Warner*, 2006 WL 903236, at *15 n.17 (S.D.N.Y. Apr. 6, 2006) (where objector's account statements reflected a profit on the subject securities, the court stated "[w]ithout an injury, Heyburn does not have standing to object").

[12] Ex. 1-A (Notice ¶¶2-5); 15 U.S.C. § 78u–4(a)(7)(B); *In re Bank of Am. Corp. Sec., Derivative, & Employee Ret. Income Sec. Act (ERISA) Litig*., 772 F.3d 125, 134 (2d Cir. 2014*); In re Indep. Energy Holdings PLC Sec. Litig*., 302 F. Supp. 2d 180, 184 (S.D.N.Y. 2003)

Securities, without specifying every conceivable cause of action, this is permissible so long as the released claims arise "out of the 'identical factual predicate' as the settled conduct." *Wal-Mart Stores*, 396 F.3d at 107.   Finally, Mr. King's objection that the Notice is vague because it states counsel shall apply for a fee of up to 25% is flatly rejected by the very case he cites, holding that a Notice *is* adequate when it states that attorneys shall apply for legal fees "not to exceed . . . 20%" of the settlement fund.  *Carlson v. Xerox Corp.*, 355 F. App'x 523, 525 & n.1 (2d Cir. 2009).  So too here, the Notice is adequate.

In sum, "[c]ourts routinely approve settlements over conclusory objections." *In re AOL Time Warner, Inc.*, No. 02 CIV. 5575 (SWK), 2006 WL 903236, at *15 (S.D.N.Y. Apr. 6, 2006); *see also Merrill Lynch Research*, 246 F.R.D. at 168-69 (eleven meritless objections to fairness of settlement "do not weigh against approval").  Because Mr. King's objection is superficial and unsupported by the facts or the law, the Court should overrule it and approve the Settlement.

**D.**      **The Stage of Proceedings and Amount of Discovery Completed**

The third *Grinnell* factor assesses "whether the parties had adequate information about their claims such that their counsel can intelligently evaluate the merits of plaintiff's claims, the strengths of the defenses asserted by defendants, and the value of plaintiffs' causes of action for purposes of settlement."  *In re Facebook, Inc. IPO Sec. & Derivative Litig.*, MDL No. 12-2389, 2015 WL 6971424, at *4 (S.D.N.Y. Nov. 9, 2015); *see also Global Crossing*, 225 F.R.D. at 459 (final approval warranted where counsel had "developed an informed basis from which to negotiate a reasonable compromise").

At the time the Settlement was reached, the Parties had gained a thorough understanding of the strengths and weaknesses of the claims and the obstacles to success.  As detailed in the Rosen Declaration, Plaintiffs' Counsel dedicated significant time and effort to prosecuting the

action, including, among other things: (i) conducting a significant legal and factual investigation into the claims asserted and drafting the Complaint; (ii) opposing Defendants' motion to dismiss the initial complaint; (iii) successfully navigating the appeal; (iv) obtaining class certification; (v) engaging in extensive discovery efforts, including the review and analysis of more than 1.1 million pages of documents, participation in numerous meet and confer sessions with defense counsel in an effort to resolve various discovery disputes, taking 22 fact witness depositions, and defending the five Plaintiffs' depositions; (vi) retaining seven experts and assisting in the preparation of five opening expert reports and six rebuttal expert reports, and preparing the experts for deposition; and (vii) engaging in protracted settlement negotiations with Defendants' counsel, including two formal mediations facilitated by Judge Phillips.  ¶¶11(a)-(z); ¶¶22-110.

Thus, the Settlement was only achieved after the Parties had sufficient familiarity with the issues in the case, and were able to evaluate its merits and agree on a settlement amount that was acceptable both sides, and which Plaintiffs deemed fair, reasonable, and adequate to the Class.  As Judge Phillips recognized, based on his knowledge of the issues in dispute as vigorously argued to him by the Parties' counsel, "the Mediator's Proposal reflected my assessment that $250 million was the most that Alibaba would pay and the least that the Plaintiffs would accept to settle the action . . . .  It also reflected my assessment of an amount that would be fair, reasonable, and in the best interests of Plaintiffs and the Class."  Ex. 2 ¶15.

### E.   Defendants' Ability to Withstand a Greater Judgment

Alibaba's ability to withstand a greater judgment (*Grinnell* factor seven) does not counsel against final approval.  Defendants no doubt *could* withstand a greater judgment, but "a defendant is not required to empty its coffers before a settlement can be found adequate." *Shapiro*, 2014 WL 1224666, at *11.  Defendants' financial wherewithal "do[es] not ameliorate

the force of the other *Grinnell* factors, which lead to the conclusion that the settlement is fair, reasonable and adequate." *Id*. The more pertinent risk to consider in this regard is Plaintiffs' ability to *collect* on a greater judgment. Given that U.S. judgments are, for all intents and purposes, virtually unenforceable under Chinese law, and in light of the particular political and economic risks and volatility that Hong Kong has been experiencing for months now, Plaintiffs' ability to collect on a greater judgment—even if obtained—is far from clear. ¶¶134-135, 176. This factor thus weighs in favor of granting final approval of the Settlement.

**F.     The Remaining Rule 23(e) Factors Support Final Approval**

**1.     The Proposed Method of Distribution to the Class Is Effective (Rule 23(e)(2)(C)(ii))**

The Settlement proceeds will be allocated to Class Members who submit valid Claim Forms in accordance with the Plan of Allocation. *See* Sec. IV, *infra*. The Claims Administrator, Strategic Claims Services ("SCS"), will review and process all Claim Forms received, provide claimants with an opportunity to cure any deficiency in their claim or request review of the denial of their claim, and ultimately mail a check to or wire Authorized Claimants their *pro rata* share of the Net Settlement Fund as calculated under the Plan of Allocation, upon approval of the Court. This type of claims processing and method for distributing settlement proceeds is standard in securities and other class actions and is effective. Moreover, the Settlement is not "claims-made"—none of the Settlement will revert to Alibaba.

**2.     The Proposed Award of Attorneys' Fees Is Fair and Reasonable (Rule 23(e)(2)(C)(iii))**

The relief provided for the Class is also adequate when the terms of the proposed award of attorneys' fees are taken into account. As discussed in detail in the accompanying Fee Memorandum, the proposed attorneys' fees of 25%, to be paid upon approval by the Court, are reasonable in light of the substantial work and efforts of Plaintiffs' Counsel, their significant

investment of resources in the case, their skillful prosecution of the action for the benefit of the Class, the risks that they faced in the litigation, and the overall benefit of the Settlement achieved.   Most importantly, with respect to the Court's consideration of the Settlement's fairness, the approval of attorneys' fees is entirely separate from approval of the Settlement; neither Plaintiffs nor Plaintiffs' Counsel may terminate the Settlement based on the ultimate award of attorneys' fees or expenses.

### 3.   Identification of Agreements in Connection with the Settlement (Rule 23(e)(2)(C)(iv) and Rule 23(e)(3))

The Parties entered into a confidential agreement establishing conditions under which Defendants may terminate the Settlement if a certain threshold of Class Members submit valid and timely requests for exclusion.  This type of agreement is standard in securities class action settlements and has no negative impact on the fairness of the Settlement.  *See Erica P. John Fund, Inc. v. Halliburton Co.*, No. 3:02-cv-1152, 2018 WL 1942227, at *5 (N.D. Tex. Apr. 25, 2018) (approving settlement with similar confidential agreement).

### 4.   The Settlement Treats Class Members Equitably Relative to Each Other (Rule 23(e)(2)(D))

Rule 23(e)(2)(D) requires that the Court assess whether "the proposal treats class members equitably relative to each other."  The Settlement does that.  All Authorized Claimants will receive their *pro rata* share of the Net Settlement Fund based on the amount of their Recognized Loss calculated under the Plan of Allocation.  Ex. 1-A (Notice at pp. 14-26); *see also* Sec. IV, *infra* (regarding Plan of Allocation).

## IV.   THE PLAN OF ALLOCATION IS FAIR AND REASONABLE

A plan of allocation, like a settlement itself, "must be fair and adequate" to warrant approval.  *Meredith Corp. v. SESAC, LLC*, 87 F. Supp. 3d 650, 667 (S.D.N.Y. 2015).  A plan of allocation "need only have a reasonable, rational basis, particularly if recommended by

experienced and competent class counsel."  *City of Providence*, 2014 WL 1883494, at *10. Accordingly, "courts look primarily to the opinion of counsel" in determining whether a proposed plan of allocation is fair and adequate to warrant approval.  *Giant Interactive*, 279 F.R.D. at 163.

The proposed Plan of Allocation, developed by Plaintiffs' expert in conjunction with Plaintiffs' Counsel, reflects an assessment of the damages that Plaintiffs contend could have been recovered under the theories of liability asserted in the action.[13]  More specifically, the Plan of Allocation reflects, and is based on, Plaintiffs' allegation that the price of Alibaba's ADSs was artificially inflated during the period September 19, 2014 to January 28, 2015 due to Defendants' alleged materially false and misleading statements and omissions.  The Plan of Allocation is based on the premise that the decrease in the price of Alibaba ADSs on January 28, 2015, following the alleged corrective disclosure of the publication of the White Paper, may be used to measure the alleged artificial inflation in the price of Alibaba ADSs prior to this disclosure. Plaintiffs' expert, Dr. Tabak, performed an event study to determine that the amount of fraud-related artificial inflation in Alibaba's ADSs during the Class Period was $4.29 per ADS.  ¶155. He further calculated aggregate Class-wide damages based on the estimated number of Alibaba Securities affected by the alleged fraud to be approximately $1,455,300,000.  *Id.*  Of this amount, Dr. Tabak estimated aggregate damages to options holders were approximately 10% or less.  *Id.*

A Claimant's recovery under the Plan of Allocation will depend on a number of factors, including how many and the type(s) of Alibaba Securities the Claimant purchased, acquired, or

---

[13]  The Plan of Allocation is detailed in the Notice.  *See* Ex. 1-A (Notice at pp. 14-26). Additional detail regarding the Plan of Allocation, including a "Plan of Allocation Guide" to assist potential Class Members to determine whether they have eligible transactions, and Options Tables that include pricing information for Alibaba call and put options during the Class Period, is available on the Settlement website.  *See* Ex. 1 (Mulholland Decl. ¶17).

sold during the Class Period, when that Claimant bought, acquired, or sold the shares, and the number of valid claims filed by other Claimants.  ¶157.  If a Claimant has an overall market *gain* with respect to his, her, or its transactions in Alibaba Securities during the Class Period, the Claimant is not entitled to recover under the Plan of Allocation.  Ex. 1-A (Notice at p. 16). Moreover, if a Claimant purchased Alibaba Securities during the Class Period, but did not hold any of those Securities through the alleged corrective disclosure, the Claimant is not a Class Member and would have no Recognized Loss under the Plan of Allocation, as any loss suffered would not have been caused by the revelation of the alleged fraud.

Plaintiffs and Lead Counsel believe that the proposed Plan of Allocation will result in a fair and equitable distribution of the Net Settlement Fund among Class Members who suffered damages as a result of the fraudulent conduct alleged in the action.  As of the date of this filing, no objections to the Plan of Allocation have been received.  For these reasons, Plaintiffs respectfully request that the Court approve the proposed Plan of Allocation.

## V.        THE NOTICE PROGRAM SATISFIES RULE 23 AND DUE PROCESS

Rule 23(e) and due process together require that notice of a settlement be "reasonable"— *i.e.*, it must "fairly apprise the prospective members of the class of the terms of the proposed settlement and of the options that are open to them in connection with the proceedings." *Wal-Mart Stores*, 396 F.3d at 114 (noting "[t]here are no rigid rules to determine whether a settlement notice to the class satisfies constitutional or Rule 23(e) requirements"); *see also Merrill Lynch Research*, 246 F.R.D. at 166 ("Notice need not be perfect, but need be only the best notice practicable under the circumstances, and each and every class member need not receive actual notice, so long as class counsel acted reasonably in choosing the means likely to inform potential class members.").

Both the substance of the Notice and the method of its dissemination to the Class satisfies those standards here.  In accordance with the Preliminary Approval Order, SCS disseminated more than 1,000,000 Notice Packets to potential Class Members.  *See* Ex. 1 (Mulholland Decl. ¶11).  SCS undertook substantial efforts to ensure that as many potential Class Members as possible were identified and received Notice of the Settlement.  *Id.* ¶¶5-14.

The Notice informs Class Members of, among other things: (1) the nature of the action; (2) the definition of the Class; (3) the claims and defenses asserted; (4) a description of the terms of the Settlement; (5) the right of a Class Member to enter an appearance; (6) the right of a Class Member to request exclusion from the Class, and instructions, manner, and time for doing so; (7) the right of a Class Member to object to any aspect of the Settlement, and the instructions, manner, and time for doing so; (8) the binding effect of the Settlement on Class Members that do not elect to be excluded; and (9) the date and time of the final Settlement Hearing.  *See* Fed. R. Civ. P. 23(c)(2)(B); Ex. 1-A (Notice).  The Notice also advises that Plaintiffs' Counsel will apply to the Court for an award of attorneys' fees in an amount not to exceed 25% of the Settlement Fund as well as reimbursement of Litigation Expenses, including awards of up to $12,500 to each of the five representative Plaintiffs.  *Id.* (Notice ¶5).

In addition to mailing more than 1,000,000 copies of the Notice Packet, SCS caused the Summary Notice to be published once in each of *Investor's Business Daily*, *Barron's*, *The New York Times*, and *The Wall Street Journal*, and transmitted once over the *PR Newswire* on June 3, 2019.  Ex. 1 (Mulholland Decl. ¶15); Ex. 1-E (publication affidavits).  SCS also posted the Notice, Claim Form, Stipulation of Settlement, and other important case documents on a website dedicated the Settlement (www.AlibabaSettlement.com), and bought strategic keyword search ads to ensure the Settlement website would be prominently displayed in search results.  Ex. 1

(Mulholland Decl. ¶¶17-19).   SCS also established a toll-free number to respond to Class Member inquiries, and received over 3,500 calls.  *Id.* ¶16.

These various methods of notice provided all of the necessary information for Class Members to make an informed decision regarding the Settlement.  Moreover, the combination of Notice Packets sent individually by first-class mail and/or e-mail to those Class Members who could be identified with reasonable effort, combined with the print and Internet-based publication of Settlement documents was "the best notice . . . practicable under the circumstances."  Fed. R. Civ. P. 23(c)(2)(B); *see, e.g.*, *Dornberger v. Metro. Life Ins. Co.*, 203 F.R.D. 118, 123-24 (S.D.N.Y. 2001) (approving notice plan and concluding that "reasonable efforts were taken to notify all members of the class" where part of the class received direct mail notice and part of the class was covered by publication notice).

## VI.    CONCLUSION

For the reasons stated herein and in the Joint Declaration, Plaintiffs respectfully request that the Court grant final approval of the Settlement and approve the Plan of Allocation.


Dated:  September 11, 2019                              THE ROSEN LAW FIRM P.A.


By:  *s/ Laurence Rosen*
Laurence Rosen
Phillip Kim
275 Madison Avenue, 34th Floor
New York, NY 10016
Telephone: (212) 686-1060
Facsimile: (212) 202-3827
lrosen@rosenlegal.com
pkim@rosenlegal.com

*Counsel for Plaintiffs and the Class*

**PROOF OF SERVICE**

I, the undersigned say:

I am not a party to the above case and am over eighteen years old.

On September 11, 2019, I served true and correct copies of the foregoing document, by posting the document electronically to the ECF website of the United States District Court for the Southern District of New York, for receipt electronically by the parties listed on the Court's Service List.

I affirm under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on September 11, 2019.


*s/ Laurence M. Rosen*
Laurence M. Rosen