## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| CHRISTINE ASIA CO., LTD., et al.,<br><br>                        Plaintiffs,<br><br>        v.<br><br>JACK YUN MA, et al.,<br><br>                      Defendants. | No.: 1:15-md-02631 (CM) (SDA)<br><br>Related cases:<br>1:15-cv-00759-CM<br>1:15-cv-00811-CM<br>1:15-cv-00991-CM<br>1:15-cv-01405-CM<br>1:15-cv-05020-CM<br>1:15-cv-04991-CM<br>1:15-cv-05002-CM |

## MEMORANDUM OF LAW IN SUPPORT OF LEAD COUNSEL'S MOTION FOR AWARD OF ATTORNEYS' FEES AND <u>REIMBURSEMENT OF LITIGATION EXPENSES</u>

# <u>TABLE OF CONTENTS</u>

I.     INTRODUCTION ...................................................................................................1

II.    HISTORY OF THE LITIGATION ........................................................................2

III.   PLAINTIFFS' COUNSEL ARE ENTITLED TO AN AWARD OF
       ATTORNEYS' FEES FROM THE $250 MILLION SETTLEMENT FUND .................3

IV.    A FEE AWARD OF 25% OF THE SETTLEMENT FUND IS FAIR AND
       REASONABLE IN THIS CASE ...........................................................................4

       A.    The Court Should Apply the Percentage-of-Recovery Approach .........................4

       B.    The Requested 25% Fee Is Reasonable Under the *Goldberger* Factors, as
             Confirmed by a Lodestar Cross-Check ...................................................................5

             1.    The Fee Is Reasonable in Relation to the Settlement ..................................5

             2.    The Severe Risks of This Litigation Support the Requested Fee ...............8

             3.    The Magnitude and Complexity of the Litigation Support the Fee ..........13

             4.    The Quality of Representation Supports the Requested Fee ....................14

             5.    Important Public Policies Support the Requested Fee ...........................15

             6.    The Time and Labor Expended by Counsel – As Demonstrated by
                   the Lodestar Cross-Check – Supports the Requested Fee ........................16

             7.    The Reaction of the Class Supports the Requested Fee ..........................21

V.     THE COURT SHOULD APPROVE REIMBURSEMENT OF COUNSEL'S
       REASONABLE EXPENSES FROM THE SETTLEMENT FUND .............................22

VI.    THE COURT SHOULD APPROVE REIMBURSEMENT OF PLAINTIFFS'
       EXPENSES .....................................................................................................23

VII.   CONCLUSION ................................................................................................24

# **TABLE OF AUTHORITIES**

<u>CASES</u>

*Adelphia Commc'ns Corp. Sec. & Deriv. Litig.*,
   No. 03 MDL 1529 (LMM), 2006 WL 3378705 (S.D.N.Y. Nov. 16, 2006) ........................... 15

*Alaska Electrical Pension Fund v. Bank of America Corp.*,
   No. 14-CV-7126 (JMF), 2018 WL 6250657 (S.D.N.Y. Nov. 29, 2018) .................................. 6

*Allapattah Servs., Inc. v. Exxon Corp.*,
   454 F. Supp. 2d 1185 (S.D. Fla. 2006) ..................................................................................... 7

*Anixter v. Home-Stake Prod. Co.*,
   77 F.3d 1215 (10th Cir. 1996) ............................................................................................... 12

*Bd. of Trustees of the AFTRA Ret. Fund v. JPMorgan Chase Bank, N.A.*,
   2012 WL 2064907 (S.D.N.Y. June 7, 2012) .......................................................................... 18

*Boeing Co. v. Van Gemert*,
   444 U.S. 472 (1980) .................................................................................................................. 3

*Carlson v. Xerox Corp.*,
   355 F. App'x. 523 (2d Cir. 2009) ........................................................................................... 21

*Christine Asia Co., Ltd. v. Alibaba Grp. Holding Ltd.*,
   192 F. Supp. 3d 456 (S.D.N.Y. 2016) .................................................................................... 10

*City of Detroit v. Grinnell Corp.*,
   495 F.2d 448 (2d Cir. 1974) ..................................................................................................... 9

*City of Providence v. Aeropostale, Inc.*,
   No. 11 Civ. 7132 (CM), 2014 WL 1883494 (S.D.N.Y. May 9, 2014) .............................. 16, 22

*Fishoff v. Coty Inc.*,
   No. 09 Civ. 628 (SAS), 2010 WL 305358 (S.D.N.Y. Jan. 25, 2010) ................................. 10, 11

*Flag Telecom Holdings, Ltd. Sec. Litig.*,
   No. 02-CV-3400 (CM), 2010 WL 4537550 (S.D.N.Y. Nov. 8, 2010) ................... 9, 16, 22, 23

*Glickenhaus & Co. v. Household Int'l, Inc.*,
   787 F.3d 408 (7th Cir. 2015) ................................................................................................. 12

*Goldberger v. Integrated Res., Inc.*,
   209 F.3d 43 (2d Cir. 2000) ............................................................................................. *passim*

*Hicks v. Morgan Stanley & Co.*,
   No. 01 Civ. 10071 (RJH), 2005 WL 2757792 (S.D.N.Y. Oct. 24, 2005)...................................3

*In re AOL Time Warner, Inc. Sec. & "ERISA" Litig.*,
   MDL 1500, No. 02 Civ. 5575 (SWK), 2006 WL 903236 (S.D.N.Y. Apr. 6, 2006) ...............13

*In re AOL Time Warner, Inc. Sec. Litig.*,
   2006 WL 3057232 (S.D.N.Y. Oct. 25, 2006) ........................................................................18

*In re Bank of Am. Corp. Sec., Deriv., & ERISA Litig.*,
   772 F.3d 125 (2d Cir. 2014)...................................................................................................23

*In re BankAtlantic Bancorp, Inc.*,
   No. 07-61542-CIV, 2011 WL 1585605 (S.D. Fla. Apr. 25, 2011)..........................................12

*In re Beacon Assocs. Litig.*,
   No. 09 Civ. 3907 (CM), 2013 WL 2450960 (S.D.N.Y. May 9, 2013).....................................6

*In re Cardinal Health Inc. Sec. Litig.*,
   528 F. Supp. 2d 752 (S.D. Ohio 2007) ..................................................................................16

*In re Cendant Corp. Litig.*,
   264 F.3d 201 (3d Cir. 2001)....................................................................................................8

*In re China Sunergy Sec. Litig.*,
   No. 07 Civ. 7895 (DAB), 2011 WL 1899715 (S.D.N.Y. 2011) .........................................8, 22

*In re Colgate-Palmolive Co. ERISA Litig.*,
   36 F. Supp. 3d 344 (S.D.N.Y. 2014)......................................................................................18

*In re Credit Default Swaps Antitrust Litig.*,
   No. 13 md 2476 (DLC), 2016 WL 2731524 (S.D.N.Y. Apr. 26, 2016)..................................17

*In re Deutsche Telekom AG Sec. Litig.*,
   No. 00 Civ. 9475 (NRB), 2005 WL 7984326 (S.D.N.Y. June 9, 2005)..................................18

*In re EVCI Career Colls. Holding Corp. Sec. Litig.*,
   No. 05 Civ. 10240 (CM), 2007 WL 2230177 (S.D.N.Y. July 27, 2007).......................4, 5, 18

*In re Global Crossing Sec. & ERISA Litig.*,
   225 F.R.D. 436 (S.D.N.Y. 2004) ......................................................................................8, 9, 14

*In re Hi-Crush Partners L.P. Sec. Litig.*,
   No. 12 Civ. 8557 (CM), 2014 WL 7323417 (S.D.N.Y. Dec. 19, 2014)............................21, 23

*In re Ikon Office Solns., Inc. Sec. Litig.*,
   194 F.R.D. 166 (E.D. Pa. 2000) ........................................................................ 13

*In re Initial Public Offering Sec. Litig.*,
   671 F. Supp. 2d 467 (S.D.N.Y. 2009) ............................................................... 6

*In re Lloyd's Am. Trust Fund Litig.*,
   No. 96 Civ. 1262 (RWS), 2002 WL 31663577 (S.D.N.Y. Nov. 26, 2002) ............... 4

*In re Marsh & McLennan Cos. Sec. Litig.*,
   No. 04 Civ. 8144 (CM), 2009 WL 5178546 (S.D.N.Y. Dec. 23, 2009) ............... *passim*

*In re NASDAQ Market-Makers Antitrust Litig.*,
   187 F.R.D. 465 (S.D.N.Y. 1998) .................................................................... 18

*In re Oxford Health Plans, Inc. Sec. Litig.*,
   2003 U.S. Dist. LEXIS 26795 (S.D.N.Y. June 12, 2003) ................................ 6

*In re Sumitomo Copper Litig.*,
   74 F. Supp. 2d 393 (S.D.N.Y. 1999) ............................................................... 18

*In re Telik, Inc. Sec. Litig.*,
   576 F. Supp. 2d 570 (S.D.N.Y. 2008) ............................................................ 21

*In re Union Carbide Corp. Consumer Prods. Bus. Sec. Litig.*,
   724 F. Supp. 160 (S.D.N.Y. 1989) ................................................................. 17

*In re Veeco Instruments Inc. Sec. Litig.*,
   No. 05 MDL 01695 (CM), 2007 WL 4115808 (S.D.N.Y. Nov. 7, 2007) ......... 3, 15, 23

*In re WorldCom, Inc. Sec. Litig.*,
   388 F. Supp. 2d 319 (S.D.N.Y. 2005) ............................................................ 18

*In re Xcel Energy, Inc., Sec., Deriv. & "ERISA" Litig.*,
   364 F. Supp. 2d 980 (D. Minn. 2005) ........................................................... 2, 10

*La. Mun. Police Emps. Ret. Sys. v. Sealed Air Corp.*,
   No. 03-CV-4372 (DMC), 2009 WL 4730185 (D.N.J. Dec. 4, 2009) ............... 13

*LeBlanc-Sternberg v. Fletcher*,
   143 F.3d 748 (2d Cir. 1998) ......................................................................... 17

*McDaniel v. Cty. of Schenectady*,
   595 F.3d 411 (2d Cir. 2010) ......................................................................... 4

*Mills v. Elec. Auto-Lite Co.*,
  396 U.S. 375 (1970) ........................................................................................... 3

*Munoz v. China Expert Tech., Inc.*,
  No. 07 Civ. 10531(AKH), 2011 WL 5346323 (S.D.N.Y. Nov. 7, 2011) ................................ 14

*Ressler v. Jacobson*,
  149 F.R.D. 651 (M.D. Fla. 1992) ........................................................................... 21

*Robbins v. Koger Props., Inc.*,
  116 F.3d 1441 (11th Cir. 1997) ............................................................................ 12

*Roberts v. Texaco, Inc.*,
  979 F. Supp. 185 (S.D.N.Y. 1997) ......................................................................... 18

*Rose v. Deer Consumer Prods., Inc.*,
  No. 11-CV-03701 DMG, 2011 WL 6951969 (C.D. Cal. Dec. 29, 2011) ................................. 14

*Maley v. Del Glob. Techs. Corp.*,
  186 F. Supp. 2d 358 (S.D.N.Y. 2002) ....................................................................... 3

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
  551 U.S. 308 (2007) ......................................................................................... 15

*Velez v. Novartis Pharm. Corp.*,
  No. 04 Civ. 09194 (CM), 2010 WL 4877852 (S.D.N.Y. Nov. 30, 2010) ................................. 6

*Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*,
  396 F.3d 96 (2d Cir. 2005) ...................................................................... 4, 5, 16, 17

*Woburn Ret. Sys. v. Salix Pharm., Ltd.*,
  No. 14 Civ. 8925 (KMW), 2017 WL 3579892 (S.D.N.Y. 2017) ......................................... 18

<u>STATUTES</u>

15 U.S.C. § 78u-4(a)(4) ......................................................................................... 23

15 U.S.C. § 78u-4(a)(6) .......................................................................................... 5

## I.      INTRODUCTION

Court-appointed Lead Counsel The Rosen Law Firm, P.A., on behalf of all Plaintiffs' Counsel, respectfully submits this memorandum of law in support of its request for attorneys' fees of 25% of the Settlement Fund (or $62,500,000, plus interest at the same rate as the Settlement Fund).[1]   Lead Counsel also seeks reimbursement of $3,937,803.35 of out-of-pocket expenses advanced by counsel, as well as $12,500 for each of the five representative Plaintiffs, as authorized by the Private Securities Litigation Reform Act of 1995 (the "PSLRA").

The Settlement of this action for $250 million in cash is an outstanding result for the Class.   That amount is approximately 17%-20% of maximum recoverable damages – a tremendous result compared to the 1%-2% median for securities class actions of similar magnitude.   ¶¶9, 137-139.   If approved by the Court, this Settlement would rank among the 70 largest securities class action settlements since the passage of the PSLRA and would be the *largest ever* against a Chinese company.   ¶8.   The recovery is all the more remarkable given that it is being paid in full by Alibaba, not by insurance.   ¶136 (Form 6-K, April 29, 2019).

That exceptional result did not come easily or quickly.   Plaintiffs' Counsel dedicated in excess of 56,500 hours over more than four years to this litigation, spending months in Hong Kong, and advancing nearly $4 million in out-of-pocket expenses on a fully contingent basis. They reviewed and analyzed more than 1.1 million pages of documents, including more than 100,000 pages in Mandarin Chinese.   They took or defended 29 fact and 6 expert depositions, including more than 20 multi-day overseas depositions in which the witness testified in

---

[1] Unless otherwise noted, capitalized terms have the meanings set forth in the Stipulation and Agreement of Settlement dated April 26, 2019 (Dkt. No. 123-1), or in the concurrently-filed Declaration of Laurence M. Rosen ("Rosen Decl."). Citations to "¶__" or "Ex. __" in this memorandum refer to paragraphs in, or exhibits to, the Rosen Declaration. Unless otherwise indicated, all emphasis is added and all internal quotation marks and citations are omitted.

Mandarin Chinese.  Very few law firms, or groups of law firms, are willing or able to dedicate such resources or risk such large sums.

This action, moreover, was fraught with risk.  "The court needs to look no further than its own order dismissing the . . . litigation to assess the risks involved."  *In re Xcel Energy, Inc., Sec., Deriv. & "ERISA" Litig.*, 364 F. Supp. 2d 980, 1003 (D. Minn. 2005).  Even after Plaintiffs overcame that significant early hurdle, substantial risks remained because Plaintiffs then bore the burden of ***proving*** their allegations at trial.  The Chinese focus of this dispute only magnified those challenges.  Plaintiffs' Counsel had to gain a thorough understanding of complicated areas of Chinese administrative law, Chinese intellectual property and consumer protection law, Chinese politics and the Chinese business environment, e-commerce and counterfeiting in China, and due diligence standards for public stock offerings of Chinese companies.  Lead Counsel knew from the outset that this would be an extremely costly and complicated action against a well-financed corporate defendant represented by some of the best defense counsel in the world.

An award of 25% of the Settlement Fund properly reflects the many risks that Plaintiffs' Counsel faced, the work done over more than four years, and the excellent result achieved in this hard-fought and difficult litigation.  It is well within the range for comparable actions and amounts to a modest lodestar multiplier of only 2.15.  Lead Counsel's motion should be granted.

## II.    HISTORY OF THE LITIGATION

The Rosen Declaration is an integral part of this submission and, for the sake of brevity, the Court is respectfully referred to it for a discussion of the background of the action (¶¶15-20); procedural history (¶¶21-50); a summary of the work performed by Plaintiffs' Counsel (¶11(a)-(z)), including a detailed discussion of discovery (¶¶51-99); and additional information on the factors that support the fee request (¶¶161-199), including the lodestar cross-check (¶¶191-199).

## III.   PLAINTIFFS' COUNSEL ARE ENTITLED TO AN AWARD OF ATTORNEYS' FEES FROM THE $250 MILLION SETTLEMENT FUND

The Supreme Court and the Second Circuit have long recognized that attorneys whose efforts create a "common fund" are entitled to a reasonable attorneys' fee from that fund.  *See Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980); *Goldberger v. Integrated Res., Inc.*, 209 F.3d 43, 47 (2d Cir. 2000).  "The rationale for the doctrine is an equitable one: it prevents unjust enrichment of those benefitting from a lawsuit without contributing to its cost."  *Goldberger*, 209 F.3d at 47; *see also In re Veeco Instruments Inc. Sec. Litig.*, No. 05 MDL 01695 (CM), 2007 WL 4115808, at *2 (S.D.N.Y. Nov. 7, 2007).  Awarding reasonable attorneys' fees from a common fund also serves an important policy goal:  It encourages "skilled counsel to represent those who seek redress for damages inflicted on entire classes of persons," and thus discourages "future misconduct of a similar nature."  *Veeco*, 2007 WL 4115808, at *2; *see also Hicks v. Morgan Stanley & Co.*, No. 01 Civ. 10071 (RJH), 2005 WL 2757792, at *9 (S.D.N.Y. Oct. 24, 2005).

For the common fund doctrine to apply, "the applicant's efforts must confer a 'substantial benefit on the members of an ascertainable class.'"  *Maley v. Del Glob. Techs. Corp.*, 186 F. Supp. 2d 358, 369 (S.D.N.Y. 2002) (quoting *Mills v. Elec. Auto-Lite Co.*, 396 U.S. 375, 393-94 (1970)).  "'[W]here the court's jurisdiction over the subject matter of the suit makes possible an award that will operate to spread costs proportionately among [the class],' an award of attorneys' fees must operate to shift the costs of litigation to that group."  *Id.*

All those elements are present here.  Lead Counsel's efforts have conferred a substantial benefit – $250 million in cash – on an ascertainable class.  And a fee award from the common fund will equitably shift the costs of litigation to the group benefitting from the Settlement, *i.e.*, the Class.  Accordingly, the Court should award attorneys' fees from the Settlement Fund.

IV.    **A FEE AWARD OF 25% OF THE SETTLEMENT FUND IS FAIR AND REASONABLE IN THIS CASE**

A.    **The Court Should Apply the Percentage-of-Recovery Approach**

The Second Circuit permits courts to award attorneys' fees in common fund cases under either of two methods, the "percentage of the fund" method or the "lodestar" method.  *McDaniel v. Cty. of Schenectady*, 595 F.3d 411, 417 (2d Cir. 2010).  While courts have the discretion to choose whichever method is appropriate to the circumstances of a case, the "trend in this Circuit is toward the percentage method," with the lodestar serving only as a "cross-check" on the resulting fee.  *Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 121, 123 (2d Cir. 2005).  Under either approach, the court should consider various factors in assessing the reasonableness of a fee, including: (1) the amount of the requested fee in relation to the settlement; (2) the risks of the litigation; (3) the magnitude and complexities of the litigation; (4) the quality of representation; (5) public policy considerations; and (6) the time and labor expended by counsel.  *Goldberger*, 209 F.3d at 50.

Lead Counsel respectfully submits that the Court should apply the "percentage of the fund" method in this case, evaluating the reasonableness of the fee primarily in relation to the Settlement Amount while using the lodestar only as a cross-check.  The percentage-of-recovery approach "directly aligns the interests of the class and its counsel and provides a powerful incentive for the efficient prosecution and early resolution of litigation."  *Wal-Mart*, 396 F.3d at 121; *see also In re EVCI Career Colls. Holding Corp. Sec. Litig.*, No. 05 Civ. 10240 (CM), 2007 WL 2230177, at *16 (S.D.N.Y. July 27, 2007).  It is also "the most efficient means of rewarding the work of class action attorneys, and avoids the wasteful and burdensome process – to both counsel and the courts – of preparing and evaluating fee petitions."  *In re Lloyd's Am. Trust Fund Litig.*, 96 Civ. 1262 (RWS), 2002 WL 31663577, at *25 (S.D.N.Y. Nov. 26, 2002); *see*

*also EVCI*, 2007 WL 2230177, at \*16 (percentage method "does not waste judicial resources analyzing thousands of hours of work, where counsel obtained a superior result").  The lodestar method, by contrast, "create[s] an unanticipated disincentive to early settlements, tempt[s] lawyers to run up their hours, and compel[s] district courts to engage in a gimlet-eyed review of line-item fee audits."  *Wal-Mart*, 396 F.3d at 121.[2]

Lead Counsel thus respectfully submits that the Court should consider the reasonableness of the fee primarily as a percentage of the amount recovered, while considering the lodestar only as a cross-check in conjunction with the remaining *Goldberger* factors.

### B.      The Requested 25% Fee Is Reasonable Under the *Goldberger* Factors, as Confirmed by a Lodestar Cross-Check

The requested fee is plainly reasonable under the percentage-of-recovery approach. Indeed, it is well within the norm for similar settlements, and application of the remaining *Goldberger* factors confirms its reasonableness.

#### 1.      The Fee Is Reasonable in Relation to the Settlement

Where a court awards fees based on the percentage-of-recovery method, the key *Goldberger* factor is, of course, "the [amount of the] requested fee in relation to the settlement." 209 F.3d at 50.  "When determining whether a fee request is reasonable in relation to a settlement amount, 'the court compares the fee application to fees awarded in similar securities class-action settlements of comparable value.'"  *In re Comverse Tech., Inc., Sec. Litig.*, No. 06-CV-1825 (NGG), 2010 WL 2653354, at \*3 (E.D.N.Y. June 24, 2010).  That factor strongly favors the 25% fee request in this case.

---

[2] The percentage method also comports with the PSLRA, which states that "[t]otal attorneys' fees and expenses awarded by the court to counsel for the plaintiff class shall not exceed a reasonable percentage of the amount of any damages and prejudgment interest actually paid to the class."  15 U.S.C. § 78u-4(a)(6); *see also EVCI*, 2007 WL 2230177, at \*16 (noting that "the PSLRA implicitly supports the use of the percentage of the fund method").

Courts in this district regularly award fees in the range of 25% to 33% in securities and other complex litigation settlements of comparable size. *See, e.g.*, *In re Pfizer Inc. Sec. Litig.*, No. 04-cv-09866 (LTS), Dkt. No. 727 at 2 (S.D.N.Y. Dec. 21, 2016) (Swain, J.) (awarding 28% of $486 million) (Ex. 19); *In re Initial Public Offering Sec. Litig.*, 671 F. Supp. 2d 467, 516 (S.D.N.Y. 2009) (Scheindlin, J.) (awarding 33⅓% of $510 million); *In re Oxford Health Plans, Inc. Sec. Litig.*, 2003 U.S. Dist. LEXIS 26795, at *13 (S.D.N.Y. June 12, 2003) (Brieant, J.) (awarding 28% of $300 million) (Ex. 20); *Anwar v. Fairfield Greenwich Ltd.*, No. 1:09-cv-00118 (S.D.N.Y.) (Marrero, J.) (awarding 28.8% of $235.25 million) (Ex. 21);[3] *Alaska Electrical Pension Fund v. Bank of America Corp.*, No. 14-CV-7126 (JMF), 2018 WL 6250657 (S.D.N.Y. Nov. 29, 2018) (Furman, J.) (awarding 26% of $486 million). This Court itself has recognized that "[d]istrict courts in the Second Circuit routinely award attorneys' fees that are 30 percent or greater." *Velez v. Novartis Pharm. Corp.*, No. 04 Civ. 09194 (CM), 2010 WL 4877852, at *21 (S.D.N.Y. Nov. 30, 2010) (collecting authorities while awarding 25% of $152.5 million in that particular case); *see also In re Beacon Assocs. Litig.*, No. 09 Civ. 3907 (CM), 2013 WL 2450960, at *5 (S.D.N.Y. May 9, 2013) ("In this Circuit, courts routinely award attorneys' fees that run to 30% and even a little more of the amount of the common fund.").[4]

Professor Geoffrey Miller has performed a comprehensive empirical study of class action attorneys' fee awards. Theodore Eisenberg, Geoffrey Miller & Roy Germano, *Attorneys' Fees in*

---

[3] Four separate fee orders were entered in *Anwar* on March 28, 2013, November 22, 2013, November 20, 2015 and May 6, 2016 (Dkt. Nos. 1099, 1233, 1457, 1569) (Ex. 21).

[4] These amounts comport with fee awards in similarly-sized settlements from other courts in the Second Circuit and around the country. *See, e.g.*, *In re U.S. Foodservice, Inc. Pricing Litig.*, No. 07-md-1894, Dkt. No. 521 ¶13 (D. Conn. Dec. 9, 2014) (awarding 33.33% of $297 million) (Ex. 22); *Comverse*, 2010 WL 2653354, at *6 (awarding 25% of $225 million); *In re Tricor Direct Purchaser Antitrust Litig.*, No. 05-cv-00340, Dkt. No. 543 ¶11 (D. Del. Apr. 23, 2009) (awarding one-third of $250 million) (Ex. 23); *In re Williams Sec. Litig.*, No. 02-cv-072-SPF-FHM, Dkt. No. 1638 ¶2 (N.D. Okla. Feb. 12, 2007) (awarding 25% of $311 million) (Ex. 26).

*Class Actions: 2009-2013*, 92 N.Y.U. L. Rev. 937 (2017).  Professor Miller's study found that "the mean fee percentage award was 27%."  *Id.* at 947.  For 116 settlements from the Second Circuit, the mean fee was 28% and the median fee was 30%.  *Id.* at 951 tbl.3.  For the 78 settlements from this District, the mean fee was 27% and the median fee was 31%.  *Id.* at 950, tbl.2.  Based on his thorough research, Professor Miller concludes that the "25% fee requested in this case is in line with these mean and median figures."  Ex. 4 (Miller Decl. ¶¶41-42).

Moreover, Professor Miller has reanalyzed the data from his earlier study and found that the average percentage fee award for cases in the $200-$300 million range is 24.6%.  *Id.* ¶43.  "The 25% fee sought in the present case is nearly spot-on with this number." *Id.*

Professor Charles Silver, another leading expert on fee awards in class action settlements, confirms that the 25% request here is well within the norm.  Ex. 3 (Silver Report ¶¶22-55).  Professor Silver finds that, in risky high-stakes cases, sophisticated business clients normally pay contingent fees in the range of 25%-40%.  *Id.* ¶¶22-42.  Professor Silver also catalogs "more than 80 cases with recoveries of at least $100 million and fee awards of at least 25 percent."  *Id.* ¶52 & tbl.2.  In some cases, courts approved awards as high as 40%.  *See id.*

Other authorities confirm that the requested 25% fee is less than market rates for negotiated agreements, which typically call for fees of 30% to 40%.  *See* Herbert M. Kritzer, *Seven Dogged Myths Concerning Contingency Fees*, 80 Wash. U.L.Q. 739, 760 (2002) (discussing RAND study finding rates of 33% over half the time, less than 33% about a quarter of the time, and more than 33% in the remainder); *Allapattah Servs., Inc. v. Exxon Corp.*, 454 F. Supp. 2d 1185, 1212 (S.D. Fla. 2006) ("Substantial empirical evidence indicates that a one-third fee is a common benchmark in private contingency fee cases.").  As Professor Silver explains, even large federal agencies, which typically demand below-market rates for fiscal and political

reasons, have agreed to contingency fees of 25% when hiring private counsel in multibillion-dollar cases. Ex. 3 (Silver Report ¶34, describing National Credit Union Administration's payment of $1.2 billion in attorneys' fees, roughly 25%, on $5.1 billion recovery).

Finally, the requested 25% fee is less than the pre-litigation fee agreement between Lead Plaintiff and Lead Counsel, which authorized counsel to seek up to 33.3%. ¶188. While this Court need not adhere to that agreement, courts apply a presumption of reasonableness where a fee request is consistent with an *ex ante* agreement. *See In re Marsh & McLennan Cos. Sec. Litig.*, No. 04 Civ. 8144 (CM), 2009 WL 5178546, at *15 (S.D.N.Y. Dec. 23, 2009) ("Since the passage of the PSLRA, courts have found such an agreement between fully informed lead plaintiffs and their counsel to be presumptively reasonable.").[5] The *Goldberger* factors seek to identify "what fees common fund plaintiffs in an efficient market for legal services would agree to." 209 F.3d at 52. That the lead plaintiff, a sophisticated businessman and investor, negotiated an agreement to pay a 33.3% fee is relevant to that inquiry and supports the reasonableness of Lead Counsel's request for a 25% fee in this case. *See Global Crossing*, 225 F.R.D. at 466; *Comverse*, 2010 WL 2653354, at *4.

### 2. The Severe Risks of This Litigation Support the Requested Fee

The requested fee is also reasonable because Plaintiffs' Counsel obtained an outstanding result in the face of substantial risks. "[T]he risk of success [is] 'perhaps the foremost' factor to be considered" in determining a reasonable fee. *Goldberger*, 209 F.3d at 54. "No one expects a lawyer whose compensation is contingent upon his success to charge, when successful, as little

---

[5] *See also In re Global Crossing Sec. & ERISA Litig.*, 225 F.R.D. 436, 466 (S.D.N.Y. 2004) ("[I]n class action cases under the PSLRA, courts presume fee requests submitted pursuant to a retainer agreement negotiated at arm's length between lead plaintiff and lead counsel are reasonable."); *Comverse*, 2010 WL 2653354, at *4; *In re China Sunergy Sec. Litig.*, No. 07 Civ. 7895 (DAB), 2011 WL 1899715, at *6 (S.D.N.Y. 2011); *In re Cendant Corp. Litig.*, 264 F.3d 201, 282 (3d Cir. 2001).

as he would charge a client who in advance had agreed to pay for his services, regardless of success." *City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 470 (2d Cir. 1974).  In applying this factor, "'litigation risk must be measured as of when the case is filed,' rather than with the hindsight benefit of subsequent events." *Global Crossing*, 225 F.R.D. at 467 (quoting *Goldberger*, 209 F.3d at 55).  The many severe risks that Plaintiffs' Counsel faced in prosecuting this suit more than justify the requested 25% fee.  *See, e.g.*, ¶¶131-132, 174-181, 183.

Numerous courts have recognized that "class actions confront even more substantial risks than other forms of litigation." *Comverse*, 2010 WL 2653354, at *5.  Securities class actions in particular are "notably difficult and notoriously uncertain." *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, No. 02-CV-3400 (CM), 2010 WL 4537550, at *27 (S.D.N.Y. Nov. 8, 2010).  This case was no exception.  From the outset, Plaintiffs' Counsel understood they were embarking on a complex, expensive, and likely lengthy litigation with no guarantee of ever being compensated for the substantial investment of time and money the case would require.  In undertaking that responsibility, counsel ensured that sufficient resources were dedicated to the action and that funds were available to compensate staff and to cover the considerable expenses the case would require.  With an average lag time of several years for a case like this to conclude, the financial burdens on Plaintiffs' Counsel were far greater than those for a firm paid on an ongoing basis, as defense counsel were.  *See Flag Telecom*, 2010 WL 4537550, at *27.  Plaintiffs' Counsel received no compensation for more than four years of litigation and advanced nearly $4 million in expenses that might never have been recovered.  ¶¶192-193 (lodestar); ¶¶200-201 (expenses).

The risks in this case were particularly acute.  Plaintiffs faced substantial obstacles proving key elements of liability such as materiality and scienter.  ¶¶115-125.  This Court's prior decision on the motion to dismiss demonstrates as much:  The Court dismissed the case with

prejudice on the ground that Plaintiffs had not sufficiently alleged those elements. *See Christine Asia Co., Ltd. v. Alibaba Grp. Holding Ltd.*, 192 F. Supp. 3d 456, 479, 482 (S.D.N.Y. 2016); *Xcel Energy*, 364 F. Supp. 2d at 1003 (dismissal indicative of risk that supported fee request).

Even after Plaintiffs prevailed on appeal, Defendants continued to press those same defenses. For example, Defendants have strenuously argued that the failure to disclose the July 2014 meeting was immaterial, and they undoubtedly would have renewed that argument at summary judgment, urging that the evidence that emerged in discovery showed that – contrary to the Complaint's allegations – Alibaba faced neither a serious prospect of significant fines nor any meaningful impact on its revenues from compliance. ¶¶126-130. Defendants would have made similar arguments on scienter, an element commonly regarded as the most difficult to prove in a securities fraud action. *See, e.g.*, *Fishoff v. Coty Inc.*, No. 09 Civ. 628 (SAS), 2010 WL 305358, at *2 (S.D.N.Y. Jan. 25, 2010), *aff'd*, 634 F.3d 647 (2d Cir. 2011). Even if Plaintiffs survived summary judgment, there would have been grave risks at trial, where Plaintiffs' Counsel would have had to prove their case to the jury based on details of Chinese administrative law established largely through witnesses testifying in Mandarin Chinese. ¶¶131, 169. If Defendants prevailed at either stage, Plaintiffs would have recovered nothing.

Even if they established liability, Plaintiffs faced significant risks on damages. The Complaint alleged losses from two corrective disclosures: the January 28, 2015 price drop immediately following publication of the White Paper, and a second drop on January 29 following Alibaba's disappointing earnings announcement. The Complaint alleged that the disappointing earnings were themselves the result of Alibaba's compliance with the SAIC's demands at the concealed July 2014 meeting. Dkt. No. 6, at ¶128, 143. Fact discovery and thorough analysis by Plaintiffs' damages expert, however, did not bear out that theory: Dr.

Tabak concluded that the evidence was insufficient to tie Alibaba's earnings shortfall to any remedial actions the company took in response to the SAIC guidance, and thus insufficient to connect the January 29 price decline to the alleged fraud.  ¶127.  Dr. Tabak therefore concluded that the only recoverable damages were those from the January 28, 2015 price decline, which he estimated at $1.46 billion.  ¶¶128, 137.  The $250 million Settlement Amount thus represents a recovery of approximately *17%* of Plaintiffs' maximum estimated damages.  ¶137.

Defendants, meanwhile, argued that the January 28 price decline was caused in whole or in part by other factors, such as the purportedly unusual method of disclosure in an unsanctioned "White Paper."  Accordingly, even if Plaintiffs established materiality and scienter, Defendants argued that Plaintiffs should recover zero damages or only a small fraction of what they sought.  ¶129.  Moreover, even if Plaintiffs succeeded in proving loss causation for the entire residual price decline on January 28, Defendants advocated different market and trading models resulting in maximum aggregate damages of only $1.23 billion.  ¶138.  Using that figure, the $250 million Settlement would constitute a recovery of *more than 20%* of maximum estimated damages.  *Id.*

That recovery is exceptional compared to other settlements in securities class actions alleging losses of a similar magnitude.  Recent studies by Cornerstone and NERA report that the median settlements in securities actions alleging multibillion-dollar losses is in the range of only *1.2% to 2.0%* of damages.  ¶9, Exs. 11-12.[6]  The recovery here is *ten times* that amount.

Even if Plaintiffs overcame all of those risks and prevailed at trial for the full amount of damages, they would still face the risk of an adverse decision on post-trial motions or reversal on

---

[6] Ex. 11 (Cornerstone Research, *Securities Class Action Settlements 2018 Review and Analysis* (2019), at p. 6 fig. 5 (reporting median recovery of 2.0% in cases alleging more than $1 billion in losses)); Ex. 12 (NERA Economic Consulting, *Recent Trends in Securities Class Action Litigation: 2018 Full-Year Review* (Jan. 29, 2019) ("NERA 2018 Report"), at p. 35 fig. 27 (reporting median recovery of 1.2% in cases alleging between $1 bn and $4.99 bn in damages)).

appeal.  *See, e.g.*, *Glickenhaus & Co. v. Household Int'l, Inc.*, 787 F.3d 408 (7th Cir. 2015) (reversing jury verdict awarding $2.46 billion on loss causation and damages grounds and remanding for a new trial).[7]  And even if Plaintiffs survived appeal, there would still be serious risks collecting the judgment:  China is not a party to any treaty with the United States on judgment recognition or enforcement, and at the time this case was filed, no Chinese court had ever enforced a U.S. civil court judgment.  *See* ¶¶134-135, 176.

Finally, Plaintiffs faced real political risks.  Much of the conduct giving rise to this dispute occurred in China, and the majority of the witnesses reside there.  Plaintiffs' ability to take depositions of Chinese nationals, even Alibaba employees, was not a foregone conclusion, particularly on the accelerated schedule the Court set.  Protests recently shut down Hong Kong's international airport, temporarily preventing travel to the location where most of the depositions occurred.[8]  Plaintiffs' ability to take even basic discovery was thus far from certain.

In sum, Plaintiffs faced substantial risks.  While Plaintiffs and their counsel believe that this case has merit and that they could have successfully navigated each risk presented, the risks remained.  If any of them materialized, the Class might have recovered far less than the proposed Settlement or nothing at all.  In the context of all those risks, the $250 million Settlement Amount is an excellent result for the Class, and Plaintiffs' Counsel's ability to obtain that result despite so many risks supports the reasonableness of the fee request.

---

[7] *See also Robbins v. Koger Props., Inc.*, 116 F.3d 1441 (11th Cir. 1997) (reversing $81 million jury verdict and directing entry or judgment for defendant); *In re BankAtlantic Bancorp, Inc.*, No. 07-61542-CIV, 2011 WL 1585605, at *20-22 (S.D. Fla. Apr. 25, 2011) (granting motion for judgment as a matter of law following jury verdict in plaintiffs' favor), *aff'd sub nom. Hubbard v. BankAtlantic Bancorp, Inc.*, 688 F.3d 713 (11th Cir. 2012); *Anixter v. Home-Stake Prod. Co.*, 77 F.3d 1215 (10th Cir. 1996) (reversing verdict for plaintiffs in case filed in 1973 and tried in 1988 on the basis of 1994 Supreme Court opinion).

[8] *See* Timothy McLaughlin & Anna Kam, *Protesters Shut Down Hong Kong Airport as China Warns of 'Terrorism,' Raising Fears of Military Crackdown*, Wash. Post, Aug. 12, 2019.

### 3.    The Magnitude and Complexity of the Litigation Support the Fee

The "magnitude and complexities of the litigation" confirm the reasonableness of the fee. *Goldberger*, 209 F.3d at 50.  Courts have repeatedly recognized the "notorious complexity" of securities class action litigation.  *In re AOL Time Warner, Inc. Sec. & "ERISA" Litig.*, MDL 1500, No. 02 Civ. 5575 (SWK), 2006 WL 903236, at *8 (S.D.N.Y. Apr. 6, 2006); *see also La. Mun. Police Emps. Ret. Sys. v. Sealed Air Corp.*, No. 03-CV-4372 (DMC), 2009 WL 4730185, at *8 (D.N.J. Dec. 4, 2009) (securities class actions "inherently complex").  Moreover, "securities actions have become more difficult from a plaintiff's perspective in the wake of the PSLRA" and other changes in the law.  *In re Ikon Office Solns., Inc. Sec. Litig.*, 194 F.R.D. 166, 194 (E.D. Pa. 2000); *see also AOL Time Warner*, 2006 WL 903236, at *9 ("[T]he legal requirements for recovery under the securities laws present considerable challenges, particularly with respect to loss causation and the calculation of damages.").

As explained above, this case raised a number of complex questions concerning liability and damages that required great skill and extensive efforts to litigate.  The complexities were especially acute given the case's international dimension, involving foreign defendants, foreign witnesses, and foreign-language documents and deposition testimony, in a dispute that turned in large part on foreign legal standards and the significance of actions by foreign regulators.  This was an incredibly complex matter – even by the standards of securities class actions.

The magnitude of this action was similarly unquestionable.  Plaintiffs' claims arose out of Alibaba's historic $25 billion IPO with well over $1 billion of damages on the line.  This was high-stakes, hard-fought, expensive, multi-year litigation that required considerable skill and resources to litigate.  The magnitude and complexity of the litigation support the requested fee.

### 4.    The Quality of Representation Supports the Requested Fee

Lead Counsel respectfully submits that the quality of representation the Class received is best evidenced by the quality of the result obtained.  *See, e.g.*, *Global Crossing*, 225 F.R.D. at 467 ("The quality of Securities Lead Counsel's representation is evidenced by the recovery obtained for the Securities Class . . . .").  The $250 million Settlement – the largest ever against a Chinese company – is an outstanding result for the Class in light of the serious risks of litigation, and represents approximately 17%-20% of the Class's estimated maximum recoverable damages, a figure ***ten times larger*** than the norm.  ¶¶9, 139, 183.  That result alone speaks volumes about the quality of the representation.

Few firms could have marshalled the expertise and resources to prosecute this action so successfully.  The Rosen Law Firm is one of the Nation's leading plaintiff-side securities firms, and it has also developed a special expertise in prosecuting securities class actions against China-based defendants.  ¶184; Ex. 5-A (Rosen Law Firm resume).  The firm has served as lead or co-lead counsel in approximately 60 such actions and obtained a recovery in at least 37 of them, with 13 still pending.  *Id.*  Securities fraud actions against Chinese companies involve unique challenges for all the reasons above, and few firms have the expertise and background necessary to prosecute this action so successfully – as this Court recognized when it appointed the Rosen Law Firm as Lead Counsel.[9]  The Rosen Law Firm also made judicious use of other counsel where appropriate, including by engaging experienced securities practitioners at Glancy Prongay & Murray to assist with the high demands of discovery, and appellate specialists at MoloLamken to successfully prosecute the appeal.  *See* Ex. 6-A (Glancy Prongay & Murray firm resume); Ex.

---

[9] *See, e.g.*, *Munoz v. China Expert Tech., Inc.*, No. 07 Civ. 10531(AKH), 2011 WL 5346323 (S.D.N.Y. Nov. 7, 2011) (Rosen Law Firm representing investor class in action concerning issues of Chinese state secrecy laws and discovery in China); *Rose v. Deer Consumer Prods., Inc.*, No. 11-CV-03701 DMG, 2011 WL 6951969 (C.D. Cal. Dec. 29, 2011) (Rosen Law Firm representing investor class in action concerning issues of service of process on PRC defendants).

7-A (MoloLamken firm resume).  The combined expertise of Plaintiffs' Counsel provided the leverage necessary to negotiate the favorable Settlement.

The quality of the opposition faced by Plaintiffs' Counsel should also be taken into account. *See, e.g.*, *Veeco*, 2007 WL 4115808, at *7 (30% fee award supported by fact that defendants were represented by "one of the country's largest law firms"); *In re Adelphia Commc'ns Corp. Sec. & Deriv. Litig.*, No. 03 MDL 1529 (LMM), 2006 WL 3378705, at *3 (S.D.N.Y. Nov. 16, 2006) ("The fact that the settlements were obtained from defendants represented by 'formidable opposing counsel from some of the best defense firms in the country' also evidences the high quality of lead counsels' work."), *aff'd*, 272 F. App'x 9 (2d Cir. 2008). Alibaba was vigorously represented by Simpson, Thacher & Bartlett LLP, one of the country's most capable and renowned law firms.  Despite that formidable opposition, Plaintiffs' Counsel vigorously and capably prosecuted this difficult action to achieve the favorable Settlement.  The quality of that representation supports the requested fee.

### 5.    Important Public Policies Support the Requested Fee

"[P]ublic policy considerations" point the same way.  *Goldberger*, 209 F.3d at 50.  "[The Supreme] Court has long recognized that meritorious private actions to enforce federal antifraud securities laws are an essential supplement to criminal prosecutions and civil enforcement actions brought, respectively, by the Department of Justice and the Securities and Exchange Commission."  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007).  The public policies underlying that federal regime are especially compelling in this case.

Alibaba's $25 billion IPO was – and remains – the largest IPO in history.  ¶16.  Alibaba conducted its IPO on the New York Stock Exchange precisely to take advantage of this country's unrivaled resources for raising capital.  The integrity of the IPO process depends critically on enforcement of this nation's longstanding securities laws.  If the "important public policy [of

enforcing the securities laws] is to be carried out, the courts should award fees which will adequately compensate Lead Counsel for the value of their efforts, taking into account the enormous risks they undertook." *Flag Telecom*, 2010 WL 4537550, at *29.  "Lawsuits such as this one can only be maintained if competent counsel can be retained to prosecute them.  This will occur if courts award reasonable and adequate compensation for such services where successful results are achieved."  *City of Providence v. Aeropostale, Inc.*, No. 11 Civ. 7132 (CM), 2014 WL 1883494, at *18 (S.D.N.Y. May 9, 2014), *aff'd sub nom. Arbuthnot v. Pierson*, 607 F. App'x 73 (2d Cir. 2015).

Lead Counsel assembled a talented team of class action attorneys with specific expertise in Chinese companies, complex securities litigation, and high-stakes appeals.  The requested award will ensure that future securities class actions attract similar counsel.

### 6. The Time and Labor Expended by Counsel – As Demonstrated by the Lodestar Cross-Check – Supports the Requested Fee

The "time and labor expended by counsel" confirms the reasonableness of the fee. *Goldberger*, 209 F.3d at 50.  Courts assess attorney time and labor using a "lodestar" that multiplies the hours reasonably expended by reasonable hourly rates.  *Wal-Mart*, 396 F.3d at 121.  Courts can then apply "a multiplier based on factors such as the riskiness of the litigation and the quality of the attorneys."  *Id.*  "Under the lodestar method, a positive multiplier is typically applied to the lodestar in recognition of the risk of the litigation, the complexity of the issues, the contingent nature of the engagement, the skill of the attorneys, and other factors."  *Marsh*, 2009 WL 5178546, at *20.[10]  As discussed above, where a court relies on the "percentage

---

[10] *See also Comverse*, 2010 WL 2653354, at *5 ("Where . . . counsel has litigated a complex case under a contingency fee arrangement, they are entitled to a fee in excess of the lodestar."); *In re Cardinal Health Inc. Sec. Litig.*, 528 F. Supp. 2d 752, 761 (S.D. Ohio 2007) ("[T]he Court rewards . . . lead counsel that takes on more risk, demonstrates superior quality, or achieves a greater settlement with a larger lodestar multiplier.").

of recovery" method, it normally uses the lodestar only as a "cross-check" on the reasonableness of the percentage.  *See Wal-Mart*, 396 F.3d at 123; *Goldberger*, 209 F.3d at 50.  "Where the lodestar is used as a cross-check, the hours documented by counsel need not be exhaustively scrutinized by the district court."  *Marsh*, 2009 WL 5178546, at *16.  "Instead, the reasonableness of the claimed lodestar can be tested by the court's familiarity with the case." *Goldberger*, 209 F.3d at 50.

The lodestar method amply confirms the reasonableness of the 25% fee request here. Plaintiffs' Counsel collectively devoted a total of over 56,600 hours to the prosecution of this action, resulting in a lodestar of $29,034,668.20.  ¶¶192-194.[11]  The requested 25% fee of $62,500,000 thus corresponds to a lodestar multiplier of approximately 2.15.  *Id*.

A 2.15 multiplier is well within the range commonly awarded in securities class actions and other complex litigation of similar magnitude.  *See Wal-Mart*, 396 F.3d at 123 & n.27 (upholding multiplier of 3.5 on lodestar of $62.9 million in antitrust class action); *In re Credit Default Swaps Antitrust Litig.*, No. 13 md 2476 (DLC), 2016 WL 2731524, at *17 (S.D.N.Y. Apr. 26, 2016) (Cote, J.) (approving $253.8 million fee based on multiplier of "just over 6" in a

---

[11] Plaintiffs' Counsel's rates range from $775 to $1,350 for partners, $395 to $750 for associates, and $375 to $450 for project attorneys.  ¶196.  The blended hourly rate for all attorney time in the action is $513.61 per hour.  *Id*.  Plaintiffs' Counsel calculated their lodestar using 2019 hourly rates.  Courts use current rates in the lodestar calculation to "compensate for the delay in receiving compensation, inflationary losses, and the loss of interest."  *In re Union Carbide Corp. Consumer Prods. Bus. Sec. Litig.*, 724 F. Supp. 160, 163 (S.D.N.Y. 1989); *see also LeBlanc-Sternberg v. Fletcher*, 143 F.3d 748, 764 (2d Cir. 1998) ("[C]urrent rates, rather than historical rates, should be applied in order to compensate for the delay in payment.").

The hourly rates here are within the range of reasonable fees for attorneys working on complex class-action litigation in this District.  *See* Ex. 10 (chart of rates charged by peer plaintiff and defense counsel in complex litigation); Ex. 3 (Silver Report ¶¶56-68); Ex. 4 (Miller Decl. ¶¶47-48).  Plaintiffs' Counsel's rates certainly are not excessive compared to what Simpson Thacher presumably charged for Alibaba's defense:  According to filings in other cases, that firm billed $840 per hour for a ***first-year associate***.  Ex. 3 (Silver Report ¶62); Ex. 10 at p.1. To be competitive with the defense firms they oppose, Plaintiffs' Counsel must at least try to keep pace with the compensation those firms pay.

case that settled *before* class certification and based on lodestar generated from *2016* partner rates of $834 to $1,125 and associate rates of $411 to $714 (Dkt. No. 482)); *Woburn Ret. Sys. v. Salix Pharm., Ltd.*, No. 14 Civ. 8925 (KMW), 2017 WL 3579892, at *6 (S.D.N.Y. 2017) (Wood, J.) ("Although a lodestar multiplier of 3.14 for a settlement of $210 million is high, it is still within the range of lodestar multipliers approved in this Circuit."); *In re Deutsche Telekom AG Sec. Litig.*, No. 00 Civ. 9475 (NRB), 2005 WL 7984326, at *4 (S.D.N.Y. June 9, 2005) (Buchwald, J.) (approving multiplier of 3.96 for settlement of $120 million); *see also EVCI*, 2007 WL 2230177, at *1, *17 (2.48 multiplier "is within the range found to be reasonable" despite settlement of only $7.7 million).[12]

Empirical evidence demonstrates that the multiplier of 2.15 requested in this case is not only reasonable, it is low compared to similarly-sized settlements. The mean lodestar multiplier for cases with recoveries in excess of $67.5 million is 2.72,[13] and "[f]or cases with class recoveries of more than $175.5 million, the mean multiplier was 3.18." Ex. 4 (Miller Decl. ¶51). The 2.15 multiplier here is thus substantially below the mean for similarly sized cases. *Id.* ¶¶50-

---

[12] *See also In re NASDAQ Market-Makers Antitrust Litig.*, 187 F.R.D. 465, 489 (S.D.N.Y. 1998) (awarding multiplier of 3.97 on lodestar of $36.2 million and noting that "multipliers of between 3 and 4.5 have become common"); *In re Sumitomo Copper Litig.*, 74 F. Supp. 2d 393, 399 (S.D.N.Y. 1999) (awarding 27.5% fee on $134.6 million settlement and finding multipliers of 3 to 4.5 to be common); *Roberts v. Texaco, Inc.*, 979 F. Supp. 185, 197 (S.D.N.Y. 1997) (multiplier of 5.5); *In re Colgate-Palmolive Co. ERISA Litig.*, 36 F. Supp. 3d 344, 353 (S.D.N.Y. 2014) (multiplier of 5.2); *Cornwell v. Credit Suisse Grp.*, No. 08-cv-03758 (VM), Dkt. No. 117 at ¶9 (S.D.N.Y. July 18, 2011) (multiplier of 4.7) (Ex. 24); *In re AOL Time Warner, Inc. Sec. Litig.*, 2006 WL 3057232 (S.D.N.Y. Oct. 25, 2006) (multiplier of 3.7); *In re WorldCom, Inc. Sec. Litig.*, 388 F. Supp. 2d 319 (S.D.N.Y. 2005) (multiplier of 4.0); *Bd. of Trustees of the AFTRA Ret. Fund v. JPMorgan Chase Bank, N.A.*, 2012 WL 2064907, at *3 (S.D.N.Y. June 7, 2012) (multiplier of 2.86); *Comverse*, 2010 WL 2653354, at *6 (multiplier of 2.78); *In re Am. Express Fin. Advisors Sec. Litig.*, No. 04 Civ. 1773 (DAB), Dkt. No. 170 at ¶16-17 (S.D.N.Y. July 18, 2007) (multiplier of 2.8 for settlement reached while motion to dismiss was pending) (Ex. 25).

[13] Eisenberg et al., *supra*, 92 N.Y.U. L. Rev. at 967 tbl.13.

51 (noting that multipliers increase as recoveries increase and that, for cases of this magnitude, a 2.15 multiplier is below expected).

The size of the lodestar reflects the exceptional amount of time and labor that Plaintiffs' Counsel had to expend to prosecute this case.  Counsel devoted many thousands of hours to investigating the underlying conduct, overcoming Defendants' motion to dismiss, and taking extensive discovery in multiple languages on two separate continents.  As set forth in greater detail in the Rosen Declaration, counsel's work included, among other things:

- Conducting a thorough investigation of Alibaba, including (i) reviewing and analyzing Alibaba's public SEC filings and other publicly available documents; (ii) consulting with a finance expert; (iii) working with a Chinese private investigator who conducted numerous interviews of former employees and other third parties based in China; and (iv) consulting with an expert in Chinese laws and regulations, and incorporating that research and investigation into the detailed Consolidated Complaint (¶¶1(a)-(b), 24, 25);

- Opposing Defendants' motion to dismiss (¶¶1(c), 32-34);

- Researching, drafting, and arguing the successful appeal from this Court's dismissal of the action in the Second Circuit (¶¶1(d), 35-40);

- Researching and drafting the motion for class certification, which included submitting an expert report on market efficiency by Dr. David Tabak and defending his class certification deposition (¶¶1(g)-(h), 47-49);

- Engaging in significant discovery efforts, including: (i) propounding substantial requests for written, documentary, and deposition discovery; (ii) preparing detailed responses to Defendants' discovery requests and producing documents; (iii) reviewing and analyzing more than 1.1 million pages of documents produced by Defendants and third parties (over 100,000 pages of which were produced in Mandarin Chinese); (iv) meeting and conferring with Defendants over many months to negotiate the scope of document production and identify requests that would be the subject of motions to compel; (v) reviewing and analyzing Defendants' 476-page initial privilege log and researching the propriety of Defendants' withholding or redaction of over 2,000 documents; and (vi) researching, drafting, and arguing motions to compel (¶¶1(i)-(l), (o)-(q), 54-82);

- Preparing for and taking two Rule 30(b)(6) depositions and twenty-two fact depositions of Alibaba employees in Hong Kong (20), New Zealand (1), and New York (1) (all but three of which were conducted in Mandarin Chinese, requiring interpretation and two full days of testimony each) (¶¶1(m), (r), 83-89);

- Preparing for and defending the deposition of each of the five Class Representatives, two of which occurred in Hong Kong (one in Mandarin Chinese), one in New York, one in Philadelphia, and one in California (¶¶1(s), 90-91);

- Working with seven experts on topics including Chinese administrative law (Professors Zhuang Liu and Li Honglei), Chinese regulation and politics (Professor Robert Berring), e-commerce and counterfeiting in China (Professor Daniel Chow), due diligence standards in IPO underwriting (William Purcell), scienter and stock sales (James Miller), and loss causation and damages (Dr. David Tabak), assisting in the preparation of five initial expert reports; reviewing and analyzing five expert reports produced by Defendants; assisting in the preparation of six rebuttal reports; and reviewing and analyzing six rebuttal reports produced by Defendants (¶¶1(t), 95-99);

- Conducting five expert depositions, including taking two depositions of Defendants' experts and defending the depositions of three of Plaintiffs' experts (a process that was ongoing when the Settlement was reached) (¶¶1(u), 98);

- Preparing to oppose Defendants' anticipated motion for summary judgment (¶1(v));

- Preparing for and participating in two full-day mediations with Judge Layn Phillips on September 6, 2018 (in New York) and March 22, 2019 (in Newport Beach, California), after which the parties accepted the mediator's recommendation and prepared a comprehensive term sheet signed on March 29-30, 2019 (¶¶1(n), (w)-(x), 100-109); and

- Preparing the Stipulation of Settlement and related exhibits and Motion for Preliminary Approval, and working with the Claims Administrator to provide notice (¶¶1(y), 110).[14]

In sum, the tremendous time and effort that Plaintiffs' Counsel devoted to this case was essential to obtain the $250 million Settlement. The lodestar cross-check thus fully confirms the reasonableness of the 25% fee request.

---

[14] Lead Counsel took care to control staffing and to use only those resources necessary for the successful prosecution of the action, balancing its fiduciary duty to the Class with the demands of fast-paced and complex litigation. To review and analyze the more than 1.1 million pages of documents produced and to prepare for the dozens of depositions as efficiently as possible, Lead Counsel employed a team of experienced project attorneys. ¶¶78-82, 88-89, 198. Many of the attorneys are graduates of top-tier law schools in China, the United States, or both, and have years of relevant experience working for either plaintiffs' firms and/or large defense firms. Ex. 9. Their work was highly substantive, crucial to the prosecution of the action, and directly contributed to the outcome achieved. By conducting substantive review and analysis of documents, assisting in preparation for depositions, and synthesizing and assembling the documentary and testimonial evidence to oppose summary judgment, the project attorneys were performing work equivalent, at least, to junior associates at a large law firm (who would be billed at much higher rates).

### 7.      The Reaction of the Class Supports the Requested Fee

Finally, the paucity of objections from the Class Members who will benefit from the Settlement provides still further evidence of the fee's reasonableness.  "In addition to the criteria set forth in *Goldberger*, courts in the Second Circuit consider the reaction of the Class to the fee request in deciding how large a fee to award."  *In re Hi-Crush Partners L.P. Sec. Litig.*, No. 12 Civ. 8557 (CM), 2014 WL 7323417, at *18 (S.D.N.Y. Dec. 19, 2014).

More than 1,000,000 copies of the Notice have been disseminated to potential Class Members, informing them that Lead Counsel intended to apply for an award of attorneys' fees not to exceed 25% of the Settlement Fund.  ¶¶189.  To date, Class Members have submitted over 164,000 Claim Forms.  Ex. 1 (Mulholland Decl. ¶26).  While the time to object does not expire until September 25, 2019, so far ***only one objection has been received***.  ¶189.[15]  The lone objector asserts that the Notice is vague because it states counsel will request a fee of up to 25%.  Ex. 27 at 3-4.  This description of the amount of the fee is adequate notice.  *Carlson v. Xerox Corp.*, 355 F. App'x 523, 525 & n.1 (2d Cir. 2009) (notice stating counsel would seek fees "not to exceed twenty percent (20%) of the Gross Settlement Fund" was adequate).[16]

That just one person has objected is "strong evidence of the propriety and acceptability" of the fee.  *Ressler v. Jacobson*, 149 F.R.D. 651, 656 (M.D. Fla. 1992); *see also In re Telik, Inc. Sec. Litig.*, 576 F. Supp. 2d 570, 594 (S.D.N.Y. 2008) ("That only one objection to the fee request was received is powerful evidence that the requested fee is fair and reasonable.").

---

[15] The merits of any additional objections will be addressed in Lead Counsel's reply papers.

[16] To date, despite Lead Counsel's request, the objector, Mr. King, has not provided any evidence that he is a Class Member.  ¶149.  Nor has Mr. King submitted a Claim Form.  Presumably, were he a Class Member and not seeking exclusion, he would submit a Claim Form.

**V.      THE COURT SHOULD APPROVE REIMBURSEMENT OF COUNSEL'S REASONABLE EXPENSES FROM THE SETTLEMENT FUND**

In addition to approving the proposed 25% fee, Lead Counsel also respectfully requests that Court approve reimbursement of counsel's out-of-pocket expenses from the Settlement Fund.   "It is well accepted that counsel who create a common fund are entitled to the reimbursement of expenses that they advanced to a class." *Flag Telecom*, 2010 WL 4537550, at *30.  Class counsel should be reimbursed "for reasonable out-of-pocket expenses incurred and customarily charged to their clients, as long as they were 'incidental and necessary to the representation.'" *China Sunergy*, 2011 WL 1899715, at *6.

As detailed in the Rosen Declaration, Plaintiffs' Counsel collectively incurred $3,937,803.35 in out-of-pocket litigation costs in the prosecution of this action.  ¶201 (expense chart).  The vast majority of those expenses were incurred for services rendered by Plaintiffs' seven experts: $2,126,911.57 (54.0%); followed by document translation and oral deposition interpretation: $877,748.10 (22.3%); travel, including air and ground transportation, hotels, and meals: $460,090.11 (11.7%); deposition reporting: $186,865.03 (4.7%); and electronic discovery fees: $151,283.05 (3.8%).  *Id.*  The remaining expenses are for costs such as copying, service of process, filing fees, and other incidental expenses. *Id.  See also* Exs. 5-8.

The total expenses are roughly 1.6% of the Settlement Amount, which is consistent with the expense ratios for other settlements of this size – and particularly reasonable here where counsel traveled to Hong Kong for nearly all of the depositions and required extensive document translation and oral interpretation services.  *See* Ex. 12 (NERA 2018 Report), at 41 fig.32 (median expenses of 1.3% to 1.4% for settlements of $100 to $500 million); Eisenberg et al., *supra*, 92 N.Y.U. L. Rev. at 963 (median expenses of 1.71%).

22

"Plaintiffs' Counsel's individual declarations attest to the accuracy of these expenses," *Aeropostale*, 2014 WL 1883494, at *19, and "[b]ecause the expenses here were incurred with no guarantee of recovery, Lead Counsel had a strong incentive to keep them at a reasonable level, and did so," *Hi-Crush*, 2014 WL 7323417, at *19.  The expenses were critical to achieving the successful Settlement, reasonable in amount, and customary and necessary for a complex securities action.  *See, e.g.*, *Flag Telecom*, 2010 WL 4537550, at *30 (approving expenses for "accounting, damages and other experts" as well as "photocopying of documents, mediation fees, court filing fees, deposition transcripts, fees for foreign counsel, on-line research, creation of a document database, messenger service, postage and next day delivery, long distance and facsimile expenses, transportation, travel, and other expenses directly related to the prosecution of this Action").  Finally, the request is below the $5 million limit disclosed in the Notice, and no Class Member has objected to the request.  In sum, the request for reimbursement of expenses in the total amount of $3,937,803.35 is reasonable and should be granted.

## VI.   THE COURT SHOULD APPROVE REIMBURSEMENT OF PLAINTIFFS' EXPENSES

The PSLRA provides that an "award of reasonable costs and expenses (including lost wages) directly relating to the representation of the class" may be made to "any representative party serving on behalf of a class."   15 U.S.C. § 78u-4(a)(4).   Courts regularly approve reimbursement of expenses under that provision.  *See, e.g.*, *Marsh*, 2009 WL 5178546, at *21 (approving $215,000 total award for "reasonable costs and expenses incurred in managing this litigation and representing the Class"); *Veeco*, 2007 WL 4115808, at *12 (awarding more than $15,900 for time spent supervising the litigation and characterizing such awards as "routine[]").[17]

_____

[17] *See also Flag Telecom*, 2010 WL 4537550, at *31 (awarding $100,000 to one lead plaintiff and $5,000 to another lead plaintiff); *In re Bank of Am. Corp. Sec., Deriv., & ERISA Litig.*, 772 F.3d 125, 132 (2d Cir. 2014) (affirming $453,000 award).

Plaintiffs seek reimbursement of $12,500 each (a total of $62,500) for costs incurred, including lost wages, in connection with the services they rendered on behalf of the Class. ¶¶207-208.   Plaintiffs dedicated a significant amount of time to the successful prosecution of this action by, among other things, regularly communicating with Lead Counsel regarding the progress and direction of the case; reviewing significant pleadings and briefs; assisting with discovery responses and in the collection of documents for production; preparing for and being deposed by Defendants as part of the class certification process; consulting with Lead Counsel regarding the settlement negotiations; and evaluating and approving the Settlement.   Ex. 14 (Tai Decl. ¶6); Ex. 15 (Amoros Decl. ¶6); Ex. 16 (Gabriel Decl. ¶6); Ex. 17 (Lee Decl. ¶6); and Ex. 18 (Liu Decl. ¶6).

Those are "precisely the types of activities that support awarding reimbursement of expenses to class representatives." *Marsh*, 2009 WL 5178546, at *21.[18]  Accordingly, Plaintiffs respectfully request that the Court grant the requested payment of $12,500 each.

## VII.    CONCLUSION

For the foregoing reasons, Lead Counsel respectfully requests that the Court grant this motion and award attorneys' fees of $62,500,000.00 from the Settlement Fund, plus interest at the same rate as the Settlement Fund, and order reimbursement from the Settlement Fund in the amount of $3,937,803.35 in expenses incurred by Plaintiffs' Counsel and $62,500.00 total to the five representative Plaintiffs.

///

///

---

[18] The Notice advised that Lead Counsel's application "may include an application for award(s) sufficient to reimburse the reasonable costs and expenses incurred by Plaintiffs . . . directly related to their representation of the Class in an amount not to exceed $12,500 for each representative Plaintiff." Ex. 1-A (¶5).  To date, there have been no objections to this request.

Dated:  September 11, 2019

THE ROSEN LAW FIRM P.A.

By:  _s/ Laurence Rosen_
Laurence Rosen
Phillip Kim
275 Madison Avenue, 34th Floor
New York, NY 10016
Telephone: (212) 686-1060
Facsimile: (212) 202-3827
lrosen@rosenlegal.com
pkim@rosenlegal.com

*Counsel for Plaintiffs and the Class*

25

**PROOF OF SERVICE**

I, the undersigned say:

I am not a party to the above case and am over eighteen years old.

On September 11, 2019, I served true and correct copies of the foregoing document, by posting the document electronically to the ECF website of the United States District Court for the Southern District of New York, for receipt electronically by the parties listed on the Court's Service List.

I affirm under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on September 11, 2019.

*s/ Laurence M. Rosen*
Laurence M. Rosen