UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| CHRISTINE ASIA CO., LTD., et al., <br><br> Plaintiffs, <br><br> v. <br><br> JACK YUN MA, et al., <br><br> Defendants. | No.: 1:15-md-02631-CM (SDA) <br><br> Related cases: <br> 1:15-cv-00759-CM <br> 1:15-cv-00811-CM <br> 1:15-cv-00991-CM <br> 1:15-cv-01405-CM <br> 1:15-cv-05020-CM <br> 1:15-cv-04991-CM <br> 1:15-cv-05002-CM |

**DECLARATION OF LAURENCE M. ROSEN IN SUPPORT OF
(I) PLAINTIFFS' MOTION FOR FINAL APPROVAL OF
CLASS ACTION SETTLEMENT AND PLAN OF ALLOCATION; AND
(II) LEAD COUNSEL'S MOTION FOR AN AWARD OF
ATTORNEYS' FEES AND REIMBURSEMENT OF LITIGATION EXPENSES**

## TABLE OF CONTENTS

I.      INTRODUCTION ................................................................................................ 2

II.     PROSECUTION OF THE ACTION ................................................................. 11

        A.      Background .......................................................................................... 11

        B.      Commencement of the Instant Action and Appointment of Lead Plaintiffs and
                Lead Counsel .............................................................................. 13

        C.      The Comprehensive Pre-Filing Investigation and Preparation of the Complaint. 14

        D.      Defendants' Motion to Dismiss the Complaint and Plaintiffs' Response ........... 15

        E.      The Dismissal of the Complaint, and Plaintiffs' Successful Appeal to the Second
                Circuit ......................................................................................... 18

        F.      The Protective Order and the Parties' Agreement Concerning the Operative
                Omission ...................................................................................... 20

                1.      The Protective Order and Case Timeline ................................. 20

                2.      The Operative Omission Stipulation ....................................... 21

        G.      Class Certification and Defendants' Answer to the Complaint .......................... 22

        H.      Plaintiffs' Comprehensive Discovery Program ................................... 23

                1.      The Pursuit of Extensive Document and Written Discovery from
                        Defendants ......................................................................... 24

                2.      The Pursuit of Extensive Discovery from Third Parties ........................ 27

                3.      Discovery Produced by Plaintiffs ........................................... 29

                4.      Discovery Disputes ............................................................. 29

                        (a)      September 30, 2018 Letter-Motion for Discovery Relief ............. 30

                        (b)      October 30, 2018 Motion to Compel ............................ 31

                        (c)      November 9, 2018 Letter-Motion to Extend Fact Discovery ....... 32

                5.      Review and Analysis of More Than 1.1 Million Pages of Documents,
                        Including Thousands of Documents Produced in Mandarin Chinese....... 33

6.      Plaintiffs' Pursuit of Extensive Deposition Discovery ............................ 35

       (a)      Rule 30(b)(6) Depositions of Alibaba.............................................. 35

       (b)      Twenty-two Fact Depositions of Alibaba Employees and Third Party Witnesses ........................................................................ 37

       (c)      Plaintiffs' Depositions ................................................................ 39

7.      Plaintiffs' Counsel's Additional Discovery and Investigation ................ 40

I.      Plaintiffs' Counsel's Substantial Work With Highly-Qualified Experts .............. 41

J.      Mediation Efforts, Settlement Negotiations, and Preliminary Approval of the Settlement ........................................................................................................ 45

1.      Initial Mediation........................................................................................ 45

2.      Continued Negotiations ............................................................................. 46

3.      Preliminary Approval of the Settlement ................................................... 47

III.      THE RISKS OF CONTINUED LITIGATION ................................................ 47

A.      Risks Faced at Summary Judgment ................................................................ 48

B.      Risks Related to Proving Liability at Trial .................................................... 48

1.      Risks of Proving Falsity and the Materiality of the Alleged Omission .... 49

2.      Risks of Proving Scienter.......................................................................... 50

3.      Risks Posed by a Battle of the Experts ..................................................... 51

C.      Risks of Proving Loss Causation and Damages at Trial ................................ 52

D.      Other Risks at Trial, Including Risks Of Witness Availability, Language Translation and Interpretation at Trial .......................................................... 54

E.      Risks of Potential Post-Trial Motions and Further Appeals .......................... 55

F.      Risks of Collecting a Judgment Against a Chinese Company........................ 55

G.      The Settlement is Reasonable in Light of the Risks and Potential Recovery in the Action.............................................................................................................. 56

ii

IV.     STATUS OF THE COMPREHENSIVE SETTLEMENT NOTICE PROGRAM........... 57

        A.     The Notice Program ......................................................................... 58

        B.     Status of Exclusion Requests and Objections ..................................... 60

V.      ALLOCATION OF THE NET PROCEEDS OF THE SETTLEMENT ......................... 61

VI.     THE FEE AND EXPENSE APPLICATION .................................................. 64

        A.     The Requested Fee is Fair and Reasonable When Considered Under the Second
               Circuit's *Goldberger* Factors ............................................................. 65

               1.     The Excellent Outcome Achieved Is the Result of the Significant Time
                      and Labor that Plaintiffs' Counsel Devoted to the Action....................... 65

               2.     The Magnitude and Complexity of the Action ......................................... 67

               3.     The Significant Risks Borne by Plaintiffs' Counsel ................................ 69

               4.     The Quality of Representation, Including the Extraordinary Result
                      Obtained, the Experience and Expertise of Plaintiffs' Counsel, and the
                      Standing and Caliber of Defendants' Counsel .......................................... 73

               5.     The Requested Fee In Relation to the Settlement ..................................... 75

               6.     Interests of Public Policy, Including the Need to Ensure the Availability of
                      Experienced Counsel in High-Risk Contingent Securities Cases............. 76

               7.     The Requested 25% Fee Is Less than the Fee Authorization Agreed Upon
                      *Ex Ante* by the Representative Plaintiffs.................................................. 76

               8.     The Reaction of the Class Supports the Fee Requested........................... 77

        B.     A Lodestar Crosscheck Confirms the Reasonableness of the Requested Fee ...... 77

        C.     The Requested Reimbursement of Litigation Expenses is Reasonable ................ 81

VII.    CONCLUSION............................................................................. 85

**TABLE OF EXHIBITS TO DECLARATION OF LAURENCE M. ROSEN**

| EX. | DESCRIPTION |
|-----|-------------|
| 1 | Declaration of Paul Mulholland of Strategic Claims Services, Inc. regarding the provision of notice ("Mulholland Declaration") |
| 2 | Declaration of Layn R. Phillips in Support of Final Approval of Class Action Settlement ("Phillips Declaration") |
| 3 | Expert Report of Charles Silver In Support of Lead Counsel's Motion for an Award of Attorneys' Fees and Reimbursement of Expenses ("Silver Report") |
| 4 | Declaration of Professor Geoffrey P. Miller ("Miller Declaration" or "Miller Decl.") |
| 5 | Declaration of Laurence M. Rosen regarding Rosen Law Firm lodestar and expenses ("Rosen Fee Declaration") |
| 6 | Declaration of Lionel Z. Glancy regarding Glancy Prongay & Murray lodestar and expenses ("Glancy Fee Declaration") |
| 7 | Declaration of Robert Kry regarding MoloLamken LLP lodestar and expenses ("MoloLamken Fee Declaration") |
| 8 | Declaration of Adam M. Apton regarding Levi & Korsinsky LLP lodestar and expenses ("Levi & Korsinsky Fee Declaration") |
| 9 | Project Attorney Biographies and Work Summaries |
| 10 | Table of Peer Law Firm Billing Rates |
| 11 | Cornerstone Research, *Securities Class Action Settlements 2018 Review and Analysis* (2019) ("2018 Cornerstone Report") |
| 12 | Stefan Boettrich and Svetlana Starykh, *Recent Trends in Securities Class Action Litigation: 2018 Full-Year Review* (NERA Jan. 29, 2019) ("2018 NERA Report") |
| 13 | ISS Securities Class Action Services, *The Top 100 U.S. Class Action Settlements of All Time* (Dec. 31, 2018) |
| 14 | Declaration of William Tai, Individually and as Authorized Representative of Christine Asia Co., Ltd. ("Tai Decl.") |
| 15 | Declaration of Abel Amoros ("Amoros Decl.") |
| 16 | Declaration of Arthur Gabriel ("Gabriel Decl.") |

| 17 | Declaration of Raymond Lee ("Lee Decl.") |
| 18 | Declaration of Gang Liu ("Liu Decl.") |
| 19 | *In re Pfizer Inc. Sec. Litig.*, No. 04-cv-09866 (LTS), Dkt. No. 727 (S.D.N.Y. Dec. 21, 2016) |
| 20 | *In re Oxford Health Plans, Inc. Sec. Litig.*, 2003 U.S. Dist. LEXIS 26795 (S.D.N.Y. June 12, 2003) |
| 21 | *Anwar v. Fairfield Greenwich Ltd.*, No. 1:09-cv-00118 (S.D.N.Y.) (four fee awards) |
| 22 | *In re U.S. Foodservice, Inc. Pricing Litig.*, No. 07-md-1894, Dkt. No. 521 (D. Conn. Dec. 9, 2014) |
| 23 | *In re Tricor Direct Purchaser Antitrust Litig.*, No. 05-cv-00340, Dkt. No. 543 (D. Del. Apr. 23, 2009) |
| 24 | *Cornwell v. Credit Suisse Grp.*, No. 08-cv-03758 (VM), Dkt. No. 117 (S.D.N.Y. July 18, 2011) |
| 25 | *In re Am. Express Fin. Advisors Sec. Litig.*,  No. 04 Civ. 1773 (DAB), Dkt. No. 170 (S.D.N.Y. July 18, 2007) |
| 26 | *In re Williams Sec. Litig.*, No. 02-cv-072-SPF-FHM, Dkt. No. 1638 (N.D. Okla. Feb. 12, 2007) |
| 27 | Objection to Proposed Class Action Settlement ("King Objection") |
| 28 | Nancy Chun Feng and Ross D. Fuerman, *Securities Class Actions of Chinese Companies*, Corporate Ownership & Control, Vol. 15, Issue 4 (Summer 2018) |
|  |  |

I, Laurence M. Rosen, declare under 28 U.S.C. §1746:

1.      I am an attorney admitted to practice before this Court and the managing attorney of The Rosen Law Firm, P.A. (the "Rosen Firm"), Court-appointed Lead Counsel for Plaintiffs and the certified Class in the above-captioned centralized action (the "action").[1]  I have personal knowledge of the matters set forth herein based on my direct oversight of, and active participation in, the prosecution and settlement of the claims asserted on behalf of the Class in this action.

2.      I respectfully submit this declaration, together with the attached exhibits, in support of Plaintiffs' Motion for Final Approval of Class Action Settlement and Plan of Allocation and the concurrently-filed memorandum in support thereof (the "Final Approval Memorandum").  As set forth in the Final Approval Memorandum, Plaintiffs seek final approval of the $250 million Settlement for the benefit of the Class, as well as final approval of the Proposed Plan of Allocation of the Net Settlement Fund to eligible Class Members.

3.      I also respectfully submit this declaration in support of Lead Counsel's Motion for an Award of Attorneys' Fees and Reimbursement of Litigation Expenses and the concurrently-filed memorandum in support thereof (the "Fee Memorandum").   As set forth in the Fee Memorandum, Lead Counsel seeks on behalf of all Plaintiffs' Counsel[2] an award of attorneys' fees in the amount of 25% of the Settlement Fund (plus interest earned thereon), and reimbursement of Litigation Expenses in the total amount of $4,000,303.35, which includes

---

[1] Unless otherwise defined herein, all capitalized terms have the meanings set forth in the Stipulation and Agreement of Settlement, dated April 26, 2019 (ECF No. 123, the "Stipulation").

[2] As set forth in the Stipulation, Plaintiffs' Counsel refers to Lead Counsel together with Glancy Prongay & Murray LLP, MoloLamken LLP, and Levi & Korsinsky LLP.  At all times, the additional Plaintiffs' Counsel firms worked only at my express direction and under my supervision.  Lead Counsel at all times maintained strict control over the litigation from the time of the filing of the Complaint through the Settlement.

Plaintiffs' Counsel's total out-of-pocket expenses in the amount of $3,937,803.35 and $62,500 in total to the certified Class Representatives ($12,500 each) pursuant to the Private Securities Litigation Reform Act of 1995 ("PLSRA") for their costs, including lost wages, incurred in connection with their representation of the Class.  *See* ¶¶191-210, *infra* (detailing Plaintiffs' Counsel's lodestar and expenses).

4.      The Court preliminarily approved the proposed Settlement by its Order entered on May 1, 2019 (the "Preliminary Approval Order"), and thereby directed the Notice of the Settlement to be disseminated to the Class.  *See* ECF No. 126.  Pursuant to the Preliminary Approval Order, Strategic Claims Services ("SCS"), the Court-approved Claims Administrator, implemented a comprehensive notice program whereby notice was given to potential Class Members by mail and by publication.  *See* ¶¶140-149, *infra* (detailing Notice program); *see also* Ex. 1 (Declaration of Paul Mulholland, the "Mulholland Decl." ¶¶4-19).

5.      In total, more than 1,000,000 Notice Packets (consisting of the Notice and Claim Form) have been mailed or e-mailed to potential Class Members, and thus far only one objection and 30 requests for exclusion (14 of them valid) have been received.  Ex. 1 (Mulholland Decl. ¶¶22-23); Ex. 1-H (table of exclusion requests); Ex. 27 (King Objection).

## I.      INTRODUCTION

6.      Plaintiffs in this action alleged claims pursuant to Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and Rule 10b-5 promulgated thereunder, arising from Defendants' alleged misrepresentations and omissions made in connection with Alibaba's September 19, 2014 Initial Public Offering ("IPO") and during the Class Period from September 19, 2014 through January 28, 2015.

7.     The proposed Settlement presented to the Court for final approval provides the resolution of all claims in the action in exchange for a cash payment of $250,000,000 (the "Settlement Amount") for the benefit of the certified investor Class.  As detailed herein, Plaintiffs and Lead Counsel submit that the proposed Settlement represents an outstanding result for the Class in light of the significant risks overcome and remaining in the action.

8.     If approved by the Court, the Settlement would rank among the 70 largest securities class action settlements since the passage of the PSLRA, and would be the largest ever securities class action settlement against a company based in China.  *See* Ex. 13 at 8; Ex. 28 at 124, tbl.6.

9.     The Settlement represents a recovery of approximately 17%-20% of maximum estimated provable damages in this case, which is a tremendous result as compared to recoveries in other cases alleging losses of a similar magnitude, that in 2018 recovered approximately 2% of alleged investor losses.  See Ex. 11 (Cornerstone Report, *Securities Class Action Settlements 2018 Review and Analysis* (the "2018 Cornerstone Report") p. 6 Fig. 5) (reporting median percentage of recovery in cases alleging greater than $1 billion in damages was 2% in 2018); *see also* Ex. 12 (Stefan Boettrich and Svetlana Starykh, *Recent Trends in Securities Class Action Litigation: 2018 Full-Year Review* (NERA Jan. 29, 2019) (the "2018 NERA Report") p. 36, Fig. 28; *id.* at p. 35, Fig. 27) (median percentage of recovery in cases alleging between $1-$4.99 in billion damages is 1.2%).

10.     The Settlement thus provides a substantial, certain, and immediate recovery, while avoiding the significant risks and expense of continued litigation, including the risk that the Class could recover less than the Settlement Amount (or nothing) after years of additional litigation and delay.

3

11.     The Settlement was achieved after more than four years of highly-contested litigation, during which time Plaintiffs' Counsel became well informed on the relative strengths and weaknesses of Plaintiffs' claims in the action.  In prosecuting the action, Plaintiffs' Counsel expended enormous efforts and resources on behalf of the Class, including, *inter alia*:

a.     Conducting a detailed and substantive investigation of Alibaba, the Individual Defendants, and the fraudulent misrepresentations and omissions alleged in the action, including: (1) reviewing and analyzing Alibaba's public Securities Exchange Commission ("SEC") filings, IPO road show materials, press releases, earnings calls, various technology conference presentations, and other public statements made by Defendants prior to, during, and after the Class Period; (2) researching, reviewing and analyzing other publicly available documents, reports, announcements, and news articles concerning Alibaba and/or the regulation of counterfeit goods in the People's Republic of China, as well as research reports prepared by securities and financial analysts regarding Alibaba; (3) working with a finance expert to analyze price movements of Alibaba securities to inform market efficiency, loss causation, and damages; (4) retaining and working with China-based private investigators who conducted numerous interviews with former employees and other third parties in China; (5) reviewing and analyzing court filings and other publicly available material related to lawsuits filed against Alibaba for violations of intellectual property rights, including but not limited to, *Gucci America Inc. et al. v. Alibaba Group Holding Ltd. et al.*, No. 1:15-cv-03784-PKC (S.D.N.Y. May 15, 2015) ("*Gucci* Litigation"); and (6) consulting with experts in PRC laws and regulations;

b.     Drafting the detailed 100-page Consolidated Complaint (the "Complaint") filed on July 1, 2015, incorporating the foregoing research and investigation efforts,

adding Named plaintiffs Abel Amoros, Arthur Gabriel, Raymond Lee, and Gang Liu to the action (ECF No. 6);

c.      Researching and drafting the opposition to Defendants' motion to dismiss (ECF Nos. 16-18), which Plaintiffs filed on August 28, 2015 (ECF Nos. 20-21);

d.      Successfully researching, drafting, and arguing the appeal of the District Court's dismissal of the action in full without leave to amend, with Plaintiffs filing their opening appellate brief on November 2, 2016, their reply in support of the appeal filed on February 22, 2017, and arguing the appeal before the U.S. Court of Appeals for the Second Circuit on May 10, 2017;

e.      Preparing for, and participating in, a scheduling conference with the Court held on January 12, 2018;

f.      Negotiating a stipulation with Defendants to clarify the nature and scope of Plaintiffs' claims going forward in light of the Second Circuit order, which stipulation the Court signed and entered on February 14, 2018.  ECF No. 46.  According to the stipulation, the "operative omission of material fact alleged in this case is that Defendants failed to disclose the existence, content, and significance of the July 16, 2014 administrative guidance meeting allegedly described in the 'White Paper Regarding the Administrative Guidance Provided to the Alibaba Group' (the 'Operative Omission')" (ECF No. 37);

g.      Researching and drafting the motion for class certification filed on March 12, 2018, which included working with Dr. David Tabak and submitting his expert report on market efficiency (ECF Nos. 52-54);

h.     Preparing for and defending Dr. Tabak's deposition regarding class certification and market efficiency on April 6, 2018;

i.     Propounding substantial requests for written, documentary, and deposition discovery, including drafting and serving: (1) six sets of Requests for Production of Documents, four sets of written Interrogatories, and three sets of written Requests for Admissions upon Defendants; (2) a detailed Rule 30(b)(6) deposition notice containing more than eighty-two (82) topics and sub-topics directed at Alibaba; (3) thirty-four (34) subpoenas on various third parties, including the IPO Underwriters, securities analysts, financial advisors, and public relations firms that worked with Alibaba in connection with the IPO; and (4) a Freedom of Information Act request to the SEC and the United States Trade Representative (the "USTR"); and engaging in substantial meet and confer efforts with Defendants and third party subpoena recipients regarding the discovery requests propounded;

j.     Reviewing and analyzing more than 1.1 million pages of documents produced by Defendants and third parties, of which approximately 12,819 documents (comprising 124,790 pages) produced by Alibaba—including integral documents such as internal Company e-mails and other correspondence—were produced in, or contained, Mandarin Chinese and thus required review by Mandarin Chinese-speaking attorneys; The most critical documents were internal Alibaba emails, memos and SAIC-related documents that were all in Mandarin Chinese and required close scrutiny by Chinese lawyers, and translation into English.

k.     Reviewing and analyzing court filings and related publicly-available information in connection with the securities class action styled *Buelow v. Alibaba Group*

*Holding Limited et al.*, filed in the Superior Court of the State of California, County of San Mateo (Master File No. CIV-535692 (consolidated with CIV-535840 and CIV-535887)) (the "State Action"), which alleged claims under Section 11 of the Securities Act of 1933 (the "Securities Act") against Defendants and the IPO Underwriters;

l.      Complying with Plaintiffs' obligations to provide written and documentary discovery, including preparing and serving Plaintiffs' Rule 26(a)(1) Initial Disclosures on February 2, 2018; preparing detailed responses to Defendants' First Set of Requests for Production of Documents served on March 16, 2018 and Defendants' First Set of Interrogatories served on December 26, 2018; and preparing and producing hundreds of pages of documents to Defendants on behalf of Plaintiffs;

m.      Preparing for and taking two Rule 30(b)(6) depositions of Defendant Alibaba over three days in Hong Kong in July 2018 (the first two days were conducted in Mandarin Chinese and the last day was in English);

n.      Preparing for and participating in a full-day private mediation session on September 6, 2018 in New York under the auspices of former United States District Court Judge, Layn R. Phillips.  The session ended without an agreement to settle.  However, the discussions among the Parties and Judge Phillips better allowed Plaintiffs to frame the issues regarding liability and damages and further focus their discovery efforts throughout the remainder of the discovery period;

o.      Reviewing and analyzing Defendants' 476-page initial privilege log, including evaluating and researching the propriety of, and legal bases for, Defendants' withholding or redaction of over 2,000 discrete documents;

p.      Researching and drafting a letter-motion seeking to compel Defendants to produce certain documents that Plaintiffs argued were improperly withheld on relevancy and burden grounds (ECF No. 65) and further arguing that letter motion at a telephonic hearing held by the Honorable Magistrate Judge Stewart D. Aaron on October 11, 2018, pursuant to which Judge Aaron issued an order granting the letter-motion to compel on October 12, 2018 (ECF No. 74) whereby Defendants were ordered to produce all documents previously redacted based on relevancy no later than November 12, 2018;

q.      Researching and drafting a motion to compel Defendants to produce certain documents and information that Plaintiffs argued were improperly withheld on privilege grounds (ECF Nos. 85-88) filed on October 30, 2018 and further arguing that motion at a telephonic hearing held by Judge Aaron on November 15, 2018, pursuant to which Judge Aaron issued an order granting in part and denying in part the motion to compel on November 16, 2018 (ECF No. 109).  Defendants were ordered to produce unredacted copies of certain documents, submit additional documents to the Court for *in camera* review, and conduct an additional review of their privilege logs taking into account the Court's assessment of certain documents reviewed *in camera*;

r.      Preparing for and taking twenty-two (22) fact depositions of current Alibaba employees and third parties over a five-month period; of the twenty-two fact depositions, seventeen (17) were conducted in Mandarin Chinese, taking two full business days to complete due to the extended time required for oral interpretation; and of the twenty-two depositions, twenty (20) were conducted in Hong Kong, one was held in New Zealand, and one was held in New York, NY;

s.     Preparing for and defending the deposition of each of the five (5) Class Representatives, one of which was conducted in Mandarin Chinese and required translation, two (2) of which occurred in Hong Kong, one in New York, one in Philadelphia, Pennsylvania, and one in Southern California;

t.     Retaining and working with seven (7) experts to testify on topics necessary for Plaintiffs to prove liability and damages in this case, including matters of Chinese administrative law (Professors Zhuang Liu and Li Honglei), Chinese regulation and politics (Professor Robert Berring), e-commerce and counterfeiting (Professor Daniel Chow), due diligence standards in the IPO underwriting process (William Purcell), scienter and stock sales (James Miller), and loss causation and damages (Dr. David Tabak); assisting in the preparation of five (5) initial expert reports to Defendants; reviewing and analyzing the five (5) competing expert reports produced by Defendants; and assisting in the preparation and submission of six (6) rebuttal reports to Defendants; and reviewing and analyzing six (6) rebuttal reports produced by Defendants.

u.     Substantially preparing to take (or defend) the deposition of each of the testifying experts, of which five (5) expert depositions were held (with Plaintiffs' Counsel taking two (2) depositions of Defendants' experts, and defending the deposition of three (3) of Plaintiffs' experts).  The Parties were in the process of conducting and concluding these depositions at the time the Settlement was reached;

v.     Preparing for Defendants' anticipated motion for summary judgment, including conducting legal research and drafting legal memoranda on the current state of the law on summary judgment, and reviewing, organizing, and cataloging relevant documentary and testimonial evidence obtained in discovery to use in opposition;

w.      Preparing for and participating in another full-day mediation session with Judge Phillips on March 22, 2019 in Newport Beach, California.  The session again ended without an agreement to settle.  However, following the mediation, Judge Phillips presented a mediator's recommendation to settle the action for $250,000,000 (the "Mediator's Proposal"), which the Parties evaluated over the following week and ultimately accepted;

x.      Negotiating and memorializing the key terms of the Parties' agreement to settle in a confidential term sheet, which the Parties executed on March 29-30, 2019;

y.      Preparing the comprehensive Stipulation of Settlement and related exhibits and thereafter moving for and obtaining the Court's preliminary approval of the Settlement; and

z.      Working with the claims administrator, SCS, to ensure proper notice to the Class, including holding regular weekly conference calls to make certain that brokerages and other firms send out notices to Class Members timely or provide names and addresses to the claims administrator to issue notices.

12.      Based on the foregoing efforts, Plaintiffs and Lead Counsel are well informed of the strengths and weaknesses of the claims and defenses in the action and believe the Settlement represents a favorable outcome for the Class and is in the best interests of the Class Members. For all the reasons set forth herein and in the accompanying memoranda and declarations, Plaintiffs and Lead Counsel respectfully submit that the Settlement is "fair, reasonable, and adequate" in all respects, and that the Court should grant final approval pursuant to Federal Rule of Civil Procedure 23(e).

13.     In addition, Plaintiffs seek approval of the proposed Plan of Allocation as fair and reasonable.  As discussed in further detail below, Lead Counsel developed the Plan of Allocation with the assistance of Plaintiffs' damages expert, Dr. David Tabak of NERA Economic Consulting ("NERA").  ¶¶150-160, *infra* (discussing Plan of Allocation).  The Plan of Allocation provides for the distribution of the Net Settlement Fund to each Authorized Claimant on a *pro rata* basis based on their Recognized Loss amounts.

14.     Finally, Lead Counsel seeks approval of the request for attorneys' fees and reimbursement of Litigation Expenses, as set forth in the Fee Memorandum.  As discussed in detail in the accompanying Fee Memorandum, the requested 25% fee is within the range of percentage awards granted by courts in this Circuit in comparable securities class actions, its fairness and reasonableness is confirmed by a lodestar cross-check, and it is warranted in light of the extent and quality of the work performed and the substantial result achieved.  Accordingly, as set forth in the Fee Memorandum and for the additional reasons set forth herein below, I respectfully submit that Lead Counsel's request for attorneys' fees and reimbursement of Litigation Expenses is fair and reasonable and should be approved.

## II.     PROSECUTION OF THE ACTION

### A.     Background

15.     Alibaba, a holding company with principal operations based in China, specializes in e-commerce, retail, Internet and technology, providing consumer-to-consumer (C2C), business-to-consumer (B2C), and business-to-business (B2B) sales services via web portals, as well as electronic payment services, shopping search engines, and cloud computing.

11

16.     On September 19, 2014, Alibaba completed a $25.0 billion Initial Public Offering on the New York Stock Exchange ("NYSE").  This is the largest initial public offering in history.[3]  The Company's securities trade on the NYSE under the ticker symbol "BABA."

17.     Unbeknownst to investors, on July 16, 2014—just two months before its historic IPO and while Alibaba was in the thick of the IPO underwriting and due diligence process—the Company was subject to an unusual and unprecedented high-level administrative guidance law enforcement proceeding administered by China's State Administration of Industry and Commerce (the "SAIC") and seven provincial and local Administrations of Industry and Commerce ("AICs") (hereinafter, the "July 2014 Meeting").  At the July 2014 Meeting, the SAIC admonished Alibaba for violating certain PRC laws and regulations by, for example, knowingly facilitating the widespread sale of counterfeit goods on its platforms, permitting unlicensed or inadequately licensed businesses to operate on its platforms, and permitting vendors to manipulate the various rating systems featured on Alibaba's platforms.  The SAIC threatened to levy massive monetary penalties on Alibaba if it failed to remedy the violations and cease the illegal business practices.  Alibaba failed to disclose the July 2014 Meeting, and the risks related to it, in its IPO Registration Statement.

18.     Then, on the evening of January 27, 2015 (Eastern time), after market close, financial media reported that the SAIC had published a "White Paper Regarding the Administrative Guidance Provided to the Alibaba Group" detailing Alibaba's violations addressed during the July 2014 Meeting between the SAIC and senior Alibaba executives (the "White Paper").

---

[3] Liyan Chen *et al.*, *Alibaba Claims Title for Largest Global IPO Ever with Extra Share Sales*, Forbes, Sept. 22, 2014, *available at* https://www.forbes.com/sites/ryanmac/2014/09/22/alibaba-claims-title-for-largest-global-ipo-ever-with-extra-share-sales/#185bbf348dcc.

19.     Following this news, the price of Alibaba ADS dropped $4.49 per ADS (approximately 4.4%), closing at $98.45 per ADS on January 28, 2015, on unusually high volume of approximately 42 million shares traded.

20.     The following morning, January 29, 2015, Alibaba released disappointing annual earnings and its Vice Chairman issued a statement downplaying the White Paper and denying Alibaba had made any effort to conceal or delay publication of the July 2014 Meeting or the administrative guidance provided therein.  On this news, Alibaba's ADS declined $8.64 per ADS (approximately 9%), closing at $89.81 on January 29, 2015, again on unusually high daily volume.

**B.      Commencement of the Instant Action and Appointment of Lead Plaintiffs and Lead Counsel**

21.     In early 2015, seven putative class action complaints were filed against Defendants in United States District Courts in New York and California.  The first case was filed on January 30, 2015, in the Southern District of New York, styled *Khunt v. Alibaba Group Holding Limited et al.* (1:15-cv-00759-CM).

22.     On May 1, 2015, the Court entered an order consolidating the seven actions filed in the Southern District of New York, appointing William Tai and Christine Asia Co., Ltd., as Lead Plaintiffs pursuant to the Private Securities Litigation Reform Act of 1995, and appointing the Rosen Firm as Lead Counsel for the putative class.

23.     On June 9, 2015, the Judicial Panel on Multidistrict Litigation centralized all of the related actions in the United States District Court for the Southern District of New York, the centralized actions bearing the docket number 1:15-md-02631-CM.  ECF No. 1.

13

C.     **The Comprehensive Pre-Filing Investigation and Preparation of the Complaint**

24.     Lead Counsel conducted an extensive and detailed pre-filing investigation of Alibaba, which included, among other things: (1) reviewing and analyzing Alibaba's public SEC filings, IPO road show materials, press releases, earnings calls, various technology conference presentations, and other public statements made by Defendants prior to, during, and after the class period; (2) researching, reviewing and analyzing other publicly available documents, reports, announcements, and news articles concerning Alibaba and/or the regulation of counterfeit goods in the PRC, and research reports prepared by securities and financial analysts regarding Alibaba; (3) working with a finance expert to analyze Alibaba securities price movements to inform market efficiency, loss causation, and damages; (4) retaining and working with China-based private investigators who conducted numerous interviews with former employees and other third parties in China; (5) reviewing and analyzing court filings and other publicly available material related to lawsuits filed against Alibaba for violations of intellectual property rights, including but not limited to, *Gucci America Inc. et al. v. Alibaba Group Holding Ltd. et al.*, No. 1:15-cv-03784-PKC (S.D.N.Y. May 15, 2015); and (6) consulting with experts in PRC laws and regulations.

25.     On June 30, 2015, Plaintiffs[4] filed and served the detailed 100-page Complaint, together with approximately 100 pages of exhibits, asserting claims under Sections 10(b) and 20(a) of the Exchange Act and Rule 10b-5 promulgated thereunder.  ECF Nos. 4, 6.  Among other things, the Complaint alleged that Alibaba and the Individual Defendants violated the Exchange Act by failing to disclose the existence, content, and significance of the July 2014

---

[4] Named Plaintiffs Abel Amoros, Arthur Gabriel, Raymond Lee, and Gang Liu were added as parties to the Complaint.

Meeting and misrepresenting the true state of Alibaba's business, and operations, and the risks Alibaba was facing at the time of its September 2014 IPO and during the Class Period.  The Complaint further alleged that, as a result of the alleged misrepresentations and omissions relating to the July 2014 Meeting, the price of Alibaba's ADS was artificially inflated during the Class Period, and that when the White Paper was published, for the first time revealing the facts and risks relating to the July 2014 Meeting, the price of Alibaba's ADS dropped $4.29 per share, causing investor losses.

26.     The Complaint also alleged that Defendants made material misrepresentations and omissions in the IPO Registration Statement and during the Class Period relating to the SAIC's enactment of the "Red Shield Web Sword" program, an initiative to eliminate the sale of counterfeit goods on e-commerce platforms (hereafter, the "Red Shield Program"), implemented shortly before the IPO, and the impact that the Red Shield Program would likely have on Alibaba's business.

27.     Finally, the Complaint also alleged that an additional $8.64 per ADS price drop experienced on January 29, 2015, following a disappointing earnings announcement for the fiscal quarter ending on December 31, 2014, was also related to and caused by the omitted facts and risks underlying the July 2014 Meeting and the Red Shield Program.

### D.     Defendants' Motion to Dismiss the Complaint and Plaintiffs' Response

28.     On July 31, 2015, Defendants moved to dismiss the Complaint for failure to state a claim.  ECF Nos. 16-18.  Defendants argued that the Complaint failed to adequately plead: (a) that Defendants' non-disclosure of the July 2014 Meeting with Chinese regulators was an omission of material fact; (b) that Defendants made any actionable misrepresentations or omissions relating to the Red Shield Program; (c) facts suggesting that a material portion of

Alibaba's revenue was derived from sales of counterfeit goods, causing Plaintiffs' claim that Alibaba was bound to suffer financial harm to also fail; (d) sufficiently particularized facts giving rise to a strong inference of scienter; and (e) loss causation as Plaintiffs did not provide any information to the public regarding the Red Shield Program or that Alibaba suffered material revenue loss from curtailing third-party sales of counterfeit merchandise.

29.     More specifically, Defendants argued that Alibaba had no duty to disclose the July 2014 Meeting with the SAIC because its risk disclosures addressing governmental inquiries and its exposure to increased regulatory scrutiny were sufficient to satisfy any requirement under Form 20-F Item 5(d).  Defendants also argued that Alibaba's non-disclosure of the existence of the Red Shield Program did not amount to an actionable omission because Alibaba's Registration Statement's risk disclosures sufficiently disclosed the existence of any governmental enforcement effort.  Moreover, Defendants argued that allegations related to Alibaba facilitating counterfeiting on its platforms were immaterial as a matter of law because the complaint in the *Gucci* Litigation already made all relevant information available to the public.

30.     Regarding scienter, Defendants argued, inter alia, that the Complaint: (a) failed to demonstrate unusual trading sufficient to establish motive and opportunity on the part of two of the four the Individual Defendants; (b) failed to allege particularized facts demonstrating Defendants' knowledge, or deliberate recklessness with respect to, the July 2014 Meeting, or any other contradictory information at the time the alleged omissions were made regarding Alibaba's regulatory risk, the existence of the Red Shield Program, and the true state of Alibaba's business and operations.

16

31.     Lastly, the Defendants raised arguments that the Complaint failed to plead loss causation in connection with allegations related to the Red Shield Program and Alibaba's true state of its business and operations generally.  Specifically, Defendants argued that the alleged corrective disclosure – the publication of the White Paper before the open of trading on January 28, 2015 – was insufficient to establish loss causation because there was no reference to either the Red Shield Program, or any effects of anti-counterfeiting initiatives generally on Alibaba's business, in the White Paper.  Defendants claimed that Plaintiffs thus failed to allege a sufficient nexus between the disclosure and the alleged fraud.

32.     On August 28, 2015, Plaintiffs filed and served their papers opposing Defendants' motion to dismiss.  ECF Nos. 20, 21.  Plaintiffs sought to refute Defendants' arguments that Alibaba did not omit material information by demonstrating the significance of the July 2014 Meeting with the SAIC was due in part to the great power conferred upon the SAIC by the Red Shield Program and the number of high-ranking individuals from both sides in attendance. Plaintiffs also sought to refute Defendants' argument that Alibaba had no independent duty to disclose the July 2014 Meeting by arguing that once Defendants ventured to speak on the topics of counterfeiting and the PRC regulatory environment and the SAIC's regulation of Alibaba's business, they had a duty to tell the whole truth, including the receipt of the administrative guidance at the July 2014 Meeting.

33.     In addition, Plaintiffs argued that the Complaint sufficiently alleges a strong inference of scienter because the Individual Defendants were reckless when they disclaimed knowledge of the July 2014 Meeting by virtue of their high positions and active participation in Alibaba's business operations.  Plaintiffs also maintained that the core operation doctrine

supported a strong inference of scienter because the ongoing omission related directly to the core of Alibaba's business.

34.     Lastly, Plaintiffs addressed Defendants' argument regarding loss causation. Plaintiffs argued that Defendants incorrectly attempted to parse out stand-alone allegations related to the Red Shield Program and the alleged impact to Alibaba's revenues.   These allegations when considered in context with the July 2014 Meeting were sufficiently linked to the corrective disclosure on January 28, 2015.

### E.     The Dismissal of the Complaint, and Plaintiffs' Successful Appeal to the Second Circuit

35.     On June 21, 2016, in a 40-page opinion, the Court granted Defendants' motion to dismiss in full with prejudice and ordered the clerk to close the case file.  ECF No. 30 (the "Dismissal Order").  Noting "extensive cautionary disclosures" in Alibaba's IPO Registration Statement, the Court held that Plaintiffs failed to allege an actionable misrepresentation or omission.  The Court likewise held that Plaintiffs failed to allege that Defendants acted with scienter.  Finally, the Court concluded that amendment would be "futile" because the Court "concluded that Defendants were under no duty to disclose the July 16 Meeting[,]" and thus denied leave to amend.  The District Court's dismissal of the action in its entirety was a serious blow to the Class and, absent Plaintiffs filing and winning the appeal (discussed below), this early dispositive decision would have resulted in zero recovery for the then putative class of allegedly aggrieved investors.

36.     On July 20, 2016, Plaintiffs filed a notice of appeal to seek review of the Court's dismissal order by the United States Court of Appeals for the Second Circuit.  ECF No. 34.

37.     On November 2, 2016, Plaintiffs filed their opening appellate brief with the Second Circuit.  Plaintiffs argued that the Dismissal Order applied the incorrect standard when

evaluating materiality by not crediting certain key allegations in the Complaint.  Specifically, Plaintiffs alleged that the SAIC threatened to impose massive financial penalties on Alibaba and that the "White Paper" was a reliable account of the July 2014 Meeting despite its removal from the SAIC's website.  Plaintiffs also argued that the Dismissal Order incorrectly concluded that though motive and opportunity allegations against certain Individual Defendants were adequately alleged, they were not an independent basis for pleading scienter.

38.     On February 1, 2017, Defendants filed their response.  Defendants argued that the Dismissal Order correctly concluded that Plaintiffs failed to plead an actionable omission by alleging that Alibaba did not explicitly disclose the July 2014 Meeting with the SAIC. Specifically, Defendants argued that (i) no independent duty to disclose the informal and non-compulsory meeting existed under Item 303; (ii) Alibaba candidly disclosed the regulatory environment and risks in detail including recently enacted regulations, such as the SAIC-promulgated measures, which were discussed at the July 2014 Meeting; (iii) appropriate consideration was given to the publication of the "white paper" and allegations of threatened penalties; and (iv) materiality is insufficient to establish falsity.  Defendants also argued that the District Court correctly determined that Plaintiffs failed to plead facts giving rise to a strong inference of scienter.  Specifically, Defendants argued that (i) the motive and opportunity allegations failed because considering proceeds alone is insufficient when evaluating stock sales for purposes of scienter; and (ii) the allegations related to conscious misbehavior or recklessness failed because Plaintiffs failed to identify any report or statement provided to any Individual Defendant that contained any fact suggesting the Registration Statement was in any way false or misleading.

39.     On February 22, 2017, Plaintiffs filed their reply brief with the Second Circuit. Plaintiffs directly responded to Defendants' continued attacks on appeal, and, in particular, argued that: (i) Alibaba's disclosures of regulatory risks were materially misleading because they omitted that the SAIC actually threatened massive fines and that Alibaba did not think the meeting was immaterial because it persuaded the SAIC to hold the meeting behind closed doors and analysts and investors did not think that meeting was immaterial when they expressed alarm over the "white paper" and drove down Alibaba's stock price; (ii) the meeting's materiality did not depend on its level of formality because the what mattered to investors was that the SAIC threatened to impose enormous sanctions unless Alibaba took costly compliance measures; and (iii) Plaintiffs pled sufficient facts giving rise to a strong inference of scienter based on motive and opportunity and conscious misbehavior.

40.     On May 10, 2017, the Second Circuit held oral argument on Plaintiffs' appeal, and on December 5, 2017, the Second Circuit vacated the Dismissal Order and remanded the case to the Court for further proceedings.  *See Christina Asia Co. v. Ma et al.*, 718 F. App'x 20 (2d Cir. 2017).

**F.     The Protective Order and the Parties' Agreement Concerning the Operative Omission**

**1.     The Protective Order and Case Timeline**

41.     Following the Second Circuit's decision, the Parties began negotiating the protective order that would govern the treatment of evidence designated confidential or highly confidential through the resolution of the case.

42.     On January 12, 2018, the Parties attended a scheduling conference with the Court to discuss, among other things, the discovery required and the proposed timeline to accomplish the fact and expert discovery required.

43.     On January 19, 2018, the Parties filed a stipulation proposing an agreed upon discovery schedule to the Court (the "Initial Scheduling Order").  ECF No. 42.  Also on January 19, 2018, the Parties filed the Stipulation and Protective Order Regarding Confidential Information and Highly Confidential Information (the "Protective Order").  ECF No. 43.  The Court endorsed both the proposed Scheduling Order and Protective Order that same day.  ECF No. 44.

44.     The key pre-trial deadlines in the Initial Scheduling Order were:

| DATE | EVENT |
|---|---|
| December 31, 2018 | Deadline to complete all fact discovery. |
| March 11, 2019 | Deadline to complete all expert discovery. |
| June 11, 2019 | Summary judgment deadline. |
| If necessary, six weeks following decision on summary judgement motions. | Deadline to file pre-trial papers. |

## 2.     The Operative Omission Stipulation

45.     Following the Second Circuit's reversal of the Dismissal Order, the Parties met and conferred about entering into a stipulation to clarify the nature and scope of Plaintiffs' claims going forward in light of the Second Circuit's order.

46.     On February 14, 2018, the Parties filed, and the Court signed that same day, a stipulation in which the Parties agreed that "[t]he operative omission of material fact alleged in this action was that Defendants failed to disclose the existence, content and significance of the July 16, 2014 administrative guidance meeting allegedly described in the 'White Paper

Regarding the Administrative Guidance Provided to the Alibaba Group' (the 'Operative Omission')." ECF No. 46.[5]

### G.   Class Certification and Defendants' Answer to the Complaint

47.   On March 12, 2018, Plaintiffs filed their opening motion to certify the action as a class action, seeking the Court's certification of a class comprised of all persons and/or entities that purchased or otherwise acquired Alibaba ADS, or purchased call options or sold put options on Alibaba ADS, during the period September 19, 2014, through January 28, 2015, inclusive, other than those shares purchased directly in the IPO.  Plaintiffs' motion included the expert report of Dr. David Tabak, which set forth the evidence in support of the efficiency of the market for Alibaba securities.  ECF Nos. 52-54.

48.   On April 30, 2018, after deposing Plaintiffs' market efficiency expert, Defendants filed a notice of non-opposition to class certification.  ECF No. 55.

49.   On May 1, 2018, the Court entered an order certifying the Class consisting of:

> all persons and/or entities that purchased or otherwise acquired Alibaba ADS, or purchased call options or sold put options on Alibaba ADS, during the period September 19, 2014, through January 28, 2015, inclusive, other than those shares purchased directly in the September 19, 2014 Initial Public Offering,[6] and appointed the Plaintiffs as the Class Representatives and the Rosen Firm, as Class Counsel.
>
> ECF No. 56.

---

[5] Consequently, Complaint paragraphs 178, 184, 188, 220-221, 223-224, and 227 were no longer operative as statements alleged to be misleading by omission.

[6] Excluded from the Class are: (a) persons who suffered no compensable losses; and (b) Defendants; the present and former officers and directors of Alibaba at all relevant times; members of their immediate families and their legal representatives, heirs, successors, or assigns; and any entity in which any of the Defendants, or any person excluded under this subsection (b), has or had a controlling interest at any time.

50.     On June 1, 2018, Defendants filed their answer to the Complaint.  ECF No. 57.  In their Answer, Defendants continued to deny Plaintiffs' claims in their entirety, and asserted seven affirmative defenses, including, among other things, that: (i) Plaintiffs' claims were barred by Plaintiffs' actual and/or constructive knowledge of the alleged omitted information due to the fact that the information was already disclosed in the public domain at the time any of the challenged statements were made; (ii) Plaintiffs failed to plead loss causation; and (iii) the alleged misstatements and omissions were made in good faith and were based on what the speakers believed to be true at the time the statements were made.

**H.      Plaintiffs' Comprehensive Discovery Program**

51.     Discovery in this action was extremely hard-fought.  These efforts involved Lead Counsel's issuance of dozens of formal document and written discovery requests to Defendants and thirty-four (34) third parties, reviewing and analyzing written responses and objections to those requests, the exchange of many hundreds of emails and numerous pages of correspondence among counsel for the Parties and third parties, and, ultimately, the production of approximately 1.1 million pages of documents by Defendants and third parties.

52.     Further, the pre-trial schedule in the action was extremely compressed.  Under the initial schedule, Plaintiffs had approximately 11.5 months to initiate document production, meet and confer, obtain, review, and analyze over one million pages of documents, and to complete over twenty party and third-party depositions.  And of course, at the same time, Plaintiffs had to complete their obligations to produce discovery, including the production of hundreds of pages of documents and defending five (5) Plaintiff depositions.  Following the completion of fact discovery, the Parties had just over three (3) months to complete expert discovery. The difficulties arising from this compressed schedule were further compounded by the fact that

counsel were required to travel internationally to Hong Kong and New Zealand for 21 fact depositions, as well as two expert depositions.

53.     This fast-paced schedule required Plaintiffs' Counsel to efficiently, skillfully, and aggressively pursue, obtain, review, analyze, and utilize a massive amount of discovery from dozens of sources.   As such, I delegated specific and discrete assignments to additional Plaintiffs' Counsel firms and directly oversaw and managed their completion of that work. Given the enormous scope of discovery and the challenge of distilling it down into a comprehensive, accessible, and usable factual record, I was in regular—and at times daily (at all hours of the day and on weekends)—communication with counsel from the additional Plaintiffs' Counsel firms, particularly Glancy Prongay & Murray and MoloLamken.   The compressed schedule and extent of work to be accomplished required all Plaintiffs' Counsel to be as efficient as possible and engage in significant collaboration in the face of an aggressive and well-funded adversary.   These efforts continued for many months and resulted in this action being litigated as efficiently and effectively as possible to the benefit of the Class.

## 1.     The Pursuit of Extensive Document and Written Discovery from Defendants

54.     To carry their burden to prove violations of the federal securities laws, Plaintiffs had to develop a very substantial amount of evidence.   For example, Plaintiffs had to develop the record necessary to prove that Defendants acknowledged the significance of the July 2014 Meeting and knowingly or recklessly did not disclose it or their follow up meetings with the SAIC in Alibaba's IPO offering documents.   This was a challenging undertaking given that the vast majority of the critical documents were produced in Mandarin Chinese and involved a company whose structure, culture, and operations were very different from how US-based companies are typically run.

24

55.     To obtain the documents necessary to build their case, over the course of the litigation, Plaintiffs vigorously pursued the production of documents by Defendants, and pressed Defendants to correct numerous specific deficiencies in Defendants' production.

56.     On January 19, 2018, Defendants made an initial production of approximately 100,000 pages of documents to Plaintiffs which was comprised of: (1) documents previously produced in the State Action; (2) documents previously produced to the SEC in response to a SEC inquiry received by Alibaba in early February 2015 requesting certain information about Alibaba's interactions with the SAIC relating to alleged counterfeit goods; and (3) certain discovery-related documents prepared in connection with the State Action, including the privilege log produced in the State Action.

57.     On February 2, 2018, Plaintiffs served on Defendants their first set of Requests for Production of Documents, which was comprised of forty-one (41) requests,[7] and their first set of written Interrogatories, which was comprised of fifteen (15) interrogatories.[8]  Also on February 2, 2018, the Parties exchanged their Initial Disclosures.

58.     On March 5, 2018, Defendants served on Plaintiffs their responses and objections to Plaintiffs' first set of Requests for Production of Documents.  On March 21, 2018, Defendants served on Plaintiffs their responses and objections to Plaintiffs' first and second set of written

---

[7] Plaintiffs subsequently served on Defendants additional Requests for Production of Documents. On August 16, 2018, Plaintiffs served seven (7) additional Requests for Production of Documents.  On October 29, 2018, Plaintiffs served seventeen (17) additional Requests for Production of Documents on Defendants.  On December 9, 2018, Plaintiffs served on Defendants fourteen (14) additional Requests for Production of Documents.  On December 28, 2018, Plaintiffs served twenty-nine (29) additional Requests for Production of Documents.  These requests targeted very specific documents that were discussed during certain depositions.  On January 1, 2019, Plaintiffs served one (1) additional Request for Production of Documents

[8] Plaintiffs subsequently served on Defendants additional written Interrogatories.  On February 19, 2018, Plaintiffs served six (6) additional written Interrogatories on Defendants.  On April 10, 2018, Plaintiffs served four (4) additional written Interrogatories on Defendants.  On September 26, 2018, Plaintiffs served on Defendants one (1) additional written Interrogatory.

Interrogatories.  On April 19, 2018, Defendants supplemented their responses and objections to Plaintiffs' first set of written Interrogatories.  On May 9, 2018, Defendants served on Plaintiffs their responses and objections to Plaintiffs' third set of written Interrogatories.  On May 31, 2018, Defendants supplemented their responses and objections to Plaintiffs' second set of written Interrogatories.

59.     Beginning in early March 2018 the Parties began negotiating the parameters of Defendants' production of documents and other evidence through an exchange of numerous meet-and-confer letters and lengthy telephonic meet-and-confer sessions.  These negotiations continued through the end of fact discovery as Plaintiffs continued to press Defendants for documents based on information uncovered in fact depositions and from reviewing documents as they were produced.  Topics negotiated included, among other things: electronic search terms, custodians, the relevant time period for Defendants' search and production, the scope of Alibaba's Rule 30(b)(6) deposition, the number and identity of deponents, and the logistics of depositions, including matters relating to interpretation, check interpretation, location, and length.

60.     On August 16, 2018, Plaintiffs served on Defendants their first set of Requests for Admissions, which was comprised of forty-eight (48) requests for admissions.  Plaintiffs subsequently served on Defendants additional Requests for Admissions.  On December 28, 2018, Plaintiffs served twenty-one (21) additional Requests for Admissions on Defendants.  That same day, Plaintiffs served thirteen (13) additional Requests for Admissions solely for authentication purposes.

### 2.      The Pursuit of Extensive Discovery from Third Parties

61.      In addition to pursuing discovery from Defendants, Plaintiffs also served thirty-four (34) third-party subpoenas for production of documents on various third parties, including, among others:

a.      The five (5) primary joint bookrunners of the IPO, and representative of the total of thirty-four (34) IPO underwriters: Credit Suisse Securities (USA) LLC; Deutsche Bank Securities Inc.; Goldman Sachs (Asia) L.L.C.; J.P Morgan Securities LLC; and Morgan Stanley & Co. International plc;[9]

b.      Twenty (20) securities analyst firms who issued substantial coverage on Alibaba before, during, and/or following the IPO during the Class Period, including: UBS Securities Asia Limited; RBC Capital Markets; Wedbush Securities; Oppenhiemer & Co. Inc.; BNP Paribas Securities (Asia) Ltd.; Credit Suisse (HK) Ltd.; Deutsche Bank AG; HSBC; ISI Group LLC; Morgan Stanley Asia Ltd.; Nomura Securities International, Inc.; SunTrust Robinson; Wells Fargo Securities LLC; Barclays Bank PLC; Cantor Fitzgerald & Co.; Jefferies Group LLC; BMO Capital Markets; CRT Capital; Topeka Capital Markets, and J.P. Morgan;

c.      Rothschild Inc., which served as Alibaba's financial advisor and information conduit between the underwriters and the Company during the IPO;

d.      Kroll Associates, Inc., a corporate investigation firm hired by Credit Suisse to create a due diligence report based on its investigation of Alibaba and its executives prior to the IPO;

e.      Three (3) public relations firms utilized by Alibaba in connection with the IPO and/or in connection with Alibaba's public response to the publication of the White Paper, including: Sard Verbinnen & Co.; Hill+Knowlton Strategies; and Brunswick Group;

f.      Pricewaterhouse Coopers, accounting firm retained by Alibaba prior to, during, and following the IPO;

g.      Softbank Telecom America Corp., one of Alibaba's significant shareholders leading up to the IPO; and

---

[9] Plaintiffs' Counsel also served a subpoena on Citigroup Global Markets, but did not pursue production of documents from this entity because it was not one of the primary joint bookrunners of the IPO.

h.   Yahoo (Altaba), one of Alibaba's significant shareholders that entered a stock sale agreement with Alibaba prior to the IPO.

62.   Plaintiffs' Counsel engaged in substantial meet and confer discussions to obtain significant productions pursuant to these subpoenas.  For instance, the law firm representing each of the five lead underwriters initially only agreed to produce all documents that were produced in the State Action and the IPO deal file (an electronic folder shared among the five lead underwriters comprised of approximately 1,000 documents).  Plaintiffs' Counsel then engaged in numerous meet-and-confer discussions to negotiate search terms and the relevant time period for the underwriters' production of documents which differed greatly from the State Action's relevant time period.  These discussions ultimately led to a significant additional production of documents by the underwriters which Plaintiffs' Counsel reviewed and analyzed.  Plaintiffs' Counsel also noticed a Rule 30(b)(6) deposition of certain underwriters and thereafter aggressively negotiated the deponent, topics, and timing leading up to the Rule 30(b)(6) deposition of Morgan Stanley taken in January 2019.

63.   Certain analyst firms (including BNP Paribas Securities (Asia) Ltd., Credit Suisse (HK) Ltd., Deutsche Bank AG, HSBC, ISI Group LLC, Morgan Stanley Asia Ltd., Nomura Securities International Inc., SunTrust Robinson, and Wells Fargo Securities LLC) were represented by the same law firm that represented the five lead underwriters.  Again, substantial efforts to meet and confer on the scope and timing of productions by these analyst firms were required to secure the production of documents.

64.   Plaintiffs' Counsel also engaged in numerous meet and confer discussions with Rothschild Inc. to obtain a significant document production pursuant to Plaintiffs' subpoena. Specifically, Plaintiffs' Counsel negotiated search terms, custodians, and the relevant time period for Rothschild's production.  The negotiation of the custodian list was particularly extensive

because many of the custodians that were significantly involved in Alibaba's IPO due diligence process were located in Hong Kong.  Plaintiffs' Counsel had to research and address Rothschild Inc.'s concern regarding the potential impact of the European Union's General Data Protection Regulation on custodians domiciled overseas in order to obtain a comprehensive document production from relevant custodians.  Plaintiffs' Counsel also noticed a Rule 30(b)(6) deposition and thereafter negotiated the topics leading up to the Rule 30(b)(6) deposition taken in January 2019.

### 3.   Discovery Produced by Plaintiffs

65.   On March 16, 2018, Defendants served their first set of Requests for Production of Documents to Plaintiffs.  On March 23, 2018, Plaintiffs served on Defendants their first production of documents, which contained documents sufficient to demonstrate each of the Plaintiffs' transactions relevant to the action.  On April 16, 2018, Plaintiffs served on Defendants their responses and objections to Defendants' first set of requests for production of documents.

66.   On November 7, 2018, Defendants served on Plaintiffs their second set of Request for Production of Documents.  Plaintiffs served their responses and objections to Defendants' second set of Request for Production of Documents on December 8, 2018. Following service of Plaintiffs' responses and objections to Defendants' second set of Request for Production of Documents, the Parties engaged in extensive meet and confer discussions regarding the scope of Plaintiffs' document production.  These discussions culminated in Plaintiffs' second production of documents on January 17, 2019.

### 4.   Discovery Disputes

67.   While the Parties made considerable effort to resolve discovery disputes without Court intervention, a few disputes did end up before the Court.  This section summarizes the

major discovery disputes that the Parties spent considerable time negotiating and, in two instances, briefing and litigating before the Court.

**(a)       September 30, 2018 Letter-Motion for Discovery Relief**

68.     On September 30, 2018, Lead Counsel filed a letter requesting a telephonic conference with the Court to discuss certain discovery disputes that arose during fact discovery that the Parties were unsuccessful in resolving.  ECF No. 61.  The Court referred the discovery dispute to Magistrate Judge Stewart D. Aaron, who set a letter-motion briefing schedule for the Parties.

69.     On October 3, 2018, Plaintiffs submitted their letter-motion on the discovery dispute.  ECF No. 65.  Plaintiffs argued that Defendants improperly redacted documents on relevancy and burden grounds.   Specifically, Plaintiffs argued, among other things, that Defendants' assertion that communications/interactions with regulators other than the SAIC/AIC are irrelevant was misplaced because those communications allowed Plaintiffs to assess the relative importance and extraordinary nature of the July 16, 2014 administrative guidance meeting with the SAIC/AIC.  Defendants filed their response to Plaintiffs' letter-motion on October 8, 2018.  ECF No. 67.  Plaintiffs' filed their reply on October 9, 2018.  ECF No. 72.

70.     On October 11, 2018, Judge Aaron held a telephonic hearing.  Following the hearing, the Court ordered the Parties to submit additional briefing on matters of privilege.  ECF No. 73.

71.     On October 12, 2018, Judge Aaron granted Plaintiffs' requested relief, ordering Defendants to produce unredacted versions of documents previously redacted on the grounds of "relevancy and burden" no later than November 12, 2018.  ECF. No. 74.

30

**(b)      October 30, 2018 Motion to Compel**

72.      In accordance with Judge Stewart's order, on October 30, 2018, Plaintiffs filed their motion to compel Defendants to produce certain documents and information that Plaintiffs argued were improperly withheld on privilege grounds.  ECF Nos. 85-87.  Specifically, Plaintiffs argued that Defendants improperly re-categorized numerous documents that were previously withheld on the ground that they contained legal advice on Chinese matters or from Chinese in-house lawyers relating to PRC legal issues, to claim that they related to U.S. legal issues instead. As a result of these improper claims of privilege, Plaintiffs argued that Defendants waived their privilege assertions with respect to all documents for which they changed descriptions and asked the Court to conduct an *in camera* review, among other arguments.

73.      On November 2, 2018, Defendants filed their response to Plaintiffs' motion.  ECF Nos. 93-95.  Specifically, Defendants argued that Plaintiffs' challenges to the claims of privilege as stated on Alibaba's initially-provided privilege log were unfounded because Defendants had revised the initial privilege log in order to provide a new log specific to this action, and that in so doing, they had merely revised certain descriptions to clarify what they deemed to be Defendants' already proper assertions of privilege, to more clearly state bases for withholding which Defendants claimed always existed.  Defendants argued that they did not waive privilege because the changes made to the privilege log were almost exclusively revised descriptions of the documents for purposes of clarification, not the basis or grounds for privilege assertions.

74.      On November 8, 2018, Plaintiffs filed their reply in further support of their motion to compel.  ECF Nos. 100-101.  Plaintiffs argued that Defendants' distinction between revising only factual descriptions on the privilege log versus the types of privilege claimed has no support in the law.

75.     On November 15, 2018, Judge Aaron held a telephonic hearing.  The next day, Judge Aaron granted in part and denied in part Plaintiffs' motion to compel.  Judge Aaron ordered Defendants to produce full and complete copies of certain documents and to submit certain additional documents to the Court for *in camera* review.  ECF No. 109.

### (c)     November 9, 2018 Letter-Motion to Extend Fact Discovery

76.     On November 9, 2018, Plaintiffs filed a letter-motion, with the consent of Defendants, requesting a thirty-day (30) extension of the fact discovery deadline from December 31, 2018 to January 31, 2019.  The request for this brief extension was based on the need to obtain and analyze the additional documents to be produced by Defendants pursuant to Judge Aaron's orders on Plaintiffs' letter motion and motion to compel, with the Parties agreeing to a modified schedule that would extend discovery by one month, thereby adjusting all other deadlines by one month as well.

77.     The Court subsequently amended the Initial Scheduling Order on November 9, 2018 (the "Amended Scheduling Order") extending all dates by thirty (30) days.  The new key pre-trial deadlines in the Amended Scheduling Order were as follows:

| DATE | EVENT |
|---|---|
| February 1, 2019 | Conclusion of fact discovery. |
| April 11, 2019 | Deadline to complete all expert discovery. |
| July 11, 2019 | Summary judgment deadline. |
| If necessary, six weeks following decision on summary judgement motions. | Deadline to file pre-trial papers. |

5.     **Review and Analysis of More Than 1.1 Million Pages of Documents, Including Thousands of Documents Produced in Mandarin Chinese**

78.    Over the course of the approximately one-year discovery period, Plaintiffs' Counsel obtained and strategically reviewed/analyzed more than 1.1 million pages of documents produced by Defendants and third parties.  The documents were hosted in an Internet-based document database allowing access remotely, in particular to those attorneys traveling overseas for depositions.  These documents needed to be reviewed, analyzed and distilled into a workable set of "hot" documents.  In reviewing these documents, project attorneys were tasked with making several analytical determinations as to their importance and relevance.  Specifically, they determined whether the documents were "hot," "highly relevant," "relevant," or "irrelevant."  They also assessed which specific issues the documents related to, including documents discussing the July 2014 Meeting by Alibaba employees, documents relating to remediation efforts undertaken by Alibaba to combat the sale of counterfeit goods on its platforms, and documents relating to the IPO due diligence process, for example.

79.    The project attorneys also analyzed the documents for several other issues related to the adequacy and scope of Defendants' document production.  For example, project attorneys assisted in the review of all privilege redactions, as well as in the review and analysis of Alibaba's numerous privilege logs, to determine whether Defendants were redacting or withholding potentially non-privileged information.   The project attorneys also reviewed Alibaba's productions for substance and completeness, to determine whether Defendants were producing the documents they had agreed to produce in response to Plaintiffs' document requests and in light of agreements made in the context of the Parties' ongoing efforts to meet and confer.

33

80.     Many of the documents produced in the action were produced in Mandarin Chinese.  This required a four-step process: (1) an initial review and analysis by a Mandarin Chinese-speaking attorney in order to assess whether the document contained information relevant to Plaintiffs' claims; (2) creating certified translations of selected documents by a translation company, Morningside Translations ("Morningside"), which given the complexity of the language, was time-consuming and costly; and (3) a second review and analysis of translated documents by an English-speaking attorney to categorize the documents based on level of relevance/interest and issues identified; and (4) a Mandarin Chinese-speaking attorney's "translation check" of translated documents to ensure the accuracy and consistency of translations.   Oftentimes, Mandarin-Chinese speaking attorneys would provide immediate rough/unofficial translations of documents determined to be "hot" so that attorneys preparing for depositions would have quick access to important information and Plaintiffs' Counsel would not be hamstrung waiting for official certified translations to be returned.

81.     During the review process, in addition to *ad hoc* communications regarding the review which often occurred on a daily basis, Plaintiffs' Counsel held frequent meetings with the attorneys engaged in the document review.   During these meetings, attorneys who analyzed documents discussed their importance, and other counsel present asked questions and discussed additional, similar documents that had been discovered.   Through these meetings, Plaintiffs' Counsel ensured that all attorneys were aware of the important documentary evidence being developed in the matter, and focused the document review teams, both English-language and Mandarin Chinese-language teams, on developing evidence in support of Plaintiffs' claims. After these meetings, an attorney would integrate any new information into a database that allowed attorneys to access all evidence developed in support of Plaintiffs' Claims.

82.     As the document review process was ongoing, Plaintiffs' Counsel created a central repository of key documents organized by issue.   Important documents related to Plaintiffs' claims were arranged chronologically and saved electronically on a web-based database platform.   This platform was regularly updated as additional key documents were discovered.   Creating this repository of key documents allowed attorneys to easily access and analyze the key documents related to any claim in the case without having to independently compile them.   This allowed the attorneys to efficiently prepare for depositions and locate evidence for numerous fact-based submissions to the Court.

### 6.     Plaintiffs' Pursuit of Extensive Deposition Discovery

#### (a)     Rule 30(b)(6) Depositions of Alibaba

83.     During the extensive fact and expert discovery in the action that ensued, in July 2018, Plaintiffs' Counsel took two Rule 30(b)(6) depositions of Defendant Alibaba over three days in Hong Kong (the first two days were conducted in Mandarin Chinese and the last day was in English).  Beginning in March 2018 through June 2018, the Parties extensively negotiated the Rule 30(b)(6) proposed topics telephonically and through the exchange of letters and e-mails. Ultimately, the Parties narrowed the scope of the Rule 30(b)(6) depositions to approximately sixty (60) topics.   Simultaneously, the Parties began negotiating a Rule 30(b)(6) deposition protocol.  The protocol addressed logistical topics such as, among other things, the length of the depositions, the use of check interpreters, and translations offered as exhibits.  This protocol was ultimately signed by both Parties just prior to beginning the first Rule 30(b)(6) deposition on July 12, 2018.

84.     On July 12 and 13, 2018, Sara Yu, Alibaba's Associate General Counsel and VP of Alibaba, testified on behalf of the Company on topics relating to, among other things: the

events relating to the July 2014 Meeting, attendees of the meeting, topics discussed at the meeting, and documents relating to the meeting; Alibaba's subsequent actions with respect to the administrative guidance provided by the SAIC and AICs at the July 2014 Meeting, including whether Alibaba accepted the guidance and/or implemented requested changes; risks facing Alibaba's business as a result of the July 2014 Meeting and administrative guidance provided with respect thereto, including Alibaba's potential exposure to fines and/or the impact of the administrative guidance on Alibaba's operations; and any regulatory or law enforcement investigations or proceedings initiated against Alibaba relating to the July 2014 Meeting and/or the White Paper.

85.     On July 16, 2018, Timothy Steinert, Alibaba's General Counsel, testified on behalf of the Company on topics relating to, among other things: communications between Alibaba and Chinese or U.S. media regarding the July 2014 Meeting; the anticipated and actual results or impact of implementing the administrative guidance received from the Company by the SAIC and AICs; any discussion or analysis of the impact that disclosure of the July 2014 Meeting may have had on the IPO, including the IPO due diligence process or IPO pricing, including whether the July 2014 Meeting was a material event, trend, or uncertainty that may have required disclosure in the IPO Registration Statement; any proceedings or communications between Alibaba and U.S. authorities regarding the subject matter discussed in the July 2014 Meeting and/or the White Paper; any lawsuits against Alibaba relating to the subject matter discussed in the July 2014 Meeting and/or the White Paper; Alibaba's internal and public response to the publication of the White Paper; Alibaba's public filings and statements made relating to the subject matter of the action; and the sale of Alibaba's ADSs in the IPO and aftermarket.

36

          **(b)**      **Twenty-two Fact Depositions of Alibaba Employees and Third Party Witnesses**

86.     In April 2018, the Parties began to negotiate the various Alibaba employees that Plaintiffs' Counsel would depose as fact witnesses.  Prior to starting fact depositions, the Parties negotiated a deposition protocol to address potential issues that arise when conducting depositions in Mandarin Chinese with English translation.   The negotiations started in May 2018 and continued throughout the fact discovery period.

87.     Between October 2018 and January 2019, Plaintiffs' Counsel took twenty-two (22) fact depositions of current Alibaba employees and third parties.  Specifically, the following witnesses were deposed on the following dates:

    a.     Chengxian Fan (Director of Taobao Rules and Regulations)
            conducted in Mandarin Chinese
            October 9-10, 2018 in Hong Kong;

    b.     Bo Shi (Assistant to the President of Alibaba Group)
            conducted in Mandarin Chinese
            October 11-12, 2018 in Hong Kong;

    c.     Shan Xu (Manager, Office of the President of Alibaba)
            conducted in Mandarin Chinese
            October 16-17, 2018 in Hong Kong;

    d.     Annie Shuyuan Ye (Alibaba Department of Grey Market Goods)
            conducted in Mandarin Chinese
            October 18-19, 2018 in Hong Kong;

    e.     Xiaoling Chen (Senior Director of Tmall Rules and Regulations)
            conducted in Mandarin Chinese
            October 25-26, 2018 in Hong Kong;

    f.     Zhixian Meng (Impact Witness #1 – Cost of Counterfeiting Rectification on Alibaba's platforms – Taobao and Tmall)
            conducted in Mandarin Chinese
            November 9, 2018 in Hong Kong;

    g.     Dongwei Hou (Alibaba's Government Affairs Advisor)
            conducted in Mandarin Chinese
            November 13-14, 2018 in Hong Kong;

h.     Weimin Yu (Alibaba's Chief Internet Security Consultant)
       conducted in Mandarin Chinese
       November 15-16, 2018 in Hong Kong;

i.     Maggie Wei Wu (CFO of Alibaba)
       conducted in Mandarin Chinese
       November 29-30 in Hong Kong;

j.     Jonathan Zhaoxi Lu (CEO of Alibaba from 2013 to 2015)
       conducted in Mandarin Chinese
       November 29-30 in Auckland, New Zealand;

k.     Sara Siyung Yu (Associate General Counsel and VP of Alibaba)
       conducted in Mandarin Chinese
       December 4-5, 2018 in Hong Kong;

l.     Dai (Trudy) Shan (Chief People Officer of Alibaba, transitioning to Chief
       Customer Officer)
       conducted in Mandarin Chinese
       December 6-7, 2018 in Hong Kong;

m.     Guan Liyuan (Impact Witness #2 – Data Product Advisor, testified to
       product removals from Alibaba platforms)
       conducted in Mandarin Chinese
       December 10, 2018 in Hong Kong;

n.     Lina (Brandy) Zhang (Alibaba's Director of Government Affairs)
       conducted in Mandarin Chinese
       December 11-12, 2018 in Hong Kong;

o.     Xiaoming Zhang (Impact Witness #3 – Data Security, testified to
       Alimama risk control and quality control)
       conducted in Mandarin Chinese
       December 12, 2018 in Hong Kong;

p.     Joseph Tsai (co-founder of Alibaba and Executive Vice Chairman)
       December 14, 2018 in Hong Kong;

q.     Daniel Wetstein (Managing Director of Morgan Stanley)
       January 17, 2019 in Hong Kong;

r.     Matthew Sperling (Director at Rothschild & Co.)
       January 17, 2019 in New York, NY;

s.     Michael Yao (Senior Vice President of Finance at Alibaba)
       January 18, 2019 in Hong Kong;

38

> t.    Xiaofeng Shao (CRO and Party Secretary of Alibaba)
>        conducted in Mandarin Chinese
>        Janaury 22-23, 2019 in Hong Kong;
>
> u.    Jack Yun Ma (founder and Executive Chairman of Alibaba)
>        January 29, 2019 in Hong Kong; and
>
> v.    Daniel Yong Zhang (COO of Alibaba from 2013 to 2015; CEO of
>        Alibaba)
>        conducted in Mandarin Chinese
>        January 31-February 1, 2019 in Hong Kong.

88.    Each of these depositions involved extensive preparation by Plaintiffs' Counsel, including detailed review of Defendants' and third-parties' productions, review of prior testimony that related to the witness, witness-specific research, and a close analysis of the issues in the case. Project attorneys also prepared extensive "deposition kits," which included the relevant documents for each witness, as well as detailed "witness memoranda" and analyses specific to each deponent.

89.    Following the conclusion of each deposition, to aid in the development and organization of the evidence in the record, and in preparation for future depositions to be conducted, project attorneys also prepared detailed deposition digests that summarized testimony given by each deponent into a readable, narrative form, as well as topical summaries of testimony by each deponent, organized according to key issues Plaintiff' Counsel had identified in the action.

### (c)    Plaintiffs' Depositions

90.    While Plaintiffs' Counsel was preparing for and taking the above-enumerated twenty-two fact depositions of Alibaba employees and third parties, each of the Class Representatives was deposed on the following dates and locations:

> a.    Christine Asia Ltd. / William Tai
>        January 21, 2019 in Hong Kong;

    b.      Abel Amoros
            November 13, 2018 in Philadelphia, Pennsylvania;

    c.      Arthur Gabriel
            January 15, 2019 in New York, New York;

    d.      Raymond Lee
            December 18, 2018 in Hong Kong; and

    e.      Gang Liu
            December 19, 2018 in Irvine, California.

91.     In each instance, Plaintiffs' Counsel spent significant time preparing each witness in advance of his deposition and represented each Class Representative at his deposition.

### 7.    Plaintiffs' Counsel's Additional Discovery and Investigation

92.     In addition to pursuing discovery from Defendants and third parties as detailed above, Plaintiffs' Counsel also reviewed and analyzed all court filings and related publicly-available information in connection with the State Action (*Buelow v. Alibaba Group Holding Limited et al.*, filed in the Superior Court of the State of California, County of San Mateo (Master File No. CIV-535692), which alleged claims pursuant to Section 11 of the Securities Act against Defendants and the underwriters of Alibaba's historic IPO.

93.     Plaintiffs' Counsel also submitted FOIA requests to the SEC and the USTR. Plaintiffs' Counsel telephonically met and conferred with the SEC's Office of FOIA Services and subsequently received a small production of non-exempt responsive documents, which were reviewed and analyzed.  Plaintiffs' Counsel also met and conferred, both telephonically and through e-mail, with the USTR's FOIA Program Manager in order to focus the USTR's record search in response to Plaintiffs' FOIA request.  Ultimately, Plaintiffs did not receive a production of documents from the USTR because the non-exempt responsive documents were already available to the public.  Plaintiffs' Counsel subsequently reviewed and analyzed all publicly available relevant documents from the USTR website.

94.     In addition to the electronic production of documents by Defendants and third parties described above, Alibaba made certain documents (that Alibaba insisted required withholding, citing Chinese state secrecy concerns) physically available for Plaintiffs' Counsel's review through a third party neutral Chinese attorney.  This compromise was the result of much meeting and conferring by the Parties over disputed documents.  In accordance with the Parties' agreement, the Chinese attorney reviewed the documents and redactions made by Defendants to ensure that redacted information was, in fact, legitimately withheld based on protected Chinese state secrets.  Jing Chen, an associate with my firm who is bilingual in English and Chinese, traveled to Shenzhen, China in December 2018 to complete this process, during which she questioned the neutral attorney about the contents of the documents and the redacted information in an attempt to determine whether any of the withheld information was relevant to the action.

## I.     Plaintiffs' Counsel's Substantial Work With Highly-Qualified Experts

95.     Given the complex nature of this action, it was critical for Plaintiffs to retain highly-qualified experts to provide support for Plaintiffs' claims of Defendants' liability and damages.  Plaintiffs' Counsel worked extensively with highly-experienced experts to inform them of the claims and evidence, analyze the evidence, and assist the experts in the preparation of their reports in this action.  Plaintiffs retained the following individuals as experts in the following fields:

### a.     Dr. David Tabak

Dr. Tabak is a Managing Director of National Economic Research Associates, Inc. (NERA) Consulting.  Dr. Tabak is a nationally recognized expert in analyzing financial issues related to securities class actions.  In the area of securities class actions, Dr. Tabak has extensive experience testifying on topics related to class certification, liability, materiality, affected trading volume, and damages.

Dr. Tabak served as an expert in market efficiency, loss causation, and damages resulting from Defendants' alleged securities law violations.  Dr. Tabak authored three critical reports for Plaintiffs and sat for deposition twice in this action.  First, on or about

41

March 9, 2018, Dr. Tabak issued a 101-page report (including substantive exhibits) establishing market efficiency to support Plaintiffs' invocation of the presumption of reliance in connection with their motion for class certification. He was deposed by Defendants in connection with his market efficiency report on April 6, 2018. Defendants thereafter did not challenge Dr. Tabak's findings on market efficiency and instead filed a notice of non-opposition to Plaintiffs' motion for class certification. After the close of fact discovery, on or about February 11, 2019, Dr. Tabak issued his 556-page report (including substantive exhibits) on topics relating to loss causation and damages. On March 7, 2019, he submitted his 43-page rebuttal report (including substantive exhibits) on loss causation and damages. He was fully prepared for his second deposition, and was in the midst of testifying at his deposition on March 29, 2019, when the agreement to settle was reached, and his deposition immediately concluded mid-stream.

### b.    William H. Purcell

Mr. Purcell is a Managing Director at Seale & Associates, an independent, global investment bank. Mr. Purcell has been involved in over 190 cases including due diligence related cases as well as complex corporate situations, specifically those involving the failure of multi-billion dollar institutions, and has been retained by U.S. government regulatory agencies, including the SEC, the Department of Justice (the "DOJ"), and the Internal Revenue Service (the "IRS"). Mr. Purcell has testified on topics including the IPO due diligence process, director and officer fiduciary duty disputes, and merger and acquisition disputes.

Mr. Purcell served as an investment banking and financial expert with respect to various due diligence and disclosure issues in connection with an initial public offering, specifically Alibaba's historic IPO of ADS on September 19, 2014. Mr. Purcell authored two detailed and integral reports regarding the IPO process in this action. His 73-page opening report contained critical conclusions regarding Alibaba's actions and omissions in this action, including his opinion that Alibaba's failure to inform the IPO underwriters of the July 2014 Meeting violated the duty of candor required in connection with the due diligence process and that the omission of the July 2014 Meeting from the IPO Registration Statement was material. Mr. Purcell also authored a 24-page rebuttal report in further support of his conclusions, issued on or about March 11, 2019.

### c.    Professor Robert C. Berring

Professor Robert Berring is the Walter Perry Johnson Professor of Law, Emeritus at the University of California Berkeley Law School. Professor Berring has submitted numerous affidavits in cases concerning matters of Chinese law in a variety of judicial and administrative venues.

Professor Berring served as an expert on the Chinese legal system as it operates generally and the role of the Chinese Communist Party in influencing a Chinese company's corporate behavior. He issued his report in the action on or about February 11, 2019. Plaintiffs' Counsel defended his deposition on March 19, 2019 in Palo Alto, California.

### d.    Professor Zhuang Liu

Professor Zhuang Liu is an Assistant Professor of law and economics at the School of Management and Economics, Chinese University of Hong Kong, Shenzhen. Professor Liu's academic papers have been published in several journals, including the Peking University Law Journal and the China Review.

Professor Liu served as an expert in the economic analysis of China's government regulation, specifically, the impact of the SAIC's issuance of administrative guidance to Alibaba.  He issued his 32-page opening report on or about February 11, 2019 and an 18-page rebuttal report on or about March 11, 2019.

### e.    Li Honglei

Professor Li Honglei is a legal researcher at the Institute of Law, a research institute within the Chinese Academy of Social Sciences and a professor and doctoral supervisor in the Chinese Academy of Social Sciences' Graduate School, Department of Law.

Professor Honglei served as an expert in Chinese administrative law and government regulation.  He issued his 43-page report (prepared in Mandarin Chinese) on or about February 11, 2019 and a 10-page rebuttal report in further support of his opinions on or about March 11, 2019.  Professor Honglei was deposed over the course of two-days, March 26 and 27, 2019, in New York, New York.

### f.    Professor Daniel C.K. Chow

Professor Daniel Chow holds the Bazler Chair in Business Law at the Ohio State University Moritz College of Law.  Mr. Chow has written extensively on the issue of counterfeiting in China and has testified before Congress related to counterfeiting and intellectual property rights infringements on several occasions.

Professor Chow served as an expert on counterfeiting in the People's Republic of China.  On or about March 11, 2019, Professor Chow issued his 19-page single-spaced report responding to specific conclusions presented by Defendants' expert, Anindya A. Ghose, related to Alibaba's treatment of counterfeiting issues on its platforms immediately prior to and surrounding its IPO.

### g.    James F. Miller

Mr. Miller is a retired investment banker who functioned as a lead investment banker or lead capital markets banker on over 100 public offerings of securities.  Mr. Miller has testified in numerous matters relating to securities class actions.

Mr. Miller served as an expert in investment banking.  Mr. Miller responded to specific opinions presented by Defendants' expert, Glenn Hubbard, related to certain of the Individual Defendants' stock sales as an economic basis for a finding of scienter.

96.     On February 11, 2019, Plaintiffs' Counsel served on Defendants Plaintiffs' five (5) opening expert reports by Dr. Tabak, William Purcell, Robert Berring, Zhuang Liu, and Li Honglei.  The same day, Defendants also served Plaintiffs with five (5) competing expert reports by the following experts in the following disciplines:  Glenn Hubbard (scienter and stock sales), Professor Xixin Wang (Chinese administrative law), Professor David P. Stowell (the IPO process, due diligence and disclosure obligations), Dr. Stephen J. Choi (loss causation and damages), and Anindya Ghose (online platform remediation).

97.     On March 11, 2019, Plaintiffs served on Defendants an additional six (6) expert rebuttal reports, by Dr. Tabak, William Purcell, Professor Li Honglei, Professor Zhuang Liu, Professor Daniel Chow, and James Miller.  The same day, Defendants also served six (6) rebuttal reports, by Glenn Hubbard, Professor Xixin Wang, Professor David Stowell, Dr. Choi, Professor Nicholas Howson (in rebuttal to Professor Berring's report), and G.M. Lawrence (in rebuttal to William Purcell's report).

98.     Plaintiffs' Counsel defended Professor Berring's deposition on March 19, 2019 in Palo Alto, California, and Professor Li Honglei's deposition on March 26-27 in New York, and deposed Professor Stowell on March 26, 2019 in Palo Alto, California.  Plaintiffs' Counsel were in the process of taking the deposition of Defendants' expert G.M. Lawrence in Palo Alto, California, and defending the deposition of Plaintiffs' loss causation and damages expert, Dr. Tabak, in New York, when the agreement to settle was reached.

99.     The expert discovery timeline was highly compressed, with Plaintiffs' Counsel preparing to take or defend fourteen (14) expert depositions over approximately four weeks in late March and early April 2019, of which three were to be conducted in Mandarin Chinese,

which required scheduling depositions over two days, and two of these were scheduled to take place in Hong Kong.

**J.    Mediation Efforts, Settlement Negotiations, and Preliminary Approval of the Settlement**

**1.    Initial Mediation**

100.    In the late summer of 2018, while Plaintiffs were actively pursuing fact discovery, the Parties began discussing a potential mediation to explore whether they could reach a settlement.  After much discussion, the Parties agreed to participate in a private mediation and selected Judge Phillips to serve as the mediator.

101.    In advance of the mediation session, Plaintiffs' Counsel dedicated substantial efforts to preparing a comprehensive and persuasive mediation statement setting forth the facts relevant to the underlying alleged fraud, analyzing applicable law, and distilling discovery that had thus far been completed, citing to dozens of exhibits unearthed in discovery.

102.    The parties exchanged opening mediation statements on August 17, 2018 and replies on August 28, 2018.  Each of Plaintiffs' and Defendants' mediation statements discussed in detail their respective analyses of the claims and defenses relating to liability and damages in this case.  The parties prepared and finalized these submissions over a period of approximately seven weeks during which intense fact discovery was also taking place.  For example, Plaintiffs' Counsel prepared for and took the first Rule 30(b)(6) deposition on July 12-13, 2018 in Hong Kong.  This was followed by the second Rule 30(b)(6) deposition on July 16, 2018 in Hong Kong.   All the while, Defendants were producing documents on a rolling basis, requiring documents to be translated and reviewed by Plaintiffs' Counsel on an expedited basis.

103.    The first full-day mediation session took place in New York on September 6, 2018.  Though the session ended without reaching a settlement, the discussions better allowed

Plaintiffs to frame the issues regarding liability and damages and further focus their discovery efforts going forward into depositions, as discussed in detail above.

### 2.    Continued Negotiations

104.    Following the close of fact discovery, the Parties agreed to participate in another in-person mediation session with Judge Phillips to re-visit the possibility of a settlement, which was subsequently scheduled for March 22, 2019 in Newport Beach, California.

105.    On March 8, 2019, in advance of the March 22, 2019 session, Plaintiffs provided Judge Phillips and Defendants a supplemental mediation statement integrating facts unearthed in discovery after the initial mediation session, citing to numerous deposition transcripts and including newly developed exhibits, portions of expert reports, and an updated analysis of potential damages based on new information obtained during the discovery process.  Plaintiffs' Counsel prepared and finalized this supplemental submission while simultaneously undertaking intense expert discovery, as discussed above. For example, during that time, Plaintiffs' Counsel were working with six experts to prepare rebuttal reports, which were due to be exchanged on March 11, 2019, just three days after the supplemental mediation submission was due.

106.    During the mediation, the Parties engaged in full and frank discussions concerning the merits of the case, including, for example, heavily disputed issues of whether Defendants acted with the requisite scienter, loss causation issues, and particularly damages. This negotiation process, engaged in after substantial law and motion practice and discovery, enabled the Parties to meaningfully assess the relative strengths and weaknesses of their respective claims and defenses.  Again, the session ended without an agreement to settle.

107.    Though the Parties did not reach an agreement to settle during the second in-person mediation session, the negotiations had reached a point where Judge Phillips believed it

was appropriate to recommend that the parties agree to settle within a specific range and/or at a specific number.   Accordingly, Judge Phillips made a mediator's recommendation that the Parties agree to resolve the action.   Judge Phillips requested that the Parties respond to this recommendation in a "double blind" process through which neither side would know whether or not the other side had accepted.

108.    The Parties thereafter accepted the mediator's recommendation and agreed to settle the action for a cash payment of $250 million.   Plaintiffs' Counsel then began negotiating the essential non-monetary terms of the Settlement.   The terms of the Settlement were memorialized in a comprehensive and confidential term sheet, which the Parties executed on March 29-30, 2019 (the "Term Sheet").

109.    The Term Sheet set forth, among other things, the Parties' agreement to settle and release all claims referenced therein in return for a cash payment of $250,000,000 to be paid by Defendants for the benefit of the Class, subject to certain terms and conditions and the execution of a customary "long-form" stipulation and agreement of settlement and related papers.

110.    Following additional negotiations, the Parties exchanged multiple drafts of and ultimately executed the Stipulation and Agreement of Settlement on April 26, 2019 (the "Stipulation").   On April 29, 2019, Plaintiffs submitted their Unopposed Motion for Preliminary Approval of Settlement and Approval of Dissemination of Notice to the Class.   ECF No. 122.

### 3.    Preliminary Approval of the Settlement

111.    On May 1, 2019, the Court entered the Preliminary Approval Order, directing notice of the Settlement to be disseminated to prospective member of the Class.   ECF No. 126.

## III.    THE RISKS OF CONTINUED LITIGATION

112.    The Settlement provides an immediate and certain benefit to the Class in the form

47

of a cash payment of $250,000,000.  As explained more fully below, there were significant risks that the Class might recover substantially less than the Settlement Amount—or nothing at all—if the case were to proceed through additional litigation to a jury trial, followed by inevitable appeals.  Prior to trial and a potentially litigated verdict, the most immediate risks faced by the Class related to the completion of expert discovery and Defendants' anticipated motion for summary judgment, which, with a filing date of July 11, 2019, loomed close at the time the agreement to settle was reached.  Indeed, on summary judgment and at trial, Defendants would have raised formidable challenges to liability, loss causation, and damages in this case.  Thus, absent the Settlement, there was no guarantee that the Class would later achieve *any* recovery, let alone one greater than $250,000,000 were the litigation to continue.

### A.    Risks Faced at Summary Judgment

113.    Motions for summary judgment were set to be filed on July 11, 2019.  Defendants were certain to file a motion for summary judgment, raising substantial arguments that: (i) the alleged Operative Omission was immaterial as a matter of law and that Plaintiffs could prove no actionable false or misleading statement as a matter of law; (ii) there was insufficient evidence upon which a jury could find a strong inference of scienter as a matter of law; and (iii) that loss causation was lacking as a matter of law with respect to the January 28, 2015 disclosure of the White Paper.  If Defendants were able to convince the Court to rule in their favor on any one of these elements, Plaintiffs risked losing everything.

### B.    Risks Related to Proving Liability at Trial

114.    In addition to the major hurdle of withstanding summary judgment, Plaintiffs faced numerous additional risks in preparing their case for trial, including likely *Daubert* motions challenging Plaintiffs' expert testimony and other pre-trial motions *in limine*.  Moreover,

Plaintiffs and Counsel also recognized that this action presented a number of substantial risks to establishing Defendants' liability at trial.

### 1.    Risks of Proving Falsity and the Materiality of the Alleged Omission

115.    Plaintiffs faced the very real risk that a jury would determine that there was no actionable material omission or false statement in Alibaba's Registration Statement.  Throughout the entirety of the litigation, Defendants argued vehemently that the July 16, 2014 administrative guidance meeting was a common regulatory interaction that resulted in Alibaba's voluntary efforts to improve its sales platforms, such that the meeting and administrative guidance were not material events, and their disclosure was not required.

116.    Although Plaintiffs uncovered substantial evidence during discovery that supported a finding that the meeting and guidance were material events requiring disclosure, Defendants would have presented a significant number of facts and counterarguments in opposition.  For example, Defendant surely would have presented the testimony of numerous Alibaba employees who testified that, in their view, the July 2014 Meeting and administrative guidance was not an unusual event and that the Company was consistently making operational changes to better its business, including its decision to voluntarily comply with the SAIC's administrative guidance.  A jury could have determined that the arguments of Alibaba and testimony of its witnesses on this matter were credible such that the failure to include a specific disclosure of the meeting in Alibaba's Registration Statement did not constitute a material omission.

117.    Defendants further argued that even if the July 2014 Meeting *was* an important regulatory event that presented an actual risk, there was no duty to specifically disclose it. Instead, Alibaba provided detailed and thorough risk disclosures in the Registration Statement

that sufficiently warned of such regulatory risks and uncertainties.  At trial, Defendants surely would have pointed to these numerous risk disclosures in an attempt to convince the jury that the very nature of any regulatory risks Plaintiffs allege were concealed from investors were, in fact, disclosed and discussed at length in the Registration Statement.  A jury may have determined that these risk warnings sufficiently absolved Alibaba of any liability for failing to specifically disclose the meeting itself.

### 2.  Risks of Proving Scienter

118.  Even if Plaintiffs were successful at convincing a jury that the failure to disclose the July 2014 Meeting was a material omission, Plaintiffs also faced the very real risk that a jury would conclude that Defendants did not act with the requisite scienter.  In order to prove scienter, Plaintiffs would need to demonstrate that Defendants intentionally omitted mention of the administrative guidance meeting from the Registration Statement in order to mislead investors as to the existence of this event and the risks it presented, or they did so with extreme recklessness.

119.  As with falsity, although Plaintiffs uncovered significant evidence during discovery that supported a finding of Defendants' scienter, Defendants would have presented substantial evidence in opposition.  For example, Alibaba has maintained that the Company did not purposely conceal the July 2014 Meeting because, according to Alibaba (and its employees), the meeting was not important enough of an event to warrant specific disclosure in the Registration Statement.

120.  Moreover, Defendants have consistently argued that Alibaba had no motive to hide the administrative guidance or rectification efforts not only because Defendants claimed that the meeting itself was a normal regulatory event, but also because the changes Alibaba was

making to its platforms in accordance with the administrative guidance would only *improve* Alibaba's platforms and business.  Thus, Defendants argued, they had no motive to hide or misrepresent the administrative guidance meeting.

121.    Furthermore, Defendants argued that none of the Individual Defendants were present at the meeting nor were they made aware of it; thus, Plaintiffs would not be able to prove that any of the Individual Defendants intentionally or recklessly concealed information about which they were not even aware.

122.    The combination of the foregoing arguments may have swayed a jury to believe that even if the failure to disclose the July 2014 Meeting in the Registration Statement was a material omission under the Securities Laws, the failure to disclose it was not done intentionally or recklessly by Defendants to mislead investors.

### 3.    Risks Posed by a Battle of the Experts

123.    As stated above, an integral element of Plaintiffs' case hinged on proving the material impact of the July 2014 Meeting upon Alibaba's business and operations, and thus the materiality of its omission from the Registration Statement.  Moreover, Plaintiffs also would have pointed to the materiality of the meeting and guidance, among other things, to establish Defendants' scienter in this case.  As discussed above, given the importance of proving materiality in this case, Plaintiffs engaged several experts to opine on topics related to the materiality of the meeting itself in the context of the Chinese regulatory system, the mandatory nature and wide-sweeping requirements of the administrative guidance provided by the SAIC, the risk and magnitude of SAIC-threatened fines, and the operational and financial impact of the rectification requirements included in the guidance.

124.    For their part, Defendants proffered experts in an attempt to counter the various

opinions from Plaintiffs' experts relating to materiality and Defendants' scienter regarding the omission.  For example, Defendants proffered experts who argued that the July 16, 2014 administrative guidance meeting was a routine regulatory action, that the rectification efforts flowing therefrom were the result of Alibaba's voluntary cooperation with the SAIC's suggested changes, and that the risk of fines was not material because there was no reason for Alibaba to believe that the SAIC's views expressed at the meeting could lead to penalties or any compulsory action against Alibaba.

125.    The above-described competing and complex expert opinions would have led to a risky battle of the experts, with Plaintiffs' success at trial potentially hinging on which expert(s) the jury decided were most persuasive.  In a case such as the instant action, where liability could potentially turn on directly-contradictory expert opinions, this inevitable battle of the experts posed real and substantial risks at trial.

        **C.    Risks of Proving Loss Causation and Damages at Trial**

126.    Even assuming that Plaintiffs overcame the above risks and successfully established liability, Plaintiffs would have confronted considerable challenges in establishing loss causation and damages.

127.    Prior to settlement, Plaintiffs already were forced to admit an inability to prove loss causation with respect to one of the two dates on which Alibaba's ADS' price dropped as initially alleged in this action.  The Complaint alleged that two price drops occurred following two separate corrective disclosures in January 2015.  First, the price of Alibaba's ADSs dropped by $4.29 on January 28, 2015, following the after-hours publication of the White Paper by the SAIC on January 27, 2015.  Second, the price of Alibaba's ADSs dropped again by an additional $8.64 on January 29, 2015, following Alibaba's pre-market earnings announcement.  Plaintiffs

alleged, and attempted to prove, that the disappointing earnings results announced on January 29, 2015, were caused, at least in part, by operational changes Alibaba implemented in response to the July 2014 Meeting.  After substantial fact and expert discovery into the financial impact—if any—of the meeting and administrative guidance, Plaintiffs' expert determined that he could not prove that Alibaba's financial results were materially impacted as a result of the meeting and guidance, and, as such, he did not attribute any portion of the January 29, 2015 ADS price decline to a corrective disclosure.  *See also* Declaration of Laurence Rosen in Support of Preliminary Approval (ECF No. 123) ¶¶4-6 (discussing loss causation challenges).

128.    Separately, Plaintiffs had solid arguments that the January 27, 2015 publication of the White Paper revealed for the first time the facts and risks associated with the July 16, 2014 administrative guidance meeting, causing the $4.29 per ADS price drop experienced on January 28, 2015.  Under Plaintiffs' arguments, the entire $4.29 price drop was attributable to the revelation of the alleged fraud and amounted to approximately $1,455,300,000 billion in aggregate Class-wide damages.

129.    But Defendants raised a counter-argument that the White Paper was not an accurate or official record of the SAIC's position at the administrative guidance meeting and was, instead, the action of an overzealous SAIC administrator *mis*-titled as a White Paper.  As such, Defendants argued, the White Paper was not a corrective disclosure of anything previously misrepresented or omitted, let alone a corrective disclosure of fraud.  Alternatively, Defendants asserted that the unorthodox method of disclosure of the administrative guidance in an unsanctioned White Paper caused the share price decline, rather than the facts contained in the White paper. Defendants argued that if the method of disclosure, or certain portions of the White Paper not based on the July 2014 Meeting, caused the price decline, then Plaintiffs could not

prove loss causation or, at least, Plaintiffs would be entitled to lower per share damages. Defendants also asserted that the Registration Statement and other publicly available information had already disclosed the adverse information contained in the White Paper concerning counterfeit products and other potential violations on Alibaba's e-commerce platforms, such that there could be no provable loss causation associated with the January 28 price drop.  Lastly, Defendants contended that because the SAIC later retracted the White Paper, the January 28 share price decline was not fairly charged to Defendants as the SAIC had disowned it. As a result of their various loss causation arguments, Defendants asserted that damages related to the concealment of the July 16, 2014 Meeting were zero, or at most, some amount substantially less than the Settlement amount.

130.    The Parties developed and would have presented competing evidence on these issues, including competing expert evidence.   While Plaintiffs believed they had the better arguments, the risk remained that Defendants could have defeated loss causation, or significantly diminished damages, for the one remaining alleged corrective disclosure date.

### D.    Other Risks at Trial, Including Risks Of Witness Availability, Language Translation and Interpretation at Trial

131.    Winning at trial would have been no easy task for Plaintiffs.  There were many obstacles standing in Plaintiffs' way to obtaining a similar or better recovery.  One glaring risk would have been the difficulty in securing the availability and willingness of Alibaba's employees and former employees to testify as witnesses at trial.  With no practical way to compel these individuals, particularly the former employees, to travel to New York, Plaintiffs would have been forced to rely on their recorded deposition testimony—which is not a highly compelling form of evidence to present to a jury.  Moreover, a trial would necessarily involve testimony (whether previously recorded or live) and the presentation of documentary evidence in

another language, Mandarin Chinese, a language that is highly nuanced, and notoriously complicated to translate and interpret into English.  The parties still faced many battles over the correct translation of documents and interpretation of testimony—the subject of much dispute during depositions, and the outcome of which could have greatly impacted the meaning or persuasiveness of the offered evidence, and ultimately the outcome of the case itself.

132.    Moreover, Plaintiffs' Counsel know from direct experience that despite the most vigorous and competent of efforts, success in any trial, let alone complicated dual-language litigation, is never assured.  For example, Glancy Prongay & Murray recently received a negative verdict following a six-week antitrust jury trial in the Northern District of California after five years of litigation, which included many overseas depositions, the expenditure of millions of dollars of attorney and paralegal time, and the expenditure of more than a million dollars in hard costs.  *See In re: Korean Ramen Antitrust Litigation*, Case No. 3:13-cv-04115 (N.D. Cal.).

### E.    Risks of Potential Post-Trial Motions and Further Appeals

133.    Even if Plaintiffs succeeded in obtaining a class-wide judgment at trial, Defendants almost certainly would have pursued post-trial motions to overturn the verdict and an appeal.  Defendants are well funded and represented by experienced counsel who would be expected to continue to mount a zealous and thorough defense to the Class's claims for relief not only before and during a full trial on the merits, but afterwards, through post-trial motions and appeals.  On their inevitable appeal, Defendants would have an opportunity not only to seek to overturn the judgment on the jury's verdict (assuming that Plaintiffs succeeded at trial) but also to revisit the legal issues they had raised in their earlier dispositive motions.

### F.    Risks of Collecting a Judgment Against a Chinese Company

134.    Even if Plaintiffs were successful at establishing liability and damages at trial, and

were awarded a substantial monetary verdict, there would have been additional risks related to the collectability of any monetary judgment.  While Alibaba is a firmly established and reputable corporation, Chinese courts generally do not enforce U.S. court judgments, giving rise to serious collectability issues.  *See, e.g.*, Deng Xinran, *Enforcement of Foreign Judgments in China*, MMLC Group[10]; Winstron & Strawn LLP, Terence Wong, Nassim H. Hooshmandnia & Ya'nan Zhao, *The Current Status of Enforcing U.S. Judgments in China*, Lexology (July 30, 2019) (noting that Chinese courts have only twice recognized and enforced a U.S. civil court judgment)[11]; Dan Harris, *China Enforces United States Judgment: This Changes Pretty Much Nothing*, China Law Blog (Sept. 5, 2017).[12]

135.    China is not a signatory to any international convention on recognition and enforcement of a foreign court judgement.  Moreover, there is no bilateral treaty or multilateral convention in force between the United States and any other country, including China, on reciprocal recognition and enforcement of court judgments.[13]

### G.    The Settlement is Reasonable in Light of the Risks and Potential Recovery in the Action

136.    Given the significant litigation risks described above, including the risks that the Class would recover a lesser amount—or nothing at all—if the action were further litigated, Plaintiffs and Plaintiffs' Counsel believe that the Settlement represents an excellent result for the Class.  The result is especially remarkable when considering that the $250 million Settlement

---

[10] *available at* https://www.hg.org/legal-articles/enforcement-of-foreign-judgements-in-china-21436.

[11] *available at* https://www.lexology.com/library/detail.aspx?g=ef57b307-d4f0-40c3-81ce-a9d6bf95cbc1.

[12] *available at* https://www.chinalawblog.com/2017/09/china-enforces-united-states-judgment-this-changes-pretty-much-nothing.html.

[13] https://travel.state.gov/content/travel/en/legal/travel-legal-considerations/internl-judicial-asst/Enforcement-of-Judges.html.

was entirely cash funded by the Company with no remaining insurance available.  As Alibaba explained it its SEC Form 6-K filing, dated April 29, 2019, at Ex. 99.1: "On April 26, 2019, Defendants entered into a definitive settlement agreement pursuant to which we agreed to pay US$250 million to settle the Federal Action.  No contribution will be made by any Defendant other than the Company."[14]

137.    Plaintiffs' expert estimated that *maximum* recoverable Class-wide damages in the action are approximately $1,455,300,000.  The Settlement thus represents approximately 17% of recoverable damages.  Of course, as noted above, Defendants contended that there were no provable damages at all, and that Plaintiffs would recover nothing.

138.    Alternatively, Defendants argued that even if Plaintiffs were able to prove that all of the price decline on January 28, 2015 was caused by revelation of the previously concealed July 2014 Meeting, (i) Plaintiffs' per-share damages were less than $4.29 per share based on a market model using different industry indices, and (ii) based on different trading assumptions for the ADSs purchased and sold during the Class Period, aggregate Class-wide damages were only at most $1.23 billion.  Under this scenario, the Settlement represents a 20% recovery.

139.    The Settlement under either of the foregoing damages scenarios, of between 17% to 20% of **maximum** damages **potentially** available in the action, is thus an excellent result when viewed against the risks of continued litigation, and the real potential for a zero recovery.

## IV.    STATUS OF THE COMPREHENSIVE SETTLEMENT NOTICE PROGRAM

140.    Pursuant to the Preliminary Approval Order, Lead Counsel, the Court-approved Claims Administrator (SCS), implemented a comprehensive notice program whereby notice was

---

[14] *available at* https://otp.investis.com/clients/us/alibaba/SEC/sec-show.aspx?Type=page&FilingId=13382550-3477-6304&CIK=0001577552&Index=20000

given to the members of the Class by mail, e-mail, and by publication.  *See generally* Ex. 1 (Mulholland Decl.).

### A.    The Notice Program

141.    The Court-approved Notice disclosed, among other things, the following information necessary to evaluate the benefits of the Settlement to the Class Members: (1) the amount of the Settlement Fund to be distributed to Authorized Claimants on a per share basis (estimated to be $0.57 per affected ADS, $0.14 per affected call option, and $0.24 per affected put option before the deduction of any Court-approved fees, expenses and costs); (2) the Plan of Allocation; (3) that Lead Counsel would apply for an award of attorneys' fees for all Plaintiffs' Counsel in an amount not to exceed 25% of the Settlement Fund, plus interest, and expenses incurred in prosecuting the litigation in an amount not to exceed $5,000,000, and that any Class Member could object to the requested fee; (4) a detailed explanation of the reasons for the Settlement; (5) that requests for exclusion from the Settlement must be filed no later than September 25, 2019; (6) that objections to the Settlement, the Plan of Allocation, or the Fee Motion and Memorandum must be filed no later than September 25, 2019; and that the deadline for filing Proof of Claims is September 3, 2019.  *See* Ex. 1-A (Notice).

142.    To disseminate the Notice, SCS obtained information from Alibaba and from banks, brokers, and other nominees regarding the names and addresses of potential Class Members. Ex. 1 (Mulholland Decl. ¶¶5-10).  The vast majority of all publicly traded ADS are held in street name by nominees who act as nominees for the benefit of the actual ADS holder. As detailed in the Mulholland Declaration, in order to facilitate this process and ensure proper notice to all Class Members, SCS, with the assistance of Plaintiffs' Counsel, spent a significant amount of time tracking nominee reporting and following up with nominees to make sure Notice

Packets were mailed to all identifiable purchasers of Alibaba securities during the Class Period. *Id*.

143.    As of Monday, September 9, 2019, approximately 1,086,191 Notice Packets had been sent to potential Class Members.  Ex. 1 (Mulholland Decl. ¶11).  SCS physically mailed 828,157 copies of the Notice Packet, and e-mailed 1,721 copies of the Notice Packet. *Id*.  One nominee, Broadridge, elected to e-mail notice of the Settlement to 256,313 of its customers who are potential Class Members notice, including links to the Notice and Claim Form on the settlement website. *Id*.

144.    In addition to the direct dissemination efforts, SCS posted the Notice and Claim Form, along with other important case-related documents, including the Stipulation of Settlement, online at www.alibabasettlement.com.  Ex. 1 (Mulholland Decl. ¶¶17-19).   All documents are downloadable and Class Members have the option of submitting Claim Forms online.  SCS ran keyword search advertisements in an attempt to increase website traffic and make the website more easily located by potential Class Members looking for more information. *Id*.

145.    SCS also caused the Summary Notice to be published once in each of *Investor's Business Daily*, *Barron's*, *The New York Times*, and *The Wall Street Journal*, and transmitted once over the *PR Newswire* on June 3, 2019.  Ex. 1 (Mulholland Decl. ¶15); Ex. 1-E (publication affidavits).

146.    On or about May 3, 2019, a case-specific toll-free phone number, 833-226-6360, was established with an Interactive Voice Response system and operators during business hours. The automated attendant answers the calls and presents callers with a series of common questions and answers.  If callers need further assistance, they have the option to be transferred

to an operator during business hours.  To date, SCS has received over 3,500 calls.  Ex. 1 (Mulholland Decl. ¶16).

### B.      Status of Exclusion Requests and Objections

147.    The Notice informed potential Class Members that written requests for exclusion are to be mailed such that they are received no later than September 25, 2019.  Both Lead Counsel and SCS have been monitoring receipt of such exclusions.  As of the date of this Declaration, we have received 30 exclusion requests.  *See* Ex. 1-G (compilation of exclusion requests received).  Out of the requests for exclusion, 14 provided the information required for a valid exclusion; 7 did not provide the information required to be a valid exclusion; 8 provided the information required, however, they would not be eligible to receive a portion of the Settlement if a Claim Form was filed; and 1 does not clearly identify itself as an exclusion request. Ex. 1 (Mulholland Decl. ¶¶22-23); Ex. 1-H (chart reflecting status of exclusions).  SCS has mailed letters to the individuals requesting exclusion with insufficient documentation, notifying them that their request is invalid and that the transaction and holding information is needed in order for their exclusion request to be assessed.  Ex. 1 (Mulholland Decl. ¶22).

148.    According to the Notice, Class Members seeking to object to the Settlement, the proposed Plan of Allocation or Lead Counsel's motion for an award of attorneys' fees and reimbursement of Litigation Expenses are required to submit their objection in writing such that the request is received by Lead Counsel and Defendants' Counsel, as well as filed with the Clerk for the Court's Office no later than September 25, 2019.  As of the date of this Declaration, Lead Counsel has received one (1) objection.  Ex. 27.

149.    On August 28th, 2019, Lead Counsel received from Christopher King an Objection to Proposed Class Action Settlement, dated August 21, 2019.  *See* Ex. 27 (the "King

Objection"). The next day, on August 29th, 2019, Lead Counsel sent two letters, one via U.S. overnight mail and one U.S. registered mail to Mr. King at the address listed in the King Objection, requesting he provide Lead Counsel a list of his purchases of Alibaba securities during the Class Period or some other evidence of his membership in the Class, as required by ¶15 of the Court's May 1st, 2019 Order Preliminarily Approving Settlement and Providing for Notice, Doc. No. 125-2. To date, Lead Counsel has not received any response from Mr. King. As discussed in the Final Approval Memorandum, the objection is without merit; more fundamentally, the objector has failed to demonstrate his standing as a Class Member.

## V.      ALLOCATION OF THE NET PROCEEDS OF THE SETTLEMENT

150.      Pursuant to the Preliminary Approval Order (ECF No. 126), and as set forth in the Notice, all Class Members who want to participate in the distribution of the Net Settlement Fund (*i.e.*, the $250 million Settlement Amount plus any and all interest earned thereon less: (i) any Taxes; (ii) any Notice and Administration Costs; (iii) any Litigation Expenses awarded by the Court; and (iv) any attorneys' fees awarded by the Court) must submit a valid Claim Form with all required information submitted online or postmarked no later than September 3, 2019. *See* Ex. 1-A (Notice ¶¶41, 43); ECF No. 123-1 (Stipulation of Settlement ¶¶ 21, 26). The Net Settlement Fund will be distributed among Authorized Claimants according to the proposed Plan of Allocation, as subject to approval by the Court.

151.      The proposed Plan of Allocation is detailed in the Notice. *See* Ex. 1-A (Notice at pp. 10-17); ECF No. 123-1 (Stipulation of Settlement ¶ 1(cc)).

152.      If approved, the Plan of Allocation will govern how the Net Settlement Fund will be distributed among Authorized Claimants. The Plan of Allocation's objective is to equitably distribute the Net Settlement Fund to those Class Members who suffered economic losses as a

result of the alleged fraud as opposed to losses caused by market or industry-wide factors or Company-specific factors unrelated to the alleged fraud.

153.    As described in the Notice, a Recognized Loss calculation under the Plan of Allocation is not intended to be an estimate of, nor indicative of, the amount a Class Member might have been able to recover after a trial, nor an estimate of the amount that will be paid to an Authorized Claimant pursuant to the Settlement.  Instead, the Recognized Loss calculation under the Plan of Allocation is the basis upon which the Net Settlement Fund will be proportionately allocated to the Authorized Claimants.

154.    The Plan of Allocation, developed by Plaintiffs' expert working in conjunction with Plaintiffs' Counsel, is based on an out-of-pocket theory of damages consistent with Section 10(b) of the Exchange Act and reflects an assessment of the damages the Plaintiffs contend could have been recovered under the theories of liability and damages asserted in the action.  More specifically, the Plan of Allocation reflects, and is based on, Plaintiffs' allegation that the price of Alibaba's ADSs was artificially inflated during the period from September 19, 2014 through and including January 28, 2015, due to Defendants' alleged materially false and misleading statements and omissions.  The Plan of Allocation is based on the premise that the decrease in the price of Alibaba ADSs following the alleged corrective disclosure of the publication of the White Paper on January 28, 2015 may be used to measure the alleged artificial inflation in the price of Alibaba ADSs prior to this disclosure.  *See* Ex. 1-A (Notice ¶¶14, 27).

155.    Plaintiffs' expert, Dr. Tabak, performed an event study to determine that the amount of fraud-related artificial inflation in Alibaba's ADSs during the Class Period was $4.29 per ADS.  He further calculated aggregate Class-wide damages based on the estimated number of Alibaba Securities affected by the alleged fraud to be approximately $1,455,300,000.  In order

to equitably account for Alibaba Call Options and Put Options constituting approximately 10% or less of the combined estimated damages of Alibaba Securities during the Class Period, "cumulative payments of all claims associated with Alibaba Call Options and Put Options will be limited to 10% of the Net Settlement Fund." *See* Ex. 1-A (Notice at p. 17 & n.16).   If the cumulative Recognized Loss amounts for Call Option and Put Option claims exceeds 10% of all Total Recognized Losses, then the Recognized Loss for those claims will be reduced proportionately until they collectively equal 10% of all Total Recognized Losses.  *See id.*[15]

156.    Under the proposed Plan of Allocation, each Authorized Claimant will receive his, her, or its *pro rata* share of the Net Settlement Fund based on his, her, or its Total Recognized Loss as compared to the Total Recognized Losses of all Authorized Claimants.  A Claimant's Total Recognized Loss is the sum of all calculated Recognized Losses across all transactions in Alibaba securities.

157.    The calculation of a Claimant's Recognized Loss will depend upon several factors including how many and the type(s) of Alibaba Securities the Claimant purchased, acquired, or sold during the Class Period, when that Claimant bought, acquired, or sold the shares, and the number of valid claims filed by other Claimants.  A Claimant's Recognized Loss for each Alibaba ADS purchased or acquired during the Class Period is generally calculated as the difference between the estimated artificial inflation on date of purchase and the estimated artificial inflation on date of sale (with certain adjustments based on the 90-day average price following the end of the class period if the ADS was still held as of the end of the Class Period)

---

[15] In the unlikely event that the Net Settlement Fund, allocated in accordance with the Plan of Allocation, is sufficient to pay 100% of the Alibaba ADS claims, any excess amount will be used to pay the balance on the remaining Call Option and Put Option claims.  In the event that the maximum 10% of the Net Settlement Fund allocated to Call Option and Put Option Authorized Claimants is sufficient to pay 100% of those claims, any excess amount will be used to pay the balance on the remaining ADS claims. Ex. 1-A (Notice, at p. 17).

or the difference between the actual purchase price and sales price of the stock, whichever is less. *See* Ex. 1-A (Notice at pp. 11-12).  The calculations for Recognized Loss per share for each Alibaba Call and Put Option are also set forth in the Notice.  Ex. 1-A (Notice at pp. 12-15).

158.   If the prorated payment to be distributed to any Authorized Claimant is less than $10.00, no distribution will be made to that Authorized Claimant.  Any prorated amounts of less than $10.00 will be included in the pool distributed to those Authorized Claimants whose prorated payments are $10.00 or greater.  Ex. 1-A (Notice at p. 17).  In Lead Counsel's experience, sending a check for less than $10.00 is cost prohibitive.

159.   In sum, the Plan of Allocation was designed to allocate the proceeds of the Net Settlement Fund fairly among Class Members based on the losses they suffered on transactions in Alibaba Securities that were attributable to the conduct alleged in the Complaint. Accordingly, Lead Counsel respectfully submits that the Plan of Allocation is fair and reasonable and should be approved by the Court.

160.   As noted above, as of September 9, 2019, more than 1,000,000 copies of the Notice, which details the Plan of Allocation and advises Class Members of their right to object to the proposed Plan of Allocation, have been sent to potential Class Members.  *See* Ex. 1 (Mulholland Decl. ¶11).  To date, no objections to the proposed Plan of Allocation have been received.

## VI.   THE FEE AND EXPENSE APPLICATION

161.   In addition to seeking final approval of the Settlement and Plan of Allocation, Lead Counsel are applying for a fee award of 25% of the Settlement Fund (*i.e.*, $62.5 million, plus interest accrued thereon) on behalf of all Plaintiffs' Counsel.  Lead Counsel also request reimbursement in the amount of $3,937,803.35 for Litigation Expenses paid or incurred by

Plaintiffs' Counsel in connection with the prosecution and resolution of the action—an amount that is well below the maximum expense amount of $5,000,000 set forth in the Settlement Notice.

162.    As set forth in the accompanying Fee Memorandum, the requested 25% award, and the resulting reasonable multiplier on Plaintiffs' Counsel's lodestar of approximately 2.15, are both within the range of fee awards in other comparable securities class action settlements and are justified here in light of the extent and quality of counsel's work.  The legal authorities supporting the requested fees and expenses are set forth in the accompanying Fee Memorandum. The primary factual bases for the requested fees and expenses are set forth below.

### A.    The Requested Fee is Fair and Reasonable When Considered Under the Second Circuit's *Goldberger* Factors

163.    Based on the extensive efforts expended on behalf of the Class over the course of more than four years of active litigation, the extraordinary result achieved, the substantial risks of the litigation and the contingent nature of counsel's representation, and other factors discussed herein, I respectfully submit that the facts recited below demonstrate that the request for an award of attorneys' fees in the amount of 25% of the Settlement Fund is justified and should be approved.

### 1.    The Excellent Outcome Achieved Is the Result of the Significant Time and Labor that Plaintiffs' Counsel Devoted to the Action

164.    The work undertaken by Plaintiffs' Counsel in investigating and prosecuting the action and arriving at the present Settlement in the face of substantial risks has been time-consuming and challenging.  Numerous attorneys, including partners, associates, and project attorneys, as appropriate, dedicated fourteen months to the intense, fast-paced, highly contentious and contested discovery period in this case.  Partners and associates made multiple international trips to and from Hong Kong to complete an aggressive deposition schedule, while

project attorneys based in the United States and China (all of whom are licensed in the U.S.) worked often around the clock to support them and aid in deposition preparation. I personally made five trips to Hong Kong and one to New Zealand in a nine-month period, staying in Hong Kong for one to four weeks at a time. An integral associate, Jing Chen, who is bilingual in Mandarin and English, and who had recently given birth in late 2017 traveled to Hong Kong with her infant in tow so that she could participate in important depositions.

165. Plaintiffs' Counsel battled doggedly to obtain documents, met and conferred continuously with counsel for Defendants to obtain the production documents and depositions, and successfully sought the Court's intervention, as required, in stalemate discovery disputes. To summarize, Plaintiffs' Counsel's extensive discovery efforts, Plaintiffs' Counsel took or defended a total of thirty-four (34) depositions of Alibaba, third party witnesses, Plaintiffs, and expert depositions; oversaw the strategic review and analysis of over 1.1 million pages of documents; and helped to prepare twelve (12) expert reports.

166. As set forth more fully above, however, Plaintiffs' Counsel demonstrated significant skill and dedication to the action long before the discovery period even began. Indeed, the action settled only after Plaintiffs' Counsel overcame multiple legal and factual challenges—including, significantly, successfully navigating an appeal to the Second Circuit after the case was dismissed with prejudice at the very preliminary stages of the litigation, and thereafter obtaining class certification. Plaintiffs' Counsel had also completed significant preparation in anticipation of Defendants' expected motion for summary judgment, and had begun additional pre-trial preparation, at the time that the agreement to settle was reached.

167. At all times throughout the pendency of the action for a period of over four years, Plaintiffs' Counsel's efforts were driven and focused on advancing the action to bring about the

most successful outcome for the Class, whether through settlement or trial.  Attached as Exhibits 5-8 hereto are declarations from each of the Plaintiffs' Counsel firms containing lodestar summary charts reflecting the time and effort expended by Plaintiffs' Counsel in prosecuting this action on behalf of the Class.  Also attached hereto as Exhibit 9 is a breakdown of biographies, qualifications, and summaries of work conducted by all project attorneys who contributed significant and integral work in connection with prosecution of the action.

168.    As demonstrated in Plaintiffs' Counsel's lodestar charts, and as discussed in more detail at ¶¶191-199, *infra*, Plaintiffs' Counsel have dedicated more than 56,600 hours to the prosecution of the action to complete the significant work detailed herein above.  These substantial efforts resulted directly in the extraordinary Settlement obtained for the benefit of the Class and, accordingly, this factor weighs strongly in favor of the requested 25% award of attorneys' fees.

## 2.    The Magnitude and Complexity of the Action

169.    As detailed in the Fee Memorandum, securities class action cases are known for their "notorious complexity[.]"  *In re AOL Time Warner, Inc. Sec. & "ERISA" Litig.*, 2006 WL 903236, at *8 (S.D.N.Y. Apr. 6, 2006).  The complexity of this case was no different.  As detailed above, this action presented numerous novel and complex issues, including the need for Plaintiffs' Counsel to understand matters of, among other things: Chinese administrative law and regulatory process; the workings of the Chinese political and legal system; complex issues of technology and the operation of Alibaba's online platforms; Chinese and international intellectual property law; Alibaba's implementation of the July 2014 Meeting and administrative guidance, and its impact on Alibaba's business and operations; and Alibaba's IPO and due diligence process.

170.    Regarding the magnitude of the action, Plaintiffs' claims arose out of Alibaba's historic $25 billion IPO—which was at the time of filing and remains today, the largest IPO in history.  The action has been particularly high-stakes, seeking to recover on investors' losses of over $1 billion, and has proven to be a highly contentious, hard-fought, lengthy, expensive, international litigation.

171.    In addition to its magnitude and complex legal issues, the action presented a number of unique practical and logistical complexities.  While various teams of lawyers from Plaintiffs' Counsel were traveling internationally between the U.S. and Hong Kong or New Zealand, they had to simultaneously coordinate and conduct discovery, draft mediation briefing and prepare exhibits, participate in meeting and conferring with Defendants and third parties regarding discovery, research and draft their motion to compel documents, take depositions and review documents and translations, and prepare expert discovery—among all of the other day-to-day litigation management tasks required to keep efficiently and effectively advancing the action forward.  Plaintiffs' Counsel also had to coordinate all of the international deposition logistics, hiring court reporters, videographers, interpreters, and check interpreters to attend the depositions in Hong Kong.

172.    For the approximately 124,790 pages of documents produced by Alibaba in (or containing) Mandarin Chinese, Plaintiffs' Counsel implemented and coordinated a complex process of first-level Chinese document review, identification of relevancy, translation of selected documents by a certified translator, English language document review, and check review(s) of translation by Chinese-speaking project attorneys. This was necessary because of the difficulty of accurately translating complex business and legal documents from Mandarin Chinese to English.   Plaintiffs' Counsel engaged Morningside Translations, a certified

68

professional translation services company, to provide written translations of the documents. Many of the documents produced by Alibaba in Chinese included integral documents core to Plaintiffs' allegations, such as internal Company e-mails and other correspondence. As discussed above, due to the pace of discovery, project attorneys would provide immediate "rough" translations of hot documents when necessary, and Plaintiffs' Counsel often requested Morningside to provide document translations on a high-priority, expedited basis, so that they would be ready for use in depositions.

173.    That the vast majority of Alibaba's witnesses also testified in Mandarin Chinese added further complexity to the action. The necessity of oral interpretation of deposition questions and answers added yet another a layer of complexity, indeed at times confusion, to an already difficult task of obtaining relevant testimony from Alibaba employees.

### 3.    The Significant Risks Borne by Plaintiffs' Counsel

174.    This prosecution was undertaken by Plaintiffs' Counsel on a contingent-fee basis, and the risks assumed by Plaintiffs' Counsel, and the time and expenses incurred without any payment, were substantial. From the outset, Plaintiffs' Counsel understood that they were embarking on a complex, expensive and lengthy litigation with no guarantee of ever being compensated for the substantial investment of time and money the action would require in order to be effectively prosecuted. In undertaking that responsibility, counsel were obligated to ensure that sufficient resources were dedicated to the prosecution of the action, and that funds were available to compensate attorneys and staff and to cover the considerable litigation costs that a case like this requires. With an average lag time of many years for complex cases like this to conclude, the financial burden on contingent-fee counsel is far greater than on a firm that is paid on an ongoing basis.

175.     As a general matter, it should be observed that there are numerous cases where Plaintiffs' Counsel in contingent-fee cases such as this have expended thousands of hours, only to receive no compensation whatsoever.   Indeed, Plaintiffs' Counsel bore the risk that no recovery would be achieved.   As discussed above, from the outset, the action presented multiple risks and uncertainties that could have prevented any recovery whatsoever.   Despite the most vigorous and competent of efforts, success in contingent-fee litigation like this is never assured. Plaintiffs' Counsel know from experience that the vigorous prosecution of a class action does not guarantee a settlement, regardless of the number of battles won along the way.   *See* ¶132, *supra* (litigated to negative verdict in *Korean Noodles*).

176.     The risk of non-payment was particularly real in this case, where *even if* Plaintiffs' Counsel were to continue to litigate the action to a successful jury verdict, the collectability of any favorable judgment would have been difficult at best.   *See* ¶¶134-135, *supra* (unenforceability of U.S. civil court judgments in China).[16]   The current political turmoil engulfing Hong Kong, and the uncertainty of the government's response would have raised additional and difficult to quantify risks for the litigation and for payment of any future settlement or judgment.   Plaintiffs' Counsel has served the Class well by obtaining this substantial Settlement at the time that it did.

177.     Other factors that heightened the risks borne by Plaintiffs' Counsel in prosecuting

---

[16] Indeed, the Rosen Law Firm and Glancy Prongay & Murray recently litigated a case involving a Chinese corporate defendant that resulted in a $228 million judgment that they still have not been able to collect upon.  *See In re Puda Coal Sec. Inc.*, No. 11cv2598 (DLC), 2017 WL 511834, at *1 (S.D.N.Y. Feb. 8, 2017) (entering default judgment against corporation and its chairman of the board, both based in China).  In *Puda Coal*, the chairman and controlling shareholder, Ming Zhao, was alleged to have committed securities fraud by surreptitiously transferring to himself ownership of the sole operating subsidiary, leaving the U.S. issuer an empty holding company.  Although Zhao answered the complaint and began engaging in fact discovery, he later withdrew from the case and did not oppose a default judgment.  Class counsel have attempted to execute this judgment in China, to no avail thus far.

the action include that there was no parallel SEC or other governmental investigation that led to any action being taken against any of the Defendants. *See In re Credit Default Swap Antitrust Litig.*, 2016 WL 2731524, *17 (S.D.N.Y. April 26, 2016) (noting as supportive of "generous" fee award the fact that the settlement "was obtained against a backdrop of government investigations that produced no charges against the [defendants]"); *see also* Ex. 11 (2018 Cornerstone Report), at p. 12 ("Cases with a corresponding Securities and Exchange Commission (SEC) action related to the allegations are typically associated with significantly higher settlement amounts and higher settlements as a percentage of 'simplified tier damages.'"). As Cornerstone Research observed, "[i]t could be that the merits in such cases [involving SEC actions] are stronger, or simply that the presence of a corresponding SEC action provides plaintiffs with increased leverage when negotiating a settlement." *Id.* at n.9. The SEC opened an investigation into Alibaba after the White Paper was published, concurrently with the filing of the instant action on January 30, 2015. The SEC requested that Alibaba voluntarily provide certain information, and the SEC indeed obtained a small production of documents by the Company. However, the SEC concluded its investigation in relatively short order, with the SEC informing Alibaba in September 2015 that it would not pursue any legal action against the Company or its executives. *See* Alibaba Form 20-F dated May 24, 2016.[17]

      178. Meanwhile, actions by the Chinese government actually served to undercut

---

[17] In its Form 20-F, Alibaba explained: "On January 30, 2015, following the release of the so-called SAIC 'white paper,' the SEC initiated a non-public inquiry into whether any violations of the federal securities laws had occurred. The SEC advised us that the existence of the inquiry should not be construed as an indication by the SEC or its Staff that we or any of our officers or directors had violated any of the federal securities laws. As part of its inquiry, the SEC requested that we voluntarily provide certain information. The SEC's initial information request covered background facts and other information related to our interaction with the SAIC, and related matters. In September 2015, the SEC notified us that it had concluded its inquiry and, based on the information it had received, it did not intend to recommend an enforcement action against us."

Plaintiffs' case.  Rather than pursuing its investigation or implementing any punitive action against Alibaba following the publication of the White Paper, in response to Alibaba's complaints and the general decline of Chinese internet company stock prices resulting from an unexpectedly heavy market reaction to the White Paper, the Chinese government actually somewhat *walked back* the weight of the White Paper, in an apparent attempt to stabilize the market for Alibaba and other Chinese e-commerce companies.  On January 30, 2015, the SAIC published a statement on its website claiming that the White Paper had no independent legal effect and was merely minutes of a regulatory meeting.  *See*, *e.g.*, Laurie Burkitt, *Alibaba Claims 'Vindication' in Dispute With Chinese Agency*, The Wall Street Journal, Jan. 30, 2015.[18]  Indeed, while an important allegation in Plaintiffs' case was the SAIC's threat of a large fine during the July 2014 Meeting, *see Christine Asia Co. Ltd. v. Ma*, 718 Fed. Appx. 20, 22 (2d Cir. 2017), Defendants continually argued that the alleged "threat" was not credible, as evidenced by the fact that Alibaba indeed was *not* fined by the SAIC, and thus there was no duty to disclose it.

179.    Moreover, this action lacked some of the hallmarks of a relatively stronger securities action claim, such as a restatement of financial reports.  "Settled cases with restatements are generally associated with higher settlements as a percentage of 'simplified tiered damages' compared to cases without restatements."  *See* Ex. 11 (2018 Cornerstone Report), at p. 9 & Figure 8.  In fact, in 2018, the median settlement amount (expressed as a percentage of damages) of cases alleging restatements was more than double the amount of cases without an alleged restatement.  *Id.* at 9 ("In 2018, the median settlement as a percentage of 'simplified tiered damages' was 11.3 percent for cases with restatements, but 5.1 percent for cases without restatements.").  There was no such restatement of financials in this case.  To the contrary,

---

[18]www.wsj.com/articles/alibaba-chinas-saic-working-together-to-fight-counterfeits-1422631531

Alibaba repeatedly argued that the July 2014 Meeting and administrative guidance had *no* impact whatsoever on the Company's financial performance in 2014, let alone a material one.

180.    Finally, the lack of a large institutional investor, such as a public pension fund, involved as a lead plaintiff is further indicative of the risk that Plaintiffs' Counsel bore in litigating the action on behalf of the Class of investors.  Generally speaking, large institutional investors have historically wanted to take leadership positions in actions that are perceived as larger, stronger cases, including, for example, cases involving restatements—and cases that had an institutional investor as a lead plaintiff tended to settle at a higher percentage of damages.  Ex. 11 (2018 Cornerstone Report), at 10 ("Institutional investors, including public pension plans (a subset of institutional investors), tend to be involved in larger cases" but "[w]hile public pensions historically have tended to be involved in cases with accounting-related allegations (i.e., alleged GAAP violations, restatements, and accounting irregularities, this was not true in 2018."); *id.* at 15 (concluding that settlements were "higher in cases involving financial restatements, a corresponding SEC action, [or] a public pension involved as a lead plaintiff").

181.    Here, Plaintiffs' Counsel received no compensation during the course of the action and have dedicated attorney and professional time in the value of more than $29 million in prosecuting the action, and have incurred nearly $4 million in litigation expenses.  *See* ¶194, *infra*.  They bore the entirety of the risk of loss of this substantial investment of hard out-of-pocket costs and capital dedicated to the prosecution of the action.  Bearing such a substantial risk to seek recovery on behalf of the aggrieved investor Class warrants awarding the requested 25% attorneys' fees.

      **4.    The Quality of Representation, Including the Extraordinary Result Obtained, the Experience and Expertise of Plaintiffs' Counsel, and the Standing and Caliber of Defendants' Counsel**

182.    A number of considerations may be relevant to assessing the quality of counsel's

representation of the Class, including the quality of the result obtained, counsel's experience and standing, and the quality of opposing counsel.

183.    Here, the recovery obtained for the Class—a $250 million all cash payment made by Alibaba—is a truly extraordinary result.  The amount is remarkable both because it is fully funded by the Company itself (as opposed to insurance proceeds) and because it is the highest amount ever achieved in a settlement with a Chinese corporate defendant.  As discussed above, litigation against Chinese defendants is especially wrought with risk, from increased out-of-pocket litigation expenses, to logistical and language complexities, to collectability concerns. Not surprisingly, therefore, NERA reports that "[i]n 2017, the median settlement of securities class actions targeting foreign issuers was $3.4 million, in line with prior years. Securities class actions against foreign issuers are generally smaller, as measured by NERA-defined Investor Losses. ***Cases targeting firms located in China also tend to settle for less than comparable cases against domestic firms***."  Ex. 12 (2018 NERA Report, at figure 25) (emphasis added). Indeed, only *one* other "mega fund" settlement against a Chinese company has ever been obtained—and at $154 million, it is almost $100 million less than the instant Settlement.  *See* Ex. 28 (*Securities Class Actions of Chinese Companies*, by Nancy Chun Feng and Ross D. Fuerman, (Corporate Ownership & Control, Vol. 15, Issue 4, Summer 2018), at 124, tbl.6).  And even that settlement is an extreme outlier among securities class actions settlements involving Chinese corporate defendants.  The ten next largest settlements against Chinese corporations range from $20 million down to $8.6 million.  *Id.*  The result obtained in the instant Settlement is indeed extraordinary by comparison.  This extraordinary result for the Class is a direct reflection of the dedication and excellent quality of Plaintiffs' Counsel's conduct of the litigation.

184.    As demonstrated by the firm resumes included as Exhibits 5-A, 6-A, 7-A, and 8-A

hereto, Plaintiffs' Counsel are experienced and skilled law firms in the securities litigation field, with a long and successful track record representing investors in such cases. The Rosen Law Firm is consistently ranked among the top plaintiffs' firms in the country, and has extensive experience in securities litigation against China-based defendants, having served as lead or co-lead counsel in approximately 60 such securities class actions, 13 of which are currently pending, and obtained a recovery in at least 37 of them. Glancy Prongay & Murray is an equally experienced firm that has successfully prosecuted securities class action cases and complex litigation in federal and state courts throughout the country. MoloLamken added additional expertise as nationally-known appellate specialists, as well as complex civil litigation specialists. Plaintiffs' Counsel's experience thus brought credibility and added valuable leverage in the settlement negotiations.

185.    Finally, the quality of the work performed by Plaintiffs' Counsel in obtaining the Settlement should also be evaluated in light of the quality of the opposition. Here, Defendants were represented by Simpson Thacher & Bartlett, an internally renowned law firm that employed an army of securities litigators who vigorously represented the interests of Defendants, and battled Plaintiffs' Counsel formidably, throughout this action. In the face of this experienced and formidable opposition, Plaintiffs' Counsel were nonetheless able to persuade Defendants to settle the case on terms highly favorable to the Class.

### 5.    The Requested Fee In Relation to the Settlement

186.    The amount of the fee requested (25%) in relation to the Settlement Amount ($250 million) is fair and reasonable. Courts routinely award fees of 25% (or more) in large settlements valued at $100 million and greater. *See* Ex. 3 (Silver Report ¶52 & tbl. 2 (compendium of more than 80 cases with settlement amounts of $100 million or greater and fee

awards of 25% or more).

6. **Interests of Public Policy, Including the Need to Ensure the Availability of Experienced Counsel in High-Risk Contingent Securities Cases**

187. Courts have consistently recognized that it is in the public interest to have experienced and able counsel enforce the securities laws and regulations pertaining to the duties of officers and directors of public companies. As recognized by Congress through the passage of the PSLRA, vigorous private enforcement of the federal securities laws can only occur if private investors, particularly institutional investors, take an active role in protecting the interests of shareholders. If this important public policy is to be carried out, the courts should award fees that adequately compensate plaintiffs' counsel, taking into account the risks undertaken in prosecuting a securities class action. Relatedly, it is long-recognized public policy that settlement is to be encouraged, including the resolution of fee applications that fairly and adequately compensate the counsel who bear the risks and dedicate the time, financial investment, and expertise necessary to achieve those settlements.

7. **The Requested 25% Fee Is Less than the Fee Authorization Agreed Upon *Ex Ante* by the Representative Plaintiffs**

188. Lead Plaintiff William Tai, a sophisticated professional investor in his own right, signed a retainer agreement prior to the initiation of the action authorizing counsel to seek an award of attorneys' fees in the amount of up to 33.3% of any eventual settlement amount. Mr. Tai explicitly reaffirmed this agreement in writing when Plaintiffs' Counsel decided to pursue the appeal on behalf of the Class following the Court's dismissal of the action in full without leave to amend. The Lead Plaintiff's *ex ante* agreement on fees, while not dispositive, supports the reasonableness of Plaintiffs' Counsel's requested award of 25%—an amount that is significantly less than the *ex ante* agreed amount.

### 8.        The Reaction of the Class Supports the Fee Requested

189.    As of September 9, 2019, over 1,000,000 copies of Notice Packets had been sent to potential Class Members, advising them that Lead Counsel would apply for an award of attorneys' fees in an amount not to exceed 25% of the Settlement Fund.  *See* Ex. 1 (Mulholland Decl. ¶11).  In addition, the Court-approved Summary Notice has been published in *Investor's Business Daily*, *Barron's*, *The New York Times*, and *The Wall Street Journal*, and transmitted over the *PR Newswire*.  *See id.* at ¶15.  To date, only one objection regarding the request for attorneys' fees set forth in the Notice has been received.[19]  Should any additional objections be received, they will be addressed in Lead Counsel's reply papers, to be filed on October 9, 2019.

190.    In sum, Lead Counsel accepted this case on a contingency basis, committed significant resources to it, and prosecuted it without any compensation or guarantee of success. Based on the favorable result obtained, the quality of the work performed, the risks of the action, and the contingent nature of the representation, Lead Counsel respectfully submit that a fee award of 25%, resulting in a multiplier of 2.15, is fair and reasonable, and is supported by the fee awards courts have granted in other comparable cases.

### B.        A Lodestar Crosscheck Confirms the Reasonableness of the Requested Fee

191.    As described in the Fee Memorandum, not only is the requested fee percentage fair and reasonable under the percentage method but, based on the lodestar reported by Plaintiffs' Counsel, a lodestar cross-check confirms the reasonableness of the fee.

---

[19] The sole objection received alleges that the Notice was insufficient because it stated counsel would seek fees in an amount "not to exceed 25% of the Settlement Fund[,]" rather than stating a more specific request.  *See* Ex. 27, at pp. 3-4 (citing *Carlson v. Xerox Corp*., 355 F. App'x. 523, 524 (2d Cir. 2009)).  However, in *Carlson*, the Second Circuit held that a settlement notice that stated counsel would seek an award of "attorneys' fees not to exceed twenty percent (20%) of the Gross Settlement Fund" provided adequate notice.  *Id.* at 525 & n.1.  Similarly here, the Notice provided adequate information regarding the amount of attorneys' fees that would be sought.

192.    As set forth below, Plaintiffs' Counsel dedicated a total of 56,566.21 hours to the investigation, prosecution, and resolution of the action, with a resulting total lodestar of $29,034,668.20.  The requested 25% fee (or $62.5 million, plus interest accrued thereon) thus equates to a reasonable and relatively modest lodestar multiplier of approximately 2.15.

193.    Set forth below is a chart that summarizes lodestar information, by firm, listing the total reported hours expended, corresponding lodestar amounts, and litigation expenses for each Plaintiffs' Counsel's firm, based on data provided in each firm's declaration.[20]  The vast majority of the total reported lodestar—approximately 79%—is reported by Lead Counsel.[21]

| Firm | Total Hours | Total Lodestar | Litigation Expenses |
|------|------------|----------------|---------------------|
| The Rosen Law Firm | 46,497.86 | $ 22,821,231.20 | $3,709,889.55 |
| Glancy Prongay & Murray | 8,739.10 | $5,053,210.75 | $172,059.08 |
| MoloLamken | 1,225.7 | $1,058,007.50 | $53,603.28 |
| Levi & Korsinsky | 183.85 | $102,218.75 | $2,251.44 |
| **TOTAL:** | **56,646.51** | **$29,034,668.20** | **$3,937,803.35** |

---

[20] Attached hereto as Exhibits 5-8 are declarations from each of the Plaintiffs' Counsel firms (Rosen Law Firm, Glancy Prongay & Murray, MoloLamken, and Levi & Korsinsky, respectively), in support of the request for an award of attorneys' fees and reimbursement of litigation expenses.  Through the declarations, each firm is reporting its own attorneys' time and rates.  These declarations report the amount of time spent on this case by each attorney and professional support staff employed by Plaintiffs' Counsel, and the lodestar calculations are based on their current billing rates.  For attorneys or professional support staff who are no longer employed by Plaintiffs' Counsel, the lodestar calculations are based upon the billing rates for such person in his or her final year of employment.  No time expended in preparing the application for fees and reimbursement of expenses has been included.

[21] Lead Counsel will continue to perform legal work on behalf of the Class should the Court finally approve the proposed Settlement.  Additional resources will be expended assisting Settlement Class Members with their Claim Forms and related inquiries and working with the Claims Administrator, Strategic Claims, to ensure the smooth progression of claims processing.

194.     The below chart sets forth a simple analysis of the requested fee in relation to the Settlement Amount and Plaintiffs' Counsel's total lodestar:

| | |
|---|---|
| Settlement Amount | $250,000,000 |
| Requested Fee Percentage | 25% |
| Requested Fee Amount | $62,500,000 |
| Total Lodestar Amount | $29,034,668.20 |
| Lodestar Multiplier | 2.15 |

195.     Throughout this litigation, Lead Counsel took extreme care to ensure that staffing was as lean as possible to litigate effectively and efficiently without negatively impacting the prosecution of the action.  At all times, I maintained strict control of and monitored the work performed by all lawyers and other personnel on this case.   While I personally devoted substantial time to this case, and personally reviewed and edited all pleadings, briefs, court filings, and other correspondence prepared on behalf of Plaintiffs, other experienced attorneys at each of the Plaintiffs' Counsel firms were involved in the litigation of the action, the appeal, the Settlement negotiations, and other matters.   More junior attorneys, project attorneys, and paralegals worked on matters appropriate to their skill and experience level.   Throughout the litigation, I took care to maintain an appropriate level of staffing and assigned work to those attorneys best suited for the task based on their level of experience and skill.   This avoided unnecessary duplication of effort and ensured the efficient prosecution of this action.

196.     Rates for Partners working on the action range from $775 to $1350 per hour; rates for Associates range from $395 to $750 per hour; and rates for project attorneys range from $375 to $450 per hour.   The hourly rates set forth for attorneys from Plaintiffs' Counsel's firms are consistent with hourly rates in securities class action and other complex contingent-fee litigation

that have previously approved by other courts, including by courts in this Circuit, and are consistent with rates charged by defense firms. *See* Ex. 10 (Peer Law Firm Rate Chart); Ex. 3 (Silver Report ¶¶56-68); *see also In re Credit Default Swap Antitrust Litig.*, 2016 WL 2731524, *16-*17 (S.D.N.Y. April 26, 2016) (approving fee award resulting a lodestar multiplier of approximately 6x on *2016* partner rates of $834 to $1,125 and associate rates of $411 to $714, *see* ECF No. 482). Moreover, Lead Counsel's efforts to litigate this case efficiently resulted in an extremely reasonable blended hourly rate of $513.61 per hour for all attorney time worked on the case ($28,964,519.20 total attorney lodestar / 56,394.12 attorney hours). The blended hourly rate for all timekeepers who contributed professional services in the action is $512.56 per hour ($29,034,668.20 total lodestar / 56,646.51 total hours).

197. At set forth in the attached Ex. 5 (Rosen Law Firm lodestar chart ¶2) and Ex. 9 (Project Attorney Biographies and Work Summaries), project attorneys assigned to this action are billed at between $375 to $450 per hour, depending on their years of experience or particular skills and expertise. For example, attorneys with less than ten years of experience are billed at $375 per hour. Attorneys with ten or more years of experience are billed at $395 per hour. And attorneys who are bilingual in English and Mandarin Chinese, many of whom received legal education in both China and the U.S., and all of whom are licensed to practice law in the United States, are billed at $450 per hour.

198. As described in ¶¶78-82 & ¶¶88-89, *supra*, the project attorneys hired to work with Plaintiffs' Counsel on this action provided integral services for the benefit of Plaintiffs and the Class, and their work contributed greatly to the efficient and effective prosecution of the action. The unique skill sets of the dual-language Mandarin Chinese- and English-speaking attorneys were absolutely necessary to pursue Plaintiffs' and the Class's claims against

Defendants.  Moreover, the entire project attorney team provided substantive work on a fast-paced schedule, often juggling overlapping assignments of document review and analysis, deposition preparation, review and analysis of deposition transcripts, and assistance on Plaintiffs' motions to compel, for example.  Ex. 9 (project attorney biographies and work summaries).

199.    In sum, as discussed in the Fee Memorandum, the requested 2.15 multiplier is fair and reasonable based on the risks of the litigation, the quality of the representation, the excellent results obtained, and awards in similar cases.  Indeed, it is well within the range of multipliers typically awarded by Courts in this Circuit and nationwide in cases involving significant contingency fee risk and settlements of similar magnitude.  *See* Ex. 4 (Miller Decl. ¶¶50-51, concluding that "[e]mpirical evidence demonstrates that the multiplier of 2.15 requested in the present case is reasonable in light of the circumstances.").

**C.      The Requested Reimbursement of Litigation Expenses is Reasonable**

200.    From the outset, Plaintiffs' Counsel knew that they might not recover any of their expenses.  They also knew that, even if the case were ultimately successful, reimbursement for expenses would not compensate them for the lost use of the funds advanced to prosecute this case.  Accordingly, Plaintiffs' Counsel were motivated to, and did, take steps to minimize expenses whenever practicable where it would not jeopardize the vigorous and efficient prosecution of the case.

201.    As set forth in the chart below, based on the data provided in each firm's declaration,[22] Plaintiffs' Counsel incurred a total of **$3,937,803.35** in unreimbursed litigation expenses necessarily and directly incurred in connection with the prosecution of the action:

---

[22] Through each declaration, each firm is reporting its own respective litigation expenses.

| EXPENSE ITEM/CATEGORY | Rosen Law Firm | Glancy Prongay & Murray | MoloLamken | Levi & Korsinsky | TOTAL AMOUNT | Percent of Total |
|---|---|---|---|---|---|---|
| Expert Fees | $2,126,911.57 | - | - | - | $2,126,911.57 | 54.0% |
| Document Translation Fees (Morningside) | $784,289.93 | - | - | - | $784,289.93 | 19.9% |
| Travel – Hotel | $121,356.46 | $74,561.96 | $22,818.74 | | $218,737.16 | 5.6% |
| Travel – Airfare | $129,204.97 | $59,972.96 | $18,351.91 | $667.99 | $208,197.83 | 5.3% |
| Deposition & Transcript Fees (Court Reporter, Videographer, Transcript copies) | $182,710.05 | $512.38 | $3,642.60 | - | $186,865.03 | 4.7% |
| Discovery Database Hosting Fees | $151,283.05 | - | - | - | $151,283.05 | 3.8% |
| Deposition Interpreter Fees | $93,458.17 | - | - | - | $93,458.17 | 2.4% |
| Mediation Fees | $54,532.50 | - | - | - | $54,532.50 | 1.4% |
| Photocopying and Printing | $17,933.63 | $4,553.62 | $3,186.10 | - | $25,673.35 | 0.7% |
| Investigator Fees | $23,275.04 | - | - | - | $23,275.04 | 0.6% |
| Travel – Meals | $9,367.94 | $8,722.52 | $1,814.53 | $75.51 | $19,980.50 | 0.5% |
| Online Legal Research | $4,030.38 | $14,209.75 | - | - | $18,240.13 | 0.5% |
| Travel – Auto/Taxi/Train | $5,632.01 | $3,680.27 | $3,789.40 | $72.94 | $13,174.62 | 0.3% |
| Service of Process | $389.65 | $4,620.51 | - | - | $5,010.16 | 0.1% |
| Press Releases | $1,528.00 | - | - | $1,435.00 | $2,963.00 | 0.1% |
| Special/Overnight Delivery, Postage | $1,897.12 | $270.11 | - | - | $2,167.23 | 0.1% |
| Court Filing/Courtesy Copy Fees | $1,355.00 | $805.00 | - | - | $2,160.00 | 0.1% |
| Travel – Visa Fee (J. Chen) | $463.04 | - | - | - | $463.04 | 0.0% |
| Travel – International Phone | $271.04 | $150.00 | - | - | $421.04 | 0.0% |
| **TOTAL** | **$3,709,889.55** | **$172,059.08** | **$53,603.28** | **$2,251.44** | **$3,937,803.35** | 100.0% |

202.     According to the attached declarations of Plaintiffs' Counsel, these expenses are reflected on the respective books and records maintained by each respective Plaintiffs' Counsel firm, which are prepared from expense vouchers, check records, invoices and other source materials, and which accurately record the expenses incurred.  Plaintiffs' Counsel's fee and expense schedules also break down their respective expenses incurred by category (*e.g.*, experts' fees, mediation fees, travel, document hosting costs, electronic legal research costs, copying costs, and postage expenses) for which Plaintiffs' Counsel seek reimbursement.

203.     By far the largest component of expenses, $2,126,911.57 (or 54.0%), was expended on the retention of seven (7) experts—one in the field of damages and loss causation, two in the field of Chinese administrative law, one in the field of Chinese regulation and politics, one in the field of e-commerce and counterfeiting, one in the field of IPO due diligence, and one in the field of investment banking and IPO stock sales.  These experts drafted expert reports and rebuttal reports, and were prepared for scheduled depositions (and, in the case of Professor Berring, Professor Li Honglei, and Dr. Tabak, were, in fact, deposed).  Dr. Tabak, an expert in the field of damages and loss causation, not only prepared three expert reports and was deposed twice, he was also consulted at various points during the litigation, including on matters relating to the negotiation of the Settlement, and on preparation of the proposed Plan of Allocation.[23]

204.     Another large component of expenses, $877,748.10 (or 22.3%), was expended on translation and interpretation for the provision of necessary document translations, as well as oral interpreters and check interpreters at depositions.  Though Lead Counsel negotiated a reduced rate with Morningside, a large number of documents requiring translation into English required translation on an expedited basis because documents were being produced while depositions

---

[23]  Plaintiffs' Counsel's request for reimbursement of expenses does not include costs incurred in connection with retaining class action legal fee experts, Profs. Miller and Silver.

were ongoing, which increased the total cost substantially.

205.    Travel expenses were another large component of litigation expenses: $460,090.11 (or 11.7%).  Nearly all of the depositions were taken in Hong Kong.  This required long flights and extended hotel stays for teams of attorneys in Hong Kong (and New Zealand in one instance).  Hong Kong is perennially ranked as one of the world's most expensive cities. Counsel rented conference room space for deposition preparation only when absolutely necessary and otherwise did their best to avoid incurring expenses on behalf of the Class.

206.    It is respectfully submitted that, as set forth in the Fee Memorandum, the expenses for which reimbursement is sought were reasonably necessary to the prosecution of the action and are of the type that Plaintiffs' Counsel typically incur (and are reimbursed for) in securities cases such as this that result in the creation of a common fund.

207.    Finally, as set forth in the accompanying Fee Memorandum, the PSLRA, and case law, provides for reimbursement of the Class Representatives' costs, including their reasonable time and expenses in representing a class.  Here, the five Plaintiffs—Christine Asia Co., Ltd./William Tai, Abel Amoros, Raymond Lee, Arthur Gabriel, and Gang Liu—have been faithful and actively involved representatives of the Class.  Lead Plaintiff Tai filed the initial complaint in this action and Abel Amoros, Raymond Lee, Arthur Gabriel, and Gang Liu joined as named plaintiffs in the Complaint, and became certified Class Representatives, and all five Plaintiffs had their deposition taken.  Two of the Class Representatives that live outside the U.S. (William Tai and Raymond Lee) made lengthy trips to Hong Kong for their depositions.

208.    Each of the five Class Representatives meaningfully participated in the action by, among other things: (1) engaging in extensive and regular telephonic and e-mail communications with Lead Counsel regarding case strategy and developments in the action; (2) reviewing and

approving the complaints and other pleadings filed in this action, including the Amended Complaint, class certification briefing and each Plaintiff's declaration in support of class certification; (3) responding to Defendants' discovery requests, including locating, reviewing, and producing documents and reviewing and approving responses and objections to Defendants' discovery requests; (4) preparing for and providing their deposition testimony; and (5) consulting with Lead Counsel about the mediations and settlement negotiations and, ultimately, approving the Settlement as in the best interests of the Class.  The work performed by each of the Class Representatives is set forth in the separate declarations submitted contemporaneously herewith. *See* Ex. 14 (Tai Decl. ¶6); Ex. 15 (Amoros Decl. ¶6); Ex. 16 (Gabriel Decl. ¶6); Ex. 17 (Lee Decl. ¶6); Ex. 18 (Liu Decl. ¶6).  Based on my understanding of the work they performed, the time they dedicated to the action, and the result they helped to achieve on behalf of the Class, I believe that a compensatory award of $12,500 to each Class Representative is justified.

## VII.   CONCLUSION

209.    For all of the reasons set forth above, I respectfully submit that the Settlement and Plan of Allocation should be approved as fair, reasonable, and adequate.  I further submit that the requested fee in the amount of 25% of the Settlement Fund (plus interest) should be approved as fair and reasonable, and the request for reimbursement of Litigation Expenses in the total amount of $4,000,303.35 (which includes $3,937,803.35 in unreimbursed costs incurred by Plaintiffs' Counsel and $62,500.00 total for the five Class Representatives) also should be approved.

I declare under the penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on September 11, 2019 in New York, New York.

Laurence Rosen

85

**PROOF OF SERVICE**

I, the undersigned say:

I am not a party to the above case and am over eighteen years old.

On September 12, 2019, I served true and correct copies of the foregoing document, by posting the document electronically to the ECF website of the United States District Court for the Southern District of New York, for receipt electronically by the parties listed on the Court's Service List.

I affirm under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on September 12, 2019.

*s/ Laurence M. Rosen*
Laurence M. Rosen